# EXHIBIT A

# JAMS ARBITRATION
## CASE REFERENCE NO. 1200058273

**HOLLY Y. LI**

      **Claimant,**

         **and**

**APOGEE LAW GROUP, P.C.**

      **Respondent.**

---

**APOGEE LAW GROUP, P.C.**

      **Counter-Claimant,**

         **and**

**HOLLY Y. LI**

      **Counter-Respondent.**

---

# FINAL AWARD

**Counsel:**

Holly Li
142 W. 57th Street
11th Floor
New York, NY 10019
Phone: 866-786-4036
hli@intelinklaw.com

*In pro per*

Paul N. Tauger, Esq.
AddyHart P.C.
15 Hubble, Suite 200
Irvine, CA 92618
Phone: 949-438-3218
ptauger@addyhart.com

Robert P. Hart, Esq.
AddyHart P.C.
401 North Michigan Ave., Suite 1200-1
Chicago, IL 60611
Phone: 312-834-7701
robert@addyhart.com

*Counsel for Respondent and
Counter-Claimant*

**Arbitrator:**

> Hiro N. Aragaki, C.Arb, Esq.
> JAMS
> 555 West 5th Street, 32nd Floor
> Los Angeles, CA 90013
> Tel: (213) 620-1133
> E-mail: HAragaki@jamsadr.com

**Place of Arbitration:  Irvine, California, U.S.A.**

**Date of Final Award: October 31, 2023**

Having been designated in accordance with the arbitration clause is contained on page 5 of the Offer Letter dated April 14, 2016, between Claimant and Respondent (the "Offer Letter"), and having examined the submissions, proofs and allegations of the Parties, I, THE UNDERSIGNED ARBITRATOR, now find, conclude and issue this Final Award as follows:

## I.    Introduction and Procedural Statement

Claimant and Counter-Respondent is a lawyer licensed in New York and New Jersey.  She is the founder of IP Advantages LLC, an intellectual property advisory firm established in 2009.  She is representing herself in this proceeding.

Respondent and Counter-Claimant is a law firm that was formed as a corporation in 2015.  Respondent is represented by Paul N. Tauger and Robert H. Hart of AddyHart P.C.

Claimant signed the Offer Letter several days after the date thereof (April 14, 2016) and began working for Respondent.  The arbitration agreement contained in the Offer Letter (the "Arbitration Agreement") provides:

> Any and all disputes, claims or controversies arising out of or relating to this Agreement or the breach, termination, enforcement. interpretation or validity, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one (1) arbitrator.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules.  Judgment on a JAMS award may be entered in any court having jurisdiction.

(Exh. R-011.)

Claimant filed a Demand for Arbitration with JAMS dated March 26, 2021. Respondent responded to the Demand and asserted counterclaims on May 26.  Claimant

responded to the counterclaims on June 9.  In the interim, JAMS determined that the
JAMS Policy on Employment Arbitration Minimum Standards of Fairness (the
"Employment Minimum Standards") applied to this case.  (*See* Letter dated April 29,
2021, from Scott Parreno to Parties.)

The Arbitrator was selected as the sole arbitrator pursuant to the Arbitration
Agreement.  A preliminary hearing was held on September 2, 2021.  The matter was
stayed for 60 days in order to allow Respondent to cure the suspension of its status.  (*See*
Order No. 1.)  Thereafter, Respondent was granted leave to file a motion to dismiss
individual respondents Robert Hart, Gregory Gulliver, and Francisco Rubio-Campos.
(*See* Order No. 2.)  The individual respondents were dismissed without prejudice on
March 24, 2022.  (*See* Order No. 4.)

A continued preliminary hearing was held on March 30, 2022, at which time the
Parties agreed that the applicable substantive law is the law of the State of California and
that the JAMS Comprehensive Arbitration Rules & Procedures, as modified by the
Expedited Procedures (collectively, the "Rules"), would apply.  (*See* Order No. 5.)

By Order No. 9 dated December 16, 2022, Respondent was granted leave to file
another dispositive motion.  On March 9, 2023, the motion was granted as to
Respondent's counterclaim for conversion, but denied as to Claimant's breach of contract
claim.  In the intervening period, the Parties raised several discovery disputes as well as
issues around Respondent's suspension status.

The Parties filed simultaneous Pre-Hearing Arbitration Briefs on March 27, 2023.
A Final Status Conference was conducted on March 28.  The Parties agreed that any
exhibits referred to during the Hearing, for which no objection was lodged or for which
the objection was overruled, would be deemed entered into the record.  (*See* Order No.
16.)

A one-day Hearing was held on April 7, 2023, in the JAMS office at 5 Park Plaza
Suite 400 Irvine, CA 92614.  Claimant represented herself and appeared by Zoom.
Respondent was represented by Messrs. Tauger and Hart, who appeared in person.  Each
side called Claimant and Mr. Hart, President of Apogee, as witnesses.  A tentative
agreement was reached to deem all exhibits previously identified by the Parties into the
record.  (Reporter's Transcript ("RT") at 99-102.)  Additional rebuttal exhibits of the
Respondent, marked as Exhibits R-201 (Hapa/IP Advantages Engagement Letter), R-202
(The 100 Most Common Chinese Family Names), and R-203 (Real Property Data
Search), were admitted into the record.  The Parties agreed to submit Post-Hearing briefs
in lieu of oral closing arguments.

Order No. 17 dated April 17, 2023, was issued providing guidance to the Parties
regarding post-hearing briefs and suggesting that they consider reaching an agreement
whereby Respondent would authorize Claimant, at her own effort and expense, to pursue
collections against CTG.  The Parties did not inform the Arbitrator by the stated deadline
whether they wished to pursue this option.  Thereafter, the Parties apparently continued

to entertain the option, but they were unable to reach a final agreement. Order No. 17 also requested the Parties to inform the Arbitrator if there were any exhibits not referred to during the Hearing that the Parties wished to have excluded from the record. Neither Party responded.

Thereafter, the Parties made further filings, most of which are unnecessary to detail except the following:

- On April 24, 2023, Claimant re-submitted the declaration of Francisco Rubio-Campos pursuant to Order No. 17.

- On May 25, Respondent filed its objections to Claimant's exhibit list, to which Claimant responded on the same day.

- On June 18, Claimant filed a declaration of Jason Balogh. The declaration is STRICKEN from the record as untimely.

The Parties submitted simultaneous Post-Hearing arbitration briefs on June 20.

On June 21, Respondent filed a letter brief responding to Claimant's filing of the Balogh declaration, responding to several points made in Claimant's Post-Hearing brief, and suggesting a further round of opposition briefing from both sides. Respondent's letter brief is also stricken from the record as improper and untimely argument. The Arbitrator sees no need for opposition briefs to be filed.

On June 27, Claimant filed a second declaration of Jason Balogh. The declaration is STRICKEN from the record as untimely.

On July 1, Respondent filed a Motion to Strike Declarations of Jason Balogh and Request for Sanctions, which will be dealt with herein. (*See* section IV.N *post*.)

A Partial Interim Award was issued on July 20, 2023. In the Award, the Parties were instructed to inform the Case Manager by August 15, 2023, of (1) whether there were any remaining matters (beyond the request for sanctions) they wish to submit to the Arbitrator before a Final Award is issued; (2) what those issues are (if any); and (3) whether they would like to bring to the Arbitrator's attention any clerical errors in the Partial Interim Award or any suggested changes that do not affect the outcome. Additionally, the Award provided:

If further issues have been identified by the stated deadline, the Arbitrator will, in consultation with the Parties, set further procedures and deadlines for hearing them. If no further issues have been identified, a Final Award will be issued incorporating this Partial Interim Award and disposing of all issues submitted.

On August 9, 2023, Claimant requested an adjournment of 30 days in order to deal with a family emergency in China.  Respondent agreed to continuing all outstanding dates 30 days."  (E-mail dated August 9, 2023, from Paul Tauger to Louis Boney.)

On September 14, 2023, Respondent submitted a Supplement to Opening Brief, in which it raised the following further issues for determination:  prejudgment interest and punitive damages.  Because Respondent's submission contained argument, Claimant was provided an additional period of time in which to respond.  Claimant submitted her Response to Respondent's Supplement to Opening Brief on September 29.  The Arbitrator sees no need for a hearing on these submissions and will rule on the issues herein.

In response to Respondent's request for sanctions, the Partial Interim Award also provided:

> The Arbitrator is of the view that before entertaining a motion for sanctions, Respondent should first indicate the amount it seeks for each example of sanctionable conduct and provide a *brief* justification therefor.  Claimant should also be afforded an opportunity to respond to the motion, and Respondent may reply if it wishes.  A ruling on the motion will be deferred until that time.  The Arbitrator sets the following briefing schedule, which the Parties may modify by mutual agreement:
>
> - Respondent's supplemental opening brief indicating the amounts sought and a brief justification of the amounts shall be filed by **August 22, 2023** and shall not exceed 5 double spaced pages, exclusive of any exhibits.  Note: There is no need to re-argue the entitlement to sanctions, only the amount requested.
>
> - Claimant's opposition brief shall be filed within **three weeks** of the filing of Respondent's opening brief and shall not exceed 15 double spaced pages, exclusive of any exhibits;
>
> - Respondent may file a reply within **one week** of the filing of Claimant's opposition brief**,** which shall not exceed 5 double spaced pages. No further exhibits allowed other than in rebuttal.

On September 21, 2023, Respondent submitted a Supplement re Sanctions Calculation.  Claimant responded on October 12, 2023.  Respondent declined to file a reply.

## II.    Facts

The factual findings that follow are necessary to the Award.  They are derived from the briefs, affidavits, and exhibits presented to the Arbitrator.  To the extent that these findings differ from any Party's position, that is the result of determinations by the

Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weighing of the evidence, both oral and written.

In or about April 2016, Claimant went to work for Respondent law firm pursuant to terms of the Offer Letter. The Offer Letter provided that Claimant would be "a non-equity partner with the title of 'Partner'" (Exh. R-011), which effectively meant that Claimant was not entitled to receive profits or make capital contributions. (RT at 175.) The Offer Letter stated that "[y]our offer to join the Firm is not an offer of employment as an employee, but as a contract 1099 attorney." (Exh. R-011.) It also provided that Claimant would be compensated based on a percentage of the amount she billed and collected, plus an additional percentage for matters for which she was the originating attorney, with the remainder going to the Respondent and other Apogee attorneys. (*Id*. at 2-4.) Claimant refers to this as "fee-splitting."

Respondent is not currently operating as a law firm and has no clients. (RT at 111.) When it was in operation, it was a small, virtual law firm that at one point had an office in Irvine, California. (RT at 123.)

### A. The CTG Litigation

In 2016, Cathy Trading Group LLC ("CTG") solicited Claimant to represent it in two separate defensive actions pending in the New Jersey U.S. District Court. (RT at 18.)

On May 24, 2016, CTG and Respondent entered into an Engagement Agreement (the "CTG Engagement Agreement"), pursuant to which Respondent would represent CTG in the New Jersey District Court actions. (*See* Exh. R-014.) Yun Chen signed the CTG Engagement Agreement in her capacity as CTG's managing partner. (*Id*. at 9.) Hill Wallack was the local counsel for the CTG lawsuits. (RT at 148.)

In the course of the CTG litigation, Claimant pushed to file a motion to dismiss. (RT at 189.) Mr. Hart, who at the time was Vice President and a member of the Board of Directors of Apogee, advised Claimant that such a motion was frivolous, but Claimant apparently refused to take his advice. (RT at 189:5-11.) Opposing counsel for the plaintiff, Interlink, warned Claimant that if she proceeded with the motion to dismiss, he was going to "seek sanctions against everybody." (RT at 190.) It is unclear if the motion was ultimately filed; however, Ms. Chen was apparently dissatisfied with Claimant's handling of the motion and with other aspects of her representation. One such aspect was Claimant's practice of billing CTG for work performed by Respondent from Claimant's own separate firm, IP Advantages in late 2016 and early 2017. Claimant directed CTG to pay, and CTG did pay, IP Advantages a total of $205,965 for those services.

In total, Respondent billed attorney's fees of over $600,000 over the course of the CTG litigation. (*See* Exh. R-068, at 2.) Of that amount, $362,448.43, excluding interest, remained unpaid by CTG. (*Id*.)

On June 19, 2017, Mr. Hart wrote to Claimant instructing her to start looking for a new law firm to practice with "as we are done." (Exh. R-022.) On the next day, Claimant issued a resignation letter to Respondent. (Exh. R-023.)

### B. CTG Files Complaints Against Claimant

On October 19, 2017, CTG and Ms. Chen filed a bar complaint with the Office of Attorney Ethics for the State of New Jersey against Claimant individually. (Exh. R-083, at 2.) The complaint raised several issues, including Claimant's practice of billing CTG from IP Advantages rather than Apogee, failure to appear at conferences, failure to include adequate descriptions of services in invoices, and withholding of information. (Exh. R-083.)

On January 17, 2018, CTG and Ms. Chen filed a claim with the New Jersey Lawyer's Fund for Client Protection against Claimant individually. (*See* Exh. R-078.) The gravamen of the claim was that Claimant had instructed CTG to send payments owed to Respondent to "[Claimant's] personal company's (IP Advantages) bank account." (Exh. R-078, at 7.)

On February 2, 2018, Ms. Chen filed a grievance with the New Jersey Supreme Court against Claimant individually with the New Jersey Office of Attorney Ethics. (Exh. R-029.) The grievance accused Claimant of dishonesty, misconduct relating to the motion to dismiss, missing deadlines, and missing conferences with the court. (Exh. R-079.)

None of the foregoing complaints resulted in discipline. (RT at 222.) However, they corroborate Mr. Hart's testimony that Ms. Chen had such a "visceral hatred toward [Claimant] that she just couldn't come around to paying [Respondent]." (RT at 141.)

### C. JAMS Arbitration over CTG Fees

In February 2018, Respondent initiated a collections action against CTG by filing a Demand for arbitration with JAMS. Respondent obtained an award in its favor in the principal amount of $362,448.43 plus interest and expenses for a total of $402,543.83. (Exh. R-068.)

Respondent thereafter sought an order from the U.S. District Court for the Central District of California confirming the award. On January 10, 2020, the District Court issued a judgment (the "**CTG Judgment**") in the amount of $470,217.06, which included filing costs. (*See* R-072.)

During the course of the JAMS arbitration, the court enforcement action, and even thereafter, Mr. Hart attempted to negotiate a payment plan with Ms. Chen but was unsuccessful in collecting any moneys owed.

Other material facts are addressed in the Analysis, below.

### III.    Issues Presented

The Complaint attached to Claimant's Demand raises the following issues for my decision:

- Whether Respondent is liable for breach of the Offer Letter.

- Whether Respondent is liable for breach of the implied covenant of good faith and fair dealing.

- Whether Respondent is liable for conversion.

- Whether Respondent is liable for breach of fiduciary duty.

- Whether Respondent is liable under Business & Professions Code § 17200 et seq.

- Whether Respondent is liable in quantum meruit.

- The relief to which Claimant is entitled.

Respondent's counterclaims raise the following further issues for my decision:

- Whether Claimant is liable for breach of contract.

- Whether Claimant is liable for the tort of breach of the covenant of good faith and fair dealing.

- Whether Claimant is liable for conversion.

- Whether Claimant is liable for breach of fiduciary duty.

- The relief to which Respondent is entitled.

In addition, Respondent seeks:

- a determination that the Employment Minimum Standards do not apply in this case.

- sanctions against Claimant.

### IV.    Analysis

#### A.  Is Respondent Liable for Breach the Offer Letter?

Claimant advances two grounds on which she claims Respondent breached the offer letter: (1) by obstructing Claimant from invoicing and collecting fees for work she

performed for CTG, and (2) by failing to collect, or expend reasonable good faith efforts to collect, the CTG Judgment.

### 1.   Obstructing Claimant From Invoicing And Collecting Fees For Work She Performed

Because Claimant brought CTG to Respondent, Claimant was the "originating attorney" for purposes of the Offer Letter. (RT at 128.) Mr. Hart testified that the originating attorney is responsible for issuing and getting out invoices, and that he had informed Claimant of the same. (RT at 127, 132.) This included inputting time, either directly or with the assistance of Suzanne Mello, into the Tabs3 software used by Respondent for billing. Mr. Hart outlined the process as follows: Suzanne Mello works with the originating attorney and sends out a prebill. The originating attorney reviews it to make sure it's correct. The originating attorney then generates a final invoice and sends it out to the client. (RT at 131.) Claimant did not follow this procedure, which was part of her origination responsibilities and for which she was receiving 15% of all collections. (RT at 132, 193.) Mr. Hart assisted Claimant with paying third party vendors because she did not have access to the firm's operations or trust accounts. (*Id*. at 132-33.)

Claimant argues that the reason bills to CTG were not timely issued, thereby causing friction with Ms. Chen, was Mr. Hart's delay and refusal to enter his own time for work on CTG matters. But Mr. Hart explained that he did not bill all of his work on CTG because Claimant had informed him that CTG was short on funds, so he thought this would assist Claimant. (RT at 136-37.) I found Mr. Hart's testimony on this point more credible. It also defies reason that Respondent, which profits only when bills are issued and paid, would prevent Claimant from issuing bills. Claimant also appeared to have no problem billing CTG through her other firm, IP Advantages, without waiting for Mr. Hart's billing entries to be finalized, which begs the question why she could not have done the same through Respondent.

Claimant also claims that she was not given access to Tabs3, the billing software. This was contradicted by Mr. Hart's testimony (*see* RT at 132) and is also not credible. The Offer Letter does not specifically prohibit Claimant from sending bills out on her own. As the originating attorney, Claimant had the power to write off time and decide the hourly rate billed to her clients. (*See* Exh. R-11.) Thus, Claimant had both power and responsibility to bill clients for whom she was the originating attorney, which makes sense given that her compensation was ultimately tied to "*your* collections." (Exh. R-11 (emphasis added).) Indeed, Claimant had no problem billing CTG through Respondent, and using Respondent's letterhead, in the past. (*See* Exh. R-023.)

### 2.   Failing to Collect, or to Expend Reasonable Good Faith Efforts to Collect, the CTG Judgment

The Offer Letter explains in no uncertain terms that Claimant's compensation will be tied to amounts "collected" by Respondent. (*See* Exh. R-11.) Claimant also testified

that Respondent's obligation to compensate her did not mature until client funds were actually received, whether directly by Respondent or by other entities affiliated with Respondent or under Respondent's control.  (RT at 56, 64.)

There was no credible evidence to suggest that Respondent did, in fact, receive the value of the CTG judgment or any portion thereof.  Thus, because a condition precedent to Respondent's obligation to compensate Claimant did not arise, Respondent is not in breach of the Offer Letter simply because Claimant was not compensated.

Nonetheless, a covenant of good faith and fair dealing is implied by law into every contract.  (*Balfour, Guthrie & Co. v. Gourmet Farms,* 108 Cal. App. 3d 181, 191 (1980).)  The question therefore arises whether Respondent breached the covenant—and thereby breached the Offer Letter—by failing to expend good faith or reasonable efforts in attempting to collect the CTG Judgment.

A party defending against a breach of contract allegation "must demonstrate he reasonably performed his obligations under the agreement in a manner consistent with the implied covenant of good faith and fair dealing."  (*Pech v. Morgan*, 61 Cal. App. 5th 841, 855 (2021).)  "The essence of the good faith covenant is objectively reasonable conduct." (*See Lazar v. Hertz Corp.*, 143 Cal. App. 3d 128, 141 (1983).)  Another good faith requirement is avoidance of arbitrary or capricious conduct with respect to performance obligations.  (*See Robinson v. Hewlett-Packard Corp.*, 183 Cal. App. 3d 1108, 1121 (1986).)

I conclude that Respondent acted in good faith in attempting to collect the CTG Judgment because its conduct was objectively reasonable, not inconsistent with the Offer Letter, and not arbitrary or capricious.  This conclusion is based on the following findings of fact:

- Between August and December 2017, Respondent engaged in several discussions regarding payment with CTG's Ms. Chen.  (RT at 140; Exh. R-027.)  CTG initially agreed to a repayment plan whereby it would pay Respondent $10,000 per month.  (RT at 140.)  However, CTG ultimately failed to make any payments. (RT at 142.)

- There were two reasons why CTG did not follow through with the repayment plan.  First, CTG did not have sufficient funds.  (RT at 140.)  Second, Ms. Chen was infuriated by Claimant's conduct, both in issuing bills from IP Advantages for work performed by Respondent, and in allegedly mishandling the CTG litigation matter as detailed in the two ethics complaints filed against Claimant. (*See* RT at 142-43.)  The upshot is that Claimant's own conduct contributed to the difficulties Respondent faced in collecting from CTG.

- At its sole expense, Respondent initiated a JAMS arbitration against CTG for the unpaid legal fees.  Although both sides were jointly responsible for the JAMS arbitration fees, Respondent was forced to pay CTG's share in addition to its own

because CTG refused to contribute. (RT at 145.) During the arbitration, Mr. Hart continued to negotiate with Ms. Chen in an effort to reach a settlement. (RT at 144-45.)

- Respondent proceeded to enforce the JAMS award with the U.S. District Court for the Central District of California, a process that took seven to nine months. (RT at 229.) It retained attorney Craig McLaughlin for this purpose, to the tune of three to five thousand dollars. (RT at 229.) The District Court issued a judgment in the amount of $470,217.06, which included filing costs but did not include Mr. McLauglin's legal fees. (*See* Exh. R-072.)

- Thereafter, Mr. Hart continued to negotiate with Ms. Chen, but found that "she wasn't interested, she wasn't cooperating, she wasn't responding." (RT at 144.)

- Respondent twice consulted with Lynn Primo, a collection attorney in the Maryland area, regarding collection efforts. (RT at 230.) The first consultation occurred when the JAMS demand against CTG was filed. At that time, Ms. Primo estimated $3,000-$4,000 in costs to collect the judgment. (RT at 231.) The second consultation occurred while the enforcement proceeding was pending in the District Court, at which point Mr. Hart was able to lay out the issues in greater detail. (RT at 230.) Ms. Primo advised that the matter was more complex than she had initially anticipated and revised her quote to $40,000. (RT at 231.) At that point, Respondent did not have $40,000 in its operating account. (RT at 232.)

- Even if Respondent had had $40,000 to pay Ms. Primo, Mr. Hart could not be certain that all or part of the CTG Judgment would actually be collected. (RT at 269-70.) CTG had already informed Mr. Hart it was having financial difficulty. (RT at 140.) Claimant had also informed Mr. Hart that CTG "did not have a whole lot of money," which is why Mr. Hart often did not bill the time he worked on CTG matters. (RT at 136.) Because CTG's ability to pay was either doubtful or at best unknown, it was reasonable for Respondent to conclude that the costs and risks of collecting on the CTG Judgment outweighed its potential benefits. Claimant did not present evidence sufficient to rebut the reasonableness of Respondent's conclusion. For example, she did not demonstrate that Respondent knew or should have known that CTG was, in fact, capable of paying the CTG Judgment. She herself was unable to ascertain CTG's true financial condition and was unable to provide any credible evidence of the same.

- During the pendency of the JAMS arbitration against CTG and the enforcement proceeding, Claimant still retained the $205,965 that she had collected from CTG through her own firm, IP Advantages. If this amount had been paid directly to Respondent, Respondent would have had more money in its operating account, which in turn could have been used to hire Ms. Primo or to further Respondent's collection efforts. (*See* RT at 232-33.)

- Mr. Hart thereafter explored with Claimant's former counsel Jason Balogh the possibility of Claimant taking over collection efforts. (*See* RT at 146.)  Mr. Hart made the following proposal, to which Claimant agreed in principle:

  We will let you take over collection efforts (see the lawsuit filed in U.S. District Court in Los Angeles), provided that (1) any funds received from [CTG] are directed to a mutually agreed upon neutral party's trust account for disbursement (based on Holly's previous misappropriation, she can't be trusted) and (2) both Apogee and Hill Wallack has approval on any settlement offers for less than the full amount of the JAMS award, which is what we would do with Holly as well if we continue the fight and get a settlement offer from Cathy Trading for less than the full amount of the JAMS award.

  (R-088, at 2; *see* R-089.)  Over the next year, Mr. Hart and Mr. Balogh attempted to work out the details.  (RT at 148.)  During their last conversation in December 2020, Mr. Hart asked Mr. Balogh where the parties were with regard to Mr. Hart's proposal.  (RT at 240.)  Mr. Balogh responded, "I'm still waiting to hear back from Holly [Li].  (*Id*.)  Respondent's offer remained open through March 2021, when Claimant filed the Demand in this case.  (*See* RT 244.)  Respondent continued to entertain the possibility of an assignment of the CTG Judgment to Claimant as late as December 2021 or January 2022.  (RT at 247.)

- In response to the Arbitrator's suggestion in Order No. 17, Respondent made a proposal to assign the CTG Judgment to Claimant.  (*See* Declaration of Paul N. Tauger in Support of Apogee's Post-Hearing Brief, at ¶ 2 & Exh. A.)  It is unclear whether Claimant made her own proposal to Respondent.  Regardless, no mutual agreement regarding assignment was reached.

For the foregoing reasons, Claimant has failed to prove her breach of contract claim by a preponderance of the evidence.

### B.  Is Respondent Liable for Breach of the Implied Covenant of Good Faith and Fair Dealing?

By Order No. 14 dated March 9, 2023, Claimant's cause of action for breach of the implied covenant of good faith and fair dealing was construed as a claim sounding in breach of contract rather than in tort.  It was therefore subsumed within Claimant's breach of contract claim, and any tort-based claim was summarily dismissed with prejudice.

### C.  Is Respondent Liable for Conversion?

"Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein."  (*State Farm Mut. Auto. Ins. Co. v. Dep't of Motor Vehicles*, 53 Cal. App. 4th 1076, 1081 (1997).)  In order for money

to be the subject of a conversion, "a plaintiff must prove a specific, identifiable sum of money that was taken from [her]." (*Greif v. Sanin*, 74 Cal. App. 5th 412, 449 (2022).)

Here, Claimant has no property interest, and therefore no right, in the CTG Judgment; thus, there was no property of hers that Respondent could have converted. Respondent is the only party with a right to the CTG Judgment. Claimant's right to compensation from the CTG Judgment is derivative—subject to the condition precedent of "collection." Because I have already determined that Respondent did not prevent collection and was not responsible for the failure to collect, Claimant's right to compensation never arose.

For the foregoing reasons, Claimant has failed to prove her conversion claim by a preponderance of the evidence.

### D. Is Respondent Liable for Breach of Fiduciary Duty?

"The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." (*Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995).)

Claimant cites *Fox v. Abrams*, 173 Cal. App. 3d 610, 611 (1985), for the proposition that because "Respondents and Claimant worked as attorneys in a law corporation together," they owe each other fiduciary duties. (Claimant's Post-Hearing Brief at 9.) This is only partly correct. *Fox* held that parties who were all shareholders in a law corporation owed each other fiduciary duties in much the same way that partners in a law partnership do. (*Fox,* 173 Cal. App. 3d at 174.) Here, although Claimant was entitled to use the "Partner" title, in actual fact she was an independent contractor with no equity stake in Apogee. (*See* Exh. R-11.) The Offer Letter also makes clear that she would be considered for equity partnership only in the future. (*Id.*)

Because Claimant was not a shareholder in Respondent, neither Hart nor Respondent owed her any fiduciary duties. In any event, Respondent was the law corporation, not just another shareholder; thus, even if Claimant were a shareholder, she cited no authority for the proposition that the law corporation *itself* owes fiduciary duties to lawyer-shareholders. (*See Salsgiver v. AOL Online, Inc*., 32 Fed. App. 894, 897 (9th Cir. 2002) ("[T]here is generally no fiduciary relationship between employee and employer").

Claimant further argues that, by acting on Claimant's behalf when pursuing CTG in arbitration for unpaid fees, Respondent and its principals somehow assumed fiduciary duties toward Claimant. But other than citing the "law of voluntary assumption," Claimant provided no authority for imposing such a duty on Respondent. In any event, Respondent did not act on Claimant's behalf when filing a JAMS arbitration against CTG and seeking to have the award in its favor enforced in federal district court; it acted on its own behalf. CTG was not Claimant's client; it was Respondent's. Claimant thus had no right to commence an arbitration against CTG at JAMS and no title to the arbitration

award or the resulting CTG Judgment.  Respondent therefore could not have acted on her behalf in pursuing CTG.

For the foregoing reasons, Claimant has failed to prove by a preponderance of the evidence that Respondent breached any fiduciary duties owed to her.

### E.  Is Respondent Liable under Bus. & Prof. Code § 17200 et seq.?

Claimant claims that Respondent's (1) misclassification of her employment status and (2) violation of Cal. R. Prof. Resp. 2-200 by splitting fees with her amount to an unlawful, unfair, or fraudulent business practice under Cal. Bus. & Prof. Code § 17200, et seq.

As to the first point, I find that Claimant was not misclassified.  The Offer Letter makes clear that it "was not an offer of employment as an employee, but as a contract 1099 attorney." (Exh. R-011, p. 1.)  The nature of Claimant's relationship with Respondent confirms as much.  During her tenure at Apogee, Claimant worked independently and was not directly supervised. (RT at 177.)  She brought in her own clients, who then became clients of Apogee but were free to leave with her if Claimant chose to terminate her relationship with Apogee. (*See* R-011, at 5.)  Claimant was solely responsible for the work she performed for those clients. (RT at 177.)  Claimant worked remotely from an office she maintained in Hong Kong and was responsible for paying her own office lease. (*See* RT at 18, 83, 180.)  She selected, hired and paid her own support staff. (RT at 180.)  Respondent paid for "some support staffing" in Hong Kong and California but did not do so directly to the support staff. (RT at 180.)  It also paid for malpractice insurance and some marketing support. (R-011.)  There was no evidence that Claimant was on payroll or received any standard employee benefits.

As to the second point, Respondent did not engage in any "fee splitting" in violation of Rule 2-200 of the California Rules of Professional Conduct.  Rule 2-200 provides that "A member shall not divide a fee for legal services with a lawyer who is not a *partner of, associate of, or shareholder with the member*." (*Id.* (emphasis added).)  Claimant argues that she did not fall into any of these categories because she was a mere employee, and thus that Respondent violated Rule 2-200 by splitting fees with her in the manner contemplated in the Offer Letter.  An initial problem with this argument is that, had Claimant been an employee of Respondent (which she was not), she would have fallen squarely within the meaning of an "associate," in which case there would be no violation of Rule 2-200 at all.

As explained above, however, Claimant was in fact an independent contractor.  Respondent acknowledges that the phrase "partner of, associate of, or shareholder with" in Rule 2-200 does not apply on its face to independent contractors.  Nonetheless, Respondent cites Formal Opinion No. 1994-138 of the State Bar Standing Committee on Professional Responsibility and Conduct for the proposition that Rule 2-200 was "intended to address concerns related to forwarding or referral fees, typically found in contingency fee situations." (Respondent's Pre-Hearing Brief at 6.)  These fees are

problematic when they are paid to "outside lawyers" who are not employees of the firm providing the legal services.[1]  (*Id*.)

The Opinion went on to provide indicia of an "outside lawyer": "Other than working on particular matters, the outside lawyer has no other formal relationship with the law office or the client, and neither the law office nor the outside lawyer contemplate a permanent relationship."  (*Id*.)  This analysis was expressly adopted by the California Supreme Court in *Chambers v. Kay*.  (*See* 29 Cal. 4th 142, 149-50 (2002).)  The *Chambers* Court also found relevant the fact that the lawyers who split fees "maintained independent law practices with separate identities, separate addresses of record with the State Bar, and separate clients, expenses, and liabilities."  (*Id*. at 150)

Here, Claimant was not an "outside lawyer" to Respondent.  The Offer Letter clearly invites her to "join" the firm, gives her the title "Partner" (albeit a non-equity Partner), and contemplates Claimant being considered to become an equity partner in the future.  (Exh. R-011.)  It does not provide that Claimant would be maintaining a separate law practice with a separate identity.  Respondent covered Claimant through its malpractice insurance, and provided marketing support and support staffing in Hong Kong and Southern California.  Claimant also used Respondent's letterhead in corresponding with clients and issuing bills.  (*See*, *e.g.*, Exh. R-023.)  Any clients that Claimant brought to Respondent became Respondent's clients.

For the foregoing reasons, Claimant has failed to prove any predicate acts that would constitute a violation of Bus. & Prof. Code § 17200 et seq.

### F.  Is Respondent Liable in Quantum Meruit?

Claimant argues that, assuming Respondent engaged in impermissible fee splitting and misclassified her employment status, the Offer Letter would be rendered void and unenforceable.  (*See* Demand ¶ 83.)  In this event, she seeks the value of her services in *quantum meruit*.

Because I have already found and concluded the Respondent did neither of the things Claimant alleges, the Offer Letter stands.  And because I found no breach of the Offer Letter, *a fortiori* Claimant has no viable restitutionary claim in *quantum meruit*.

---

[1]     Rule 2-200 was eventually superseded by Rule 1.51 on November 1, 2018.  In place of "lawyer who is not a partner of, associate of, or shareholder with the member," Rule 1.51 substitutes the phrase, "lawyers . . . [who] are not in the same firm."  This language essentially tracks the Opinion's phrase, "outside lawyer," suggesting that the touchstone is whether the fees are being split with an "outside lawyer" who is "not in the same firm" rather than whether the lawyer counts as a "partner," "associate," or "shareholder."

(*See Oliver v. Campbell*, 43 Cal. 2d 298, 306 (1954) ("The remedy of restitution in money is not available to one who has fully performed his part of a contract, if the only part of the agreed exchange for such performance that has not been rendered by the defendant is a sum of money . . . .  In such cases he recovers the full contract price and no more.").)

For the foregoing reasons, Claimant has failed to prove her *quantum meruit* claim by a preponderance of the evidence.

### G.  To what remedies is Claimant entitled?

Because Claimant has failed to prove any of her causes of action, she is not entitled to any remedies.

### H.  Is Claimant Liable for Breach of Contract

Respondent and Counter-Claimant claims that Claimant breached the Offer Letter and/or the CTG Engagement Letter when (1) she billed CTG through her own company, IP Advantages, for services provided by Respondent and then (2) withheld from Respondent the $205,965 collected from CTG.

The CTG Engagement Letter signed by Robert Hart and Claimant identified CTG as a client of Respondent.  (*See* Exh. R-014.)  It provided, *inter alia*, that all payments should be sent to "the Firm" at Apogee Law Group P.C. 2020 Main Street, Suite 600, Irvine, CA 92614.  (*Id*.)  This was confirmed in transmittal letters, sent on Apogee letterhead and signed by Claimant, instructing CTG to "forward all payments to the following address: Apogee Law Group P.C., Attn: Accounting, 2020 Main Street, Suite 600, Irvine, CA 92656, (949) 862-8480."  (Exh. R-023.)

Although the Offer Letter does not specifically prohibit Claimant from billing CTG in her own capacity or through IP Advantages, I find that this was implied by the very nature of Claimant's relationship with Respondent.  A reasonable person in the position of Claimant would have understood that all billing to, and collections from, clients of Respondent would be done by Respondent.  The natural implication of the Offer Letter language explaining how to calculate Claimant's compensation assumes that amounts will be "collected" by Respondent first, before any disbursements were made to Claimant.

Claimant argues that Mr. Hart expressly approved of her issuing bills to CTG from IP Advantages when Mr. Hart replied, "Okay" after Claimant informed him on February 15, 2017, that, "[i]n order to work with the my client's [*sic*] preference, I invoiced her my time from IP Advantages for September, October, November and December 2016."  (Exh. C-002)  She also argues that she forewarned Mr. Hart that she would do so back in November 2016, but received no objection.  (*See* RT at 61-63; Exh. C-013.)

As Respondent correctly notes, however, Mr. Hart's "Okay" response came *after* Claimant had already issued the bills to CTG from IP Advantages; thus, except with respect to the two March 17, 2017, invoices (*see* Exh. R-25), the response could not have authorized Claimant to do so *ex ante*.  At most, it was an *ex post* ratification.  However, Mr. Hart testified that he did not intend to ratify Claimant's billing practices.  (*See* RT at 207-09.)  Mr. Hart's testimony on this point was credible.  Indeed, because it was not reasonable for Claimant to bill CTG through IP Advantages to begin with—especially given the potential liability, insurance, and malpractice issues Mr. Hart identified—it was not objectively reasonable for her to take his one-line " Okay" as either an authorization or a ratification thereof.

Claimant's November 16 emails and Mr. Hart's failure to object to them also do not justify Claimant's conduct.  (*See* Exh. C-013.)  The November 16 emails do not make explicit that Claimant intended to bill CTG from IP Advantages rather than from Apogee.  Nor would that have been a reasonable interpretation of the November 16 emails for the reasons identified above.

Although Respondent appears to seek the entire $205,965 as damages for this claim, Claimant is entitled to retain a large portion of this amount under the compensation arrangements outlined in the Offer Letter.  Respondent's recovery in breach of contract will accordingly be limited to $24,898—the remaining amount it is owed and that it would have received had Claimant fully performed under the Offer Letter.

For the foregoing reasons, Respondent and Counter-Claimant has proven its breach of contract claim by a preponderance of the evidence.

## I.    Is Claimant Liable for the Tort of Breach of the Covenant of Good Faith and Fair Dealing?

A cause of action for the tort of breach of the covenant of good faith and fair dealing "arises when the party not only breaches the contract but also denies *in bad faith* that a contract *even exists*."  (*Kruse v. Bank of America*, 202 Cal. App. 3d 38, 57-58 (1988) (emphasis added).)

I find that Claimant did not deny in bad faith that the Offer Letter exists.  Instead, she believed—albeit erroneously and unreasonably—that she had no practical alternative but to bill CTG from her own firm and/or that Mr. Hart had authorized or ratified her conduct.

For the foregoing reasons, Respondent and Counter-Claimant has failed to prove its tort claim for breach of the covenant of good faith and fair dealing by a preponderance of the evidence.

**J.  Is Claimant Liable for Conversion?**

By Order No. 14, the Arbitrator already found in favor of Respondent on this cause of action.

**K.  Is Claimant Liable for Breach of Fiduciary Duty?**

As explained in section IV.D *ante*, as a general rule, an employee/employer relationship does not normally give rise to fiduciary obligations.  Respondent has not argued any exception to this general rule.

For the foregoing reasons, Respondent and Counter-Claimant has failed to prove by a preponderance of the evidence that Claimant breached any fiduciary duties.

**L.  To What Damages is Respondent and Counter-Claimant Entitled?**

In its Pre- and Post-Hearing Briefs, Respondent did not specifically denominate the amount of damages it seeks.  However, based on the evidence adduced at the Hearing, Respondent's submissions in connection with its Motion for Summary Judgment, and Order No. 14, Respondent is entitled to **$24,898** from Claimant.  This represents Respondent's 30% cut of the $205,965 invoiced to CTG and received by IP Advantages, minus amounts due to Respondent for overhead and travel, minus $25,000 that Claimant already returned to Respondent.  (*See* Exh. R-086.)

Claimant argues that she actually owes Respondent only $15,116, which is $24,898 minus (a) $ 8,610.00 for "Contractor Costs" and (b) $1,172.00 for "Court Reporter Costs."  (*See id*.)  Respondent did not respond to this argument.  Nonetheless, I construe Exhibit R-86 as merely an internal accounting that shows the net amount that Respondent would retain after all third parties were paid.  Because Respondent, not Claimant, would have been responsible for paying those third parties, Respondent would effectively be paying twice if Claimant were to further deduct those amounts from what she owes.

Respondent also prayed for punitive damages on its third cause of action for conversion.  In order to be entitled to punitive damages, Respondent must show that claimant acted with "oppression, fraud or malice."  (Cal. Civ. Proc. Code § 3294.)

Although Claimant's conduct was highly unorthodox, unprofessional, and unreasonable, on balance I find that Claimant did not act with oppression, fraud or malice.

**M.  Does the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness Apply to this Matter?**

On July 7, 2023, the Arbitrator issued a recommendation on this matter finding in favor of Respondent.  On July 10, the JAMS NAC adopted the Arbitrator's recommendation in full.

Because the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness do not apply to this matter, Claimant shall pay her pro rata share of all costs of the arbitration, which defaults at 50%, including the Arbitrator's remuneration, incurred to date and going forward.  Respondent has paid all such amounts to date.  This determination does not preclude a further determination by the Arbitrator that these costs should be allocated in a different manner under Rule 24(f).  (*See post*, section IV.O.)

### N.  Respondent's Motion to Strike

On July 1, 2023, Respondent filed a Motion to Strike Declarations of Jason Balogh and Request for Sanctions.  The Motion to Strike is GRANTED.  The Request for Sanctions is dealt with below.

### O.  Respondent's Motion for Sanctions

In addition to seeking sanctions for the improper filing of the two Balogh declarations, Respondent seeks sanctions against Claimant in connection with (1) Claimant's improper demand for relief on November 3, 2022; (2) Claimant's motion to compel discovery; (3) Claimant's motion for default judgment; (4) Claimant's submission entitled, "Proposed Conference Topics and Discovery Schedule"; (5) Claimant's Opposition to Respondent's Motion for Summary Judgment; (6) Claimant's conduct throughout the arbitration; and (7) Claimant's false representation that Claimant was an "Employee" of Respondent.  (*See* Respondent's Post-Hearing Brief; Respondent's Motion to Strike Declarations of Jason Balogh and Request for Sanctions dated July 1, 2023.)

JAMS Rule 29 provides:

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

California Code of Civil Procedure section 128.7, cited by Respondent, does not apply in arbitration.

Respondent seeks some $15,900 in attorneys' fees for time spent responding to arguments or filings made by Claimant (in relation to one of the seven issues itemized above) that Respondent contends were frivolous or unjustified.  Respondent also seeks $96,141.00 for "[Claimant's] conduct at the Final Hearing and Throughout this

Arbitration," which represents the total attorneys' fees invoiced to Respondent by its counsel Addy Hart in respect of this arbitration. (*See* Invoice from Addy Hart to Respondent dated September 21, 2023.)

Having considered the conduct complained of by Respondent, the Arbitrator finds that some, but not all, rise to the level of sanctionable conduct. Other than in connection with discreet instances of sanctionable conduct, the Arbitrator finds no basis for awarding Respondent the entirety of the invoiced attorneys' fees ($96,141.00), as this would represent an end run around the undisputed fact that there is no fee shifting clause in the Offer Letter.

The Arbitrator finds that Claimant had *prima facie* grounds for bringing her claims against Respondent even though she ultimately failed to prevail. However, as the Arbitrator remarked at various points during the life of this case, Claimant's conduct throughout was vexatious and had the effect of unnecessarily complicating and prolonging the proceedings. For example, Claimant unnecessarily and repeatedly attempted to re-litigate issues that had already been determined, such as Respondent's FTB suspension status or my lack of jurisdiction over the individual Respondents. She unreasonably interpreted the Offer Letter and her role at Apogee as creating an employer-employee relationship. She incorrectly claimed that she had not received any initial exchange from Respondent, even though she had not bothered to first check with her prior counsel, whom she had dismissed. Her lack of legal representation throughout most of these proceedings, moreover, caused her to misunderstand aspects of the arbitration procedure; this, in turn, caused additional delay and multiplied the number of her objections and filings. Her motion to compel discovery was largely unwarranted, and the Arbitrator specifically found that her "delay in issuing reformulated RFA 4 pending the Arbitrator's ruling on Respondent's suspension status was improper." (*See* Order No. 13.) At that time, the Arbitrator expressed

> concern[] that the number of filings in this case is disproportionate to the amount in dispute and the relatively straightforward nature of the claims and defenses. Claimant in particular is cautioned to avoid creating unnecessary disputes and delays, and is encouraged to seek representation by a California attorney who can help her navigate these proceedings in a more efficient and cost-effective manner.

(*Id.*)

Finally and perhaps most significantly, there was no basis whatsoever for Claimant to have withheld from Respondent the $24,898 she recouped from CTG. This amount was undeniably owed to Respondent, and it was unreasonable and unnecessary for Claimant to have continued to take a contrary position in this arbitration.

For the foregoing reasons, the Arbitrator determines that Claimant's conduct violated both the letter and spirit of the Rules and the Arbitrator's Orders. A reasonable sanction for the entirety of Claimant's vexatious conduct is to shift the Arbitration fees

and Arbitrator compensation and expenses entirely to Claimant pursuant to Rule 24(f). As of the date of this Final Award, these costs amount to **$57,980.06**.

### P.  Further Issues Raised by Respondent in its Supplement to Opening Brief

#### 1.    Prejudgment Interest

Section 3287 of the California Code of Civil Procedure provides, in pertinent part:

> A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt.

The statutory rate for prejudgment interest due on a breach of contract award is ten (10) percent per annum.  (Cal. Civ. Proc. Code § 3287(c).)

#### a.  Prejudgment Interest on $24,898 Owed to Respondent

The difference between the amounts billed and collected by IP Advantages from CTG, and the $25,000 that Claimant later credited to Respondent ($24,898), is without doubt a sum certain that is not open to dispute.  Respondent is accordingly entitled to pre-judgment interest on this sum.  Interest began to run from December 15, 2016, the due date of the first two invoices from IP Advantages to CTG, which together exceed $24,898.  Claimant has not provided any evidence showing that she did not, in fact, receive funds exceeding $24,898 by December 2016.  Her objections largely re-argue matters that were already decided in the Partial Interim Award.

The amount of interest is calculated as follows:

- 10% of $24,898 = $2,489.80 / year = $6.82 / day

- 2,510 days from December 15, 2016 to October 30, 2023

- 2,510 * $6.82 = **$17,118.20**

#### b.  Prejudgment Interest on Claimant's Share of the Costs of Arbitration

When JAMS initially classified this matter as subject to the Employment Minimum Standards, it was due to the fact that "Claimant claim[ed] to have been misclassified as an independent contractor."  (*See* Letter dated March 20, 2023, from Sheri Eisner to the Parties (referencing Complaint ¶ 69 et seq.).)

Claimant's allegation that she was misclassified was objectively unreasonable. The Offer Letter states that "[y]our offer to join the Firm is not an offer of employment as an employee, but as a contract 1099 attorney" and that Claimant would be "a non-equity

partner with the title of 'Partner'" (Exh. R-011)  It also provided that Claimant would be compensated based on a percentage of the amount she billed and collected, plus an additional percentage for matters for which she was the originating attorney, with the remainder going to the Respondent and other Apogee attorneys.  (*Id*. at 2-4.)  For matters in which she was acting as the originating attorney, Claimant had the power to write off time and decide the hourly rate billed to her clients.  (*See* Exh. R-11.)  Thus, Claimant had both the power and responsibility to bill clients for whom she was the originating attorney.  This is consistent with the fact that Claimant's compensation was ultimately tied to "your collections."  (Exh. R-11.)  Indeed, there are other occasions on which Claimant billed CTG through Respondent and by using Respondent's letterhead.  (*See* Exh. R-023.)

At the same time, Respondent could have brought a motion regarding the misclassification much earlier.  Until that motion was heard and decided, Respondent had no "right to recover which is *vested* in the person upon a particular day," because JAMS had originally ruled against Respondent, and a further determination by the Arbitrator was required to reverse that ruling.  (*See* Cal. Code Civ. Proc. § 3287 (emphasis added).)

For the foregoing reasons, I find that Respondent has no right to prejudgment interest on the arbitration costs.  Claimant's unreasonable denial of her independent contractor status were factored into the assessment of sanctions.  (*See ante* section IV.O.)

## 2.    Punitive Damages

Because the Partial Interim Award already determined that Claimant did not act with oppression, fraud or malice (*see ante* section IV.L), Respondent's renewed request for punitive damages is DENIED.

## Q.  Conclusion

For the foregoing reasons, Claimant has failed to establish by a preponderance of the evidence any of her claims against Respondent.  Respondent has established by a preponderance of the evidence its counterclaims for breach of contract and conversion and is entitled to **$24,898** in damages.  Respondent is also entitled to **$17,118.20** in prejudgment interest on this sum.  JAMS has adopted the Arbitrator's recommendation that the Employment Minimum Standards do not apply in this case.  The Arbitrator has furthermore shifted all costs of the Arbitration, in the amount of **$57,980.06**, to Claimant as a sanction.

///

///

///

///

## FINAL AWARD

Claimant shall take nothing from Respondent.

Claimant shall pay Respondent $99,996.26.  Payment is due immediately. Interest on this sum will begin to accrue at 10% per annum as of the date of this Award.

This Award determines all issues submitted for decision in this proceeding.  Any claims not expressly addressed in this Award are denied.


Dated: October 31, 2023

_____

Hiro N. Aragaki
Arbitrator