Paul Tauger, Esq. (SBN 160552)
ptauger@addyhart.com
AddyHart P.C.
5151 California Street, Suite 100
Irvine, CA 92617
(949) 438-3218
ptauger@addyhart.com

Attorney for Counterclaimant
Apogee Law Group P.C.

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

| | |
|---|---|
| APOGEE LAW GROUP P.C., a California corporation,<br><br>Plaintiff/Petitioner<br><br>v.<br>HOLLY YING LI, an individual.<br><br>Defendant/Respondent | ) **CASE NO: 8:24-cv-02368-JVS-KES**<br>)<br>)<br>) **JAMS ARBITRATION NO: 1200058273**<br>)<br>) **DECLARATION OF PAUL N. TAUGER IN SUPPORT OF PLAINTIFF/PETITIONER APOGEE LAW GROUP P.C.'S OPPOSITION TO DEFENDANT/RESPONDANT HOLLY LI'S MOTION TO DISMISS**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

DECLARATION OF PAUL N. TAUGER IN SUPPORT OF PLAINTIFF/PETITIONER APOGEE LAW GROUP P.C.'S OPPOSITION TO DEFENDANT/RESPONDANT HOLLY LI'S MOTION TO DISMISS

I, Paul N. Tauger, declare as follows:

1. I am an attorney, licensed and admitted to practice before all of the United States District Courts and State Courts of the State of California.  I am the attorney of record for Plaintiff/Respondent Apogee Law Group P.C.  I have personal knowledge of the facts averred herein and, if called upon, could and would testify to the truth thereof.

2. Attached hereto as Exhibit A is a true and correct copy of the arbitrator's Final Award for which Apogee seeks enforcement.  The Court should note that the highlighting is not original, but added by Apogee to identify the relevant language cited in its Opposition.

3. Attached hereto as Exhibit B is a true and correct copy of the Reporter's Transcript of Proceeding.  The Court should note that the highlighting is not original, but added by Apogee to identify the relevant language cited in its Opposition.

4. Attached hereto as Exhibit C is a true and correct copy of a screen print of pages from the Intelink Website I made on June 20, 2026.  Page one of this exhibit shows two drop down menus, one for "Category" and the other for "Area."  I clicked on "Area" and was shown a list of locations.  These were

DECLARATION OF PAUL N. TAUGER IN SUPPORT OF PLAINTIFF/PETITIONER APOGEE LAW GROUP P.C.'S OPPOSITION TO DEFENDANT/RESPONDANT HOLLY LI'S MOTION TO DISMISS

Lisbon, New York, Orange County, Phoenix, San Diego and San Francisco. Upon clicking on "New York," page two of this exhibit was displayed.

5.  No conference of counsel pursuant to Local Rule 7-3 ever took place.  No conference of counsel was ever requested by Li's counsel prior to filing and service of Li's Motion to Dismiss.

I swear under penalty of perjury pursuant to the laws of the State of California and of the United States that foregoing is true and correct.  Executed this 20th day of June, 2026, at Santa Rosa, California.

_____
Paul N. Tauger

3

DECLARATION OF PAUL N. TAUGER IN SUPPORT OF PLAINTIFF/PETITIONER APOGEE LAW GROUP P.C.'S OPPOSITION TO DEFENDANT/RESPONDANT HOLLY LI'S MOTION TO DISMISS

**Exhibit A**

DECLARATION OF PAUL N. TAUGER IN SUPPORT OF PLAINTIFF/PETITIONER APOGEE LAW GROUP P.C.'S OPPOSITION TO DEFENDANT/RESPONDANT HOLLY LI'S MOTION TO DISMISS

# JAMS ARBITRATION
## CASE REFERENCE NO. 1200058273

**HOLLY Y. LI**

    **Claimant,**

        **and**

**APOGEE LAW GROUP, P.C.**

    **Respondent.**

---

**APOGEE LAW GROUP, P.C.**

    **Counter-Claimant,**

        **and**

**HOLLY Y. LI**

    **Counter-Respondent.**

---

# FINAL AWARD

**<u>Counsel:</u>**

| | |
|---|---|
| Holly Li | Paul N. Tauger, Esq. |
| 142 W. 57th Street | AddyHart P.C. |
| 11th Floor | 15 Hubble, Suite 200 |
| New York, NY 10019 | Irvine, CA 92618 |
| Phone: 866-786-4036 | Phone: 949-438-3218 |
| hli@intelinklaw.com | ptauger@addyhart.com |
| | |
| *In pro per* | Robert P. Hart, Esq. |
| | AddyHart P.C. |
| | 401 North Michigan Ave., Suite 1200-1 |
| | Chicago, IL 60611 |
| | Phone: 312-834-7701 |
| | robert@addyhart.com |
| | |
| | *Counsel for Respondent and Counter-Claimant* |

**Arbitrator:**

> Hiro N. Aragaki, C.Arb, Esq.
> JAMS
> 555 West 5th Street, 32nd Floor
> Los Angeles, CA 90013
> Tel: (213) 620-1133
> E-mail: HAragaki@jamsadr.com

**Place of Arbitration:  Irvine, California, U.S.A.**

**Date of Final Award: October 31, 2023**

Having been designated in accordance with the arbitration clause is contained on page 5 of the Offer Letter dated April 14, 2016, between Claimant and Respondent (the "Offer Letter"), and having examined the submissions, proofs and allegations of the Parties, I, THE UNDERSIGNED ARBITRATOR, now find, conclude and issue this Final Award as follows:

## I.       Introduction and Procedural Statement

Claimant and Counter-Respondent is a lawyer licensed in New York and New Jersey.  She is the founder of IP Advantages LLC, an intellectual property advisory firm established in 2009.  She is representing herself in this proceeding.

Respondent and Counter-Claimant is a law firm that was formed as a corporation in 2015.  Respondent is represented by Paul N. Tauger and Robert H. Hart of AddyHart P.C.

Claimant signed the Offer Letter several days after the date thereof (April 14, 2016) and began working for Respondent.  The arbitration agreement contained in the Offer Letter (the "Arbitration Agreement") provides:

> Any and all disputes, claims or controversies arising out of or relating to this Agreement or the breach, termination, enforcement. interpretation or validity, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Orange County, California before one (1) arbitrator.  The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules.  Judgment on a JAMS award may be entered in any court having jurisdiction.

(Exh. R-011.)

Claimant filed a Demand for Arbitration with JAMS dated March 26, 2021. Respondent responded to the Demand and asserted counterclaims on May 26.  Claimant

responded to the counterclaims on June 9.  In the interim, JAMS determined that the JAMS Policy on Employment Arbitration Minimum Standards of Fairness (the "Employment Minimum Standards") applied to this case.  (*See* Letter dated April 29, 2021, from Scott Parreno to Parties.)

The Arbitrator was selected as the sole arbitrator pursuant to the Arbitration Agreement.  A preliminary hearing was held on September 2, 2021.  The matter was stayed for 60 days in order to allow Respondent to cure the suspension of its status.  (*See* Order No. 1.)  Thereafter, Respondent was granted leave to file a motion to dismiss individual respondents Robert Hart, Gregory Gulliver, and Francisco Rubio-Campos.  (*See* Order No. 2.)  The individual respondents were dismissed without prejudice on March 24, 2022.  (*See* Order No. 4.)

A continued preliminary hearing was held on March 30, 2022, at which time the Parties agreed that the applicable substantive law is the law of the State of California and that the JAMS Comprehensive Arbitration Rules & Procedures, as modified by the Expedited Procedures (collectively, the "Rules"), would apply.  (*See* Order No. 5.)

By Order No. 9 dated December 16, 2022, Respondent was granted leave to file another dispositive motion.  On March 9, 2023, the motion was granted as to Respondent's counterclaim for conversion, but denied as to Claimant's breach of contract claim.  In the intervening period, the Parties raised several discovery disputes as well as issues around Respondent's suspension status.

The Parties filed simultaneous Pre-Hearing Arbitration Briefs on March 27, 2023.  A Final Status Conference was conducted on March 28.  The Parties agreed that any exhibits referred to during the Hearing, for which no objection was lodged or for which the objection was overruled, would be deemed entered into the record.  (*See* Order No. 16.)

A one-day Hearing was held on April 7, 2023, in the JAMS office at 5 Park Plaza Suite 400 Irvine, CA 92614.  Claimant represented herself and appeared by Zoom.  Respondent was represented by Messrs. Tauger and Hart, who appeared in person.  Each side called Claimant and Mr. Hart, President of Apogee, as witnesses.  A tentative agreement was reached to deem all exhibits previously identified by the Parties into the record.  (Reporter's Transcript ("RT") at 99-102.)  Additional rebuttal exhibits of the Respondent, marked as Exhibits R-201 (Hapa/IP Advantages Engagement Letter), R-202 (The 100 Most Common Chinese Family Names), and R-203 (Real Property Data Search), were admitted into the record.  The Parties agreed to submit Post-Hearing briefs in lieu of oral closing arguments.

Order No. 17 dated April 17, 2023, was issued providing guidance to the Parties regarding post-hearing briefs and suggesting that they consider reaching an agreement whereby Respondent would authorize Claimant, at her own effort and expense, to pursue collections against CTG.  The Parties did not inform the Arbitrator by the stated deadline whether they wished to pursue this option.  Thereafter, the Parties apparently continued

to entertain the option, but they were unable to reach a final agreement.  Order No. 17 also requested the Parties to inform the Arbitrator if there were any exhibits not referred to during the Hearing that the Parties wished to have excluded from the record.  Neither Party responded.

Thereafter, the Parties made further filings, most of which are unnecessary to detail except the following:

- On April 24, 2023, Claimant re-submitted the declaration of Francisco Rubio-Campos pursuant to Order No. 17.

- On May 25, Respondent filed its objections to Claimant's exhibit list, to which Claimant responded on the same day.

- On June 18, Claimant filed a declaration of Jason Balogh.  The declaration is STRICKEN from the record as untimely.

The Parties submitted simultaneous Post-Hearing arbitration briefs on June 20.

On June 21, Respondent filed a letter brief responding to Claimant's filing of the Balogh declaration, responding to several points made in Claimant's Post-Hearing brief, and suggesting a further round of opposition briefing from both sides.  Respondent's letter brief is also stricken from the record as improper and untimely argument.  The Arbitrator sees no need for opposition briefs to be filed.

On June 27, Claimant filed a second declaration of Jason Balogh.  The declaration is STRICKEN from the record as untimely.

On July 1, Respondent filed a Motion to Strike Declarations of Jason Balogh and Request for Sanctions, which will be dealt with herein.  (*See* section IV.N *post*.)

A Partial Interim Award was issued on July 20, 2023.  In the Award, the Parties were instructed to inform the Case Manager by August 15, 2023, of (1) whether there were any remaining matters (beyond the request for sanctions) they wish to submit to the Arbitrator before a Final Award is issued; (2) what those issues are (if any); and (3) whether they would like to bring to the Arbitrator's attention any clerical errors in the Partial Interim Award or any suggested changes that do not affect the outcome. Additionally, the Award provided:

If further issues have been identified by the stated deadline, the Arbitrator will, in consultation with the Parties, set further procedures and deadlines for hearing them.  If no further issues have been identified, a Final Award will be issued incorporating this Partial Interim Award and disposing of all issues submitted.

On August 9, 2023, Claimant requested an adjournment of 30 days in order to deal with a family emergency in China.  Respondent agreed to continuing all outstanding dates 30 days." (E-mail dated August 9, 2023, from Paul Tauger to Louis Boney.)

On September 14, 2023, Respondent submitted a Supplement to Opening Brief, in which it raised the following further issues for determination:  prejudgment interest and punitive damages.  Because Respondent's submission contained argument, Claimant was provided an additional period of time in which to respond.  Claimant submitted her Response to Respondent's Supplement to Opening Brief on September 29.  The Arbitrator sees no need for a hearing on these submissions and will rule on the issues herein.

In response to Respondent's request for sanctions, the Partial Interim Award also provided:

> The Arbitrator is of the view that before entertaining a motion for sanctions, Respondent should first indicate the amount it seeks for each example of sanctionable conduct and provide a *brief* justification therefor.  Claimant should also be afforded an opportunity to respond to the motion, and Respondent may reply if it wishes.  A ruling on the motion will be deferred until that time.  The Arbitrator sets the following briefing schedule, which the Parties may modify by mutual agreement:
>
> - Respondent's supplemental opening brief indicating the amounts sought and a brief justification of the amounts shall be filed by **August 22, 2023** and shall not exceed 5 double spaced pages, exclusive of any exhibits.  Note: There is no need to re-argue the entitlement to sanctions, only the amount requested.
>
> - Claimant's opposition brief shall be filed within **three weeks** of the filing of Respondent's opening brief and shall not exceed 15 double spaced pages, exclusive of any exhibits;
>
> - Respondent may file a reply within **one week** of the filing of Claimant's opposition brief**,** which shall not exceed 5 double spaced pages. No further exhibits allowed other than in rebuttal.

On September 21, 2023, Respondent submitted a Supplement re Sanctions Calculation.  Claimant responded on October 12, 2023.  Respondent declined to file a reply.

## II.    Facts

The factual findings that follow are necessary to the Award.  They are derived from the briefs, affidavits, and exhibits presented to the Arbitrator.  To the extent that these findings differ from any Party's position, that is the result of determinations by the

Arbitrator as to credibility and relevance, burden of proof considerations, legal principles, and the weighing of the evidence, both oral and written.

In or about April 2016, Claimant went to work for Respondent law firm pursuant to the terms of the Offer Letter.  The Offer Letter provided that Claimant would be "a non-equity partner with the title of 'Partner'" (Exh. R-011), which effectively meant that Claimant was not entitled to receive profits or make capital contributions.  (RT at 175.) The Offer Letter stated that "[y]our offer to join the Firm is not an offer of employment as an employee, but as a contract 1099 attorney."  (Exh. R-011.)  It also provided that Claimant would be compensated based on a percentage of the amount she billed and collected, plus an additional percentage for matters for which she was the originating attorney, with the remainder going to the Respondent and other Apogee attorneys.  (*Id*. at 2-4.)  Claimant refers to this as "fee-splitting."

Respondent is not currently operating as a law firm and has no clients.  (RT at 111.)  When it was in operation, it was a small, virtual law firm that at one point had an office in Irvine, California.  (RT at 123.)

## A.  The CTG Litigation

In 2016, Cathy Trading Group LLC ("CTG") solicited Claimant to represent it in two separate defensive actions pending in the New Jersey U.S. District Court.  (RT at 18.)

On May 24, 2016, CTG and Respondent entered into an Engagement Agreement (the "CTG Engagement Agreement"), pursuant to which Respondent would represent CTG in the New Jersey District Court actions.  (*See* Exh. R-014.)  Yun Chen signed the CTG Engagement Agreement in her capacity as CTG's managing partner.  (*Id*. at 9.)  Hill Wallack was the local counsel for the CTG lawsuits.  (RT at 148.)

In the course of the CTG litigation, Claimant pushed to file a motion to dismiss. (RT at 189.)  Mr. Hart, who at the time was Vice President and a member of the Board of Directors of Apogee, advised Claimant that such a motion was frivolous, but Claimant apparently refused to take his advice.  (RT at 189:5-11.)  Opposing counsel for the plaintiff, Interlink, warned Claimant that if she proceeded with the motion to dismiss, he was going to "seek sanctions against everybody."  (RT at 190.)  It is unclear if the motion was ultimately filed; however, Ms. Chen was apparently dissatisfied with Claimant's handling of the motion and with other aspects of her representation.  One such aspect was Claimant's practice of billing CTG for work performed by Respondent from Claimant's own separate firm, IP Advantages in late 2016 and early 2017.  Claimant directed CTG to pay, and CTG did pay, IP Advantages a total of $205,965 for those services.

In total, Respondent billed attorney's fees of over $600,000 over the course of the CTG litigation.  (*See* Exh. R-068, at 2.)  Of that amount, $362,448.43, excluding interest, remained unpaid by CTG.  (*Id*.)

On June 19, 2017, Mr. Hart wrote to Claimant instructing her to start looking for a new law firm to practice with "as we are done." (Exh. R-022.) On the next day, Claimant issued a resignation letter to Respondent. (Exh. R-023.)

## B. CTG Files Complaints Against Claimant

On October 19, 2017, CTG and Ms. Chen filed a bar complaint with the Office of Attorney Ethics for the State of New Jersey against Claimant individually. (Exh. R-083, at 2.) The complaint raised several issues, including Claimant's practice of billing CTG from IP Advantages rather than Apogee, failure to appear at conferences, failure to include adequate descriptions of services in invoices, and withholding of information. (Exh. R-083.)

On January 17, 2018, CTG and Ms. Chen filed a claim with the New Jersey Lawyer's Fund for Client Protection against Claimant individually. (*See* Exh. R-078.) The gravamen of the claim was that Claimant had instructed CTG to send payments owed to Respondent to "[Claimant's] personal company's (IP Advantages) bank account." (Exh. R-078, at 7.)

On February 2, 2018, Ms. Chen filed a grievance with the New Jersey Supreme Court against Claimant individually with the New Jersey Office of Attorney Ethics. (Exh. R-029.) The grievance accused Claimant of dishonesty, misconduct relating to the motion to dismiss, missing deadlines, and missing conferences with the court. (Exh. R-079.)

None of the foregoing complaints resulted in discipline. (RT at 222.) However, they corroborate Mr. Hart's testimony that Ms. Chen had such a "visceral hatred toward [Claimant] that she just couldn't come around to paying [Respondent]." (RT at 141.)

## C. JAMS Arbitration over CTG Fees

In February 2018, Respondent initiated a collections action against CTG by filing a Demand for arbitration with JAMS. Respondent obtained an award in its favor in the principal amount of $362,448.43 plus interest and expenses for a total of $402,543.83. (Exh. R-068.)

Respondent thereafter sought an order from the U.S. District Court for the Central District of California confirming the award. On January 10, 2020, the District Court issued a judgment (the "**CTG Judgment**") in the amount of $470,217.06, which included filing costs. (*See* R-072.)

During the course of the JAMS arbitration, the court enforcement action, and even thereafter, Mr. Hart attempted to negotiate a payment plan with Ms. Chen but was unsuccessful in collecting any moneys owed.

Other material facts are addressed in the Analysis, below.

### III.    Issues Presented

The Complaint attached to Claimant's Demand raises the following issues for my decision:

- Whether Respondent is liable for breach of the Offer Letter.

- Whether Respondent is liable for breach of the implied covenant of good faith and fair dealing.

- Whether Respondent is liable for conversion.

- Whether Respondent is liable for breach of fiduciary duty.

- Whether Respondent is liable under Business & Professions Code § 17200 et seq.

- Whether Respondent is liable in quantum meruit.

- The relief to which Claimant is entitled.

Respondent's counterclaims raise the following further issues for my decision:

- Whether Claimant is liable for breach of contract.

- Whether Claimant is liable for the tort of breach of the covenant of good faith and fair dealing.

- Whether Claimant is liable for conversion.

- Whether Claimant is liable for breach of fiduciary duty.

- The relief to which Respondent is entitled.

In addition, Respondent seeks:

- a determination that the Employment Minimum Standards do not apply in this case.

- sanctions against Claimant.

### IV.    Analysis

### A.  Is Respondent Liable for Breach the Offer Letter?

Claimant advances two grounds on which she claims Respondent breached the offer letter: (1) by obstructing Claimant from invoicing and collecting fees for work she

performed for CTG, and (2) by failing to collect, or expend reasonable good faith efforts to collect, the CTG Judgment.

### 1. Obstructing Claimant From Invoicing And Collecting Fees For Work She Performed

Because Claimant brought CTG to Respondent, Claimant was the "originating attorney" for purposes of the Offer Letter. (RT at 128.) Mr. Hart testified that the originating attorney is responsible for issuing and getting out invoices, and that he had informed Claimant of the same. (RT at 127, 132.) This included inputting time, either directly or with the assistance of Suzanne Mello, into the Tabs3 software used by Respondent for billing. Mr. Hart outlined the process as follows: Suzanne Mello works with the originating attorney and sends out a prebill. The originating attorney reviews it to make sure it's correct. The originating attorney then generates a final invoice and sends it out to the client. (RT at 131.) Claimant did not follow this procedure, which was part of her origination responsibilities and for which she was receiving 15% of all collections. (RT at 132, 193.) Mr. Hart assisted Claimant with paying third party vendors because she did not have access to the firm's operations or trust accounts. (*Id*. at 132-33.)

Claimant argues that the reason bills to CTG were not timely issued, thereby causing friction with Ms. Chen, was Mr. Hart's delay and refusal to enter his own time for work on CTG matters. But Mr. Hart explained that he did not bill all of his work on CTG because Claimant had informed him that CTG was short on funds, so he thought this would assist Claimant. (RT at 136-37.) I found Mr. Hart's testimony on this point more credible. It also defies reason that Respondent, which profits only when bills are issued and paid, would prevent Claimant from issuing bills. Claimant also appeared to have no problem billing CTG through her other firm, IP Advantages, without waiting for Mr. Hart's billing entries to be finalized, which begs the question why she could not have done the same through Respondent.

Claimant also claims that she was not given access to Tabs3, the billing software. This was contradicted by Mr. Hart's testimony (*see* RT at 132) and is also not credible. The Offer Letter does not specifically prohibit Claimant from sending bills out on her own. As the originating attorney, Claimant had the power to write off time and decide the hourly rate billed to her clients. (*See* Exh. R-11.) Thus, Claimant had both power and responsibility to bill clients for whom she was the originating attorney, which makes sense given that her compensation was ultimately tied to "*your* collections." (Exh. R-11 (emphasis added).) Indeed, Claimant had no problem billing CTG through Respondent, and using Respondent's letterhead, in the past. (*See* Exh. R-023.)

### 2. Failing to Collect, or to Expend Reasonable Good Faith Efforts to Collect, the CTG Judgment

The Offer Letter explains in no uncertain terms that Claimant's compensation will be tied to amounts "collected" by Respondent. (*See* Exh. R-11.) Claimant also testified

that Respondent's obligation to compensate her did not mature until client funds were actually received, whether directly by Respondent or by other entities affiliated with Respondent or under Respondent's control.  (RT at 56, 64.)

There was no credible evidence to suggest that Respondent did, in fact, receive the value of the CTG judgment or any portion thereof.  Thus, because a condition precedent to Respondent's obligation to compensate Claimant did not arise, Respondent is not in breach of the Offer Letter simply because Claimant was not compensated.

Nonetheless, a covenant of good faith and fair dealing is implied by law into every contract.  (*Balfour, Guthrie & Co. v. Gourmet Farms,* 108 Cal. App. 3d 181, 191 (1980).)  The question therefore arises whether Respondent breached the covenant—and thereby breached the Offer Letter—by failing to expend good faith or reasonable efforts in attempting to collect the CTG Judgment.

A party defending against a breach of contract allegation "must demonstrate he reasonably performed his obligations under the agreement in a manner consistent with the implied covenant of good faith and fair dealing."  (*Pech v. Morgan,* 61 Cal. App. 5th 841, 855 (2021).)  "The essence of the good faith covenant is objectively reasonable conduct."  (*See Lazar v. Hertz Corp.*, 143 Cal. App. 3d 128, 141 (1983).)  Another good faith requirement is avoidance of arbitrary or capricious conduct with respect to performance obligations.  (*See Robinson v. Hewlett-Packard Corp.*, 183 Cal. App. 3d 1108, 1121 (1986).)

I conclude that Respondent acted in good faith in attempting to collect the CTG Judgment because its conduct was objectively reasonable, not inconsistent with the Offer Letter, and not arbitrary or capricious.  This conclusion is based on the following findings of fact:

- Between August and December 2017, Respondent engaged in several discussions regarding payment with CTG's Ms. Chen.  (RT at 140; Exh. R-027.)  CTG initially agreed to a repayment plan whereby it would pay Respondent $10,000 per month.  (RT at 140.)  However, CTG ultimately failed to make any payments.  (RT at 142.)

- There were two reasons why CTG did not follow through with the repayment plan.  First, CTG did not have sufficient funds.  (RT at 140.)  Second, Ms. Chen was infuriated by Claimant's conduct, both in issuing bills from IP Advantages for work performed by Respondent, and in allegedly mishandling the CTG litigation matter as detailed in the two ethics complaints filed against Claimant.  (*See* RT at 142-43.)  The upshot is that Claimant's own conduct contributed to the difficulties Respondent faced in collecting from CTG.

- At its sole expense, Respondent initiated a JAMS arbitration against CTG for the unpaid legal fees.  Although both sides were jointly responsible for the JAMS arbitration fees, Respondent was forced to pay CTG's share in addition to its own

because CTG refused to contribute.  (RT at 145.)  During the arbitration, Mr. Hart continued to negotiate with Ms. Chen in an effort to reach a settlement.  (RT at 144-45.)

- Respondent proceeded to enforce the JAMS award with the U.S. District Court for the Central District of California, a process that took seven to nine months. (RT at 229.)  It retained attorney Craig McLaughlin for this purpose, to the tune of three to five thousand dollars.  (RT at 229.)  The District Court issued a judgment in the amount of $470,217.06, which included filing costs but did not include Mr. McLauglin's legal fees.  (*See* Exh. R-072.)

- Thereafter, Mr. Hart continued to negotiate with Ms. Chen, but found that "she wasn't interested, she wasn't cooperating, she wasn't responding."  (RT at 144.)

- Respondent twice consulted with Lynn Primo, a collection attorney in the Maryland area, regarding collection efforts.  (RT at 230.)  The first consultation occurred when the JAMS demand against CTG was filed.  At that time, Ms. Primo estimated $3,000-$4,000 in costs to collect the judgment.  (RT at 231.) The second consultation occurred while the enforcement proceeding was pending in the District Court, at which point Mr. Hart was able to lay out the issues in greater detail.  (RT at 230.)  Ms. Primo advised that the matter was more complex than she had initially anticipated and revised her quote to $40,000.  (RT at 231.) At that point, Respondent did not have $40,000 in its operating account.  (RT at 232.)

- Even if Respondent had had $40,000 to pay Ms. Primo, Mr. Hart could not be certain that all or part of the CTG Judgment would actually be collected.  (RT at 269-70.)  CTG had already informed Mr. Hart it was having financial difficulty. (RT at 140.)  Claimant had also informed Mr. Hart that CTG "did not have a whole lot of money," which is why Mr. Hart often did not bill the time he worked on CTG matters.  (RT at 136.)  Because CTG's ability to pay was either doubtful or at best unknown, it was reasonable for Respondent to conclude that the costs and risks of collecting on the CTG Judgment outweighed its potential benefits. Claimant did not present evidence sufficient to rebut the reasonableness of Respondent's conclusion.  For example, she did not demonstrate that Respondent knew or should have known that CTG was, in fact, capable of paying the CTG Judgment.  She herself was unable to ascertain CTG's true financial condition and was unable to provide any credible evidence of the same.

- During the pendency of the JAMS arbitration against CTG and the enforcement proceeding, Claimant still retained the $205,965 that she had collected from CTG through her own firm, IP Advantages.  If this amount had been paid directly to Respondent, Respondent would have had more money in its operating account, which in turn could have been used to hire Ms. Primo or to further Respondent's collection efforts.  (*See* RT at 232-33.)

- Mr. Hart thereafter explored with Claimant's former counsel Jason Balogh the possibility of Claimant taking over collection efforts. (*See* RT at 146.) Mr. Hart made the following proposal, to which Claimant agreed in principle:

  We will let you take over collection efforts (see the lawsuit filed in U.S. District Court in Los Angeles), provided that (1) any funds received from [CTG] are directed to a mutually agreed upon neutral party's trust account for disbursement (based on Holly's previous misappropriation, she can't be trusted) and (2) both Apogee and Hill Wallack has approval on any settlement offers for less than the full amount of the JAMS award, which is what we would do with Holly as well if we continue the fight and get a settlement offer from Cathy Trading for less than the full amount of the JAMS award.

  (R-088, at 2; *see* R-089.) Over the next year, Mr. Hart and Mr. Balogh attempted to work out the details. (RT at 148.) During their last conversation in December 2020, Mr. Hart asked Mr. Balogh where the parties were with regard to Mr. Hart's proposal. (RT at 240.) Mr. Balogh responded, "I'm still waiting to hear back from Holly [Li]. (*Id*.) Respondent's offer remained open through March 2021, when Claimant filed the Demand in this case. (*See* RT 244.) Respondent continued to entertain the possibility of an assignment of the CTG Judgment to Claimant as late as December 2021 or January 2022. (RT at 247.)

- In response to the Arbitrator's suggestion in Order No. 17, Respondent made a proposal to assign the CTG Judgment to Claimant. (*See* Declaration of Paul N. Tauger in Support of Apogee's Post-Hearing Brief, at ¶ 2 & Exh. A.) It is unclear whether Claimant made her own proposal to Respondent. Regardless, no mutual agreement regarding assignment was reached.

For the foregoing reasons, Claimant has failed to prove her breach of contract claim by a preponderance of the evidence.

**B.  Is Respondent Liable for Breach of the Implied Covenant of Good Faith and Fair Dealing?**

By Order No. 14 dated March 9, 2023, Claimant's cause of action for breach of the implied covenant of good faith and fair dealing was construed as a claim sounding in breach of contract rather than in tort. It was therefore subsumed within Claimant's breach of contract claim, and any tort-based claim was summarily dismissed with prejudice.

**C.  Is Respondent Liable for Conversion?**

"Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." (*State Farm Mut. Auto. Ins. Co. v. Dep't of Motor Vehicles*, 53 Cal. App. 4th 1076, 1081 (1997).) In order for money

to be the subject of a conversion, "a plaintiff must prove a specific, identifiable sum of money that was taken from [her]." (*Greif v. Sanin*, 74 Cal. App. 5th 412, 449 (2022).)

Here, Claimant has no property interest, and therefore no right, in the CTG Judgment; thus, there was no property of hers that Respondent could have converted. Respondent is the only party with a right to the CTG Judgment. Claimant's right to compensation from the CTG Judgment is derivative—subject to the condition precedent of "collection." Because I have already determined that Respondent did not prevent collection and was not responsible for the failure to collect, Claimant's right to compensation never arose.

For the foregoing reasons, Claimant has failed to prove her conversion claim by a preponderance of the evidence.

### D. Is Respondent Liable for Breach of Fiduciary Duty?

"The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." (*Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995).)

Claimant cites *Fox v. Abrams*, 173 Cal. App. 3d 610, 611 (1985), for the proposition that because "Respondents and Claimant worked as attorneys in a law corporation together," they owe each other fiduciary duties. (Claimant's Post-Hearing Brief at 9.) This is only partly correct. *Fox* held that parties who were all shareholders in a law corporation owed each other fiduciary duties in much the same way that partners in a law partnership do. (*Fox,* 173 Cal. App. 3d at 174.) Here, although Claimant was entitled to use the "Partner" title, in actual fact she was an independent contractor with no equity stake in Apogee. (*See* Exh. R-11.) The Offer Letter also makes clear that she would be considered for equity partnership only in the future. (*Id*.)

Because Claimant was not a shareholder in Respondent, neither Hart nor Respondent owed her any fiduciary duties. In any event, Respondent was the law corporation, not just another shareholder; thus, even if Claimant were a shareholder, she cited no authority for the proposition that the law corporation *itself* owes fiduciary duties to lawyer-shareholders. (*See Salsgiver v. AOL Online, Inc*., 32 Fed. App. 894, 897 (9th Cir. 2002) ("[T]here is generally no fiduciary relationship between employee and employer").

Claimant further argues that, by acting on Claimant's behalf when pursuing CTG in arbitration for unpaid fees, Respondent and its principals somehow assumed fiduciary duties toward Claimant. But other than citing the "law of voluntary assumption," Claimant provided no authority for imposing such a duty on Respondent. In any event, Respondent did not act on Claimant's behalf when filing a JAMS arbitration against CTG and seeking to have the award in its favor enforced in federal district court; it acted on its own behalf. CTG was not Claimant's client; it was Respondent's. Claimant thus had no right to commence an arbitration against CTG at JAMS and no title to the arbitration

Page **13** of **23**

award or the resulting CTG Judgment.  Respondent therefore could not have acted on her behalf in pursuing CTG.

For the foregoing reasons, Claimant has failed to prove by a preponderance of the evidence that Respondent breached any fiduciary duties owed to her.

### E.  Is Respondent Liable under Bus. & Prof. Code § 17200 et seq.?

Claimant claims that Respondent's (1) misclassification of her employment status and (2) violation of Cal. R. Prof. Resp. 2-200 by splitting fees with her amount to an unlawful, unfair, or fraudulent business practice under Cal. Bus. & Prof. Code § 17200, et seq.

As to the first point, I find that Claimant was not misclassified.  The Offer Letter makes clear that it "was not an offer of employment as an employee, but as a contract 1099 attorney." (Exh. R-011, p. 1.)  The nature of Claimant's relationship with Respondent confirms as much.  During her tenure at Apogee, Claimant worked independently and was not directly supervised.  (RT at 177.)  She brought in her own clients, who then became clients of Apogee but were free to leave with her if Claimant chose to terminate her relationship with Apogee.  (*See* R-011, at 5.)  Claimant was solely responsible for the work she performed for those clients.  (RT at 177.)  Claimant worked remotely from an office she maintained in Hong Kong and was responsible for paying her own office lease.  (*See* RT at 18, 83, 180.)  She selected, hired and paid her own support staff.  (RT at 180.)  Respondent paid for "some support staffing" in Hong Kong and California but did not do so directly to the support staff.  (RT at 180.)  It also paid for malpractice insurance and some marketing support.  (R-011.)  There was no evidence that Claimant was on payroll or received any standard employee benefits.

As to the second point, Respondent did not engage in any "fee splitting" in violation of Rule 2-200 of the California Rules of Professional Conduct.  Rule 2-200 provides that "A member shall not divide a fee for legal services with a lawyer who is not a *partner of, associate of, or shareholder with the member*." (*Id*. (emphasis added).)  Claimant argues that she did not fall into any of these categories because she was a mere employee, and thus that Respondent violated Rule 2-200 by splitting fees with her in the manner contemplated in the Offer Letter.  An initial problem with this argument is that, had Claimant been an employee of Respondent (which she was not), she would have fallen squarely within the meaning of an "associate," in which case there would be no violation of Rule 2-200 at all.

As explained above, however, Claimant was in fact an independent contractor.  Respondent acknowledges that the phrase "partner of, associate of, or shareholder with" in Rule 2-200 does not apply on its face to independent contractors.  Nonetheless, Respondent cites Formal Opinion No. 1994-138 of the State Bar Standing Committee on Professional Responsibility and Conduct for the proposition that Rule 2-200 was "intended to address concerns related to forwarding or referral fees, typically found in contingency fee situations." (Respondent's Pre-Hearing Brief at 6.)  These fees are

problematic when they are paid to "outside lawyers" who are not employees of the firm providing the legal services.[1]  (*Id*.)

The Opinion went on to provide indicia of an "outside lawyer": "Other than working on particular matters, the outside lawyer has no other formal relationship with the law office or the client, and neither the law office nor the outside lawyer contemplate a permanent relationship."  *(Id*.)  This analysis was expressly adopted by the California Supreme Court in *Chambers v. Kay*.  (*See* 29 Cal. 4th 142, 149-50 (2002).)  The *Chambers* Court also found relevant the fact that the lawyers who split fees "maintained independent law practices with separate identities, separate addresses of record with the State Bar, and separate clients, expenses, and liabilities."  (*Id*. at 150)

Here, Claimant was not an "outside lawyer" to Respondent.  The Offer Letter clearly invites her to "join" the firm, gives her the title "Partner" (albeit a non-equity Partner), and contemplates Claimant being considered to become an equity partner in the future. (Exh. R-011.)  It does not provide that Claimant would be maintaining a separate law practice with a separate identity.  Respondent covered Claimant through its malpractice insurance, and provided marketing support and support staffing in Hong Kong and Southern California.  Claimant also used Respondent's letterhead in corresponding with clients and issuing bills. (*See*, *e.g.*, Exh. R-023.)  Any clients that Claimant brought to Respondent became Respondent's clients.

For the foregoing reasons, Claimant has failed to prove any predicate acts that would constitute a violation of Bus. & Prof. Code § 17200 et seq.

## F.  Is Respondent Liable in Quantum Meruit?

Claimant argues that, assuming Respondent engaged in impermissible fee splitting and misclassified her employment status, the Offer Letter would be rendered void and unenforceable.  (*See* Demand ¶ 83.)  In this event, she seeks the value of her services in *quantum meruit*.

Because I have already found and concluded the Respondent did neither of the things Claimant alleges, the Offer Letter stands.  And because I found no breach of the Offer Letter, *a fortiori* Claimant has no viable restitutionary claim in *quantum meruit*.

---

[1]    Rule 2-200 was eventually superseded by Rule 1.51 on November 1, 2018.  In place of "lawyer who is not a partner of, associate of, or shareholder with the member," Rule 1.51 substitutes the phrase, "lawyers . . . [who] are not in the same firm."  This language essentially tracks the Opinion's phrase, "outside lawyer," suggesting that the touchstone is whether the fees are being split with an "outside lawyer" who is "not in the same firm" rather than whether the lawyer counts as a "partner," "associate," or "shareholder."

(*See Oliver v. Campbell*, 43 Cal. 2d 298, 306 (1954) ("The remedy of restitution in money is not available to one who has fully performed his part of a contract, if the only part of the agreed exchange for such performance that has not been rendered by the defendant is a sum of money . . . .  In such cases he recovers the full contract price and no more.").)

For the foregoing reasons, Claimant has failed to prove her *quantum meruit* claim by a preponderance of the evidence.

### G.  To what remedies is Claimant entitled?

Because Claimant has failed to prove any of her causes of action, she is not entitled to any remedies.

### H.  Is Claimant Liable for Breach of Contract

Respondent and Counter-Claimant claims that Claimant breached the Offer Letter and/or the CTG Engagement Letter when (1) she billed CTG through her own company, IP Advantages, for services provided by Respondent and then (2) withheld from Respondent the $205,965 collected from CTG.

The CTG Engagement Letter signed by Robert Hart and Claimant identified CTG as a client of Respondent.  (*See* Exh. R-014.)  It provided, *inter alia*, that all payments should be sent to "the Firm" at Apogee Law Group P.C. 2020 Main Street, Suite 600, Irvine, CA 92614.  (*Id*.)  This was confirmed in transmittal letters, sent on Apogee letterhead and signed by Claimant, instructing CTG to "forward all payments to the following address: Apogee Law Group P.C., Attn: Accounting, 2020 Main Street, Suite 600, Irvine, CA 92656, (949) 862-8480."  (Exh. R-023.)

Although the Offer Letter does not specifically prohibit Claimant from billing CTG in her own capacity or through IP Advantages, I find that this was implied by the very nature of Claimant's relationship with Respondent.  A reasonable person in the position of Claimant would have understood that all billing to, and collections from, clients of Respondent would be done by Respondent.  The natural implication of the Offer Letter language explaining how to calculate Claimant's compensation assumes that amounts will be "collected" by Respondent first, before any disbursements were made to Claimant.

Claimant argues that Mr. Hart expressly approved of her issuing bills to CTG from IP Advantages when Mr. Hart replied, "Okay" after Claimant informed him on February 15, 2017, that, "[i]n order to work with the my client's [*sic*] preference, I invoiced her my time from IP Advantages for September, October, November and December 2016."  (Exh. C-002)  She also argues that she forewarned Mr. Hart that she would do so back in November 2016, but received no objection.  (*See* RT at 61-63; Exh. C-013.)

As Respondent correctly notes, however, Mr. Hart's "Okay" response came *after* Claimant had already issued the bills to CTG from IP Advantages; thus, except with respect to the two March 17, 2017, invoices (*see* Exh. R-25), the response could not have authorized Claimant to do so *ex ante*.  At most, it was an *ex post* ratification.  However, Mr. Hart testified that he did not intend to ratify Claimant's billing practices.  (*See* RT at 207-09.)  Mr. Hart's testimony on this point was credible.  Indeed, because it was not reasonable for Claimant to bill CTG through IP Advantages to begin with—especially given the potential liability, insurance, and malpractice issues Mr. Hart identified—it was not objectively reasonable for her to take his one-line " Okay" as either an authorization or a ratification thereof.

Claimant's November 16 emails and Mr. Hart's failure to object to them also do not justify Claimant's conduct.  (*See* Exh. C-013.)  The November 16 emails do not make explicit that Claimant intended to bill CTG from IP Advantages rather than from Apogee.  Nor would that have been a reasonable interpretation of the November 16 emails for the reasons identified above.

Although Respondent appears to seek the entire $205,965 as damages for this claim, Claimant is entitled to retain a large portion of this amount under the compensation arrangements outlined in the Offer Letter.  Respondent's recovery in breach of contract will accordingly be limited to $24,898—the remaining amount it is owed and that it would have received had Claimant fully performed under the Offer Letter.

For the foregoing reasons, Respondent and Counter-Claimant has proven its breach of contract claim by a preponderance of the evidence.

## I.   Is Claimant Liable for the Tort of Breach of the Covenant of Good Faith and Fair Dealing?

A cause of action for the tort of breach of the covenant of good faith and fair dealing "arises when the party not only breaches the contract but also denies *in bad faith* that a contract *even exists*."  (*Kruse v. Bank of America*, 202 Cal. App. 3d 38, 57-58 (1988) (emphasis added).)

I find that Claimant did not deny in bad faith that the Offer Letter exists.  Instead, she believed—albeit erroneously and unreasonably—that she had no practical alternative but to bill CTG from her own firm and/or that Mr. Hart had authorized or ratified her conduct.

For the foregoing reasons, Respondent and Counter-Claimant has failed to prove its tort claim for breach of the covenant of good faith and fair dealing by a preponderance of the evidence.

### J.  Is Claimant Liable for Conversion?

By Order No. 14, the Arbitrator already found in favor of Respondent on this cause of action.

### K.  Is Claimant Liable for Breach of Fiduciary Duty?

As explained in section IV.D *ante*, as a general rule, an employee/employer relationship does not normally give rise to fiduciary obligations.  Respondent has not argued any exception to this general rule.

For the foregoing reasons, Respondent and Counter-Claimant has failed to prove by a preponderance of the evidence that Claimant breached any fiduciary duties.

### L.  To What Damages is Respondent and Counter-Claimant Entitled?

In its Pre- and Post-Hearing Briefs, Respondent did not specifically denominate the amount of damages it seeks.  However, based on the evidence adduced at the Hearing, Respondent's submissions in connection with its Motion for Summary Judgment, and Order No. 14, Respondent is entitled to **$24,898** from Claimant.  This represents Respondent's 30% cut of the $205,965 invoiced to CTG and received by IP Advantages, minus amounts due to Respondent for overhead and travel, minus $25,000 that Claimant already returned to Respondent.  (*See* Exh. R-086.)

Claimant argues that she actually owes Respondent only $15,116, which is $24,898 minus (a) $ 8,610.00 for "Contractor Costs" and (b) $1,172.00 for "Court Reporter Costs."  (*See id.*)  Respondent did not respond to this argument.  Nonetheless, I construe Exhibit R-86 as merely an internal accounting that shows the net amount that Respondent would retain after all third parties were paid.  Because Respondent, not Claimant, would have been responsible for paying those third parties, Respondent would effectively be paying twice if Claimant were to further deduct those amounts from what she owes.

Respondent also prayed for punitive damages on its third cause of action for conversion.  In order to be entitled to punitive damages, Respondent must show that claimant acted with "oppression, fraud or malice."  (Cal. Civ. Proc. Code § 3294.)

Although Claimant's conduct was highly unorthodox, unprofessional, and unreasonable, on balance I find that Claimant did not act with oppression, fraud or malice.

### M. Does the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness Apply to this Matter?

On July 7, 2023, the Arbitrator issued a recommendation on this matter finding in favor of Respondent.  On July 10, the JAMS NAC adopted the Arbitrator's recommendation in full.

Because the JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness do not apply to this matter, Claimant shall pay her pro rata share of all costs of the arbitration, which defaults at 50%, including the Arbitrator's remuneration, incurred to date and going forward. Respondent has paid all such amounts to date. This determination does not preclude a further determination by the Arbitrator that these costs should be allocated in a different manner under Rule 24(f). (*See post*, section IV.O.)

### N. Respondent's Motion to Strike

On July 1, 2023, Respondent filed a Motion to Strike Declarations of Jason Balogh and Request for Sanctions. The Motion to Strike is GRANTED. The Request for Sanctions is dealt with below.

### O. Respondent's Motion for Sanctions

In addition to seeking sanctions for the improper filing of the two Balogh declarations, Respondent seeks sanctions against Claimant in connection with (1) Claimant's improper demand for relief on November 3, 2022; (2) Claimant's motion to compel discovery; (3) Claimant's motion for default judgment; (4) Claimant's submission entitled, "Proposed Conference Topics and Discovery Schedule"; (5) Claimant's Opposition to Respondent's Motion for Summary Judgment; (6) Claimant's conduct throughout the arbitration; and (7) Claimant's false representation that Claimant was an "Employee" of Respondent. (*See* Respondent's Post-Hearing Brief; Respondent's Motion to Strike Declarations of Jason Balogh and Request for Sanctions dated July 1, 2023.)

JAMS Rule 29 provides:

The Arbitrator may order appropriate sanctions for failure of a Party to comply with its obligations under any of these Rules or with an order of the Arbitrator. These sanctions may include, but are not limited to, assessment of Arbitration fees and Arbitrator compensation and expenses; assessment of any other costs occasioned by the actionable conduct, including reasonable attorneys' fees; exclusion of certain evidence; drawing adverse inferences; or, in extreme cases, determining an issue or issues submitted to Arbitration adversely to the Party that has failed to comply.

California Code of Civil Procedure section 128.7, cited by Respondent, does not apply in arbitration.

Respondent seeks some $15,900 in attorneys' fees for time spent responding to arguments or filings made by Claimant (in relation to one of the seven issues itemized above) that Respondent contends were frivolous or unjustified. Respondent also seeks $96,141.00 for "[Claimant's] conduct at the Final Hearing and Throughout this

Arbitration," which represents the total attorneys' fees invoiced to Respondent by its counsel Addy Hart in respect of this arbitration. (*See* Invoice from Addy Hart to Respondent dated September 21, 2023.)

Having considered the conduct complained of by Respondent, the Arbitrator finds that some, but not all, rise to the level of sanctionable conduct. Other than in connection with discreet instances of sanctionable conduct, the Arbitrator finds no basis for awarding Respondent the entirety of the invoiced attorneys' fees ($96,141.00), as this would represent an end run around the undisputed fact that there is no fee shifting clause in the Offer Letter.

The Arbitrator finds that Claimant had *prima facie* grounds for bringing her claims against Respondent even though she ultimately failed to prevail. However, as the Arbitrator remarked at various points during the life of this case, Claimant's conduct throughout was vexatious and had the effect of unnecessarily complicating and prolonging the proceedings. For example, Claimant unnecessarily and repeatedly attempted to re-litigate issues that had already been determined, such as Respondent's FTB suspension status or my lack of jurisdiction over the individual Respondents. She unreasonably interpreted the Offer Letter and her role at Apogee as creating an employer-employee relationship. She incorrectly claimed that she had not received any initial exchange from Respondent, even though she had not bothered to first check with her prior counsel, whom she had dismissed. Her lack of legal representation throughout most of these proceedings, moreover, caused her to misunderstand aspects of the arbitration procedure; this, in turn, caused additional delay and multiplied the number of her objections and filings. Her motion to compel discovery was largely unwarranted, and the Arbitrator specifically found that her "delay in issuing reformulated RFA 4 pending the Arbitrator's ruling on Respondent's suspension status was improper." (*See* Order No. 13.) At that time, the Arbitrator expressed

> concern[] that the number of filings in this case is disproportionate to the amount in dispute and the relatively straightforward nature of the claims and defenses. Claimant in particular is cautioned to avoid creating unnecessary disputes and delays, and is encouraged to seek representation by a California attorney who can help her navigate these proceedings in a more efficient and cost-effective manner.

(*Id*.)

Finally and perhaps most significantly, there was no basis whatsoever for Claimant to have withheld from Respondent the $24,898 she recouped from CTG. This amount was undeniably owed to Respondent, and it was unreasonable and unnecessary for Claimant to have continued to take a contrary position in this arbitration.

For the foregoing reasons, the Arbitrator determines that Claimant's conduct violated both the letter and spirit of the Rules and the Arbitrator's Orders. A reasonable sanction for the entirety of Claimant's vexatious conduct is to shift the Arbitration fees

and Arbitrator compensation and expenses entirely to Claimant pursuant to Rule 24(f). As of the date of this Final Award, these costs amount to **$57,980.06**.

### P.  Further Issues Raised by Respondent in its Supplement to Opening Brief

#### 1.  Prejudgment Interest

Section 3287 of the California Code of Civil Procedure provides, in pertinent part:

> A person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in the person upon a particular day, is entitled also to recover interest thereon from that day, except when the debtor is prevented by law, or by the act of the creditor from paying the debt.

The statutory rate for prejudgment interest due on a breach of contract award is ten (10) percent per annum.  (Cal. Civ. Proc. Code § 3287(c).)

#### a.  Prejudgment Interest on $24,898 Owed to Respondent

The difference between the amounts billed and collected by IP Advantages from CTG, and the $25,000 that Claimant later credited to Respondent ($24,898), is without doubt a sum certain that is not open to dispute.  Respondent is accordingly entitled to pre-judgment interest on this sum.  Interest began to run from December 15, 2016, the due date of the first two invoices from IP Advantages to CTG, which together exceed $24,898.  Claimant has not provided any evidence showing that she did not, in fact, receive funds exceeding $24,898 by December 2016.  Her objections largely re-argue matters that were already decided in the Partial Interim Award.

The amount of interest is calculated as follows:

- 10% of $24,898 = $2,489.80 / year = $6.82 / day

- 2,510 days from December 15, 2016 to October 30, 2023

- 2,510 * $6.82 = **$17,118.20**

#### b.  Prejudgment Interest on Claimant's Share of the Costs of Arbitration

When JAMS initially classified this matter as subject to the Employment Minimum Standards, it was due to the fact that "Claimant claim[ed] to have been misclassified as an independent contractor."  (*See* Letter dated March 20, 2023, from Sheri Eisner to the Parties (referencing Complaint ¶ 69 et seq.).)

Claimant's allegation that she was misclassified was objectively unreasonable. The Offer Letter states that "[y]our offer to join the Firm is not an offer of employment as an employee, but as a contract 1099 attorney" and that Claimant would be "a non-equity

partner with the title of 'Partner'" (Exh. R-011)  It also provided that Claimant would be compensated based on a percentage of the amount she billed and collected, plus an additional percentage for matters for which she was the originating attorney, with the remainder going to the Respondent and other Apogee attorneys.  (*Id*. at 2-4.)  For matters in which she was acting as the originating attorney, Claimant had the power to write off time and decide the hourly rate billed to her clients.  (*See* Exh. R-11.)  Thus, Claimant had both the power and responsibility to bill clients for whom she was the originating attorney.  This is consistent with the fact that Claimant's compensation was ultimately tied to "your collections."  (Exh. R-11.)  Indeed, there are other occasions on which Claimant billed CTG through Respondent and by using Respondent's letterhead.  (*See* Exh. R-023.)

At the same time, Respondent could have brought a motion regarding the misclassification much earlier.  Until that motion was heard and decided, Respondent had no "right to recover which is *vested* in the person upon a particular day," because JAMS had originally ruled against Respondent, and a further determination by the Arbitrator was required to reverse that ruling.  (*See* Cal. Code Civ. Proc. § 3287 (emphasis added).)

For the foregoing reasons, I find that Respondent has no right to prejudgment interest on the arbitration costs.  Claimant's unreasonable denial of her independent contractor status were factored into the assessment of sanctions.  (*See ante* section IV.O.)

### 2.      Punitive Damages

Because the Partial Interim Award already determined that Claimant did not act with oppression, fraud or malice (*see ante* section IV.L), Respondent's renewed request for punitive damages is DENIED.

## Q. Conclusion

For the foregoing reasons, Claimant has failed to establish by a preponderance of the evidence any of her claims against Respondent.  Respondent has established by a preponderance of the evidence its counterclaims for breach of contract and conversion and is entitled to **$24,898** in damages.  Respondent is also entitled to **$17,118.20** in prejudgment interest on this sum.  JAMS has adopted the Arbitrator's recommendation that the Employment Minimum Standards do not apply in this case.  The Arbitrator has furthermore shifted all costs of the Arbitration, in the amount of **$57,980.06**, to Claimant as a sanction.

///

///

///

///

**FINAL AWARD**

Claimant shall take nothing from Respondent.

Claimant shall pay Respondent $99,996.26.  Payment is due immediately. Interest on this sum will begin to accrue at 10% per annum as of the date of this Award.

       This Award determines all issues submitted for decision in this proceeding.  Any claims not expressly addressed in this Award are denied.

Dated: October 31, 2023

_____

Hiro N. Aragaki
Arbitrator

**Exhibit B**

DECLARATION OF PAUL N. TAUGER IN SUPPORT OF PLAINTIFF/PETITIONER APOGEE LAW GROUP P.C.'S OPPOSITION TO DEFENDANT/RESPONDANT HOLLY LI'S MOTION TO DISMISS

JAMS

5 PARK PLAZA, SUITE 400, IRVINE, CA 92614

HOLLY Y. LI                         )
                                    )  JAMS REFERENCE NO.
                                    )  1200058273
           CLAIMANT,                )
                                    )  ARBITRATOR:
                                    )  HIRO N. ARAGAKI, ESQ.
      VS.                           )
                                    )
APOGEE LAW FIRM, P.C., ET AL.,      )
                                    )
           RESPONDENT.              )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APRIL 7, 2023

(APPEARANCES ON THE FOLLOWING PAGE)

LISA A. AUGUSTINE, RPR, CSR #10419
OFFICIAL COURT REPORTER PRO TEMPORE

**HOLLY Y. LI vs APOGEE LAW FIRM, P.C., ET AL.**
**Hearing on 04/07/2023**                                                    Page 2

APPEARANCES OF COUNSEL


FOR THE CLAIMANT:

        HOLLY LI
        142 W. 57TH STREET
        11TH FLOOR
        NEW YORK, NEW YORK 10019
        HLI@INTELINKLAW.COM


FOR THE RESPONDENT:

        ADDYHART, P.C.
        BY: PAUL TAUGER
        5151 CALIFORNIA STREET
        SUITE 100
        IRVINE, CA 92617
        949-438-3218
        PTAUGER@ADDYHART.COM

        ADDYHART, P.C.
        BY: ROBERT HART
        401 N. MICHIGAN AVENUE
        SUITE 1200-1
        CHICAGO, IL 60611
        312-834-7701
        ROBERT@ADDYHART.COM


ARBITRATOR:

        HIRO N. ARAGAKI,  FCIARB, ESQ.
        MEDIATOR/ARBITRATOR/NEUTRAL EVALUATOR
        HARAGAKI@JAMSADR.COM
        555 WEST 5TH STREET
        32ND FLOOR
        LOS ANGELES, CA  90013
        213-620-1133

```
                          I N D E X


   EXAMINATION                                           PAGE

   HOLY LI

   DIRECT EXAMINATION                                    17
   CROSS-EXAMINATION                                     48

   ROBERT HART

   DIRECT EXAMINATION                                    110
   CROSS-EXAMINATION                                     171
   REDIRECT EXAMINATION                                  242
   RECROSS EXAMINATION                                   258


   EXHIBITS                    MARKED          RECEIVED

   C-021 - DOCUMENT                             33
   C-022 - DOCUMENT                             34
   R-201 - DOCUMENT            73               73
   R-203 - DOCUMENT            226              227
```

IRVINE, CALIFORNIA - FRIDAY, APRIL 7, 2023

MORNING SESSION

* * * * *

(9:09 A.M.)

THE ARBITRATOR:  LET'S GO ON THE RECORD.

GOOD MORNING, EVERYONE.  WE'RE HERE IN THE MATTER OF HOLLY LI VERSUS APOGEE.  AND WE HAVE A COUPLE HOUSEKEEPING MATTERS TO TAKE CARE OF FIRST BEFORE WE BEGIN.  AND MAINLY THE MOTION IN LIMINE OF MR. TAUGER AND ANY OTHER ISSUE YOU WANTED TO RAISE RELATING TO THE EXHIBITS.

SO PLEASE GO AHEAD, MR. TAUGER.

MR. TAUGER:  THANK YOU.  FIRST WE WERE DISCUSSING THE ADMISSION OF A DECLARATION WHICH WE HAVE NOT SEEN BY MS. LI, AND I OBJECT MOST STRENUOUSLY ON THE GROUNDS THAT NUMBER ONE, MR. RUBIO IS NOT ON HER WITNESS LIST AND, YOUR HONOR, I PRINTED OUT HER LAST EMAIL LISTING WITNESSES.

NUMBER TWO, IT IS A HEARSAY DECLARATION SINCE THE WITNESS IS NOT HERE.

NUMBER 3, IF YOU WANTED TO HAVE HIM APPEAR, MS. LI SHOULD HAVE SERVED A NOTICE OF APPEARANCE.  AND I'D LIKE TO MAKE A GENERAL OBSERVATION UNDER CALIFORNIA LAW PRO SES AND PRO PERS ARE HELD TO THE SAME STANDARDS AS ATTORNEYS IN THESE PROCEEDINGS.

AND I'D ADD TO THAT NOT ONLY WOULD MS. LI BE

HELD TO THE SAME STANDARD AS I AM AND AS MR. HART IS AS A PRO SE, SHE'S ALSO AN ATTORNEY, ALBEIT ONE NOT LICENSED IN THIS JURISDICTION, AND I'M NOT INCLINED TO GRANT HER ANY LEEWAY IN THIS REGARD.

THE ARBITRATOR:  MS. LI, CAN --

MS. LI:  CAN I RESPOND?

THE ARBITRATOR:  YES, OF COURSE.

MS. LI:  FIRST OF ALL, I DID NOT SUBPOENA HIM BECAUSE HE IS LISTED AS THE CEO, AT LEAST FROM THE MOST RECENT COPY OF CORPORATE DOCUMENTS I HAVE OBTAINED OR MY PREVIOUS COUNSEL OBTAINED, AND SO HE IS ACTUALLY ONE OF THE PRINCIPAL OF THE RESPONDENT, THE PARTY.  HE'S A PARTY WITNESS.

SECOND, MR. TAUGER HAD LISTED HIM AS A WITNESS.  THAT'S WHY I WAS UNDER THE IMPRESSION THAT I COULD DO CROSS-EXAMINATION OF HIM.

AND THIRDLY, THE DECLARATION WAS PREVIOUSLY PRODUCED IN THIS PROCEEDING AS PART OF THE DOCUMENTS THAT WAS ALREADY PART OF THIS PROCEEDING.

AND LAST, BUT NOT LEAST, EVEN THOUGH MY POSITION AND CLAIMANT MAY BE PREJUDICED FOR NOT PRODUCING THIS PIECE OF -- FOR NOT INTRODUCING THE DISTRIBUTION, I DO NOT WANT TO HANG ON THIS TOO LONG IN WHICH CASE SPENDING TOO MUCH TIME ON THIS POINT.

THE ARBITRATOR:  SO MS. LI, LET ME ASK YOU A

QUESTION.  YOU SAID THAT YOU HAD PREVIOUSLY DISCLOSED THIS DECLARATION TO THE OTHER SIDE, SO IS THAT PART OF YOUR --

MS. LI:  YES, I PRODUCED -- I PRODUCED THIS DECLARATION WITH MY SUBMISSION TO THIS TRIBUNAL REPORTING MR. TAUGER AND MR. HART BECAUSE BOTH OF THEIR NAMES ARE ON THE RECORD REPRESENTING MR. RUBIO WITHOUT HIS CONSENT.

THE ARBITRATOR:  THANK YOU, MS. LI.

MS. LI:  I DID SUBMIT IT.

THE ARBITRATOR:  THANK YOU.  JUST HOLD ON A SECOND.

SO DO YOU RECALL RECEIVING THIS DECLARATION?

MR. TAUGER:  I HAVE NO IDEA WHAT SHE'S REFERRING TO.  IT'S NOT IN THE LATE-PRODUCED DOCUMENTS.

MS. LI:  I CAN --

MS. TAUGER:  EXCUSE ME, MS. LI, I AM SPEAKING.

MS. LI:  I CAN --

MR. TAUGER:  MS. LI, PLEASE.

THE ARBITRATOR:  MS. LI, MR. TAUGER IS STILL FINISHING HIS SENTENCE.  YOU WILL GET A CHANCE TO RESPOND IN JUST A MINUTE.

MR. TAUGER:  I RECALL THAT MS. LI, IN CONNECTION WITH PERHAPS INITIAL DISCLOSURES OR MAYBE ONE OF HER MANY MOTIONS, I THINK THERE MAY HAVE BEEN A DECLARATION FROM MR. RUBIO.  I DON'T RECALL EXACTLY.  I HAVE NO IDEA WHAT THE CONTENTS ARE, BUT I STAND BY MY OBJECTION.

MY OBJECTION IS SHE COULD HAVE NOTICED HIM TO APPEAR; SHE DIDN'T.  SHE COULD HAVE PUT HIM ON HER WITNESS LIST; SHE DIDN'T.  THERE'S JUST NO GROUND FOR CALLING HIM, AND THERE'S NO GROUNDS FOR ADMITTING THIS DECLARATION.

THE ARBITRATOR:  SO WHAT I WOULD SAY IS I'D LIKE TO SEE THIS DECLARATION, AND I'D LIKE TO SEE -- I'D LIKE TO ASCERTAIN WHETHER IT WAS ACTUALLY PRODUCED BEFOREHAND TO MR. TAUGER.  I DON'T THINK WE NEED TO DO THIS NOW, THOUGH.

IT MAY BE THAT, MS. LI, YOU DON'T REALLY HAVE A NEED TO CALL HIM OR TO SUBMIT THE DECLARATION AFTER ALL.  I THINK IT'S SOMETHING THAT WE CAN PROBABLY TALK ABOUT DURING THE LUNCH BREAK, OR I COULD REVIEW DURING THE LUNCH BREAK.

MS. LI:  YES.

THE ARBITRATOR:  SO I WOULD SAY BETWEEN NOW AND THE LUNCH BREAK, MS. LI, PLEASE RECIRCULATE THAT DECLARATION TO MR. TAUGER AND TO MYSELF SO WE CAN TAKE A QUICK LOOK AT IT FIRST AND THEN I'LL MAKE SOME KIND OF A RULING ON IT DURING THE LUNCH HOUR.

MS. LI:  YES.

THE ARBITRATOR:  I DON'T THINK WE SHOULD CONSUME MUCH MORE TIME NOW ON THIS ISSUE.

MS. LI:  OKAY.  I WILL -- I WILL HOPEFULLY

IDENTIFY THE JAMS SUBMISSION.  IT'S IDENTIFIED ON THE RECORD ELECTRONICALLY THAT I SUBMITTED THE DECLARATION ALONG WITH MY COMMUNICATION TO MR. TAUGER AND YOUR HONOR IN NOVEMBER -- AROUND NOVEMBER -- BETWEEN OCTOBER TO NOVEMBER 2022.

THE ARBITRATOR:  OKAY.  GREAT.  UNDERSTOOD.

MS. LI:  IT WAS PART OF THE INITIAL DISCLOSURE.

THE ARBITRATOR:  UNDERSTOOD.  OKAY.  LET'S MOVE ON FROM THIS TOPIC.  I THINK THE NEXT TOPIC IS?

MR. TAUGER:  MY MOTION IN LIMINE, YOUR HONOR.

THE ARBITRATOR:  YES.

MR. TAUGER:  PER YOUR ORDER WAS THE FINAL STATUS CONFERENCE ORDER NUMBER 16, I BELIEVE.  DOCUMENTS WERE TO BE EXCHANGED BY TUESDAY OF THIS WEEK.  I FORGET THE DATE, AND I APOLOGIZE.  WE DID OUR INITIAL PRODUCTION EARLY IN THE AFTERNOON/EARLY EVENING AND WE DID A SUPPLEMENTAL FINAL AT ABOUT 9:30 P.M. OUR TIME, BUT WELL WITHIN COMPLIANCE.

AT THAT TIME I ALSO WROTE MS. LI AN EMAIL SAYING YOU'RE REQUIRED TO PRODUCE, YOU HAVEN'T, AND IF YOU DON'T, I'M GOING TO MOVE IN LIMINE.

MS. LI DID NOT PROVIDE DOCUMENTS UNTIL THE FOLLOWING DAY AT 8:30 P.M.  WHICH LEFT ME EXACTLY THURSDAY TO REVIEW THEM WHEN I WAS PREPPING WITNESSES AND TRYING TO PREPARE FOR TRIAL.  IT WAS HIGHLY PREJUDICIAL.  IT WAS

VIOLATIVE OF YOUR ORDERS.  IT WAS VIOLATIVE OF ORDER FIVE

AND IT'S VIOLATIVE OF JAMS RULES, AND I THEREFORE MOVE TO

EXCLUDE ALL OF HER EXHIBITS.

THE ARBITRATOR:  SO LET ME JUST ASK YOU,

MR. TAUGER.  SO THERE WAS A PRODUCTION THAT SHE DID ON THE

4TH, IT SOUNDS LIKE, BY 6:00 OR 7:00 OR 8:00 P.M.  AND

THEN THERE WAS A SUBSEQUENT PRODUCTION OR DISCLOSURE, I

GUESS, ON THE 5TH.

MR. TAUGER:  NO, THAT'S NOT CORRECT, YOUR HONOR.

THE ARBITRATOR:  OKAY.

MR. TAUGER:  OUR PRODUCTION WAS ON THE 4TH WHICH

WAS THE DEADLINE FOR PRODUCTION, AND WE MADE TWO.  WE MADE

ONE EARLY EVENING AND ONE LATER EVENING WHEN I FOUND SOME

ERRORS ON THE FIRST ONE.  AT THAT TIME I EMAILED MS. LI.

I DID NOT GET HER DOCUMENTS UNTIL WEDNESDAY, 8:30 P.M.

THAT'S THE 5TH.

THE ARBITRATOR:  I SEE.

OKAY.  MS. LI, YOUR RESPONSE?

MS. LI:  YES.  I'D LIKE TO POINT OUT THAT IN ORDER

TO GIVE MR. TAUGER THE CHANCE AND TO MEET THE DEADLINE

SPECIFIED ON ORDER 16, WHICH IS THE MOST LATEST ORDER THAT

I MUST -- PARTIES EXCHANGE EXHIBITS THEY INTEND TO USE.  I

SEND THE LINK TO MY EXHIBITS TO MR. TAUGER WELL BEFORE THE

MIDNIGHT DEADLINE OF APRIL 4, 2023.

AND SUBSEQUENTLY I ACKNOWLEDGE MY UNSKILLFUL

PARALEGAL SKILLS, WHICH I'M NOT ONE, AND ALSO THE COMMAND OF ALL OF THIS FANCY ADOBE OR ANY OTHER TOOLS THAT I DID NOT AND WAS NOT ABLE TO PUT A ADEQUATE OR NOTICEABLE MARKING ON MY EXHIBITS.

THAT'S WHY OVERNIGHT I SOLICITED A PARALEGAL TO HELP ME, BUT EVERY PARALEGAL WAS ASSIGNED WITH SOME SORT OF TASK.  SO UNTIL THE NEXT DAY, APRIL 5TH, I, AT MY UTMOST EFFORT, FOUND A PARALEGAL TO HELP ME TO MARK THE EXHIBITS WITH THE REQUIRED SYMBOL C, AND I UPLOADED TO A VERY EASY DOWNLOADABLE SECURED SERVER PROVIDED BY MICROSOFT.

ON THE OTHER HAND --

THE ARBITRATOR:  MS. LI, LET ME INTERRUPT YOU FOR JUST A MINUTE.  I CAN'T SEEM TO FIND THE EMAIL NOW, BUT I THOUGHT THERE WAS ACTUALLY AN EMAIL SAYING WHERE YOU HAD PROVIDED MR. TAUGER THE LINK ON THE 4TH AND THEN DID YOU NOT PROVIDE --

MR. TAUGER:  I HAVE MISSPOKEN, AND I APOLOGIZE TO THE TRIBUNAL AND TO MS. LI.

MS. LI:  I HAVE ALL --

MR. TAUGER:  EXCUSE ME, MS. LI.

THE ARBITRATOR:  OKAY.  JUST A MINUTE, MS. LI. LET'S WAIT FOR PEOPLE TO FINISH TALKING BEFORE WE INTERJECT.

MS. LI:  I'M SORRY.  I COULDN'T HEAR WHAT

MR. TAUGER WAS SAYING ACTUALLY.

MR. TAUGER:  I WAS SAYING YOU WERE RIGHT, SO HOLD ON A SECOND.

MS. LI:  THANK YOU, MR. TAUGER.

MR. TAUGER:  MS. LI DID, INDEED, SEND ME A LINK.

THE ARBITRATOR:  I CAN'T SEEM TO FIND THAT EMAIL ANYMORE.

MR. TAUGER:  I HAVE THAT EMAIL WHICH IS WHAT I'M GOING TO PRINT OUT FOR YOU RIGHT NOW.

THE ARBITRATOR:  IF THAT'S TRUE, I GUESS, MR. TAUGER, MY QUESTION WOULD BE HOW IS THE LINK THAT YOU PROVIDED ON THE 4TH DIFFERENT FROM THE ONE ON THE 5TH?

MR. TAUGER:  THERE WERE A SERIES OF FILES THAT WERE PAGE RANGES.

THE ARBITRATOR:  OKAY.

MR. TAUGER:  FROM HER BATES STAMPING, I GUESS, PRIOR.

MS. LI:  MAY I --

MR. TAUGER:  NO, YOU CAN WAIT.  I'M SORRY.

THE ARBITRATOR:  MS. LI?  MS. LI?  THIS IS NOT GOING TO WORK IF YOU KEEP INTERRUPTING.

MS. LI:  OKAY.  I APOLOGIZE.

THE ARBITRATOR:  SO PLEASE LET THE SPEAKER FINISH THEIR SENTENCE.  AND IF IT'S REALLY SOMETHING URGENT WHERE YOU CAN'T HEAR THEM OR SOMETHING LIKE THAT, YOU KNOW,

RAISE YOUR HAND AND WE'LL CALL ON YOU, BUT IT'S NOT VERY PRODUCTIVE WHEN SOMEONE IS SPEAKING AND YOU'RE TALKING OVER THEM.  OKAY.

          MS. LI:  I APOLOGIZE.

          MR. TAUGER:  THIS WAS NOT JUST A QUESTION OF NOT BEING MARKED C-01.  THIS WAS A QUESTION OF PROVIDING -- THERE WERE PAGE RANGES THAT NAME -- THE NAMES OF THE FILE, SO IT WOULD BE LIKE LI 00474 THROUGH LI 000976.  THERE WERE JUST A BUNCH OF PAGES, AND I HAVE NO IDEA WHICH WERE SUPPOSED TO BE EXHIBITS, IF THEY WERE COMPOSITE EXHIBITS, IF THEY WERE SEPARATE EXHIBITS.  THERE WAS EVEN A DUPLICATED FILE NAME.  I DON'T REMEMBER WHAT IT SAID.  BUT THAT'S WHY I SENT HER THIS EMAIL.

          AND ADDRESSING WHAT SHE SAID ABOUT PARALEGALS.  I DON'T UNDERSTAND AT ALL BECAUSE SHE USED AN INTERLINK PARALEGAL TO PREPARE THESE.  I SAW HIS NAME, AND I SAW INTERLINK WHEN I DOWNLOADED THE FINAL ONES.

          WE ALSO USED A PARALEGAL AND THAT PARALEGAL WAS PAID FOR OUT OF THE POCKET OF THE PRINCIPALS OF APOGEE.  MR. HART AND MR. GULLIVER PAID FOR THEM JUST LIKE MS. LI SAID SHE HAD TO PAY FOR HER PARALEGAL.  SO I CANNOT ACKNOWLEDGE ANY DIFFICULTY ON HER PART.

          AND, AGAIN, I REFERENCE CALIFORNIA LAW. SHE'S HELD TO THE SAME STANDARD.  YOU DON'T GET TO COME IN AND MAKE EXCUSES UNLESS THERE'S A REALLY COMPELLING

REASON.  HER LACK OF FAMILIARITY WITH PDFS IS NOT A
LEGITIMATE EXCUSE.

THE ARBITRATOR:  LET ME ASK YOU, MR. TAUGER, IT'S
A LITTLE BIT HARD FOR ME TO IMAGINE, SIR, BY WHAT YOU MEAN
BY THE PAY RANGES HERE, BUT THAT'S FINE.  YOU DON'T NEED
TO PULL THAT UP NOW.

TO WHAT DEGREE ARE THESE DOCUMENTS THAT
YOU'RE ALREADY FAMILIAR WITH THAT YOU'VE SEEN BEFORE?

MR. TAUGER:  IN MY QUICK REVIEW OF THEM LAST NIGHT
BEFORE I WENT TO BED, THERE WERE SOME DOCUMENTS THAT
OVERLAP OUR OWN, THERE WERE SOME DOCUMENTS I HAVE NOT
SEEN, AND THERE WERE SOME DOCUMENTS THAT WERE EXPRESSLY
AND SPECIFICALLY PRECLUDED BY YOUR ORDERS.

THE ARBITRATOR:  I SEE.  OKAY.  SO AGAIN, IT
SOUNDS LIKE SOME OF THIS IS FAMILIAR TERRAIN TO YOU.  SOME
OF IT WOULD BE EXCLUDABLE ANYWAY BECAUSE IT'S VIOLATIVE OF
THE ORDER.

MY CONCERN, MR. TAUGER, WOULD JUST BLANKET
EXCLUDING ALL HER EXHIBITS IS THAT IT REALLY HAMPERS HER
ABILITY TO PRESENT ANY KIND OF CASE AT ALL.  AND I DON'T
KNOW THAT THAT IS EVEN IN YOUR BEST INTEREST, FRANKLY,
BECAUSE OF THE STANDARDS OF REVIEW FOR ARBITRAL AWARDS.

TO THE EXTENT THESE ARE EXHIBITS THAT YOU'RE
EITHER ALREADY FAMILIAR WITH OR PART OF YOUR PRODUCTION TO
BEGIN WITH, I THINK THERE'S NO HARM IN INTRODUCING THOSE

DOCUMENTS.  TO THE EXTENT THEY ARE EXHIBITS THAT YOU'RE SEEING FOR THE FIRST TIME AND THEY WERE NOT MEANINGFULLY KIND OF BROUGHT TO YOUR ATTENTION ON THE 4TH, WHICH WAS THE DEADLINE, THEN I THINK WE CAN JUST HANDLE THOSE EXHIBITS ON A CASE-BY-CASE BASIS.  THAT WOULD BE MY SUGGESTION.

MR. TAUGER:  THAT WILL BE FINE AS LONG AS I CAN RESERVE MY RIGHT TO OBJECT --

THE ARBITRATOR:  OF COURSE.

MR. TAUGER:  -- UPON INTRODUCTION.

THE ARBITRATOR:  OF COURSE.

MR. TAUGER:  I WOULD NOT HAVE A PROBLEM WITH THAT, YOUR HONOR.

THE ARBITRATOR:  OF COURSE.  YOU KNOW, MY PRACTICE AS AN ARBITRATOR -- OH, HI.

HI, SARAH.

MS. SARAH:  HI.  ARE WE OKAY WITH THE AUDIO ISSUE?

THE ARBITRATOR:  MS. LI, ARE YOU ABLE TO HEAR US WELL?

LET'S GO OFF THE RECORD JUST A SECOND WHILE WE DEAL WITH THIS ISSUE.

(BRIEF PAUSE.)

THE ARBITRATOR:  LET'S GO BACK ON THE RECORD.

ALL RIGHT.  JUST TO ROUND OUT THIS DISCUSSION, MS. LI, YOU WILL BE ABLE TO INTRODUCE YOUR

EXHIBITS, BUT MR. TAUGER WILL ALSO HAVE AN OPPORTUNITY TO OBJECT TO THE EXTENT HE IS NOT FAMILIAR WITH THE EXHIBITS AND DID NOT HAVE AN OPPORTUNITY TO REALLY REVIEW THEM PRIOR TO THE HEARING.  WE'LL JUST TAKE THOSE ON A CASE-BY-CASE BASIS.  MY SENSE IS THAT THERE WILL NOT BE A WHOLE LOT OF THEM, BUT LET'S NOT SPEND TOO MUCH TIME NOW TALKING ABOUT THIS ISSUE.  LET'S JUST DEAL WITH IT AS IT ARISES.  OKAY?

MR. TAUGER:  THAT'S FINE.

THE ARBITRATOR:  ANYTHING ELSE WE SHOULD DISCUSS BEFORE PROCEEDING?

MS. LI:  I DO HAVE ONE MORE POINT RELATED TO THE LAST THREE EXHIBITS I INTEND TO INTRODUCE, BUT MR. TAUGER MAY OBJECT.  I THINK FOR FAIRNESS I WOULD ALSO BE GLADLY TO TAKE THEM DOWN BUT, HOWEVER, THIS IS RELATED TO THE THIRD-PARTIES WITNESS SUBPOENA.

I PROVIDED THE LATE-RECEIVED AFFIDAVITS AND EVIDENCE AND DUE DILIGENCE CERTIFICATES FROM TWO -- THREE PROCESS SERVERS.  TWO ON THE GROUND, ONE BY ELECTRONIC MEANS.  THE ELECTRONIC MEANS WAS RECEIVED; HOWEVER, THAT WAS DURING DEPOSITION PERIOD.  ON THE LAST ROUND OF SERVICE ATTEMPTS, THE PROCESS SERVER MADE FOUR ATTEMPTS TO --

THE ARBITRATOR:  MS. LI, LET ME JUST CLARIFY.  ARE YOU SAYING THE LAST THREE EXHIBITS ALL HAVE TO DO WITH

SERVICE OF PROCESS ON THE THIRD PARTY?

MS. LI:  YES.  CORRECT.

THE ARBITRATOR:  OKAY.  SO WHAT I WOULD SUGGEST WHY DON'T YOU JUST EMAIL THEM TO MR. TAUGER.  HE CAN MAYBE REVIEW THEM DURING THE BREAK.  IT SOUNDS LIKE THEY'RE NOT PARTICULARLY WEIGHTY DOCUMENTS TO BEGIN WITH, AND LET'S JUST DEAL WITH THOSE ISSUES AS NECESSARY.

MR. TAUGER:  MAY I ASK ARE THOSE THE ONES THAT ARE MARKED AS C-24, 25, 26?

MS. LI:  YES.

MR. TAUGER:  OH, OKAY.  I HAVE NO OBJECTION AT ALL TO 25 AND 26 COMING IN.  AND -- I'M SORRY, 24 AND 25 COMING IN.  LET ME TRY THAT AGAIN.  I'M SORRY.  WITHDRAW THAT.

I HAVE NO OBJECTION TO EXHIBITS 25 AND 26 COMING IN.  I DON'T UNDERSTAND THE RELEVANCE OF 24, AND I WOULD OBJECT ON 352.

THE ARBITRATOR:  OKAY.  SO AGAIN, LET'S COME TO THAT ISSUE IF AND WHEN MS. LI DECIDES SHE WANTS TO TRY TO INTRODUCE THEM.  OKAY?

MR. TAUGER, ANYTHING ELSE ON YOUR PART?

MR. TAUGER:  NOTHING ON MY PART, YOUR HONOR.

THE ARBITRATOR:  GREAT.  IT IS NOW 9:30 A.M., AND I THINK WE ARE NOW READY TO BEGIN WITH MS. LI'S CASE-IN-CHIEF.

WE DECIDED TO WAIVE ORAL OPENING STATEMENTS, SO MS. LI, YOU MAY BEGIN.

DIRECT EXAMINATION

MS. LI:  YES.  GOOD MORNING, YOUR HONOR.  GOOD MORNING, MR. TAUGER AND MR. HART.

MY NAME IS HOLLY LI.  AGAIN, I'M A LAWYER LICENSED TO PRACTICE IN NEW YORK, NEW JERSEY USPTO AND SOME DISTRICT COURTS.

THE COURT REPORTER:  I'M SORRY.  NEW JERSEY AND WHERE?

THE ARBITRATOR:  SORRY, MS. LI.  THE COURT REPORTER COULD NOT HEAR YOU.

MS. LI:  OH, I'M SORRY.  I APOLOGIZE.  I WILL SPEAK OUT AGAIN.

THE ARBITRATOR:  OKAY.  MS. AUGUSTINE, DO YOU WANT TO JUST TELL HER --

MS. LI:  MY NAME IS HOLLY LI.  I'M A LAWYER LICENSED TO PRACTICE IN NEW YORK, NEW JERSEY, PTO AND VARIOUS DISTRICT COURT.

SO THE HISTORY IS THAT I CAME TO KNOW APOGEE LAW GROUP, APOGEE, THE RESPONDENT, IN 2016, THROUGH MR. ROBERT HART.  I'VE KNOWN ROBERT HART WHILE I -- WHEN I WAS WORKING AS IN-HOUSE COUNSEL IN SOUTHERN CALIFORNIA FOR A TECH COMPANY.  AND I ALSO KNEW THAT AT THE TIME AND THROUGHOUT THE PROCESS I WAS WORKING FOR APOGEE, MR. HART

WAS A RESIDENT OF ORANGE COUNTY, CALIFORNIA.

IN 2009 --

MR. TAUGER:  OBJECTION.  LACK OF FOUNDATION.

MS. LI:  WHAT?  YOU SAID SOMETHING?

MR. TAUGER:  I'M SORRY.  I SAID OBJECTION.  LACK OF FOUNDATION.  AND THAT WAS WITH RESPECT TO YOUR CONTENTION THAT MR. HART WAS A RESIDENT OF SOUTHERN CALIFORNIA.

THE ARBITRATOR:  OVERRULED.

MS. LI:  OKAY.  I'M TESTIFYING TO MY FIRST INSTANCE KNOWLEDGE.

IN 2009 I FOUNDED AN IP ASSET ADVISORY FIRM CALLED IP ADVANTAGES.  SUBSEQUENTLY, I ALSO COFOUNDED AN IP LAW PRACTICE WITH FIVE OTHER LAWYERS.  OUR PRACTICE WAS BASED IN VIRGINIA NEXT TO THE USPTO FOR THE LAW PRACTICE, BUT MY ADVISORY FIRM WERE BASED IN CONNECTICUT, AND SUBSEQUENTLY I FOUNDED ANOTHER ADVISORY FIRM IN HONG KONG WHEN I RESIDED THERE.

IN 2016 I WAS LOOKING FOR A NEW LAW PRACTICE ENVIRONMENT TO GROW MY LITIGATION PRACTICE.  THIS IS ALSO AT THE SAME TIME CATHY TRADING SOLICITED ME TO REPRESENT THE COMPANY IN TWO DEFENSIVE ACTIONS IN NEW JERSEY DISTRICT COURT.

AND PRIOR TO THAT I GOT OTHER SOLICITATIONS OF CLIENTS FOR ALSO IP LITIGATION CASES, BUT BECAUSE OF MY

LIMITATION AT THE PREVIOUS LAW FIRM I CO-FOUNDED, THE LIMITATION IS THAT FIRM WAS FOCUSED ON IP TRANSACTIONAL WORK.  THERE WERE NO LITIGATION SUPPORT.  THERE WERE NO LITIGATION SUPPORT.  SUBSEQUENTLY, THEY DID OBTAIN LITIGATION SUPPORT.

SO I COMMUNICATED WITH MR. HART WHO, AT THE TIME, TOLD ME THAT HE WAS STARTING A NEW LAW FIRM WITH HIS PARTNERS, AND HE TOLD ME THE FIRM'S STRUCTURE ROUGHLY AND ALSO THE NAME, THE APOGEE, AND HE HAD ALSO TOLD ME THAT THE INTENTION IS TO EXPAND THEIR PRACTICES THROUGHOUT THE NATION IN THE U.S. AND ALSO IN ASIA.

WHILE I WAS RESIDING IN HONG KONG, I ALWAYS KEPT AN INTEREST IN DEVELOPING U.S. PRACTICE AND ALSO EXPAND TO GREATER CHINA AND ASIA MARKET.  THAT'S WHY I SPARKED -- MR. HART'S REPRESENTATION OF APOGEE SPARKED MY GREAT INTEREST IN JOINING THE FIRM.

AND IN ADDITION, MR. HART ALSO TOLD ME THAT THE FIRM, APOGEE, WILL BE FOCUSED ON IP AND CORPORATE LAW PRACTICE, WHICH IS ANOTHER AREA I WAS INTERESTED.  AND THE FIRM WOULD BE PROVIDING BILLING, ACCOUNTING, DOCKETING AND ASSOCIATED PARALEGAL SUPPORT.  AND GIVEN THE URGENCY OF TAKING ON CATHY TRADING'S CASES AND ALONG WITH SOME OTHER CASES, I DECIDED TO JOIN APOGEE SWIFTLY.

AND ALSO, I HEAVILY RELIED ON MR. HART'S REPUTATION OF WHAT APOGEE CAN DO.  I TRUSTED HIS WORDS.

AND I ALSO REQUESTED TO HAVE A CONVERSATION WITH HIM AND

HIS PARTNERS WHILE THE WORD PARTNER BEING PRESENTED TO ME

BY MR. HART.  I UNDERSTOOD THAT THEY WERE PARTNERS; I.E.,

MR. RUBIO, MR. GULLIVER, AND PERHAPS ONE OTHER LAWYER,

WHICH I DON'T RECALL THE NAME.

SO SHORTLY AFTER I STARTED WORKING AT APOGEE

IN APRIL OF 2016, I DISCOVERED THAT MANY OF MR. HART'S

REPRESENTATIONS OF APOGEE WERE NOT TRUE.

THE ARBITRATOR:  OH, I THINK YOU'RE FROZEN.

MS. LI, YOU WERE FROZEN FOR ABOUT 30 SECONDS THERE, SO WE

DIDN'T CATCH ANYTHING YOU SAID FOR THE PAST 30 SECONDS OR

SO.

MS. LI:  I WILL REPEAT.  SO DID YOU HEAR FROM

SHORTLY AFTER I STARTED WORKING AT APOGEE IN APRIL 2016.

THE ARBITRATOR:  YES.  AND THEN YOU SAID MANY OF

THE REPRESENTATIONS TURNED OUT NOT TO BE TRUE.  THAT WAS

THE LAST THING WE HEARD.

MS. LI:  CORRECT.  YES.  SO I GIVE EXAMPLES SUCH

AS THERE WAS NO ADEQUATE DOCUMENTING SUPPORT THAT USPTO

DEADLINES WERE MISSED FOR SEVERAL OF MY CLIENTS, AND SOME

OF THE CLIENTS HAD SOON LEFT APOGEE AFTER I TRANSFERRED

THEM TO APOGEE.

SO WHAT IS THE MOST ASTONISHING TO ME AT

THAT TIME IS THAT APOGEE REPEATEDLY FAILED TO ISSUE

INVOICES TIMELY.  WHAT I MEAN TIMELY MEANING THAT WITHIN

30 DAYS OF RECORDING BILLING TIME OR CONVERTING SERVICES TO A CLIENT.  THIS IS WHAT I HAVE KNOWN SINCE I WAS A FIRST-YEAR ASSOCIATE AT A LAW FIRM THAT LAW FIRMS URGE US STRICTLY OR USE THE WORD STRENUOUSLY THAT WE MUST RECORD BILLABLE TIME SO THAT THE FIRM CAN SEND OUT INVOICES.

AND AFTER I LEARNED THAT INVOICES ARE NOT TIMELY SENT, THE CLIENT ALWAYS HAD MADE-UP REASONS OR EXCUSES FOR NOT PAYING THEM ON TIME, GIVEN EXCUSES SUCH AS OUR BUDGET DIDN'T ALLOW OR ACTUALLY GO TO THE BAR ASSOCIATION YOU'RE DIGGING OUT THE SPECIFIC SECTIONS STATING THAT, WELL, I CHECK OUT THESE SECTIONS OF BAR RULES AS WELL THAT WE HAVE TO ACT WITH REASONABLE DUE DILIGENCE AND PROMPTNESS WITH RESPOND TO CLIENT'S REQUEST.

IN THIS INSTANCE, I MUST SAY THAT CATHY TRADING HAD REPEATEDLY REQUESTED INVOICES BEING SENT WITHIN 30 DAYS TO WHICH I SAID 30 DAYS IS WHAT THE ENGAGEMENT AGREEMENT STATES, THEREFORE, WE WILL SEND YOU INVOICES EVERY 30 DAYS.  BUT WITHIN 30 DAYS MIGHT NOT BE REASONABLE.

SO I CONVEYED THESE URGENCY AND I CONVEYED THESE CONCERNS TO MR. HART WHO WAS MY MAIN CONTACT AT APOGEE.  IN FACT, I RARELY SPOKE TO MR. RUBIO.

AND I SPECIFICALLY CALLED TO MR. HART'S ATTENTION WHEN HE TOLD ME THAT HE COULD NOT OR FAILED NOT OR TOO BUSY TO ENTER HIS TIME, BILLABLE TIME, FROM

SEPTEMBER, OCTOBER, NOVEMBER, DECEMBER 2016 JUST MERELY FIVE MONTHS AFTER I JOINED APOGEE.  AND THESE WERE SHOWN BY EMAIL COMMUNICATIONS BETWEEN ME AND MR. HART, SOMETIMES COPIED WITH ONE OF THE BILLING CLERK ON MY EXHIBITS TO WHICH I WILL DISCUSS IN DETAIL LATER.  SUBSEQUENTLY, MY CONVERSATIONS WAS HERE.

SO IN JUNE 2016 I REALIZED THAT APOGEE HAS NOT BEEN ABLE TO PROVIDE TIMELY INVOICES.  I SENT CONVERSATION -- EMAIL COMMUNICATIONS TO MR. HART TO WHICH I WROTE ONE EMAIL REQUESTING THAT I WILL BILL OUT MY TIME SO THAT I CAN SATISFY MY OBLIGATIONS TO THE CLIENT AND ALSO TO FULFILL MY PROFESSIONAL RULES OF CONDUCT OBLIGATIONS.

SO AT THE END OF THE CONVERSATION IS -- IN FEBRUARY 16, 2017, I WROTE TO MR. HART WHEN HE TOLD ME THAT I'M GOING TO DIRECT A NUMBER OF THINGS.  I'M GOING TO PUT MY TIME, ET CETERA, ET CETERA, AND I SAID -- THIS IS SHOWN ON CLAIMANT DOCUMENT C-002, PAGE NUMBER LI 000111.

IF YOU NEED ME TO EXHIBIT -- TO PULL OUT THE EXHIBIT, I WOULD BE GLAD TO.

THE ARBITRATOR:  YES, CAN YOU SHARE THE SCREEN, PLEASE, MS. LI.

MS. LI:  YES, I WILL.

OKAY.  SO MAY I KNOW IF EVERYONE CAN SEE THIS EXHIBIT?

THE ARBITRATOR:  YES.

MS. LI:  EXHIBIT C-002 SHOWS AN EMAIL COMMUNICATION BETWEEN HOLLY LI AND ROBERT HART DATED FROM FEBRUARY 15TH TO FEBRUARY 16TH OF 2017 AT WHICH POINT IN THE -- I WOULD CALL YOUR ATTENTION TO PAGE -- THE FIRST PAGE L-I, UNDERSCORE, 000111.

IN THE TOP MIDDLE PART MR. HART WROTE, OKAY. THIS IS A RESPONSE TO MY EMAIL QUESTION.  I WILL READ MY QUESTION.  HI, ROBERT.  A LITTLE HISTORY OF THESE DELAYED INVOICES.  IF YOU RECALL THAT THE CLIENT ASKED US TO SEND OUT OUR 2016 INVOICES PRIOR TO THE END OF 2016 MULTIPLE TIMES.  I HAVE ALSO SENT YOU MULTIPLE EMAILS ASKING THE INVOICES TO BE SENT OUT WITHIN ONE MONTH OF COMPLETION OF THE WORK.  HOWEVER, THERE HAS BEEN LONG DELAYS AT YOUR END.  IN ORDER TO WORK WITH MY CLIENT'S PREFERENCE, I INVOICED HER MY TIME FROM IP ADVANTAGES FROM SEPTEMBER, OCTOBER, NOVEMBER, AND DECEMBER 2016.  IN THIS CASE WE SHOULD ISSUE THE CLIENT A DEBIT FOR MY FEES SHE HAS ALREADY PAID.  APOGEE AND I CAN WORK OUT THE BALANCE BETWEEN APOGEE AND ME SEPARATELY.  WHAT DO YOU THINK?

SO TO MY QUESTION, WHAT DO YOU THINK, MR. HART SAID, OKAY.

SO I UNDERSTOOD AND I BELIEVED THAT WAS AN OKAY.  OKAY.  WE'RE OKAY.  THEREFORE, FROM THAT POINT ON, I ACTED ACCORDINGLY TO THIS TYPE OF ARRANGEMENTS WHENEVER

APOGEE HAS DELAYS MORE THAN 30 DAYS IN ISSUING INVOICES.

THEREAFTER -- THERE ARE STILL CONTINUED DELAYS.  THIS IS ALSO IDENTIFIED FROM MULTIPLE COMMUNICATION RECORDS WHICH I PRODUCED AS MY EXHIBITS WHICH I WON'T GO TO DETAIL AT THIS POINT.  SO UNTIL JUNE 2016 -- STRIKE THAT.  I MISSPOKE.

UNTIL JUNE 2017, BECAUSE OF THE CONTINUED AND CONSISTENT DELAYS OF ISSUING INVOICES AND RECORDING TIME, I DECIDED TO RESIGN FROM APOGEE, THEREFORE, I SUBMITTED A RESIGNATION LETTER ON JUNE 20, 2017, AS SHOWN IN EXHIBIT C-005.

MR. HART WROTE ME BACK IMMEDIATELY AFTER I SUBMITTED THE RESIGNATION TO WHICH HE STATED THAT HE FIRED ME, BUT HE WOULD LIKE ME TO STAY ON THE CASE TO CONTINUE THE DEFENSIVE ACTIONS FOR CTC AND THEN LEAVE APOGEE.

I DID -- INITIALLY I DIDN'T WANT TO DO SO. I WANTED TO LEAVE IMMEDIATELY.  IN FACT, I DID REQUEST THAT I WOULD LEAVE IMMEDIATELY.  HOWEVER, MR. HART SAID IT WOULD NOT BE GOOD FOR THE DEFENSIVE ACTIONS IF YOU LEAVE AT THE LATER STAGE OF THE CASE, SO I WAS CONVINCED SO I STAYED UNTIL AUGUST OF 2017 THAT I HELPED CTC TO NEGOTIATE A VERY FAVORABLE, RATHER VICTORIOUS, SETTLEMENT AGAINST THE PLAINTIFF.

SUBSEQUENTLY, I COMMUNICATED THE MESSAGE TO CTC THAT BECAUSE APOGEE HAS NOT ISSUED INVOICES TIMELY AND

WOULD REQUIRE HER TO PAY ALL THE INVOICES I ISSUED, WHICH SHE DIDN'T PAY ALL OF THEM, AND IF SHE HAS ANY QUESTION, SHE COULD DIRECTLY COMMUNICATE TO MR. ROBERT HART BECAUSE I WAS CONFIDENT THAT MR. HART, TO OUR COMMUNICATION PRIOR IN WRITING AS WRITTEN ALTERATION OF MY AGREEMENT WITH APOGEE.

MY IMPRESSION AND MY UNDERSTANDING OF THE WHOLE PROCESS IS THAT APOGEE COULD NOT MAINTAIN ITS OBLIGATION TO ISSUE INVOICES OR ANY OTHER OBLIGATIONS UNDER THAT AGREEMENT, THE AGREEMENT I SIGNED WITH APOGEE, THEREFORE, THEY BREACHED THAT AGREEMENT.  AND WE SUBSEQUENTLY ALTERED IT.  AND THE ALTERATION WAS IDENTIFIED AND RECORDED BY WRITING.  IT WAS WRITTEN ALTERATION AS REQUIRED BY THE AGREEMENT.  EVERYTHING WAS IN WRITING.

AND I BELIEVED MR. HART WOULD BE COMMUNICATING AND TELL CATHY TRADING THAT YOU SHALL PAY THE INVOICES FOR HOLLY LI'S WORK AND WE WILL ISSUE ADDITIONAL INVOICE FOR OUR WORK WHICH WOULD HAVE BEEN A MUCH EASIER AND STRAIGHTFORWARD CASE.

BUT AT THAT JUNCTURE, MR. HART WROTE ME A VERY, VERY -- I WOULD RATHER USE THE WORD NASTY NOW -- LETTER STATING THAT I HAD SOME SORT OF A CONVERTED, STOLEN, ISSUED INVOICE ILLEGALLY, ET CETERA, ET CETERA, WHICH ARE UNFOUNDED.  I RECORDED AND DOCUMENTED AND ASKED

FOR APPROVAL NUMEROUS TIMES AS IDENTIFIED IN THE --

MR. TAUGER:  OBJECTION.  RELEVANCE.

THE ARBITRATOR:  STOP, MS. LI.

MS. LI:  SORRY.

MR. TAUGER:  HER CONCLUSION IS THE LAW OF THE CASE IN RES JUDICATA.  THE TRIBUNAL HAS ALREADY RULED ON IT, AND FOR HER TO TALK HER WAY OUT OF IT NOW IS JUST WASTING EVERYONE'S TIME.

MS. LI:  WHAT WAS THE OBJECTION?  I DIDN'T HEAR YOU.

MR. TAUGER:  352.

MS. LI:  YOU'RE CITING CALIFORNIA RULE OF EVIDENCE?

MR. TAUGER:  YES.

MS. LI:  I'M SORRY.  I'M NOT LICENSED TO PRACTICE THERE NOR DO I KNOW THE EVIDENCE RULE.  CAN YOU JUST SPEAK FABOUT YOUR OBJECTION?  THE FIRST WORD, YOU SAID SOMETHING.

MR. TAUGER:  MAY I RESPOND?

THE ARBITRATOR:  YES.

MR. TAUGER:  MS. LI, AS I SAID AT THE INCEPTION OF THIS PROCEEDING TO DATE, YOU'RE HELD TO THE SAME STANDARD THAT I AM.  I CAN'T HELP IT IF YOU'RE UNFAMILIAR WITH CALIFORNIA LAW --

MS. LI:  OKAY.  WHAT WAS THE OBJECTION?

MR. TAUGER:  LET ME FINISH, PLEASE.  OH, BOY.

MS. LI, THE ARBITRATOR RULED THAT WE WOULD NOT DO SPEAKING OBJECTIONS.  THAT WE WOULD STATE OBJECTION AND THE REASON.  AND THE ARBITRATOR ASKED ME WHAT WERE THE GROUNDS FOR MY OBJECTION, AND I TOLD HIM.

MS. LI:  WHAT WAS YOUR GROUND?

MR. TAUGER:  352 IS MORE PREJUDICIAL THAN PROBATIVE.

THE ARBITRATOR:  RIGHT.  SO THIS IS ARBITRATION, RIGHT, IT'S SUPPOSED TO BE MORE INFORMAL THAN LITIGATION.

I WANTED TO UNDERSTAND BETTER, THOUGH, MR. TAUGER, DID YOU SAY THAT I HAD MADE A RULING IN ADVANCE OF THE HEARING THAT WOULD PRECLUDE THIS EVIDENCE FROM COMING IN?

MR. TAUGER:  NO.  YOU HAVE ALREADY RULED IN SUMMARY JUDGMENT THAT MS. LI IS LIBEL FOR CONVERSION AND FOR HER TO TRY TO OFFER TESTIMONY THAT EXCULPATES HER FROM CONVERSION IS CONTRARY TO THE LAW OF THE CASE.  IT IS A MATTER ALREADY DECIDED.

THE ARBITRATOR:  I SEE.  SO I'M GOING TO SUSTAIN THE OBJECTION.

MS. LI, I DON'T KNOW HOW MUCH MILEAGE YOU'RE GETTING OUT OF THIS LINE OF TESTIMONY, SO I WOULD ENCOURAGE YOU TO MOVE ON TO SOME OF THE MORE CONTESTED ASPECTS OF THIS CASE.

THE OTHER THING I WOULD SUGGEST, MS. LI, IS WHEN YOU'RE NOT NEEDING TO REFER TO A DOCUMENT, PERHAPS YOU COULD DISABLE YOUR SCREEN SHARE SO THAT WE CAN SEE YOU A LITTLE BIT MORE.  YOU'RE A VERY SMALL LITTLE TILE THERE IN THE CORNER.

OKAY.  THIS IS MUCH BETTER.  WE CAN SEE YOU MUCH BETTER NOW.  THANK YOU FOR THAT.

MS. LI:  I APOLOGIZE.  I FORGOT TO STOP SHARING.

THE ARBITRATOR:  THAT'S FINE.

MS. LI:  ALL RIGHT.  I WILL MOVE ON TO MY MAIN POINT.

MR. TAUGER:  YES.

MS. LI:  AFTER I LEFT APOGEE, APOGEE -- OBVIOUSLY CTC FAILED TO PAY THE 40 INVOICES, AND THERE WERE LOTS OF BACK AND FORTH.  AT THE END, FINALLY, MR. HART INFORMED ME THAT THEY'RE GOING TO START AN ARBITRATION AGAINST CTC TO WHICH I OFFERED MY HELP, AND I WAS REJECTED BY MR. HART STATING THAT YOU'RE NOT A APOGEE -- YOU'RE NOT IN APOGEE ANYMORE, WE DON'T NEED YOUR HELP.  THE ONLY HELP IS TO PAY OUT YOUR MONEY THAT YOU COLLECTED.

BUT AT THE END I DID OFFER HELP FURTHER AND MR. HART DID ASK ME TO PROVIDE, ON SEVERAL INSTANCES, ASSISTANCE IN TERMS OF THE EVIDENCE OFFERING DURING THE ARBITRATION PROCEEDING AGAINST CTC.

SO ONE OF THE INSTANCES THAT CTC BROUGHT

COMPLAINTS FOR THOSE COMPLAINTS IN NEW JERSEY BAR THAT WAS ALL DISMISSED.  AND DURING THOSE COMMUNICATIONS, THERE WERE IDENTIFICATION OF MR. HART'S COMMUNICATION WITH THE NEW JERSEY BAR ASSOCIATION TO WHICH HE SAID HE WAS THINKING TO ADD ME TO --

MR. TAUGER:  OBJECTION.  HEARSAY.

THE ARBITRATOR:  OVERRULED.

YOU MAY CONTINUE, MS. LI.

MS. LI:  OKAY.  THANK YOU.

I SAID -- I NOTE ONE MAJOR POINT IS THAT HE WAS THINKING TO ADD ME INTO THE ARBITRATION, BUT AT THE END IN ONE EMAIL COMMUNICATION BETWEEN MR. HART AND ME, HE DENIED HE HAD SAID THAT TO THE NEW JERSEY BAR.  AND I WAS PUZZLED WHY APOGEE HAD EXCLUDED ME EVEN THOUGH I WAS THE ONE WHO CONTRIBUTED MOST IN THE BILLABLE HOURS AND BASICALLY DAMAGES CAUSED BY CTC.

NOW, THIS IS -- APOGEE OBTAINED, AT THE END, A VICTORY AWARD IN THE ARBITRATION.  I RECALL YOUR ATTENTION TO ONE COMMUNICATION THAT WAS BETWEEN ME AND MR. HART IN LATE 2019.  I ASKED MR. HART TO GIVE ME AN UPDATE.

MR. TAUGER:  IS THAT IN REFERENCE TO AN EXHIBIT?

THE ARBITRATOR:  HOLD ON, MS. LI.

MR. TAUGER:  IS THAT IN REFERENCE TO AN EXHIBIT?

THE ARBITRATOR:  ARE YOU TALKING ABOUT A SPECIFIC

EXHIBIT, MS. LI, THAT YOU CAN SHARE WITH US?

MS. LI:  YES.  I JUST WANTED TO SAY ONE THING THAT WHEN I SPEAK, MR. TAUGER RAISES OBJECTION, I SUPPOSE IT'S BECAUSE TWO VOICES ARE TOGETHER ON THE ZOOM PLATFORM, I CAN'T HEAR HIS OBJECTION.

MR. TAUGER:  I'LL RAISE MY HAND.  HOW'S THAT?

MS. LI:  YEAH, IF HE MAY SPEAK TWICE OR SECOND TIME LOUDER AND FACING THE MICROPHONE NOT JUST FACING YOUR HONOR THAT WOULD BE HELPFUL SO I CAN HEAR HIM.

MR. TAUGER:  I'LL RAISE MY HAND.  AND I AM FACING THE MICROPHONE WHEN I SPEAK TO THE ARBITRATOR.

MS. LI:  YEAH.  EVERY TIME I COULD NOT HEAR YOUR OBJECTIONS THAT'S WHY SOMETIMES I ACTUALLY CONTINUED.

THE ARBITRATOR:  THANK YOU FOR EXPLAINING THAT.

MR. TAUGER:  MY OBJECTION IS IF SHE'S GOING -- THIS IS BEST EVIDENCE.  IF SHE'S GOING TO REFERENCE AN EXHIBIT, LET'S SEE THE EXHIBIT.

THE ARBITRATOR:  YEAH.  SO ARE YOU SHARING YOUR SCREEN NOW, MS. LI?

MS. LI:  YES.

MR. TAUGER:  MAY I ASK WHICH EXHIBIT NUMBER THIS IS?

THE ARBITRATOR:  THIS LOOKS LIKE EXHIBIT C-001.

MS. LI:  YES, YOUR HONOR, THIS IS -- I'D LIKE TO INTRODUCE C-001, MY COMMUNICATION WITH MR. HART AND

MR. GULLIVER.

SO THERE ARE A SERIES OF COMMUNICATIONS. I'LL SUMMARIZE HERE AS EVERYONE CAN SEE THE CONTENT. THIS IS A -- THIS IS REGARDING THE ARBITRATION STATUS THAT I REQUIRED -- I REQUESTED TO KNOW AND THE REFUSAL OF MR. HART AND MR. GULLIVER CONTINUOUSLY AND INSISTING THAT I MUST PAY OUT THE MEAGER FEES I COLLECTED.

AT THE END OF 2019, I REQUESTED TO KNOW INFORMATION, AND I COULD NOT OBTAIN ANY INFORMATION FROM MR. HART NOR MR. GULLIVER.

TO THE BEGINNING OF 2020, I REQUESTED, AGAIN, TO KNOW THE INFORMATION. I BASICALLY ASKED PERIODICALLY TO HAVE AN UPDATE, AND I STILL DID NOT GET ANY SUBSTANTIVE UPDATES.

I FOUND THE COMMUNICATION BETWEEN -- FROM MR. HART AND MR. GULLIVER TO BE VERY EVASIVE. THE ONLY QUESTION THEY WERE ASKING ME IS TO PAY OUT THE NEARLY COLLECTION I DID IN MY OWN DUE DILIGENCE.

SO AT LAST I HAD TO RETAIN COUNSEL BY THE NAME JASON BALOGH WHO YOU ALL KNOW WHO REPRESENTED ME IN THIS PROCEEDING.

MR. TAUGER:  I'M SORRY. MAY I HAVE THE WITNESS' TESTIMONY READ BACK GOING, I THINK, IT'S TWO SENTENCES.

THE ARBITRATOR:  SO LET'S REREAD THAT FROM THE BEGINNING, MS. AUGUSTINE.

(WHEREUPON THE RECORD WAS READ.)

MS. LI:  MAY I CONTINUE?

MR. TAUGER:  I'M FINE.

THE ARBITRATOR:  YES, YOU MAY CONTINUE.

MS. LI:  MR. BALOGH WROTE A LETTER TO MR. HART AT THE END OF -- IN THE BEGINNING OF 2020, AND THERE WERE A SERIES OF COMMUNICATIONS BETWEEN MR. HART AND MR. BALOGH.

MR. TAUGER:  OBJECTION.  BEST EVIDENCE.  HEARSAY.

THE ARBITRATOR:  MS. LI, DO YOU HAVE A DOCUMENT THAT GOES TO THIS ISSUE?  I THINK YOU TALKED ABOUT THE LETTER.  CAN YOU SHOW US THE LETTER?

MS. LI:  YES.  YES.  MAY I INTRODUCE EXHIBIT C-021, A LETTER DATED SEPTEMBER 6, 2019, FROM BALOGH'S OFFICE TO MR. ROBERT HART AND MR. FRANK RUBIO.

MR. TAUGER:  OBJECTION.  HEARSAY.

MS. LI:  I'M READING THE EXHIBIT

MR. TAUGER:  AND I HAVE AN OBJECTION.

THE ARBITRATOR:  THE LETTER IS HEARSAY YOU ARE SAYING?

MR. TAUGER:  MR. BALOGH ISN'T HERE.  IT'S NOT AUTHENTICATED.  HOW CAN SHE TESTIFY TO IT?  IT'S NOT HER COMMUNICATION.

MS. LI:  THIS IS THE LETTER I RECEIVED FROM MY ATTORNEY WHICH I REVIEWED AND EDITED AND DRAFTED.

THE ARBITRATOR:  WELL, YOU KNOW, THE LETTER SPEAKS

FOR ITSELF. AND YOUR POINT ABOUT THIS LETTER WAS THAT MR. BALOGH WROTE TO MR. HART?

MS. LI: YES, REGARDING THE PENDING ISSUES THAT I HAVE WITH APOGEE AND ALSO THE EVASIVE COMMUNICATIONS ABOUT THE CTC ARBITRATION PROCEEDING AND ALSO ABOUT MOST DAMAGES THAT I HAVE SUFFERED FROM --

THE ARBITRATOR: FAIR ENOUGH.

MR. TAUGER: YOUR HONOR, MAY I BE HEARD BRIEFLY?

WHAT MS. LI JUST CLARIFIED IS THAT THIS LETTER GOES TO THE VERY HEART OF THE TRUTH OF THE MATTER ASSERTED THEREIN. WE HAVE A RIGHT TO CONFRONT SOMEONE WHO MAKES ALLEGATIONS AGAINST US AS MR. BALOGH DID IN THIS LETTER. HE'S NOT HERE. THIS LETTER SHOULD BE EXCLUDED.

MS. LI: I AM PART OF THE DRAFTERS OF THIS LETTER MYSELF.

THE ARBITRATOR: ALL RIGHT. SO I'M GOING TO INCLUDE THE LETTER, BUT I'M GOING TO GIVE IT THE WEIGHT THAT I THINK IT DESERVES GIVEN MR. TAUGER'S OBJECTION. I HAVEN'T REALLY SEEN THIS LETTER, SO I DON'T REALLY KNOW WHAT TO MAKE OF IT.

(WHEREUPON EXHIBIT C-21 WAS RECEIVED INTO EVIDENCE.)

MS. LI: WELL, MAY I INTRODUCE ANOTHER LETTER FROM MR. HART TO MR. BALOGH? WOULD THAT BE AN OBJECTION AS WELL?

MR. TAUGER:  WHAT LETTER WOULD THAT BE?  WHAT EXHIBIT?

MS. LI:  A LETTER FROM MR. HART.

MR. TAUGER:  WHAT EXHIBIT IS IT, MS. LI?

MS. LI:  I WILL SHOW THE COMMUNICATION RECORD BETWEEN MY COUNSEL, MYSELF, AND THE RESPONDENT.

MR. TAUGER:  WHAT EXHIBIT IS THAT?  I CAN'T KNOW WHETHER TO OBJECT OR NOT UNTIL I KNOW WHAT THE DOCUMENT IS.

MS. LI:  OKAY.  MAY I INTRODUCE EXHIBIT C-022 WHICH I WILL PUT UP ON THE SCREEN AS WELL.

MR. TAUGER:  WE'LL STIPULATE TO THE ADMISSIBILITY OF C-022.

(WHEREUPON EXHIBIT C-022 WAS RECEIVED INTO EVIDENCE.)

MS. LI:  DO YOU HAVE ANY OBJECTIONS TO THIS LETTER?

MR. TAUGER:  I JUST STIPULATED TO ITS ADMISSION, MS. LI.

MS. LI:  EXCUSE ME, I CAN'T HEAR YOU WHAT SAID.

MR. TAUGER:  I'M SORRY.  I REALIZE WHAT'S HAPPENING IS I'M LOOKING AT THE MONITOR ACROSS THIS WAY SOMETIMES TO SEE YOU, AND I REALLY SHOULD LOOK AT THIS ONE, SO THAT I'M TALKING INTO THE MICROPHONE.

I'VE STIPULATED TO THE ADMISSIBILITY OF

THIS.  I HAVE NO OBJECTION.

MS. LI:  ALL RIGHT.  MAY I GO ON TO TALK ABOUT THESE TWO LETTERS?

THE ARBITRATOR:  YOU MAY CONTINUE, MS. LI.

MS. LI:  THANK YOU.  SO I ALREADY DISCUSSED ABOUT C-021.  ESSENTIALLY WE WERE ASKING FOR A SOLUTION.  I USE WE SO THAT I DON'T --

MR. TAUGER:  OBJECTION.  HEARSAY.  BEST EVIDENCE.

THE ARBITRATOR:  SO, YOU KNOW, THE DOCUMENT SPEAKS FOR ITSELF, RIGHT.  SO I WILL REVIEW THE DOCUMENT, BUT I'D LIKE TO KNOW MS. LI'S -- YOU KNOW, WHAT SHE -- WHAT HER THEORY IS AND HOW THIS IS RELEVANT TO HER CASE.

SO MS. LI, YOU MAY PROCEED.

MS. LI:  YES.  THANK YOU, YOUR HONOR.

THIS IS THE BEST EFFORTS WE HAVE SPENT, WE HAVE PUT FORWARD TO GET -- TO OBTAIN A POSSIBILITY OF RESOLVING THE CONFLICTS IN AN AMICABLE AND EFFICIENT MANNER.

HOWEVER, AS SHOWN IN C-022, RESPONSE FROM MR. HART ON ADDYHART LETTERHEAD STATED, I'M REPEATING AGAIN READING THIS LETTER, A FEW ALLEGATIONS IN TERMS OF SHE MAY HAVE NOT INFORMED YOU OF HER VIOLATIONS OF HER CONSULTING AGREEMENTS WHERE SHE DIRECTED CATHY TRADING TO PAY OVER $200,000.  THIS IS THE FIFTH PARAGRAPH.

AND ALSO, ON THE SECOND PARAGRAPH, PURSUANT

TO THIS CONSULTING AGREEMENT, SHE IS ENTITLED TO 70

PERCENT OF ALL NET AMOUNTS COLLECTED FROM CATHY TRADING.

        MR. TAUGER:  I'M GOING TO OBJECT TO HER TESTIMONY

REGARDING THE FIRST PARAGRAPH WHERE MR. HART IS PURPORTED

TO HAVE SAID SHE MAY NOT HAVE INFORMED YOU OF HER

VIOLATIONS.  AGAIN, THAT'S RES JUDICATA.  SHE CONVERTED

THE MONEY PERIOD.  AND THAT WOULD BE A 352 OBJECTION.

        THE ARBITRATOR:  I TAKE YOUR OBJECTION,

MR. TAUGER, BUT I'M GOING TO OVERRULE IT BECAUSE I'D LIKE

TO UNDERSTAND BETTER WHAT MS. LI IS TRYING TO SAY HERE.

            MS. LI, WHY DON'T YOU PROCEED.

        MS. LI:  YES.  SO THERE WERE SERIOUS -- CONTINUED

SERIOUS ALLEGATIONS IN TERMS OF HOW AND -- HOW THINGS WERE

DEVELOPED BASICALLY.  THERE WERE NO IDENTIFICATION OF THE

COMMUNICATION INVITING THE WRITTEN CHANGES TO THE

EMPLOYMENT AGREEMENT.  I'LL JUST CALL IT THE EMPLOYMENT

AGREEMENT BECAUSE THERE'S SO MANY AGREEMENTS INVOLVED IN

THIS PROCEEDING.

            AND ALSO, I BELIEVE AT THE SECOND PAGE, PAGE

L-I, UNDERSCORE, 000189, MR. HART POINTED OUT TO MR. --

WELL, I SHALL NOT -- THE LETTER STATES IF -- STRIKE THAT.

        MR. TAUGER:  I'M SORRY.  I APOLOGIZE.  WHAT

EXHIBIT ARE WE LOOKING AT NOW?  I JUST DIDN'T HEAR YOU.  I

APOLOGIZE.  YOU READ OFF AN EXHIBIT NUMBER, MS. LI, AND I

DIDN'T HEAR THAT, SO IF YOU COULD REPEAT IT, I APPRECIATE

IT.

THE ARBITRATOR:  I THINK SHE MIGHT BE FROZEN.

MR. TAUGER:  I THINK YOU'RE RIGHT.

THE ARBITRATOR:  MS. LI, YOU WERE FROZEN FOR ABOUT 15 SECONDS THERE.  CAN YOU REPEAT THAT?

MS. LI:  I WILL REPEAT.  SO STARTING FROM -- STRIKE OUT WHATEVER I SAID.  I'D LIKE TO --

THE ARBITRATOR:  BY THE WAY, I BELIEVE THIS IS EXHIBIT 022.

MS. LI:  YES.

MR. TAUGER:  THANK YOU.

MS. LI:  WE START AGAIN.  ON EXHIBIT C-00 -- C-022, PAGE L-I, UNDERSCORE, 000189, SECOND PARAGRAPH. THE LETTER STATE -- IT'S STATED IN THE LETTER, IF YOU WOULD LIKE TO SEE AND MONITOR APOGEE'S COLLECTION EFFORTS, WE WOULD DIRECT YOU TO WWW.PACER.GOV WHERE YOU CAN SEARCH FOR EITHER APOGEE LAW GROUP OR CATHY TRADING IN THE CENTRAL DISTRICT OF CALIFORNIA.  THERE YOU CAN READ ABOUT APOGEE'S CURRENT ENFORCEMENT ACTIONS.  IF WE EVER DO RECEIVE FUNDS FROM CATHY TRADING, WE WILL GLADLY PROVIDE MS. LI AND YOUR FIRM WITH A COMPLETE ACCOUNTING OF THE FUNDS RECEIVED, LESS EXPENSES AND LESS THE FUNDS THAT MS. LI MISAPPROPRIATED PLUS INTEREST ON THE UNPAID AMOUNTS MS. LI OWES APOGEE.

SO MY QUOTATION OF THE LETTER ENDS NOW.  I'D

LIKE TO CONTINUE WITH MY OWN TESTIMONY.

THE ARBITRATOR:  GREAT.  CAN YOU STOP SHARING THE SCREEN, MS. LI, SO WE CAN SEE YOU BETTER.

MS. LI:  OH, ACTUALLY, YOUR HONOR, MAY I JUST CONTINUE ONE MORE POINT?

THE ARBITRATOR:  OKAY.

MS. LI:  ON THE LAST -- SECOND TO LAST PARAGRAPH, THERE WAS ONE SENTENCE, THE PARAGRAPH READS, ONE FINAL POINT, MR. FRANK RUBIO RECENTLY LEFT APOGEE, SO YOU CAN DIRECT ALL FUTURE CORRESPONDENCE TO ME.

ALL RIGHT.  I WILL STOP SHARING.

SO MY TESTIMONY IS THAT AFTER I READ THIS LETTER, I FOUND, AGAIN, SURPRISING, SHOCKING, SHOCK TO THE CONSCIENCE, THAT THERE WAS NO MENTIONING ABOUT WHAT MONEY OWED TO ME TO THE SERVICE I CONFERRED AND I DID FOR APOGEE.  AND I HAVE DONE ALL MY BEST TO REPRESENT A CLIENT THAT WAS CONTRIBUTED TO APOGEE'S REVENUE, PROFIT, PERHAPS OTHER THINGS, BUT THERE WERE NO MENTIONING ABOUT IT. THERE WERE ESSENTIALLY BASICALLY A LETTER WRITTEN WITH EXTREME ANGER, A LOT OF ALLEGATIONS USING LARGE WORDS SUCH AS CONVERTED, STOLE, ET CETERA, UNFOUNDED PHRASES.

AND ALSO STATED WE SHALL COMMUNICATE WITH THE WRITER HIMSELF, MR. HART, NOT THE CEO WHO WAS LISTED ON THE SECRETARY OF STATE REGISTRATION DOCUMENT.

MR. TAUGER:  OBJECTION.  LACK OF FOUNDATION.

MS. LI:  THE FOUNDATION BEING PROVIDED IN THE LETTER.  IT STATES, PLEASE DIRECT ALL COMMUNICATIONS TO ME INSTEAD OF MR. RUBIO.

THE ARBITRATOR:  SO THE LETTER SPEAKS FOR ITSELF.

MR. TAUGER:  THE LETTER DOES, BUT HER ALLEGATION ABOUT WHO THE SECRETARY OF STATE IDENTIFIES AS THE CEO DOESN'T.

MS. LI:  WHAT?  THE SECRETARY OF STATE?

THE ARBITRATOR:  SO MS. LI, I'D ASK YOU TO KIND OF MOVE ON FROM THIS TOPIC.

MS. LI:  OKAY.  I'LL MOVE ON NOW.  SO FINALLY, SERIOUS COMMUNICATION LIKE SUCH CONTINUED AND CONTINUED UNTIL THE END OF OCTOBER -- I'M SORRY, THE END OF 2020, NAMELY, OCTOBER 2020, ARE NOT -- GO TO DETAIL DOCUMENTS BECAUSE MY TIME IS LIMITED.

ESSENTIALLY, MR. HART AND MR. BALOGH -- WELL, I SHALL TAKE THAT OUT.  STRIKE THAT.

MR. HART AGREED WITH ME AND MY COUNSEL TO HAVE ME ENFORCE THE MONETARY JUDGMENT AGAINST CTC.  THEN WE WERE DISCUSSING ABOUT THE DISCREPANCIES BETWEEN THE DISTRIBUTION.  I WAS ORIGINALLY GIVEN DISTRIBUTION SHEETS BY MR. GULLIVER AND MR. HART NUMEROUS TIMES SHOWING A FIGURE OF DISTRIBUTION TO ME FROM THAT JUDGMENT WHICH IS MORE THAN $470,000 OR RATHER THE ARBITRAL AWARD WAS $402,000 PLUS, PLUS EXPENSES, ET CETERA, THAT WAS -- THE

JUDGMENT WAS BEYOND 470,000.  AND THE DISTRIBUTION TO ME WAS AROUND $280,000.  IN FACT, IT WAS 290,000, AND THERE WERE EXPENSES BEING REDUCED.

HOWEVER, ON OUR LAST -- TO OUR LAST SURPRISE THAT MR. HART SENT A DISTRIBUTION THAT SHOWS I WAS SUPPOSED TO BE GETTING $120,000 LESS WHICH WOULD REDUCE MY SHARE OF THE ARBITRATION -- MONETARY JUDGMENT FROM CTC TO 160,000 PLUS.

MR. TAUGER:  OBJECTION.  BEST EVIDENCE.

MS. LI:  THIS WAS AGAINST --

THE ARBITRATOR:  MS. LI, IS THERE SOME DOCUMENTATION THAT YOU'RE REFERRING TO?

MS. LI:  YES.  SO I WOULD LIKE TO SHARE MY SCREEN AND TO SHOW EXHIBIT C-020.  I INCLUDED THE COMMUNICATION BETWEEN MR. BALOGH AND MYSELF JUST TO SHOW THE AUTHENTICITY.  AND AGAIN, I AM A PARTY AND TESTIFYING TO MY KNOWLEDGE, SO THIS IS NOT HEARSAY.

MR. TAUGER:  I'M GOING TO OBJECT ON THE GROUNDS THAT THIS EXHIBIT DOES NOT ESTABLISH WHAT MS. LI CONTENDS IT DOES.  I DON'T OBJECT TO ITS ADMISSION, BUT I STILL OBJECT TO HER TESTIMONY.

THE ARBITRATOR:  SO I'LL NOTE THE OBJECTION.  I'D LIKE TO UNDERSTAND BETTER WHAT THIS DOCUMENT IS AND WHAT IS THE POINT THAT YOU'RE TRYING TO MAKE, MS. LI.

MS. LI:  MAY I SPEAK ABOUT THIS --

THE ARBITRATOR:  YES.

MS. LI:  -- EXHIBIT?

THANK YOU.

THIS EXHIBIT SHOWS THE COMMUNICATION RECORD BETWEEN RESPONDENT MR. -- RESPONDENT/PRINCIPAL MR. HART AND MY COUNSEL.  ESSENTIALLY COMMUNICATION BETWEEN THOSE TWO PEOPLE I JUST STATED FROM SEPTEMBER -- FROM AUGUST TO OCTOBER OF 2019.

ESSENTIALLY -- I'LL SUMMARIZE.  ON THE TWO EXHIBITS I JUST SHOWED TO THIS TRIBUNAL, THE COMMUNICATION BETWEEN MR. HART AND MR. BALOGH REGARDING THE ALLEGATIONS OF HOLLY LI AND THE DAMAGES HOLLY LI SUFFERED, ET CETERA.

AND SUBSEQUENTLY, MR. BALOGH WROTE TO MR. HART ON THIS LETTER IDENTIFIED SHOWING THAT THERE WAS A DISCREPANCY RAISED FROM THE DISTRIBUTION SHEET.

MR. TAUGER:  I'M GOING TO STILL OBJECT TO THAT.

THE ARBITRATOR:  HOLD ON, MS. LI.

MR. TAUGER:  I'M STILL GOING TO OBJECT TO HER REFERENCE TO THE LETTER FROM MR. BALOGH AS BEING HEARSAY.  WHAT HE SAID TO MR. HART IS OUTSIDE THIS COURT.  SHE'S OFFERING IT TO PROVE THE TRUTH OF THE MATTER ASSERTED.

MS. LI:  I AM NOT OFFERING THE PROVE OF THE MATTER ASSERT.  I'M TRYING TO DESCRIBE WHAT HAPPENED AND WHAT WAS -- THE LETTER SHOWS WHAT HE SAID, AND NOW I'M READING WHAT HE SAID.  I'M TELLING THE COURT WHAT HAPPENED.

THE ARBITRATOR:  ALL RIGHT.  SO THE EVIDENCE RULES DON'T STRICTLY APPLY IN ARBITRATION, MR. TAUGER.  I THINK YOU'RE MAKING A GOOD POINT.  I WANT TO THINK ABOUT THAT, BUT I'M NOT GOING TO EXCLUDE THE EVIDENCE ON THAT GROUND.

SO I WILL TAKE A LOOK AT THE LETTER, MS. LI. AND THERE'S NO NEED FOR YOU TO KIND OF SUMMARIZE WHAT THE LETTER SAYS.  IT SPEAKS FOR ITSELF.  IF YOU JUST WANT TO BRIEFLY INFORM ME OF HOW IT'S RELEVANT TO YOUR CASE, YOU CAN JUST DO THAT AND THEN MOVE ON.  I CAN READ THE EXHIBIT TO MYSELF AFTERWARDS.

MS. LI:  OKAY.  THANK YOU, YOUR HONOR.

TO THE POINT THAT MR. HART PRESENTED A DISTRIBUTION TO ME 120,000 LESS THAN THE DISTRIBUTION HE PRESENTED TO ME PRIOR TO THE ARBITRATION PROCEEDING AGAINST CTC.

MR. TAUGER:  OBJECTION.  LACK OF FOUNDATION.

MS. LI:  LACK OF WHAT?

MR. TAUGER:  I'M SORRY.  LACK OF FOUNDATION.  BEST EVIDENCE.  I APOLOGIZE.

THE ARBITRATOR:  SO SHE'S REFERRING TO THIS DOCUMENT, SO THAT IS THE BEST EVIDENCE, AND IT SAYS WHAT IT SAYS.  I HAVEN'T READ IT YET.  SO I'LL ALLOW MS. LI TO CONTINUE EXPLAINING WHY SHE THINKS IT'S RELEVANT.

MR. TAUGER:  I WOULD REQUEST THAT YOU TAKE MY OBJECTION UNDER SUBMISSION.  I AM FAMILIAR WITH THE

EXHIBIT SHE'S REFERENCING, AND IT SAYS NOTHING OF THE SORT.

THE ARBITRATOR:  OKAY.  WELL, --

MS. LI:  MAY I INTRODUCE --

THE ARBITRATOR:  I'LL MAKE THAT DETERMINATION.

MS. LI, YOU MAY FINISH YOUR SENTENCE.

MS. LI:  OKAY.  I'LL MOVE ON TO THE NEXT EXHIBIT, C-019.  I WILL SHARE THIS SCREEN NOW.

THIS C-019 SHOWS A COMMUNICATION BETWEEN MR. HART, PRINCIPAL OF APOGEE, AND MY COUNSEL FROM SEPTEMBER 2020 TO OCTOBER 2020.  TO SUMMARIZE -- AGAIN, I'M NOT TALKING ABOUT WHO SAID WHAT.  I'M JUST READING FROM THIS LETTER.

THIS LETTER SHOWS THE LACK OF COMMUNICATION AND RESPONSE FROM MR. HART SPECIFICALLY WITH A QUESTION ABOUT WHY THERE WAS $120,000 DISCREPANCY.

MR. TAUGER:  I'M GOING TO OBJECT NOT TO MR. HART'S STATEMENTS.  AN EMAIL THAT COMES IN IS ADMISSION BY A PARTY.

MS. LI:  (INAUDIBLE.)

(OVERTALKING).

MR. TAUGER:  I'M SORRY.

THE ARBITRATOR:  MS. LI, LET MR. TAUGER FINISH, PLEASE.

MR. TAUGER:  AND I APOLOGIZE FOR SNAPPING.  I'M

TIRED OF THIS.  THIS IS JUST FRUSTRATING.

MS. LI:  STATE THE OBJECTION YOU ARE PROVIDING.

MR. TAUGER:  MS. LI, PLEASE.

WITH RESPECT TO THE EMAILS THAT WERE PURPORTED TO BE WRITTEN BY JASON BALOGH, I'M GOING TO OBJECT ON THE GROUNDS THAT IT'S HEARSAY.

THE ARBITRATOR:  OKAY.  OVERRULED.

MS. LI:  SO WE DID NOT HEAR FROM MR. HART FROM OCTOBER 21ST, THIS LAST COMMUNICATION, UNTIL FEBRUARY OF 2021, MERELY ONE MONTH BEFORE I FILED THE ARBITRATION DEMAND.  THERE WERE NO HOPE WHATSOEVER ANYMORE TO SETTLE OR TO REACH ANY AMICABLE RESOLUTION.  THERE WAS NO TRUST ANYMORE.

MR. TAUGER:  I MUST INTERPOSE AN OBJECTION TO THE STATEMENT THAT YOU DIDN'T HEAR FROM MR. HART UNTIL THE NIGHT BEFORE YOU FILED CURRENT ARBITRATION.  IF THAT'S REFERENCING THE COMMUNICATION, THAT'S BEST EVIDENCE, AND I'D LIKE TO SEE THAT.

THE ARBITRATOR:  DO YOU HAVE A DOCUMENT TO THAT EFFECT, MS. LI?

MS. LI:  I DID NOT HEAR MR. TAUGER'S REQUEST CLEARLY.  WHAT DOCUMENTS ARE YOU REQUESTING?

MR. TAUGER:  YOU TESTIFIED, MS. LI, THAT YOU DID NOT HEAR FROM MR. HART UNTIL THE NIGHT BEFORE OR THE DAY BEFORE YOU FILED THE CURRENT ARBITRATION.  AND I'M ASKING

IF THAT IS A WRITTEN COMMUNICATION, I'D LIKE TO SEE IT.

MS. LI:  WELL, THERE IS A LACK OF COMMUNICATION. OF COURSE I WOULDN'T HAVE ANYTHING.  I DID NOT RECEIVE ANYTHING.  AND PLUS I NEVER USED THE PHRASE THE NIGHT BEFORE.  I SAID UNTIL FEBRUARY I DID NOT HEAR FROM ANYONE FROM APOGEE WITH REGARDS TO OUR OFFER.  OUR OFFER TO ENFORCE THE CTC JUDGMENT FOR BOTH ME MYSELF AND APOGEE FOR THE BENEFIT OF BOTH PARTIES DESPITE WHAT APOGEE HAS DONE TO ME BREACHING THE AGREEMENT, THE EMPLOYMENT AGREEMENT. THEREFORE, I GAVE UP HOPE.

MR. TAUGER:  UPON CLARIFICATION, MS. LI, I WITHDRAW MY OBJECTION.

MS. LI:  I CAN'T HEAR WHAT YOU SAID.

MR. TAUGER:  UPON YOUR CLARIFICATION, I WITHDRAW MY OBJECTION.  THANK YOU.

MS. LI:  THANK YOU.  THANK YOU.

I HAVE ALSO WANTED TO SAY I APOLOGIZE, I CAN'T HEAR YOUR OBJECTIONS, BY THE WAY.  I JUST HEAR YOU WHEN YOU STAND UP AND INTERRUPT ME, BUT I CAN'T --

MR. TAUGER:  I'LL TRY TO REMEMBER TO RAISE MY HAND.

MS. LI:  ON MARCH 20 -- I BELIEVE 26TH, I DID FILE DEMAND TO THIS TRIBUNAL TO DEMAND ARBITRATION.  THROUGHOUT THE PROCEEDING, APOGEE HAS NOT ACTED IN ITS -- I BELIEVE NOT IN ITS BAD FAITH FIRST BY REFUSING TO REVIVE ITS

SUSPENSION STATUS FOR MERELY 15 MONTHS AT THE FTB.  LATEST WAS FINALLY REVIVED AFTER NUMEROUS EXTENSIONS.

AND SECOND, I OFFERED EARLY ON DURING THE ARBITRATION PROCEEDING AGAINST APOGEE THAT A SETTLEMENT MIGHT BE THE OPTION TO SAVE COST, TIME, AND MONEY FOR EVERYBODY, BUT APOGEE, IN FACT, REFUSED.

AND ALSO, ALONG WITH THE KEEPING ITSELF IN THE SUSPENSION STATUS SO THAT THE ASSIGNMENT POSSIBILITY WOULD BE CURTAILED.

SO IN SUMMARY, I HAVE WORKED AND BILLED ALMOST 991 HOURS AT A VERY MEAGER AND REDUCE THE RATE OF 480 PER HOUR FOR THE CTC LITIGATION MATTERS FOR THE BENEFIT OF APOGEE BEFORE MY RESIGNATION.  HOWEVER, I WAS ONLY PAID MERELY -- A MERELY $228,000 FROM APOGEE AND CTC JOINTLY.  AND APOGEE OWES ME AT LEAST, COUNTING INTEREST, WOULD BE 280,000 PLUS DOLLARS NOT -- NOT COUNTING INTEREST.

SO I SUFFERED ALL OF THESE DAMAGES FOR ALL OF THESE YEARS.  I GAVE HOPE TO SEEK RESOLUTIONS BY AMICABLE SETTLEMENT.  ALL OF THESE EFFORTS WERE FAILED.

THE ARBITRATOR:  IS THAT THE CONCLUSION OF YOUR TESTIMONY, MS. LI?

MS. LI:  I'D LIKE TO SUMMARIZE IN CONCLUSION.  I BELIEVE I HAVE CONTRIBUTED WORK.  I FULFILLED MY OBLIGATIONS UNDER THAT EMPLOYMENT AGREEMENT I SIGNED AND

APOGEE SIGNED IN APRIL 2016.  I'M ENTITLED TO BE COMPENSATED FOR THE WORK I HAVE DONE.  MY PERFORMANCE -- ALSO MY MITIGATION OF DAMAGES WHEN APOGEE FIRST BREACHED THEIR PROMISE TO ISSUE INVOICES.

AND SECONDLY, WHEN THEY REFUSED TO ENFORCE THE JUDGMENT AGAINST CTC, I OFFERED MY HELP, BUT I WAS REJECTED.  I WAS ALSO TOLD THAT WITHDRAW THE WITHHOLD.  I WAS ALSO EXCLUDED FROM KNOWING THE ENFORCEMENT EFFORT WHATSOEVER.  EITHER THE ENFORCEMENT FROM APOGEE OR APOGEE'S PRINCIPALS OR ANYONE INVOLVED IN THE HEART OF THIS DISPUTE.  AND THAT IS NOT A GOOD-FAITH BEHAVIOR.  TO ME THAT'S BAD CONDUCT, AND IT'S BAD FAITH.  AND ALSO --

MR. TAUGER:  YOUR HONOR, WE'RE INTO CLOSING ARGUMENT TERRITORY.  THIS ISN'T TESTIMONY.  THIS IS HER OPINION.

THE ARBITRATOR:  YEAH.  SO I TEND TO AGREE WITH MR. TAUGER.  THIS SOUNDS MORE LIKE ARGUMENT, MS. LI, THAN TESTIMONY.  SO IF THERE AREN'T ANY ADDITIONAL FACTS THAT YOU WISH TO TESTIFY TO, I THINK WE SHOULD TAKE A BREAK AND THEN BEGIN WITH YOUR CROSS-EXAMINATION.

MS. LI:  THANK YOU, YOUR HONOR.  THAT CONCLUDES MY TESTIMONY.

MR. TAUGER:  THANK YOU.

THE ARBITRATOR:  SO IT IS NOW 10:26 A.M., AND WE'VE COME TO THE END OF MS. LI'S DIRECT EXAMINATION.

LET'S TAKE A FIVE-MINUTE BREAK.  DOES THAT WORK?  TEN MINUTES.

MR. TAUGER:  I'M GOING TO REQUEST SEVEN MINUTES. THAT'S HOW LONG IT TAKES ME TO SMOKE A CIGARETTE.

MR. HART:  FIFTEEN.

THE ARBITRATOR:  LET'S JUST MAKE IT TEN MINUTES JUST TO ROUND IT OUT.  LET'S TAKE A 10-MINUTE BREAK. WE'LL BE BACK AT 10:36 BY MY COUNT, AND WE CAN GO OFF THE RECORD.

(RECESS TAKEN 10:26 TO 10:37 AM)

THE ARBITRATOR: THIS WILL BE THE CROSS-EXAMINATION.  SO LET'S GET BACK ON THE RECORD.

ALL RIGHT.  IT'S 10:37 IN THE MORNING, AND WE ARE READY TO PROCEED WITH THE CROSS-EXAMINATION OF MS. LI.

MR. TAUGER.

MR. TAUGER:  THANK YOU, YOUR HONOR.

CROSS-EXAMINATION

BY MR. TAUGER:    Q    MS. LI, I'M GOING TO ASK YOU A QUESTION THAT I'M NOT TRYING TO BE SMART.  I JUST NEED TO KNOW THE ANSWER TO THIS.

YOU'RE MULTI-LINGUAL; IS THAT RIGHT?

A    MAY I BEG YOUR PARDON, PLEASE?

Q    YES.

A    I CAN'T HEAR YOU BECAUSE YOU'RE NOT FACING

ME.  OH, I'M SORRY.  YOU'RE SPEAKING TOWARDS THE SCREEN.
OKAY.

       Q     IS THIS BETTER IF I TURN THIS WAY?

       A     YEAH, IT SEEMS TO BE A LITTLE BETTER.

       THE ARBITRATOR:  YOU KNOW --

       BY MR. TAUGER:    Q    MS. LI, YOU'RE
MULTI-LINGUAL; IS THAT CORRECT?

       A     I AM MULTI-LINGUAL, YES.

       Q     WHAT IS YOUR PRIMARY LANGUAGE?

       A     MY PRIMARY LANGUAGE IS MANDARIN CHINESE.

       Q     (COUNSEL SPOKE IN MANDARIN).

       A     I CAN'T HEAR YOU CLEARLY.

       Q     (COUNSEL SPOKE IN MANDARIN).

       A     (THE WITNESS SPOKE IN MANDARIN).

       Q     THE RECORD SHOULD REFLECT I ASKED MS. LI IN
MANDARIN IF SHE SPOKE MANDARIN.

       A     I'M SORRY.  YOU MAY ASK ME IN FRENCH AS
WELL.  I SPEAK FRENCH ALSO.

       Q     WELL, I JUST WANT TO CONFIRM MANDARIN IS
YOUR PRIMARY LANGUAGE, AND SHE RESPONDED THAT THAT WAS
CORRECT IN MANDARIN.

       I'D LIKE YOU TO LOOK AT WHAT WE MARKED AS
RESPONDENT'S 1, PLEASE.

       A     RESPONDENT 1?

       Q     THAT'S CORRECT.

MS. LI:  YOUR HONOR, WOULD THIS BE SHARED ON THE SCREEN, OR I JUST GO TO RESPONDENT 1?

MR. TAUGER:  I DON'T HAVE THE ABILITY TO SHARE HERE, SO I SHARED WITH YOU AND YOU SHOULD HAVE IT.

THE ARBITRATOR:  YEAH, I THINK WE SPOKE ABOUT HOW EVERYONE WOULD GET HARD COPIES OF THE EXHIBITS EXCEPT MYSELF.  I THINK THAT WAS WHAT WE --

MR. TAUGER:  MY UNDERSTANDING WAS WE AGREED THAT IT WOULD BE ALL DIGITAL.

THE ARBITRATOR:  OH, SORRY.

MR. TAUGER:  AND THAT I HAD INDICATED I WOULD PREFER TO HAVE A HARD COPY WITH ME.

MS. LI:  THAT WAS NOT STATED IN THE ORDER.  THE WITNESSES SHOULD BE GIVEN ELECTRONIC COPY.

MR. TAUGER:  AND YOU HAVE IT, MS. LI.

MS. LI:  YOU'RE SUPPOSED TO POST IT ON THE SCREEN SO I CAN SEE IT OTHERWISE WE WOULD BE SPEAKING -- WE HAVE TO VERIFY THE EXHIBITS EVERY TIME BECAUSE I'M GOING TO GO --

MR. TAUGER:  MS. LI, I SERVED YOU ON THE 4TH WITH OUR EXHIBITS AND OUR EXHIBIT LIST.  YOU HAVE IT, AND YOU SHOULD OPEN IT ON YOUR END.

MS. LI:  I HAVE YOUR LIST.  I RECEIVE YOUR LIST ON APRIL 5TH.  I UNDERSTOOD THAT IS YOUR REPLACEMENT LIST. I'M NOT DEBATING ON GOING THERE TO TRY, BUT I'M TELLING

YOU THAT SINCE I WILL NOT BE LOOKING AT THE DOCUMENTS FROM YOU, SO I'M GOING TO GO TO THE DRIVE THAT YOU SENT ME AND PICK OUT THE DOCUMENTS YOU INSTRUCT ME TO DO.

ANYWAY, WHICH DOCUMENT --

MR. TAUGER:  I'M GOING TO ASK YOUR HONOR TO RESOLVE THIS, PLEASE.

THE ARBITRATOR:  WELL, IT SOUNDS LIKE SHE'S ABLE TO ACCESS THE ELECTRONIC EXHIBITS ON HER OWN.  YOU HAVE A COPY, I HAVE A COPY, SO WE SHOULD BE GOOD.  I DON'T THINK WE NEED TO SCREEN SHARE NECESSARILY.

MS. LI:  OKAY.  I PULLED OUT R-0001 READS APOGEE LAW GROUP ON THE TITLE AND OFFER LETTER TO JOIN APOGEE LAW GROUP.  IS THIS THE CORRECT EXHIBIT?

MR. TAUGER:  YES, BUT I WANT TO CLARIFY SOMETHING YOU JUST SAID.

AND I HAVE TO ASK YOUR HONOR, IS THERE A REASON WHY WE'RE NOT DOING THIS TESTIMONY UNDER OATH?

THE ARBITRATOR:  THAT'S MY BAD.

MR. TAUGER:  OKAY.

THE ARBITRATOR:  I DID NOT SWEAR IN THE WITNESS.

MR. TAUGER:  IN THAT CASE I WOULD REQUEST THAT MS. LI BE SWORN.

THE ARBITRATOR:  ALL RIGHT.  MS. LI, I OMITTED TO SWEAR YOU IN AS A WITNESS.  SO LET ME ASK YOU TO RAISE YOUR RIGHT HAND.

DO YOU SWEAR THAT THE TESTIMONY THAT YOU BOTH GAVE THIS MORNING AND ARE ABOUT TO GIVE IN THIS PROCEEDING IS THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

THE WITNESS:  YES.

THE ARBITRATOR:  THANK YOU.

MR. TAUGER:  THANK YOU, YOUR HONOR.  AND THANK YOU, MS. LI.

HOLLY LI,

CALLED AS A WITNESS ON HER OWN BEHALF AND HAVING BEEN FIRST DULY SWORN WAS EXAMINED AND TESTIFIED AS FOLLOWS:

CROSS-EXAMINATION

BY MR. TAUGER:    Q    I WANT TO CLARIFY SOMETHING YOU JUST SAID.  DID YOU JUST SAY -- IS IT YOUR TESTIMONY THAT YOU DIDN'T GET MY EXHIBITS UNTIL THE 5TH?

A    MR. TAUGER, LET ME STATE VERY CLEARLY YOU SENT ME A LINK TO A DRIVE ON APRIL 4TH.

Q    CORRECT.

A    2023 TO MAKE IT CLEAR.

AND YOU SUBSEQUENTLY SENT ME A LINK.  I DID NOT RECEIVE IT -- OR I DID NOT SEE IT UNTIL APRIL 5, 2023.

Q    THANK YOU.  SO IT'S NOT YOUR TESTIMONY THAT YOU WERE SERVED WITH MY EXHIBITS ON THE 5TH BECAUSE THAT'S YOU WHAT JUST SAID.

A       UPON VERIFYING THE TIME SENDING, WE ALL KNOW ELECTRONIC AND IP PEOPLE CAN CHANGE THE SENDING TIME, BUT THIS IS --

MR. TAUGER:  YOUR HONOR, THAT'S A YES OR NO QUESTION.  CAN YOU DIRECT THE WITNESS TO ANSWER THE QUESTION, PLEASE.

THE ARBITRATOR:  SO MS. LI, I THINK IT WILL BE HELPFUL IF MR. TAUGER ASKS YOU A YES OR NO QUESTION TO START YOUR RESPONSE WITH EITHER THE YES, NO, OR YOU DON'T KNOW.  AND THEN YOU CAN PROVIDE WHATEVER EXPLANATION YOU WISH AFTER THAT.

MR. TAUGER:  AND FOR THE SAKE OF THE RECORD, I'M EXAMINING THIS WITNESS UNDER 776 AT YOUR PERMISSION.

MS. LI:  I CANNOT HEAR YOU.

MR. TAUGER:  FOR THE SAKE OF THE RECORD, MAY I HAVE YOUR PERMISSION TO EXAMINE THIS WITNESS UNDER 776?

THE ARBITRATOR:  YOU HAVE TO EXPLAIN TO ME WHAT 776 IS.

MR. TAUGER:  HOSTILE WITNESS.  I CAN LEAD.

THE ARBITRATOR:  YES.

MS. LI:  I CANNOT ENGAGE IN THIS CONVERSATION WHEN YOU SPEAK TOWARDS THE OTHER WALL OR TOWARDS THE OTHER SIDE BACK TO ME.  I CAN'T HEAR YOU AND --

MR. TAUGER:  MS. LI, IF YOU CAN'T HEAR ME, JUST SAY SO.  YOU DON'T NEED TO MAKE A SPEECH ABOUT IT.  THIS

IS MY TIME NOW, AND YOU'RE CUTTING INTO IT.

Q    TO CLARIFY, YES OR NO, WERE YOU SERVED WITH MY FINAL EXHIBIT LIST ON THE 4TH?

A    NO.

Q    YOUR HONOR, I'M GOING TO PRINT OFF A REBUTTAL EXHIBIT.  I'M NOT SURE HOW TO SHOW THIS TO YOU, MS. LI, BUT I WILL READ IT TO YOU.

WHAT I'M GOING TO GIVE TO THE ARBITRATOR IS AN EMAIL DATED 4/4 AT 9:23 P.M.

DEAR MS. LI, IN REVIEWING MY EXHIBITS AND CORRESPONDING LIST, I FOUND A FEW MINOR ERRORS.

EXCUSE ME.

THIS LINK WILL ALLOW YOU TO DOWNLOAD THE COMPLETE AND CORRECT SET.  I APOLOGIZE FOR ANY INCONVENIENCE.

AND AGAIN, I WILL SAY THE TIMESTAMP IS TUESDAY, 4/4/2023, EXCUSE ME, AT 9:23 P.M.

YOU SUBSEQUENTLY SENT AN EMAIL TO MR. BONEY NOTHING WITH THE INTENT OF IT BEING GIVEN TO THE ARBITRATOR IN WHICH YOU CLAIM AND PROVIDED YOUR EMAIL VERSION OF THIS THAT SHOWED A DATE OF 4/5.  AND I ADVISED YOU THAT BECAUSE YOU WERE IN NEW YORK, THAT'S THREE HOURS LATER THAN WHEN I SENT IT.  DO YOU RECALL THAT?

A    I DO RECALL THAT, MR. TAUGER.  YOU ASKED ME IF I WAS --

Q      THANK YOU.  YOU ANSWERED THE QUESTION, MS. LI.  THANK YOU.

WERE YOU PREPARED THIS MORNING TO START AT 6:00 A.M. OUR TIME, IS THAT YOUR UNDERSTANDING, WERE YOU AVAILABLE AT 6:00 A.M. OUR TIME TO START THIS HEARING, OR DID YOU UNDERSTAND THAT WE WERE TALKING CALIFORNIA TIME?

A      I DO UNDERSTAND YOU ARE TALKING ABOUT CALIFORNIA TIME.

Q      THANK YOU.

A      THIS HEARING IS SCHEDULED IN CALIFORNIA TIME.

Q      THANK YOU.

MS. LI:  OBJECTION, YOUR HONOR.  THIS IS RELEVANCY.  IS IT RELEVANT?

MR. TAUGER:  GOES TO THE CREDIBILITY OF THE WITNESS.

THE ARBITRATOR:  I WILL ALLOW THE EXAMINATION AND THE QUESTION, AND I'LL GIVE IT THE WEIGHT THAT I THINK IT DESERVES.

MR. TAUGER:  THANK YOU.

Q      I'M GOING TO REFER NOW TO RESPONDENT'S R-001.  DO YOU HAVE THAT IN FRONT OF YOU, MS. LI?

A      YES.

Q      YOU READ THIS DOCUMENT; IS THAT CORRECT?

A      YES.

Q    YOU'RE FAMILIAR WITH ITS CONTENTS?

A    YES.

Q    WHAT DO YOU UNDERSTAND THE WORD "COLLECTED" TO MEAN?

A    COLLECTED MEANING ANY FUNDS, ANY FEES, ANY SUBJECT BEING RECEIVED.

Q    IN THE CONTEXT OF THE AGREEMENT, WHICH IS RESPONDENT'S 001, WHAT DO YOU UNDERSTAND THE WORD "COLLECTED" TO MEAN?

A    MAY I ASK YOUR FAVOR TO POINT OUT THE WORD EXACTLY WHERE IT APPEARS.

Q    SURE.  IF YOU LOOK AT THE SECOND PARAGRAPH OF PAGE 1 OF EXHIBIT 1 AND IF YOU LOOK AT THE THIRD SENTENCE IT SAYS, FOR WORK THAT YOU ORIGINATE AND WORK ON YOURSELF, 65 PERCENT GOES TO THE ATTORNEY BASED ON FUNDS COLLECTED.

DO YOU SEE THAT?

A    YES.

Q    WHAT DOES "COLLECTED" MEAN?  WHAT DO YOU UNDERSTAND "COLLECTED" TO MEAN IN THIS AGREEMENT.

A    MY UNDERSTANDING IS THE FUNDS, I.E., MONEY OR ANY EQUIVALENCE OF MONEY BEING -- YOU KNOW, IT'S VERY HARD TO FIND THE SUBSTITUTE OF THE WORD COLLECTED BUT RATHER RECEIVED IN SOME SORT OF FORM OR MANNER.

Q    WOULD YOU AGREE THAT RECEIVED BY THE FIRM IS

A REASONABLE EXPLANATION OF WHAT COLLECTED MEANS IN THIS CONTEXT?

A     NO.

Q          WHY WOULD THAT NOT BE A CORRECT OR REASONABLE CONSTRUCTION OF THE TERM "COLLECTED"?

A          I HAVE ISSUES AND I HAVE QUESTIONS WITH THE WORD "FIRM".  WHAT DOES FIRM -- WHAT IS FIRM REFER TO IN YOUR QUESTION?

Q          WHAT DO YOU THINK FUNDS MEANS?  AND THIS IS WHY I ASKED YOU ABOUT YOUR PRIMARY LANGUAGE.  I WANT TO MAKE SURE THERE'S NO CONCERN --

A          YES, I DO NOT THINK FIRM MEANING A FARM WITH CHICKENS.  I'M SPECIFICALLY SPEAKING FIRM REFERS TO APOGEE'S PREVIOUS STRUCTURE, SUBSEQUENT STRUCTURE, ANY REPRESENTATIVE -- REPRESENTATIONS OF APOGEE ACCURATELY, I DON'T HAVE SUCH INFORMATION.

Q          OKAY.  CAN YOU TELL ME WHAT FUNDS COLLECTED MEANS -- LET ME DO A FOUNDATIONAL QUESTION.

YOU SIGNED THIS AGREEMENT; IS THAT RIGHT?

A     CORRECT, I SIGNED.

Q     AND ARE YOU BOUND BY THIS AGREEMENT?

A     YES, I WAS BOUND BY THIS AGREEMENT.

Q          OKAY.  DO YOU FEEL AT SOME POINT YOU WERE NOT BOUND BY THIS AGREEMENT?

A          AFTER THE -- APOGEE, WHICH IS THE -- ONE OF

THE PARTIES BREACHED, AND AFTER WE HAD WRITTEN AMENDMENT,

IT WAS BREACHED AGAIN.  I AM STILL -- THAT'S MY ANSWER.

Q     THANK YOU.  YOU SAY THERE WERE WRITTEN

AMENDMENTS TO THIS AGREEMENT?

A     I'M BOUND BY THIS AGREEMENT.  THERE WAS A

WRITTEN AMENDMENT AFTER THE BREACH.

Q     HAVE YOU PUT THAT AMENDMENT INTO EVIDENCE?

IS IT ONE OF YOUR IDENTIFIED DOCUMENTS?

A     YES.

Q     WHAT NUMBER WOULD THAT BE?  CAN YOU SHOW ME

WHAT DOCUMENT THAT YOU'VE IDENTIFIED CONSTITUTES A WRITTEN

AMENDMENT TO THIS AGREEMENT?

A     YES.  I SHOWED YOU EXHIBIT -- LET ME JUST

GET TO THE EXHIBIT NUMBER.  SPECIFICALLY THE WRITTEN WORK

COMMUNICATION -- WRITTEN COMMUNICATION C-002 WHEREBY

PRINCIPALS OF APOGEE AGREED WITH ME THAT THE INVOICING

PART WOULD BE DONE, EXECUTED THE WAY THAT WE DISCUSSED.

Q     THANK YOU, MS. LI.

A     I WILL ALSO POINT OUT --

Q     THANK YOU, MS. LI.  I JUST WANT TO CLARIFY

YOUR CONTENTION IS THAT EXHIBIT C-002, WHICH CONTAINED

ROBERT HART'S ONE WORD, OKAY, CONSTITUTES A WRITTEN

AMENDMENT TO THE AGREEMENT; IS THAT RIGHT?

A     NOT EXACTLY.  THERE ARE FURTHER EXHIBITS

SHOWING --

Q      THAT'S A YES OR NO QUESTION.  DO YOU CONTEND THAT C-002, WHICH IS AN EMAIL EXCHANGE BETWEEN YOU AND MR. HART AND CONTAINS MR. HART'S ONE-WORD RESPONSE, OKAY, CONSTITUTES A WRITTEN AMENDMENT TO THE AGREEMENT THAT IS R-001?

A      ONE OF THE WRITTEN AGREEMENTS.

Q      OKAY.  WHAT ARE THE OTHER WRITTEN AGREEMENTS?

A      YES.  I'D LIKE TO GO TO C-001.

Q      I'M JUST PULLING IT UP.

OKAY.  THIS IS ANOTHER EMAIL EXCHANGE APPEARS TO BE BETWEEN YOU AND MR. HART.

CAN YOU TELL ME WHAT IN THIS DOCUMENT CONSTITUTES A WRITTEN AMENDMENT TO THE AGREEMENT?

A      YES.  I'D LIKE TO GO TO A SPECIFIC PAGE. JUST BEAR WITH ME ONE --

Q      TAKE YOUR TIME, MS. LI.  I WANT TO BE ACCURATE.

A      C-010.

Q      OKAY.  MY MONITOR JUST TURNED OFF.  I'M SORRY.

C-010?

A      YES, CORRECT.

Q      ALRIGHTY.

A      DO I NEED TO SHARE THIS DOCUMENT?

Q    IT MIGHT BE HELPFUL.  I HAVE IT IN FRONT OF ME.  I DON'T KNOW IF THE ARBITRATOR HAS IT.  IT MIGHT BE HELPFUL.

Q    ACTUALLY, I DON'T NEED TO SEE IT ON THE MONITOR, BUT IT'S UP TO YOU.

CAN YOU SHOW ME WHERE IN THIS AGREEMENT YOU CONTEND THERE IS A WRITTEN MODIFICATION -- I'M SORRY.  WHERE IN THE EMAIL, C-010, THERE IS A WRITTEN MODIFICATION TO THE AGREEMENT R-001?

A    I WITHDRAW THIS DOCUMENT BECAUSE THIS IS A DOCUMENT --

Q    THANK YOU.  THAT'S SUFFICIENT.  I DON'T NEED AN EXPLANATION AS TO WHAT THE DOCUMENT IS.

ARE THERE ANY OTHER DOCUMENTS THAT YOU CONTEND --

A    I'M SORRY.  I WITHDRAW MY WITHDRAWAL.  I MUST APOLOGIZE.  I JUST READ THE SENTENCE MORE CLEARLY.

THIS WRITTEN COMMUNICATION TO ME ADMIT THAT IN ALL FAIRNESS -- STRIKE THE WORD "ALL".

IN FAIRNESS, THE WEIGHT IS ON ME STATED BY MR. HART.  THAT MEANS THE WEIGHT IS ON HIM.

Q    I'M GOING TO INTERRUPT YOU, MS. LI, BECAUSE THIS IS NOT RESPONSIVE TO MY QUESTION.  MY QUESTION WAS WHERE IN THIS DOCUMENT DO YOU FIND A WRITTEN MODIFICATION TO R-001.  I JUST NEED YOU TO IDENTIFY IT.  I DON'T WANT

YOU TO EXPLAIN IT.

IS IT YOUR CONTENTION THAT THE FIRST SENTENCE OF THE FIRST PAGE OF THE EMAIL FROM ROBERT HART IS A WRITTEN MODIFICATION TO THE AGREEMENT?

A     NO.  I WITHDRAW THIS AS TO YOUR QUESTION, BUT IT'S SUPPORTING TO --

Q     I'M GOING TO ASK THAT YOU JUST CONFINE YOUR RESPONSES TO THE QUESTION THAT I ASK.  I DON'T WANT AN EXPLANATION UNLESS I ASK YOU FOR ONE.  IS THAT UNDERSTOOD?  IS THAT FAIR, MS. LI?  YES?

A     YES.

Q     CAN YOU SHOW ME, AND I'M ASKING AGAIN EXACTLY WHERE IN THIS DOCUMENT, C-010, YOU FIND WHAT YOU CONTEND IS A WRITTEN MODIFICATION --

A     OKAY.

Q     -- TO EXHIBIT R-001?

A     I WITHDRAW MY IDENTIFICATION OF THIS DOCUMENT TO YOUR QUESTION.

Q     THANK YOU.  ARE THERE ANY OTHER DOCUMENTS THAT YOU CONTEND CONSTITUTE A WRITTEN MODIFICATION TO R-001?

A     YES.

Q     WHAT WOULD THAT BE?

A     EXHIBIT C-013.

Q     OKAY.  AND WHERE IN C-013 DO YOU FIND THAT

WRITTEN MODIFICATION?

A    YES.  AS I STATED IN THE DOCUMENT ON NOVEMBER 28, 2016, I DID START WITH, HI, ROBERT.  HOPE YOU HAD A GOOD HOLIDAY.  I DIDN'T RECEIVE ANYTHING FROM YOU LAST WEDNESDAY.  AS A RESULT OF THESE REPEATED DELAYS, I AM PLANNING TO SEND OUT MY --

Q    YOU DON'T HAVE TO READ IT.  IT'S THAT PARAGRAPH.  I THINK WE ALL SEE IT.

IS YOUR CONTENTION THAT THAT IS A WRITTEN MODIFICATION, OR IS THERE MORE?

A    IT'S NOT A RUMOR.  IT'S STATED FROM THE WITNESS MYSELF.

Q    NO.  I'M NOT OBJECTING TO IT.  I JUST DON'T NEED YOU TO READ IT.  IT WASTES TIME, AND WE BOTH HAVE LIMITED TIME.

A    BUT YOU HAD ASKED ME TO IDENTIFY.

Q    AND ALL YOU NEED TO SAY IS IT'S THAT PARAGRAPH OR THAT EMAIL.

IS THAT CORRECT YOUR EMAIL OF MONDAY, NOVEMBER 28, 2016, TO MR. LI FROM YOU -- I'M SORRY, TO MR. HART FROM YOU CONSTITUTES A WRITTEN MODIFICATION TO R-001?

A    THIS WOULD BE PART OF THE --

Q    THAT'S A YES OR NO QUESTION AGAIN, MS. LI.  IS IT OR ISN'T IT?

A     YOUR QUESTION IS WHETHER IT CONSTITUTES ONE?

Q     **YES, AND THAT'S A YES OR NO QUESTION.**

A     OTHER COMMUNICATION --

MR. TAUGER:  YOUR HONOR, CAN WE PLEASE GET THE WITNESS TO ANSWER THE QUESTION.

THE ARBITRATOR:  OKAY.  SO I'M HEARING MS. LI SAY, YES, IN PART.

MR. TAUGER:  FINE.  THAT'S ALL I NEED.

THE ARBITRATOR:  IS THAT CORRECT, MS. LI?

MS. LI:  THANK YOU, YOUR HONOR, TO HELP ME BECAUSE ENGLISH IS --

BY MR. TAUGER:    Q    THANK YOU.  IS THERE ANYTHING ELSE IN EXHIBIT C-013 BESIDES WHAT YOU JUST IDENTIFIED THAT IT'S PART OF OR CONSTITUTES A MODIFICATION TO R-001?

A     I'M READING THROUGH IT.

Q     **THAT'S FINE.  TAKE YOUR TIME.**

A     ON THE NEXT PAGE LI 000152.

Q     **THAT APPEARS TO BE AN EMAIL FROM YOU TO MR. HART, AND IT'S YOUR CONTENTION THAT THIS IS, IN PART, OR CONSTITUTES AN AMENDMENT TO R-001; IS THAT RIGHT?**

A     YES, IN PART.

Q     **OKAY.  THANK YOU.**

**LET'S GO BACK TO R-001.  AND AGAIN, I'M LOOKING AT THE SECOND PARAGRAPH WHERE IT SAYS BASED ON**

FUNDS COLLECTED.  IT'S IN THE MIDDLE OF THE SECOND PARAGRAPH.  DO YOU SEE THAT?

A    SECOND PARAGRAPH OF R-001, PAGE 1?

Q    YEAH.  IT SAYS FOR WORK THAT YOU ORIGINATE AND IT INCLUDES THE PHRASE "FUNDS COLLECTED".  DO YOU SEE THAT?

A    OKAY.  IS IT ON PAGE 1, SECOND PARAGRAPH?

Q    YES, IT IS.

A    YES.

Q    OKAY.  AGAIN, I'M TRYING TO CLARIFY YOUR UNDERSTANDING OF FUNDS COLLECTED.

A    OKAY.  CAN I CLARIFY AGAIN?  DID YOU READ FOR WORK THAT YOU ORIGINATE AND WORK ON YOURSELF?

Q    I'M ASKING YOU A VERY SPECIFIC QUESTION AND THAT IS WHAT IS YOUR UNDERSTANDING OF THE PHRASE "FUNDS COLLECTED" AS IT APPEARS ON PAGE 1 OF EXHIBIT R-001.  I'M NOT ASKING ABOUT ANYTHING ELSE.  WHAT DO YOU UNDERSTAND THOSE TERMS TO MEAN?

A    AS I SAID EARLIER, FUNDS RECEIVED -- FUNDS COLLECTED HERE MEANS FUNDS RECEIVED.

Q    THANK YOU.  THERE'S A REFERENCE HERE, AND LET ME FIND IT.  I'M LOOKING AT THE FIRST PARAGRAPH.  IT SAYS, PLEASE NOTE YOUR OFFER TO JOIN THE FIRM IS NOT AN OFFER OF EMPLOYMENT AS AN EMPLOYEE BUT AS A CONTRACT 1099 ATTORNEY.  DO YOU SEE THAT?

A        UH-HUH.  YES.

Q        WHAT DO YOU UNDERSTAND 1099 ATTORNEY TO MEAN?

A        AT THE TIME OF THE CONTRACTING -- AT THE TIME SIGNING OF THE AGREEMENT, I DIDN'T THINK TOO MUCH ABOUT THIS PHRASE.  I THOUGHT IT WAS EARLY GEARED TOWARDS A -- THIS WHOLE ISSUE RELATED TO APOGEE LAW.

Q        YOU DIDN'T UNDERSTAND THE PHRASE WHEN YOU SIGNED THIS AGREEMENT IS THAT WHAT YOU ARE SAYING, OR AM I MISINTERPRETING YOUR ANSWER?

A        YOU DIDN'T MISINTERPRET MY ANSWER.  THAT WAS CORRECT WHAT I SAID.

Q        SO YOU DID NOT, WHEN YOU SIGNED THIS AGREEMENT, UNDERSTAND THE DISTINCTION BETWEEN AN EMPLOYEE AND A 1099; IS THAT RIGHT?

A        I READ IT AS A 1099 ATTORNEY, BUT I DIDN'T REALLY KNOW WHAT EXACTLY IS A 1099 ATTORNEY.  KEEP IN MIND --

Q        THANK YOU.  THAT ANSWERED THE QUESTION.  I DON'T WANT EXPLANATIONS BECAUSE I HAVE LIMITED TIME, AND I WOULD APPRECIATE YOUR COOPERATION IN THAT REGARD.

THE ARBITRATOR:  MS. LI, CAN YOU PLEASE STOP SHARING YOUR SCREEN AS WELL SO WE CAN SEE YOU MORE CLEARLY.

MR. TAUGER:  THANK YOU.

Q     WERE YOU PRESENTED WITH THIS EMPLOYEE -- I'M SORRY, WITH THE OFFER LETTER TO JOIN APOGEE LAW GROUP, PC, AS A TAKE-IT-OR-LEAVE-IT OR WERE THERE DISCUSSIONS WITH APOGEE THAT LED UP TO SIGNING THIS DOCUMENT?

A     THERE WERE LIMITED DISCUSSIONS LEADING TO SIGNING THIS AGREEMENT.

Q     THANK YOU.  AT ANY TIME DID YOU MENTION TO ANYONE AT APOGEE THAT YOU DIDN'T UNDERSTAND WHAT 1099 ATTORNEY MEANS?

A     I DON'T RECALL BECAUSE IT'S ALMOST 10 YEARS AGO.

Q     I DON'T RECALL IS A PERFECTLY GOOD ANSWER, AND I WOULD REQUEST RATHER THAN GUESSING OR SPECULATING IF YOU DON'T REMEMBER, YOU DON'T REMEMBER, AND THAT'S FINE. THANK YOU.

      WHAT IS IP ADVANTAGES ASIA, LIMITED?

A     AS I SAID IN MY TESTIMONY, IT WAS ONE OF THE IP ADVISORY FIRM I FOUNDED, BUT I DON'T WORK THERE ANYMORE.

Q     WHAT'S AN IP ADVISORY FIRM?

A     MEANING THAT CONSULTANTS OR PEOPLE SPECIALIZED IN IP ASSET MANAGEMENT GIVE ADVICES TO COMPANIES WHO WISHES TO GROW THEIR IP ASSETS.

Q     MS. LI, I'M GOING TO EMAIL A REBUTTAL EXHIBIT TO YOU, OR I'M GOING TO TRY.

A    REBUTTAL EXHIBITS THAT WAS PREVIOUSLY INTRODUCED?

Q    NO, IT'S A REBUTTAL EXHIBIT, BUT I'M GOING TO EMAIL IT TO YOU.  IF YOU HOLD ON ONE SECOND AND LET ME KNOW WHEN YOU GET IT.

A    IS IT ADMISSIBLE?

Q    WELL, WE'RE GOING TO DETERMINE THAT ONCE YOU GET IT.  I THINK YOU'D LIKE TO SEE IT BEFORE YOU DO.

MS. LI:  OBJECTION.

THE ARBITRATOR:  MS. LI, WHY DON'T YOU WAIT TO RECEIVE THE EXHIBIT FIRST.

MR. TAUGER:  IT'S ON ITS WAY.

AND DID I PROVIDE YOU THIS?

THE ARBITRATOR:  WHICH ONE IS IT?

MR. TAUGER:  I DIDN'T.  HERE IT IS.

Q    LET ME KNOW WHEN YOU RECEIVE IT, AND I'D ASK YOU TO OPEN IT AND LOOK AT IT AND YOU CAN RAISE ANY OBJECTION YOU THINK IS APPROPRIATE.

A    OH, THIS IS AN EXHIBIT YOU WERE NEVER PRODUCED AND YOU NEVER EXCHANGED AT ALL THROUGHOUT THE PROCESS.

Q    IS THIS AN OBJECTION, MS. LI?

A    YES, OBJECTION.  RELEVANCY.

THE ARBITRATOR:  MS. LI, THIS IS A REBUTTAL EXHIBIT, SO THERE WAS NO NEED TO DISCLOSE IT IN ADVANCE

PROVIDED THAT IT IS ACTUALLY A REBUTTAL EXHIBIT.

        MR. TAUGER, WOULD YOU LIKE TO LAY FOUNDATION?

        MR. TAUGER:  I'M SORRY?

        THE ARBITRATOR:  MR. TAUGER, WOULD YOU LIKE TO LAY A FOUNDATION?

        MR. TAUGER:  I CERTAINLY WOULD.

        Q     FIRST, CAN YOU TELL ME WHAT THIS DOCUMENT IS, MS. LI?

        A     IT IS ENGAGEMENT AGREEMENT I -- IP ADVANTAGES SIGNED WITH ONE OF ITS CLIENT.

        Q     I'M SORRY, WITH ONE OF WHOSE CLIENTS?

        A     YES.

        Q     I DIDN'T HEAR YOU.  I'M SORRY.  ONE OF -- IS THIS YOUR CLIENT?  IS THIS ASIA -- I'M SORRY IP ADVANTAGES --

        A     I'M SORRY.  I CANNOT HEAR YOUR LAST SENTENCE.

        Q     OKAY.  I APOLOGIZE.  I DIDN'T HEAR WHEN YOU SAID, THIS IS AN ENGAGEMENT AGREEMENT WITH, AND I HEARD CLIENT, AND I DIDN'T HEAR WHOSE CLIENT.  IS IT YOUR CLIENT?

        A     I SAID THIS IS THE ENGAGE -- THIS IS A ENGAGEMENT AGREEMENT SIGNED BY IP ADVANTAGES WITH ONE OF ITS CLIENTS.

Q        THANK YOU.  THAT'S ALL I NEEDED TO HEAR.
THANK YOU.

LOOKING AT THE FIRST PARAGRAPH, IT INDICATES
THAT YOU'RE GOING TO -- AND BY YOU I'M REFERRING TO
IP ADVANTAGES ASIA.  YOU UNDERSTAND THAT?  IS THAT OKAY IF
I REFER TO YOU IN THIS LETTER -- IN THIS ENGAGEMENT
AGREEMENT IN THAT CONTEXT?

A        YOU ARE REFERRING ME TO THE EQUIVALENT AS
IP ADVANTAGES ASIA, LIMITED?

Q        ONLY WITH RESPECT TO QUESTIONING YOU ABOUT
THIS DOCUMENT?

A        OKAY.  IF YOU CAN STIPULATE TO THAT BECAUSE
I'M NOT IP ADVANTAGES ASIA.

Q        I UNDERSTAND YOU'RE NOT, AND IT'S JUST
FASTER --

ALL RIGHT.  I WITHDRAW THAT REQUEST.  NEVER
MIND.

A        HOW ABOUT I CAN JUST PROVIDE ONE --

Q        HOW ABOUT I ASK YOU QUESTIONS, MS. LI, AND
THEN YOU ANSWER THEM.

THIS AGREEMENT STATES THAT
IP ADVANTAGES ASIA, LIMITED, WILL REPRESENT THIS CLIENT IN
CONNECTION WITH INTELLECTUAL PROPERTY PROTECTION IN THE
UNITED STATES AND THE WORLD THAT WILL BE DEVELOPED BY YOUR
STARTUP COMPANIES SPECIFICALLY RELATING TO THE

PROSECUTION, PROCUREMENT, PROSECUTION, AGAIN, ENFORCEMENT OF HAPUS PATENTS, TRADEMARKS, AND OTHER IP-RELATED WORK THEREAFTER THE MATTER OR ENGAGEMENT.

THIS IS AN ENGAGEMENT FOR LEGAL SERVICES, ISN'T IT?

I THINK SHE MAY BE FROZEN.

CAN YOU HEAR US, MS. LI?

A      YEAH.

Q      YOU'RE FROZEN AGAIN.  I'M SORRY.  I GUESS WE'LL HAVE TO STOP FOR A MINUTE.

OKAY --

A      YEAH, I WAS --

Q      I'M SORRY.  GO AHEAD.

A      EVERYTHING WAS FROZEN FOR AWHILE.

Q      YEAH.  THIS WAS AN ENGAGEMENT TO PROVIDE LEGAL SERVICES TO THIS CLIENT?

A      NO, IT'S NOT AN ENGAGEMENT PROVIDING LEGAL SERVICE.

Q      WHAT SERVICES WERE YOU CONTRACTING TO PROVIDE IN REFERENCE TO INTELLECTUAL PROPERTY, IP PROTECTION IN THE UNITED STATES, OTHER PARTS OF THE WORLD?

A      UH-HUH.

Q      PROTECTION, PROCUREMENT, PROSECUTION, ENFORCEMENT OF HAPUS PATENTS, TRADEMARKS, AND OTHER IP RELATED WORK.  WHAT WERE YOU CONTRACTING TO PROVIDE?

A       CORRECT.  MAY I EXPLAIN?  IP PRACTICE IS NOT EQUIVALENT TO LEGAL PRACTICE.  IF I MAY, EVEN THOUGH I DON'T SPEAK ENGLISH AS MY FIRST LANGUAGE AS WELL AS YOU ARE, BUT -- YOU DO, BUT I DO UNDERSTAND IP PRACTICE AROUND THE WORLD MANY COUNTRIES, MANY JURISDICTIONS IP PRACTICE IS NOT REGARDED AS LEGAL PRACTICE.  IT'S PROVIDING IP.

**Q       THAT'S NONRESPONSIVE.**

A       IT'S VERY RESPONSIBLE BECAUSE YOU WANT ME TO SAY THESE SERVICES ARE LEGAL PRACTICE.  I'M NOT PROVIDING LEGAL  --

**Q       THE ANSWER IS NO?**

A       -- IS NOT PROVIDING --

**Q       YOUR ANSWER IS --**

THE ARBITRATOR:  MS. LI.  MS. LI.  I WOULD ASK YOU NOT TO ARGUE WITH THE ATTORNEY WHO'S EXAMINING YOU.  IF THERE'S A RESPONSE THAT YOU'D LIKE TO PROVIDE, YOU CAN DO THAT ON REDIRECT.

THE WITNESS:  I APOLOGIZE.

THE ARBITRATOR:  BUT ESSENTIALLY YOU'RE MR. TAUGER'S WITNESS, SO MR. TAUGER GETS TO CALL THE SHOTS IN TERMS OF WHAT QUESTIONS ARE DIRECTED TO YOU AND WHAT QUESTIONS YOU ANSWER AND WHAT OTHER INFORMATION, YOU KNOW, YOU'RE PRECLUDED FROM EMBELLISHING.

BY MR. TAUGER:    Q    WHAT DO YOU UNDERSTAND PROSECUTION TO MEAN?  IS THAT PATENT PROSECUTION OR

TRADEMARK PROSECUTION?  IS THAT WHAT WAS INTENDED HERE?

A        PROSECUTION INCLUDES TRADEMARK PATENTS, COPYRIGHTS, OR TRADE SECRETS, INDUSTRIAL PROPERTY RIGHTS, YEAH, ET CETERA.

Q        OKAY.  SO IT DOES INCLUDE PATENT PROSECUTION AND TRADEMARK PROSECUTION; IS THAT RIGHT?

A        CORRECT.

Q        OKAY.  LET ME ASK YOU ABOUT THIS CLIENT. THERE'S A WOMAN NAMED HOPE PORTER IN THE ADDRESS LINE. AND IT SAYS HAPPA, INC.  DID YOU HAVE ANY DEALINGS WITH MS. PORTER REGARDING ANY MATTERS THAT WERE BROUGHT INTO APOGEE OR BROUGHT TO APOGEE?

A        YOU ASK ME DO I HAVE ANY DEALINGS WITH MS. PORTER?

Q        WITH MS. PORTER OR MS. PORTER'S COMPANY THAT WERE WORKED ON BY APOGEE; IS THAT CORRECT?

A        YES, THAT'S CORRECT.

Q        AND IS THAT -- I MAY NOT BE PRONOUNCING IT CORRECTLY.  J-A-U-V-R-E, JAUVRE OR JAUVRE, WAS THAT A PATENT PROSECUTION MATTER YOU WERE DOING FOR MS. PORTER?

A        YES, CORRECT.

Q        THANK YOU.

I WOULD ASK THAT OUR REBUTTAL EXHIBIT BE ENTERED INTO EVIDENCE.

THE ARBITRATOR:  OKAY.  MS. LI, ANY OBJECTION?

MS. LI:  OBJECTION, YOUR HONOR, IS RELEVANCE.

THE ARBITRATOR:  ALL RIGHT.  SO I WILL ADMIT THE DOCUMENT.

WHAT NUMBER SHALL WE GIVE THIS?

MR. TAUGER:  I'VE MARKED IT AS R, FOR REBUTTAL, 201.  I'M SORRY, NOT FOR REBUTTAL.  R FOR RESPONDENT.

THE ARBITRATOR:  201.

OKAY.  SO THIS LETTER WILL BE ADMITTED INTO EVIDENCE AS R-201.

(WHEREUPON EXHIBIT R-201 WAS MARKED FOR IDENTIFICATION.)

(WHEREUPON EXHIBIT R-201 WAS RECEIVED INTO EVIDENCE.)

MR. TAUGER:  THANK YOU.

MS. LI:  HOW IS IT RELEVANT TO THE HEART OF THE MATTER BETWEEN CLAIMANT AND APOGEE?

THE ARBITRATOR:  MS. LI, I ADMITTED IT INTO EVIDENCE.  I WILL TAKE YOUR OBJECTION INTO ACCOUNT IN GIVING IT THE WEIGHT I THINK IT DESERVES.

BY MR. TAUGER:    Q    MS. LI, DID I UNDERSTAND YOUR TESTIMONY THAT WHEN MR. HART MET YOU TO DISCUSS PERHAPS JOINING APOGEE, HE TOLD YOU HE WAS FORMING A NEW LAW FIRM?

A    HE WAS FORMING A NEW LAW FIRM WITH OTHER PARTNERS.

Q      HE TOLD YOU THAT?

A      YES.

Q      AND WOULD IT SURPRISE YOU THAT MR. HART WILL
TESTIFY TODAY THAT APOGEE WAS FOUNDED AND FUNCTIONING ON
JANUARY 1, 2015?

A      WOULD IT BE -- I DIDN'T HEAR THE FIRST TWO
WORDS.

Q      WOULD IT SURPRISE YOU THAT MR. HART WILL
TESTIFY TODAY THAT APOGEE WAS FORMED JANUARY 1, 2015?

A      IT COULD BE BECAUSE I DID NOT KNOW WHEN
APOGEE WAS FORMED.

Q      WOULD YOU LIKE TO RECONSIDER YOUR TESTIMONY
THAT MR. HART TOLD YOU THAT HE WAS FORMING A NEW LAW FIRM?

A      I CANNOT CHANGE MY TESTIMONY.  THAT'S WHAT I
KNEW AT THE TIME.  I -- IT IS --

Q      OKAY.  THANK YOU.  YOU'VE ANSWERED THE
QUESTION.

A      ARE YOU TRYING TO ASK ME TO SPECULATE?

THE ARBITRATOR:  MS. LI, PLEASE DON'T ARGUE WITH
COUNSEL.

I THINK WE CAN MOVE ON, MR. TAUGER.

MR. TAUGER:  THANK YOU.

Q      YOU TESTIFIED EARLIER THAT APOGEE REFUSED TO
ENFORCE THE SETTLEMENT AWARD THAT WAS GIVEN AT THE JAMS
ARBITRATION AGAINST CATHY TRADING; IS THAT CORRECT?

A     I WAS TOLD THAT THEY REFUSED TO ENFORCE.

Q     OH, YOU WERE TOLD.  DID ANYONE AT APOGEE EVER TELL YOU WE'RE NOT GOING TO ENFORCE THIS?

A     YES.

Q     WHO AT APOGEE TOLD YOU WE'RE NOT GOING TO ENFORCE THIS?

A     APOGEE'S PRINCIPALS.

Q     WHO?

A     AND VIA COUNSEL, YOURSELF.

Q     I WAS NOT INVOLVED IN ANY OF LITIGATION --

A     THROUGHOUT THIS PROCEEDING.

Q     I'M SORRY?

A     THROUGHOUT THIS PROCEEDING.

Q     I'M GOING TO ASK THE QUESTION AGAIN.

A     YOU --

Q     LET ME FINISH, PLEASE.

YOU TESTIFIED UNDER RETROACTIVE, I GUESS, THAT APOGEE TOLD -- APOGEE REFUSED TO ENFORCE THE ARBITRATION AWARD IT OBTAINED AGAINST CATHY TRADING.  YOU TESTIFIED TO THAT; IS THAT CORRECT?

A     I TESTIFIED THAT APOGEE TOLD ME THEY HAVE NOT ENFORCED IT.

Q     I'M GOING TO SAY THAT'S NOT WHAT YOUR TESTIMONY WAS, AND IF YOU MAKE ME HAVE IT READ BACK --

A     AND --

Q    LET ME FINISH.  IF YOU MAKE ME HAVE IT READ BACK, I WILL, BUT I'M GOING TO ASK THE ARBITRATOR IF I CAN PAUSE MY CLOCK FOR THAT TIME.

THE ARBITRATOR:  YOU MAY PAUSE YOUR CLOCK.  WHAT'S THE DIFFERENCE HERE?

MR. TAUGER:  THE DIFFERENCE IS SHE'S REPRESENTED FROM THE INCEPTION OF THIS LITIGATION THAT APOGEE HAS REFUSED TO ENFORCE THE ARBITRATION AGREEMENT, AND I DON'T KNOW A NICER WAY TO PUT IT, THAT'S A FLAT OUT LIE.

THE ARBITRATOR:  ALL RIGHT.

MS. LI:  THIS IS NOT THE -- I'M SORRY.  MAY I SPEAK TO THE WORD "REFUSED"?

THE ARBITRATOR:  MS. LI, YOU CAN REHABILITATE THIS EXAMINATION ON YOUR REDIRECT.

MR. TAUGER, I DON'T KNOW THAT IT'S REALLY WORTH REVIEWING THIS TESTIMONY.  YOU CAN PRESENT THIS TESTIMONY TO MR. HART WHEN THAT COMES TIME, BUT IF YOU'D LIKE TO DO THAT, I'LL GIVE YOU THE OPPORTUNITY.

MR. TAUGER:  WELL, THE ONLY THING THAT I NEED TO DO RIGHT NOW BECAUSE, YES, MR. HART IS GOING TO BE -- HAS QUITE A BIT TO SAY ABOUT THAT, BUT SHE CLAIMS THAT SOMEONE AT APOGEE SAID WE REFUSED TO ENFORCE THE ARBITRATION AGREEMENT, AND SHE'S REPRESENTED THAT TO THIS TRIBUNAL REPEATEDLY FROM THE INCEPTION, AND THAT'S NOT TRUE, AND I WANT HER EVIDENCE OF THAT CLAIM OR I WANT HER TO ADMIT

SHE'S NOT TELLING THE TRUTH.

THE ARBITRATOR:  OKAY.  SO MS. LI?

MS. LI:  YES.

THE ARBITRATOR:  WHAT IS YOUR EVIDENCE THAT APOGEE REFUSED TO ENFORCE THE ARBITRATION AWARD AGAINST CATHY?

MS. LI:  YEAH.  SO THERE ARE MANY OCCASIONS THAT I WAS TOLD THE ENFORCEMENT WAS UNDER WAY, BUT I'M NOT ALLOWED TO KNOW ANYTHING --

MR. TAUGER:  SO THEY --

MS. LI:  AND ON MANY OCCASIONS -- MAY I FINISH, PLEASE?

MR. TAUGER:  I'M SORRY.  PLEASE GO AHEAD.

MS. LI:  THAT'S NUMBER ONE.  FIRST, I'M EXCLUDED TO EVEN KNOW THE PROCEEDING TO KNOW THE -- ANY COLLECTION, ANY ENFORCEMENT EFFORT.  WHEN I QUESTIONED, I WAS DENIED THE KNOWLEDGE OF ANY ENFORCEMENT STEPS --

MR. TAUGER:  THIS IS OFF TOPIC.

MS. LI:  AND NUMBER TWO.  NUMBER THREE --

MR. TAUGER:  NONRESPONSIVE.

THE ARBITRATOR:  LET'S LET HER FINISH.

MS. LI:  MR. HART, MR. GULLIVER, AND MR. TAUGER, HIMSELF, HAD COMMUNICATED TO ME THAT IS NOT WORTHWHILE TO ENFORCE.  I HAVE THE WRITTEN RECORD THROUGHOUT THE PROCEEDING, AND YOU HAVE STATED THAT IT'S NOT WORTH BEING ENFORCED AGAINST CATHY TRADING.  IT'S A DEADBEAT.  IT WAS

WRITTEN IN THE MOTION BRIEF THAT CHARACTER -- CTC WAS CHARACTERIZED AS DEADBEAT.

ALL I WANT TO SAY IS YOU EITHER WANT ME TO ENFORCE OR NOT TO ENFORCE OR YOU DON'T WANT TO -- THE QUESTION OF THE ENFORCEMENT --

THE ARBITRATOR:  SO MS. LI, I THINK WE SHOULD MOVE ON FROM THIS.

MR. TAUGER:  THANK YOU.

THE ARBITRATOR:  BUT LET ME JUST ASK YOU, MS. LI, YOU SAID THERE WERE DOCUMENTS WHERE SOMEBODY TOLD YOU THAT IT WAS NOT WORTHWHILE TO ENFORCE.  CAN YOU JUST GIVE ME THAT EXHIBIT NUMBER THAT YOU'RE REFERRING TO?

MS. LI:  YES.  YOUR HONOR, DESPITE ALL THESE UNDER -- IN EXPERIENCING CALIFORNIA RULES, I DID NOT INCLUDE THE MOTION BRIEFS IN THE EXHIBITS, BUT I ASSUME THEY'RE ADMITTED BECAUSE THEY ARE THE PROCEEDING DOCUMENTS.

MR. TAUGER:  SO THEY'RE NOT PART OF THE EXHIBITS THAT YOU SUBMITTED?

MS. LI:  I DID NOT PROPOSE THE MOTION BRIEF THAT FILED BY MR. TAUGER AND MYSELF, BUT I'M GLADLY POINTING OUT --

THE ARBITRATOR:  OKAY.  SO MS. LI, YOU CAN ADDRESS THIS ON REDIRECT IF YOU WISH, BUT I THINK, MR. TAUGER, WE SHOULD JUST CONTINUE.

MR. TAUGER:  THANK YOU, YOUR HONOR.

Q        MS. LI, YOU HAVE TESTIFIED TODAY THAT YOU WERE NOT ALLOWED TO PARTICIPATE IN THE ARBITRATION -- THE JAMS ARBITRATION AGAINST CATHY TRADING; IS THAT RIGHT?

A        CORRECT.

Q        AND YOU TESTIFIED THAT YOU WEREN'T KEPT INFORMED BY WHAT WAS HAPPENING WITH THE CATHY TRADING ARBITRATION?  YOU WEREN'T INFORMED ABOUT WHAT WAS HAPPENING WITH THE ARBITRATION; IS THAT RIGHT?

A        NOT ADEQUATELY.

Q        OKAY.  WERE YOU IN ANY WAY ASSOCIATED WITH APOGEE DURING THE CONDUCT OF THAT ARBITRATION?

A        NO, OTHER THAN THE NEXT --

Q        NO IS FINE.  THAT'S THE ANSWER.

BECAUSE YOU HAD BEEN TERMINATED PREVIOUSLY, HADN'T YOU?

A        NOT TERMINATED.  I RESIGNED.

Q        OH, YOU RESIGNED.  LET'S TALK ABOUT THAT. WOULD YOU PLEASE --

A        I CAN BE TERMINATED IF YOU MAY AS WELL.

Q        I'M SORRY.  IS IT -- NEVER MIND.  LET'S TALK ABOUT THE TERMINATION FOR A BIT.

I'D LIKE YOU TO TAKE A LOOK AT --

A        WHICH I PRODUCED A RESIGNATION LETTER.

Q        WOULD YOU LET ME DO MY CASE, PLEASE, RATHER

THAN TELLING ME WHAT I SHOULD LOOK FOR?

A    YES.

Q    THANK YOU.

WOULD YOU TAKE A LOOK, PLEASE, AT RESPONDENT'S 022.  TELL ME WHEN YOU HAVE IT.

A    OKAY.  R-022.

Q    CORRECT.

A    I HAVE IT IN FRONT OF ME.

Q    THANK YOU.  WHAT'S THE DATE ON THAT?

A    MONDAY, JANUARY 19, 2017.

Q    DO YOU UNDERSTAND BY THIS EMAIL THAT YOU HAD BEEN TERMINATED?

A    WHAT IS "WILL NEED THE 400?"

Q    TAKE A LOOK AT THE SECOND SENTENCE.  DID YOU UNDERSTAND FROM THAT SENTENCE YOU WERE BEING TERMINATED?

A    NO.

Q    WHAT DID YOU UNDERSTAND MR. HART TO MEAN WHEN HE SAID, "PLEASE START LOOKING FOR A NEW LAW FIRM TO PRACTICE WITH, AS WE ARE DONE.  CONSIDER OUR SEPARATION EFFECTIVE JULY 1ST.  WE WILL COMPLETE IN THE BILLING AND ASSIST YOU WITH TRANSMISSION TO A NEW FIRM."

WHAT DID YOU UNDERSTAND HIM TO MEAN?

A    UNDERSTAND THIS AS A COMBAT TOWARDS MY PREVIOUS STATEMENT WHICH I STATED HERE READING.  I AM READY TO MOVE MY CLIENTS OUT OF APOGEE IN ORDER TO SERVE

THEM BETTER.

Q      THAT'S WHAT YOU UNDERSTOOD MR. HART TO BE REFERENCING IS YOUR EARLIER COMMUNICATION?

A      HERE ALSO TO MY -- TO MY -- TO MY DESCRIPTION.

Q      TAKE A LOOK AT -- I'M SORRY.  I THOUGHT YOU WERE FINISHED.

A      AFTER ALL OF THE EVENTS, I AM REVISITING THE ASSOCIATION WITH APOGEE.  NO FIRM HAS A PRACTICE OF NOT SENDING INVOICES FOR MORE THAN SIX MONTHS.

Q      OKAY.  THAT'S A NEW TOPIC AND MOVE TO STRIKE, AND I'M GOING TO ASK YOU TO CONFINE YOURSELF TO ANSWER MY QUESTIONS.  AS THE ARBITRATOR HAS INSTRUCTED YOU, YOU WILL HAVE A CHANCE TO PRESENT YOUR VERSION IN REDIRECT, BUT DO NOT TRAMPLE ON MY TIME, PLEASE.

A      OKAY.  PLEASE READ YOUR QUESTION AGAIN.

Q      YES.  DID YOU NOT UNDERSTAND THE SECOND PARAGRAPH OR SECOND SENTENCE IN THE EXHIBIT R-22 TO BE TERMINATING YOUR ASSOCIATION WITH APOGEE?

A      I DON'T THINK SO.  I DON'T BELIEVE THIS IS A TERMINATION BECAUSE THIS IS A COMBATIVE ARGUMENT.

AND ALSO OBJECTION.  ARGUMENTATIVE.  YOU ASKED AND I ANSWERED.

Q      THAT WOULD BE CUMULATIVE, AND I HAVEN'T GOTTEN AN ANSWER FROM YOU YET.

A       I SAID IT'S A COMBAT.  THIS IS AN ARGUMENT.
THIS DIALOGUE COMMUNICATION FROM ROBERT HART IS.

Q       OKAY.  SO YOU DIDN'T THINK ROBERT HART
REALLY MEANT IT, IS THAT WHAT YOU'RE SAYING?  YOU WANT TO
ARGUE?  I MISUNDERSTAND YOU.  THIS WAS JUST HIS WAY OF
ARGUING?  HE DIDN'T REALLY TERMINATE YOU IN THIS EMAIL?

A       BUT I ALREADY SAID I'M MOVING.  THERE'S NO
NEED TO TERMINATE ANYMORE.  I ALREADY LEFT.

Q       MOVE TO STRIKE, AND I'LL ASK YOU TO ANSWER
THE QUESTION.

THE ARBITRATOR:  MR. TAUGER, LET ME ASK YOU A
QUESTION.  DOES IT REALLY MATTER IF SHE WAS TERMINATED OR
SHE RESIGNED?

MR. TAUGER:  YES.

THE ARBITRATOR:  ISN'T THE MORE IMPORTANT ISSUE
WHETHER THE SEPARATION WAS EFFECTIVE?

MR. TAUGER:  IT'S NOT A QUESTION OF JUST THE
TERMINATION BEING EFFECTIVE.  IT'S A QUESTION OF HOW
MS. LI HAS CONSISTENTLY, BOTH IN THIS ARBITRATION AND IN
ALL OF HER DEALINGS WITH APOGEE, WHICH MR. HART IS GOING
TO OFFER SOME TESTIMONY ABOUT THAT, DELIBERATELY MISLED OR
FLAT OUT MISREPRESENTED, AND I'M BEING CHARITABLE WHEN I
SAY MISREPRESENTED.

THE NEXT EXHIBIT WE'RE GOING TO LOOK AT,
WHICH IS EXHIBIT 21 --

MS. LI:  MAY I CLARIFY?

THE ARBITRATOR:  MS. LI, IT'S NOT YOUR TURN YET.

MR. TAUGER:  THE NEXT EXHIBIT IS 21 WHICH IS THE LETTER WHICH SHE SUPPOSEDLY RESIGNED.  SO SHE HAS MAINTAINED THAT SHE RESIGNED FROM APOGEE, AND THAT'S NOT TRUE.  SHE WAS FIRED.

THE ARBITRATOR: ALL RIGHT.  YOU KNOW, I THINK THIS EMAIL SPEAKS FOR ITSELF.  I DON'T KNOW THAT WE ARE REALLY BEING PRODUCTIVE DEBATING WHETHER SHE AGREES THAT IT WAS A TERMINATION OR NOT, SO I WOULD SAY LET'S MOVE ON.

MR. TAUGER:  I AGREE WITH YOUR HONOR.  I WAS ACTUALLY JUST CURIOUS.

Q    TAKE A LOOK AT EXHIBIT R-21, PLEASE, MS. LI.

A    EXHIBIT R-21?

Q    YES, R-21.

A    OKAY.

Q    WHAT'S THE DATE ON R-21?

A    I'M SORRY, DID YOU SAY 21 OR 20?

Q    R-21.  WHAT'S THE DATE ON IT?

A    R-021'S DATE IS 20TH OF JUNE.

Q    AND YOU WROTE THIS LETTER; IS THAT CORRECT?

A    I WROTE THIS LETTER IN HONG KONG TIME WHICH IS 15 HOURS EARLIER THAN CALIFORNIA TIME JUST FOR YOUR INFORMATION.

THIS LETTER WAS WRITTEN --

Q    THANK YOU.

A    -- BEFORE WE RECEIVED THE OTHER LETTER.

Q    I DON'T NEED ANYTHING FURTHER.  MOVE TO STRIKE.

TAKE A LOOK AT C-002.

A    C-002.  I'M SORRY, THE C-002 IS MY EXHIBIT.

Q    RIGHT.

A    YES.  YES.  SO AGAIN -- THIS -- YES, I'M HERE.  THIS EMAIL NOTIFICATION RECORD.

Q    THERE'S A REFERENCE TO THESE DELAYED INVOICES IN THE FIRST SENTENCE.  DO YOU SEE THAT?

A    WHICH LINE ARE YOU READING?

Q    I'M READING -- LET'S SEE WHERE WE ARE.

A    OH, A LITTLE HISTORY --

Q    IT'S ABOUT HALFWAY -- WAIT A MINUTE.  I JUST HAD IT.

OH, HERE.  IT'S THE VERY FIRST SENTENCE.  A LITTLE HISTORY OF THESE DELAYED INVOICES.  I'M GOING TO ASK YOU TO LOOK AT EXHIBITS R -- STARTING AT R-045.

A    R-045.

Q    THROUGH R-049.

A    R-0 -- OKAY.  START WITH R-045?

Q    RIGHT.  AND IT'S, I THINK, SIX INVOICES.  OR I MAY HAVE COUNTED WRONG.  I DON'T KNOW.

A    YES.  INVOICE --

Q    ARE THOSE THE INVOICES TO WHICH YOU'RE REFERRING IN "A LITTLE HISTORY OF THESE DELAYED INVOICES"?

A    NO.  THESE ARE NOT THE DELAYED INVOICES. THESE ARE THE INVOICES --

Q    OKAY.  THANK YOU.  ALL I ASKED YOU IF THAT'S WHAT YOU WERE REFERRING TO, AND YOU ANSWERED IT.

A    NO.  NO, THIS IS NOT.

Q    THANK YOU.  YOU'VE ANSWERED IT.  THEY'RE NOT THE DELAYED INVOICES --

A    R-045 IS NOT DELAYED.

THE ARBITRATOR:  MS. LI, YOU'VE MADE YOUR POINT. YOU CAN EXPLAIN ON YOUR REDIRECT.

MS. LI:  THANK YOU.

MR. TAUGER:  THANK YOU, YOUR HONOR.

Q    DID YOU TRANSMIT THESE INVOICES TO MR. HART WITH THIS EXHIBIT -- I'M SORRY.  WITH THIS EMAIL C-002, HI, ROBERT.  SIGNED, KIND REGARD --

A    YES, I TRANSMITTED THAT.

Q    THANKS.  THAT'S ALL I NEEDED.  THANK YOU.

GIVE ME A MOMENT.  I MAY BE DONE.

TAKE A LOOK AT WHAT YOU MARKED AS C-016.

A    OKAY.  YES, I HAVE IT IN FRONT OF ME.

Q    OKAY.  WILL YOU TAKE A LOOK AT THE RIGHT-HAND COLUMN.  YOU WILL SEE THERE'S A PRICE, 28.84?

A    YES.

Q    BY THE WAY, WHAT IS THIS?  YOU PRODUCED THIS.  IS THIS A SCREEN PRINT FROM AMAZON?

A    YES.

Q    AND WHEN DID YOU MAKE THE SCREEN PRINT FROM AMAZON?

A    IT IS.

Q    YES.  WHEN DID YOU MAKE THE SCREEN PRINT FROM AMAZON?

A    THIS IS A REPRESENTATION OF THE PRODUCTS BEING SOLD.

Q    WHEN DID YOU MAKE THE SCREEN PRINT, MS. LI, PLEASE?

A    I'M SORRY.  YOUR QUESTION WAS?

Q    MY QUESTION IS WHEN DID YOU MAKE THE SCREEN PRINT?

A    YES.  THE SCREEN PRINT TIMING IS IDENTIFIED DOWN -- IT'S AN ELECTRONIC DOCUMENT ON JANUARY 15, 2023.

Q    THANK YOU.  THAT'S ALL I NEEDED, MS. LI.

WILL YOU PLEASE LOOK DOWN THE COLUMN THAT HAS THE PRICE OF 28.84 AT THE TOP, AND YOU SEE BELOW BUY NOW IT SAYS SECURED TRANSACTIONS.  IT SHIPS FROM WANTBA, SOLD BY WANTBA, DO YOU SEE THAT?

A    YES.

Q    OKAY.  THANK YOU.

IF YOU WOULD TAKE A LOOK AT EXHIBIT C-17.

A      17?

Q      YES.  IS THIS ANOTHER SCREEN PRINT THAT YOU DID ON JANUARY 15, 2023?

A      CORRECT.

Q      OKAY.  AND DO YOU SEE AT THE TOP WHERE IT SAYS CURRENTLY SOLD OUT AND BELOW IT SAYS WANTBA HIGH PRESSURE MULTIPLE SPRAY SHOWERHEAD.  DO YOU SEE THAT?

A      YES.

Q      OKAY.  THANK YOU.

I'M DONE WITH THAT EXHIBIT.

IF THE TRIBUNAL WILL BEAR WITH ME JUST A MOMENT.

THE ARBITRATOR:  DO YOU WANT MAYBE A FIVE-MINUTE BREAK TO COLLECT YOUR THOUGHTS?

MR. TAUGER:  UM, IF WE CAN JUST GO OFF THE RECORD, AND I CAN WHISPER WITH MY COLLEAGUE HERE.

THE ARBITRATOR:  SURE.  SO IT'S 11:31 A.M.  LET'S GO OFF THE RECORD FOR ABOUT FIVE MINUTES.

(RECESS TAKEN 11:31-11:35 AM)

THE ARBITRATOR:  SO LET'S GET BACK ON THE RECORD. IT'S NOW 11:35, AND MR. TAUGER IS CONTINUING HIS CROSS-EXAMINATION.

MR. TAUGER:  I HAVE NO FURTHER QUESTIONS FOR THIS WITNESS AT THIS TIME, BUT I WOULD LIKE TO RESERVE MY DIRECT DEPENDING ON WHAT HAPPENS WITH MR. HART.

THE ARBITRATOR:  RESERVE YOUR DIRECT?

MR. TAUGER:  TO DO DIRECT OF MS. LI.  LET'S CALL IT A RECROSS AS NECESSARY.

THE ARBITRATOR:  OKAY.  SO --

MR. TAUGER:  LET ME FRAME IT A DIFFERENT WAY.

THE ARBITRATOR:  YEAH.

MR. TAUGER:  I EXPECT THAT MR. HART'S TESTIMONY IS GOING TO CONTRADICT A CONSIDERABLE AMOUNT OF MS. LI'S TESTIMONY, AND IF SHE'S GIVEN AN OPPORTUNITY TO ADDRESS THAT AT ANY POINT, I WOULD WANT TO BE ABLE TO ADDRESS HER.

THE ARBITRATOR:  OKAY.  IF SHE DOES ADDRESS THAT, SURE, YOU WILL HAVE A CHANCE TO RESPOND.

BUT THIS CONCLUDES YOUR DIRECT EXAMINATION OF MS. -- DIRECT AND CROSS OF MS. LI?

MR. TAUGER:  IT DOES.

THE ARBITRATOR:  ALL RIGHT.  MS. LI, IT'S YOUR OPPORTUNITY TO REDIRECT.  YOU WILL BE LIMITED TO THE SCOPE OF ISSUES THAT EMERGED DURING YOUR OWN EXAMINATION OF YOURSELF AND MR. TAUGER'S DIRECT AND CROSS OF YOURSELF.

ARE YOU READY TO PROCEED NOW?  DO YOU NEED A SHORT BREAK?

MS. LI:  I'M READY TO PROCEED.

THE ARBITRATOR:  OKAY.

MS. LI:  AS MUCH AS I CAN DO THIS JOB.  I AM ONE FOR ZEROS HERE.

THE ARBITRATOR:  OKAY.  GREAT.

MS. LI:  SO IF I MAKE ANY MISTAKES OR ANYTHING, PLEASE BEAR WITH ME AND REMIND ME.

THE ARBITRATOR:  THAT'S FINE.  SO IT'S 11:37 A.M., AND YOU MAY PROCEED, MS. LI.

MS. LI:  YES.  SO, YOUR HONOR, WITH REGARDS TO THE IRRELEVANT INTRODUCTION THE -- WITH REGARD -- STRIKE THAT.

WITH REGARDS TO THE EXHIBIT R-201, WHICH IS A PIECE OF IRRELEVANT, NONADMISSIBLE EVIDENCE THAT YOUR HONOR ALLOWED TO BE ADMITTED, I'D LIKE TO SAY THAT THIS IS ENGAGEMENT LETTER BETWEEN -- IPAA STANDS FOR IP ADVANTAGES ASIA, LIMITED, WITH ONE OF ITS CLIENTS THAT SUBSEQUENTLY WERE TRANSFERRED TO APOGEE LAW PRACTICE ONLY FOR THE FACT THAT APOGEE REPRESENTS THAT CLIENT IN U.S. LEGAL MATTERS.

IPAA REPRESENTS THIS COMPANY IN MUCH MORE BROADER SENSE, SENSE MEANING NONLEGAL-RELATED PRACTICE, SUCH AS ACQUIRE IP PROTECTIONS, GROW IP ASSETS OUTSIDE OF AMERICA OR IN AMERICA.  AND THIS IS A PRACTICE GOVERNED BY U.S. LAW, HONG KONG LAW OR OTHERS THERE ARE IP PRACTITIONERS THAT THEY MAY NOT BE LAWYERS.

AS THE COMPANY'S FUNDING NATURE IS NOT A LAW FIRM IN NATURE AND EVEN THOUGH ENGAGEMENT LETTER TOUCHES UPON, I'M GOING TO -- MENTION SPECIFICALLY RELATING TO PROTECTION, PROCUREMENT, PROSECUTION, ENFORCEMENT, ET CETERA, THIS IS NOT TO SAY, AND REALITY SAYS RELATING TO,

IT DOES NOT SAY WE REPRESENT YOU TO DO THESE.  WE ARE HELPING CLIENTS TO FIND SPECIFIC JURIS IN SPECIFIC JURISDICTIONS TO HELP THEM TO DO THAT.  THAT'S THE NATURE OF THE TYPE OF ADVISORY SERVICE WITHOUT SPELLING OUT ALL OUR TRADE SECRETS, THAT'S WHAT I WANT TO SAY ABOUT THIS EXHIBIT IN PROPER CONDUCT IF THAT'S WHAT IS LEADING TO.

AND IN ADDITION, I'D LIKE TO ADDRESS THE ACCUSATIONS OF ME MYSELF ENGAGING IN SOME SORT OF IMPROPER OR ILLEGAL, WHATEVER WORDS HAD BEEN PUT IN, PRACTICE OF COLLECTING FUNDS.  I PROVIDE A LEGAL SERVICE OUT OF AN AMERICAN LAW FIRM.  I ONLY DO LAW PRACTICE IN AMERICA WHERE I LICENSED SPECIFIC JURISDICTIONS AND WHEN I BESTOWED SERVICE, I COLLECT A FEE FOR MY SERVICE.  AND WHERE DOES THAT FEE GOES?  IT'S NOT PROHIBITED TO BE RECEIVED BY AN LLC.  THIS IS DONE.  THIS HAS BEEN DONE AS WELL AS MY ESTEEMED OPPONENTS HAVE DONE AS WELL.  THEY RECEIVE SERVICE -- THEY RECEIVE PAYMENTS FOR THEIR SERVICES, EITHER LEGAL OR NOT LEGAL SERVICES, FROM THEIR OWN LLCS.  THAT'S ALL I WANT TO SAY ON THAT PIECE OF EVIDENCE.

COMING BACK TO THE COLLECTED WORD.  IT IS A CONTENTION OF BOTH PARTIES THAT THE WORD COLLECT, COLLECTION, COLLECTING, COLLECTING, BEING COLLECTED, TO BE COLLECTED, THROUGHOUT THIS EMPLOYMENT AGREEMENT HAS NOT BEEN CLEARLY DEFINED.

PEOPLE -- PARTIES HAVE DIFFERENT INTERPRETATION.  MY INTERPRETATION IS ACCORDING TO THE STANDARD OF LEGAL INDUSTRY, PROFESSIONAL SERVICE INDUSTRY. COLLECTING MEANS WHEN A LAWYER JOINS A LAW FIRM, EITHER BE 1099 -- I DON'T WANT TO USE THE WORD 1099.  STRIKE THAT. EITHER BE EMPLOYEE, ASSOCIATE, PARTNER OF COUNSEL IN WHATEVER FORM, THAT FIRM IS GOING TO TIMELY ISSUE INVOICES AND TIMELY COLLECT THEM IF A CLIENT FAILS TO PAY.

MY UNDERSTANDING FROM INDUSTRY-WIDE PRACTICE, WELL-ACCEPTED NORMS AND, IN FACT, IS THE PRACTICE, IS THAT FIRM WHO IS GOING TO PUT FORWARD ENFORCEMENT EFFORT.  IT'S NOT A SINGLE ATTORNEY WHO STANDS OUT AND GO AFTER CLIENT BECAUSE AFTER ALL, IF THE ATTORNEY DOES NOT ISSUE INVOICE OR IS NOT ALLOWED TO ISSUE INVOICES, HOW ARE THEY GOING TO COLLECT?  THEY HAVE NO RIGHTS TO COLLECT TO ANY INVOICES THEY DIDN'T ISSUE.

THEY DO HAVE THE RESPONSIBILITY TO ALERT CLIENT TO PAY AND SEND PROBABLY LETTERS REMINDING THEM -- REMINDING THE CLIENT WHO FAILED TO PAY, WHICH I DID.

COLLECTING.  SO IT'S MY CONTENTION THAT THE COLLECTED FUNDS THAT'S NOT ABSOLVED RESPONDENT, APOGEE, ANY LIABILITIES IN SUCH SENSE EVEN THOUGH IT SAYS COLLECTED.

MR. TAUGER:  OBJECTION.  ARGUMENTATIVE.

THE ARBITRATOR:  OVERRULED.

MS. LI:  OKAY.  EVEN THOUGH THE FUNDS -- EVEN THOUGH THE AGREEMENT SPECIFICALLY SAYS FUNDS COLLECTED, DOES NOT ABSOLVE ANY RESPONSIBILITY OBLIGATIONS UNDER THAT CONTRACT.

AND WITH REGARDS TO ISSUE NUMBER 3 THAT MR. TAUGER RAISED IN TERMS OF THE ALTERATION OF WRITTEN MODIFICATION, WRITTEN MODIFICATION, AS INTERPRETED BY CALIFORNIA LAW, WHICH I SEARCHED AND STUDIED ON THIS CASE, IS THAT DOES NOT HAVE TO BE MULTIPLE WORDS OR THOUSANDS OF WORDS.  IT'S WRITTEN UNDERSTOOD BY BOTH PARTIES, COMMUNICATED CLEARLY.

IN THIS CASE I CALLED -- I REMIND MY OPPONENT'S ATTENTION THAT THERE WERE NUMEROUS COMMUNICATIONS IN WRITING FROM ME, A PARTY, TO THEM, APOGEE.  I REQUESTED INVOICE TO BE ISSUED.  THEY DIDN'T DO IT.  I ASKED.  AGAIN REFUSED.  CITED MULTIPLE OCCASIONS. I HAVE PRODUCED ALL THESE PIECE OF INFORMATION IN MY EXHIBITS WHICH I WON'T GO RIGHT NOW.  WE'LL SPEND TOO MUCH TIME ON READING EACH WORDS OF THESE COMMUNICATIONS. HOWEVER, THE WORD -- FINAL WORD, OKAY, WAS NOT OUT OF NOWHERE THAT NO ONE UNDERSTOOD HOW -- WHAT IT MEANS.  IT WAS SPECIFICALLY WRITTEN AS A RESPONSE TO THE QUESTION ASKED.

I'M GOING TO THIS AGAIN.  C-002.

THE ARBITRATOR:  THERE'S NO NEED TO DO THAT, MS.

LI.  THE DOCUMENT IS QUITE OBVIOUS.

MS. LI:  YES.  SO IT WAS SPECIFICALLY TO MY QUESTION, WHAT DO YOU THINK?  CAN YOU CONFIRM OUR CONDUCT. AND THE ANSWER WAS, "OKAY".

AND TO FURTHER ADD -- THE RESPONSE TO MR. TAUGER'S INQUISITION ABOUT MY ISSUING INVOICE AND WHETHER I SENT THEM WHICH I ANSWERED I DID SEND.  I SENT IT BECAUSE I WASN'T HIDING IT.  I WAS NOT TRYING TO HIDE ANYTHING.  I SAID IT.  I REMINDED APOGEE FOR FULFILL IT'S OBLIGATIONS, AND THEY FAILED TO FULFILL.  I ACTED ACCORDING TO WHAT WE WROTE DOWN THROUGHOUT EMAIL COMMUNICATION.  I ISSUED THEM, AND I SENT IT TO APOGEE.

THIS IS MANIFESTED BY MR. HART AND MR. GULLIVER'S REPEATED REQUEST FOR ME TO SEND THEM THE COLLECTIONS I RECEIVED FROM CATHY TRADING.  SO IF I DID NOT COMMUNICATE TO THEM, THAT WOULD BE -- THAT WOULD BE -- I DON'T WANT TO USE THE WORD CONVERSION, BUT THE WORD CONVERSION HAS BEEN WRONGFULLY ASSERTED.

MR. TAUGER:  OBJECTION.

THE ARBITRATOR:  SUSTAINED.

MS. LI, I WOULD ASK YOU TO BE MORE SUCCINCT WITH YOUR POINTS.  I THINK YOU'RE GOING OVER SOME TERRAIN THAT WE'VE COVERED ALREADY.  SO IF THERE'S ANYTHING NEW THAT YOU WANT TO BE ABLE TO ADDRESS, I'LL GIVE YOU THAT OPPORTUNITY.  OTHERWISE I THINK WE SHOULD PROCEED UNTIL

THE BREAK.

MS. LI:  ONE LAST ISSUE IS THE ENFORCEMENT.  ONE LAST ISSUE.  THE ENFORCEMENT IT WAS -- SO THERE ARE TWO COMPONENTS IN TERMS OF THE UNDERSTANDING OR IN TERMS OF THE QUESTION THAT WAS ASKED.  ENFORCEMENT WAS INITIALLY --

OKAY.  I WITHDRAW MY STATEMENT.  RESTART.

I DID NOT HAVE SUFFICIENT KNOWLEDGE OF ENFORCEMENT WHETHER APOGEE PERFORMED.  AFTER MY REPEATED REQUEST TO NO INFORMATION, I WAS GIVEN THAT THEY STARTED ARBITRATION, AND I DID NOT KNOW THE OUTCOME.  I DID NOT KNOW IF THEY WENT TO COURT TO HAVE IT REGISTERED AND -- SORRY.  I LOST THE TRAIN OF THOUGHT.

BUT TO HAVE IT REGISTERED IN CALIFORNIA DISTRICT COURT IN ORDER TO BE ENFORCEABLE.  UNTIL I OBTAINED COUNSEL, THIS INFORMATION BECAME AVAILABLE.  IN A WAY I FEEL -- I FELT THAT THE RESPONDENT WAS NOT TREATING ME IN GOOD-FAITH MANNER BECAUSE THEY DID NOT WANT TO COMMUNICATE WITH ME.

AND I LATER FOUND THE RAW EVIDENCE, WHICH I WILL INTRODUCE, STATING THAT THEY HAD STARTED ENFORCEMENT EVEN THOUGH THEY SAID TO ME THEY DID NOT START, OR THEY DIDN'T WANT TO.  AND I LATER ON FOUND COMMUNICATIONS SUGGEST THAT THEY DID.  I DON'T KNOW WHETHER THEY STARTED OR NOT.

MR. TAUGER:  OBJECTION.  BEST EVIDENCE ON ALL OF

THIS.

MS. LI:  I DO NOT KNOW -- SO WHEN --

THE ARBITRATOR:  MS. LI, JUST HANG ON JUST A MINUTE.  WE HAD AN OBJECTION.

MR. TAUGER:  BEST EVIDENCE.  SHE'S REFERENCED A NUMBER OF COMMUNICATIONS NONE OF WHICH HAVE BEEN PRODUCED.

THE ARBITRATOR:  OKAY.  FAIR POINT.  ARE THERE ANY DOCUMENTS --

MS. LI:  DOCUMENTS TO SHOW, YES.

THE ARBITRATOR:  SO WHY DON'T YOU JUST READ ME THE EXHIBIT NUMBERS THAT GO TO THIS ISSUE.  I DON'T THINK THERE'S REALLY A NEED FOR YOU TO REVIEW THOSE DOCUMENTS WITH US.

MS. LI:  OKAY.  I WILL READ EXHIBIT NUMBER.

(BRIEF PAUSE.)

MS. LI:  OKAY.  HERE.  OH, HERE ON EXHIBIT C-022, PAGE LI 000189.  MR. HART STATED --

THE ARBITRATOR:  THAT'S FINE, MS. LI.  WE CAN READ THE DOCUMENT FOR OURSELVES.

IS THERE ANY OTHER DOCUMENT YOU WANT TO REFERENCE ON THIS POINT?

MS. LI:  THIS DOCUMENT IDENTIFIED ONGOING COLLECTION EFFORT AGAINST CTC.

MR. TAUGER:  YOUR HONOR, I ONLY OBSERVE THAT THIS IS A LETTER FROM MR. BALOGH, AND SHE'S OFFERING IT FOR

PURE UNADULTERATED HEARSAY PURPOSE.  HE'S NOT HERE FOR US

TO EXAMINE.  HE TENDS TO BE HYPERBOLIC AS DOES MR. HART IN

THEIR COMMUNICATIONS, AND RHETORIC IS NOT EVIDENCE.

THE ARBITRATOR:  ALL RIGHT.  YOU KNOW, I NEED TO

LOOK AT THIS EXHIBIT.  I WILL TAKE YOUR OBJECTION INTO

CONSIDERATION.

MS. TAUGER:  THANK YOU.

THE ARBITRATOR:  WHAT I WOULD SUGGEST --

MS. LI:  I'M SORRY, BUT THERE IS A

MISCHARACTERIZATION.  THIS IS A LETTER FROM MR. HART NOT

MR. BALOGH.

MR. TAUGER:  I APOLOGIZE, AND I WITHDRAW MY

OBJECTION.

YOU'RE ABSOLUTELY RIGHT, MS. LI.  I MISREAD

THIS.

MS. LI:  THANK YOU.

NEXT DOCUMENT.

MR. TAUGER:  I WITHDRAW THAT OBJECTION, YOUR

HONOR.

THE ARBITRATOR:  ALL RIGHT.

MS. LI:  C-001, PAGE 91.  LI, UNDERSCORE, 00091.

THIS DOCUMENT, ALSO FROM MR. HART, STATES

THAT WE HAVE NOT RECEIVED ANY PAYMENT FROM CATHY TRADING.

TO THE EXTENT ANY FUNDS DO COME IN, SUGGESTING THAT FUNDS

ARE ON THE WAY OR SUPPOSED TO BE ON THE WAY SUGGESTING

THERE MIGHT HAVE BEEN SOME SORT OF AN EFFORT.  THAT'S WHY

THE QUESTION IS PERHAPS THERE WERE NO ENFORCEMENT ON THE

FACE THEY COMMUNICATED TO ME, BUT THERE MIGHT BE

ENFORCEMENT ON THE OTHER HAND BY THE PRINCIPALS OF APOGEE.

TO SEARCH I HAVE NO KNOWLEDGE OF.

MR. TAUGER:  I'M SORRY.  WHAT IS THIS BEING

OFFERED FOR?  THE PRIOR STATEMENT SHE SAID THERE WERE --

THE ARBITRATOR:  GO AHEAD.

MR. TAUGER:  OKAY.

MS. LI:  OFFERED TO ADDRESS OR REDIRECT MYSELF,

THE WITNESS, TO SPEAK ABOUT WHETHER COLLECTIONS FOR

ENFORCEMENT BEING REFUSED BY APOGEE.

MR. TAUGER:  OH, THAT'S WHAT YOU'RE ADDRESSING.

OKAY.

MS. LI:  YES, ENFORCEMENT.

MR. TAUGER:  OKAY.  SO YOUR CONTENTION IS THIS

EXHIBIT SUPPORTS YOUR CONTENTION THAT THERE WAS A REFUSAL

TO ENFORCE ON THE PART OF APOGEE; IS THAT RIGHT?

MS. LI:  NO, I'M NOT SAYING -- I'M NOT SAYING THIS

IS SUGGESTING REFUSAL.  I'M SUGGESTING IS REFUSAL ON

APOGEE CORPORATE, BUT I DO NOT KNOW -- WITNESS DOES NOT

KNOW WHETHER THERE ARE ENFORCEMENT EFFORT FROM APOGEE'S

PRINCIPALS.

MR. TAUGER:  OKAY.  SO YOU WERE KEPT IGNORANT OF

WHAT ENFORCEMENT EFFORTS WERE BEING MADE.  THAT'S YOUR

CONTENTION?

MS. LI:  YES.

MR. TAUGER:  OKAY.  THANK YOU.

MS. LI:  WITNESS -- OKAY.  IF I MAY ASK MYSELF A QUESTION.  IS THERE ANY ENFORCEMENT EFFORT FROM APOGEE AGAINST CTC?

ANSWER, NO KNOWLEDGE OF.

AGAIN QUESTIONING.  IS THERE ANY ENFORCEMENT FROM ANYONE AGAINST CTC?

ANSWER, PERHAPS NO KNOWLEDGE OF.

IS THERE ANY -- QUESTION NUMBER THREE.  IS THERE ANY ENFORCEMENT EFFORT FROM MR. HART AGAINST YUN CHEN?

ANSWER, PERHAPS.  I DON'T KNOW.  BECAUSE EVERYTHING WAS KEPT.  THE ONLY THING I KNEW WAS DURING THE DISCUSSION BETWEEN ME, MY COUNSEL, WITH APOGEE, MR. HART, WE OFFERED TO PUT ENFORCEMENT AGAINST CTC.  AND THIS LED TO THE DISCUSSION THAT THERE WAS A DISCREPANCY BETWEEN 120K AND ALSO THE ALLOCATION OF THE ENFORCEMENT WHERE IT SHOULD BE IF THERE ARE MONEY COMING IN FROM CTC, WHERE IT SHOULD RESIDE.

AND SUBSEQUENTLY THE COMMUNICATION WAS STOPPED BECAUSE MR. HART STOPPED TALKING TO US.  THIS IS HAPPENING BETWEEN SEPTEMBER 2020 TO MARCH JUST BEFORE FILING OF THIS DEMAND.

MR. TAUGER:  IF I MAY OFFER A SUGGESTION, YOUR HONOR.  RATHER THAN ASKING MS. LI AND OUR WITNESSES TO PROVIDE REFERENCE TO THE EXHIBITS, I WOULD STIPULATE THAT ALL OF OUR PRODUCED EXHIBITS, MS. LI'S AND OURS, ESSENTIALLY BE BEFORE THE TRIBUNAL IN TERMS OF THE TRIBUNAL'S REVIEWING OUR FINAL TRIAL BRIEFS, WE'LL BE REFERENCING SPECIFIC DOCUMENTS.  IF IN THE TRIAL BRIEF MS. LI REFERENCES, FOR EXAMPLE, THIS -- WHAT IS THIS, C-001, SHE CAN REFERENCE IT.

THE ARBITRATOR:  RIGHT.

MR. TAUGER:  YOU CAN DETERMINE WHETHER --

THE ARBITRATOR:  RIGHT.  YEAH, WE DISCUSSED THIS AT THE FSC AS WELL.  WHY DON'T YOU GUYS SEE IF YOU CAN REACH A STIPULATION ABOUT THAT DURING THE LUNCH BREAK. YOU KNOW, IT'S HELPFUL FOR HER TO BE ABLE TO POINT TO THE ACTUAL EXHIBIT NUMBERS, BUT I KNOW WHY IT'S RELEVANT AND WHICH EXHIBITS GO TO THE POINT THAT SHE'S MAKING, BUT I CERTAINLY THINK IT WOULD BE MORE CONVENIENT IF YOU COULD JUST STIPULATE TO HAVING CERTAIN EXHIBITS INTRODUCED EVEN IF YOU DON'T REFER TO THEM IN THE HEARING.

SO WHY DON'T YOU BOTH HAVE A CONVERSATION ABOUT THAT OVER THE LUNCH BREAK AND SEE IF YOU CAN REACH AN AGREEMENT ABOUT THAT OR NOT.

THE ONLY THING I WOULD SAY IS WE'VE HAD A LOT OF EXHIBITS WHICH REALLY SPEAK FOR THEMSELVES. THERE'S

NO NEED REALLY FOR WITNESS TESTIMONY TO BE READ INTO THE

RECORD WHAT THE EXHIBIT STATES, SO I WOULD SAY LET'S TRY

TO BE MORE LASER FOCUSED AND ONLY OFFER WITNESS TESTIMONY

ABOUT ISSUES THAT CANNOT BE GLEANED FROM THE DOCUMENTS

THEMSELVES.

           SO FOR EXAMPLE, IF YOU BOTH HAVE DIFFERENT

INTERPRETATIONS OF THE SAME DOCUMENT, YOU KNOW, THAT'S

RELEVANT.  THAT'S USEFUL INFORMATION FOR ORAL TESTIMONY,

BUT APART FROM THAT, I WOULD SAY LET'S TRY TO MINIMIZE

JUST READING DOCUMENTS INTO THE RECORD.

           ALL RIGHT.  MS. LI, DO YOU HAVE ANY FURTHER

TESTIMONY YOU WANT TO ADDUCE ON REDIRECT?

     MS. LI:  NO, YOUR HONOR, I COMPLETED.

     THE ARBITRATOR:  MR. TAUGER, ANYTHING ELSE?

     MR. TAUGER:  TWO VERY BRIEF QUESTIONS.

     THE ARBITRATOR:  OKAY.

                 RECROSS EXAMINATION

     BY MR. TAUGER:    Q    MS. LI, IS IT YOUR

CONTENTION THAT LATE ISSUANCE OF INVOICES BY PARTIES TO

THE OFFER LETTER AGREEMENT CONSTITUTES A BREACH OF THAT

AGREEMENT?

     A     MAY I BEG YOUR PARDON?  REPEAT.

     **Q     SURE.  I'M SORRY.  I WAS A LITTLE FAR FROM
THE MICROPHONE.**

           **IS IT YOUR CONTENTION THAT PARTIES TO**

EXHIBIT R-001, WHICH IS THE OFFER LETTER OF EMPLOYMENT, HAVE AN OBLIGATION TO ISSUE TIMELY INVOICES AND IF THEY DON'T, THEY'RE IN BREACH?

A     YES.

Q     CAN YOU POINT TO ANY DOCUMENT THAT MODIFIED R-001 THAT WOULD ALLOW YOU TO DIVERT CLIENT FUNDS TO YOUR OWN ACCOUNT?

MS. LI:  OBJECTION.  THE WORD DIVERTED IS MISPLACED.

MR. TAUGER:  IT'S ALREADY RES JUDICATA.  IF YOU PREFER, I'LL USE THE WORD CONVERTED, BUT YOU SEEM TO NOT PREFER THAT.

MS. LI:  ALSO OBJECTION.  CONVERTED IS ALSO MISUSED HERE.

THE ARBITRATOR:  OKAY.  WHY DON'T WE JUST SAY TRANSFER FOR NOW.

MR. TAUGER:  THANK YOU.  LET'S DO THAT.

Q     CAN YOU POINT TO ANY DOCUMENT THAT AUTHORIZED YOU TO TRANSFER FUNDS THAT WERE DUE APOGEE TO YOUR PERSONAL ACCOUNT PRIOR TO -- I DON'T REMEMBER, IT'S THE INFAMOUS OKAY LETTER, PRIOR TO THAT LETTER WHEN YOU DISCLOSED THE EXISTENCE OF THESE INVOICES?

A     THE INFAMOUS COMMUNICATION WHICH IS EXHIBIT C-002, C-003, 4, 5 CLEARLY IDENTIFIED IDENTIFICATIONS OF ISSUING INVOICE FROM MY OWN FROM IP ADVANTAGES.

Q       OKAY.  I MAY NOT HAVE BEEN CLEAR IN MY QUESTION.

I WANT TO KNOW WHAT DOCUMENTS PREDATE YOUR DISCLOSURE OF THE INVOICES THAT WERE SENT FROM IP ADVANTAGES TO CATHY TRADING.

A       JUST AS I SAID C-00 -- I'M GOING TO --

Q       TWO AND THREE IS THAT WHAT YOUR CONTENTION IS?

A       C-002, C-003 -- NO, I'M SORRY.  WITHDRAW C-003.

Q       OKAY.

A       02 THAT'S THIS -- I HAVE SO MANY DOCUMENTS OPENED HERE.

Q       I'M VERY INCLINED TO GO WITH THE ARBITRATOR'S SUGGESTION -- LET ME FINISH -- I'VE ASKED THE QUESTION.  YOU CAN IDENTIFY THOSE DOCUMENTS IN YOUR FINAL TRIAL BRIEF.  I'M GOING TO PROPOSE TO YOU THAT WE JUST ADMIT EVERYBODY'S EXHIBITS SO THEY'LL ALL BE HERE AND YOU CAN REFERENCE THEM.  IT WILL SAVE TIME.

MS. LI:  YES, I PREVIOUSLY CORRECT MYSELF.  I IDENTIFIED THESE DOCUMENTS.  I JUST DON'T WANT TO OVERSPEAK.  THAT'S WHY I NEED TO VERIFY THE NUMBERS AGAIN.

MR. TAUGER:  FAIR ENOUGH.

MS. LI:  YEAH.

MS. TAUGER:  I HAVE NO FURTHER QUESTIONS FOR THIS

WITNESS.

THE ARBITRATOR:  OKAY.  GREAT.

I DO HAVE ONE QUESTION, MS. LI.

MS. LI:  YES.

THE ARBITRATOR:  DO YOU KNOW WHAT ASSETS CATHY TRADING HAS, EITHER NOW OR AS OF THE DATE OF THE ARBITRATION AWARD?  IS THERE ANY EVIDENCE OF THAT IN THE RECORD?

MS. LI:  YES, YOUR HONOR.  THIS GOES TO THE HEART OF THOSE LAST THREE EXHIBITS THAT I INTENDED TO INTRODUCE BUT OPPOSE BY MR. TAUGER THAT I ALSO OFFERED TO WITHDRAW THEM BECAUSE IT WASN'T OBTAINED UNTIL APRIL 4TH.

MR. TAUGER:  I STIPULATED TO THAT.

MS. LI:  I'M SORRY.  I WILL JUST SPEAK ABOUT IT IF I MAY.

I KNEW THAT CATHY TRADING SINGLE MEMBER CATHY YUN CHEN AND HER FAMILY HAD PURCHASED A NEW LARGER HOUSE.  THEY HAVE SINCE MOVED AND --

MR. TAUGER:  OBJECTION.  LACK OF FOUNDATION.

THE ARBITRATOR:  MS. LI, IS THERE ANY DOCUMENTARY EVIDENCE TO THIS EFFECT?

MS. LI:  YES.  MAY I CALL YOUR ATTENTION TO EXHIBIT C-015 AND C-14.  THESE ARE THE CORPORATE TAX FILINGS IN THE STATE OF MARYLAND.  TIMELY.  AND ALSO SHOWING VERY GOOD STATUS AS OPPOSED TO COMPANIES SUCH AS

APOGEE LAW GROUP THAT WAS IN SUSPENSION FOR A LONG TIME

AND ALSO THE --

MR. TAUGER:  OBJECTION, YOUR HONOR.

THE ARBITRATOR:  OVERRULED.  LET HER SPEAK.

MR. TAUGER:  I WILL STIPULATE TO THE ADMISSIBILITY

OF 14, AND I'LL STIPULATE THAT IT SHOWS THAT THE RESIDENT

AGENT YUN CHEN LISTED 150 LULLABY COURT, GERMANTOWN, AS

THE ADDRESS OF CATHY TRADING IF THAT'S WHERE THE WITNESS

IS GOING.

MS. LI:  I'M NOT GOING TO JUST -- I AM TRYING TO

POINT OUT DATA AND PUBLIC AVAILABLE INFORMATION, AND I

ALSO IN THE PROCESS OF OBTAINING THE INVESTIGATORY REPORT

ABOUT CATHY TRADING AND ITS ASSETS, BUT IT'S NOT TIMELY

ENOUGH FOR ME TO PRESENT TO THIS TRIBUNAL.  WHEN I OBTAIN

THAT, I WILL.

THE ARBITRATOR:  ALL RIGHT.  SO LET ME JUST RECAP

HERE.  I ASKED YOU ABOUT CTC'S ASSETS, AND IT SOUNDS LIKE

DOCUMENT -- SORRY, EXHIBIT C-015 AND C-014 ARE THE TWO

EXHIBITS THAT YOU THINK ARE RELEVANT TO THIS ISSUE.  AND

YOU ALSO -- AND YOU ALSO WERE TESTIFYING TO THE HOME

OWNERSHIP OF MS. YUN CHEN.

MS. LI:  YES.  AND ALSO THESE TWO EXHIBITS THAT

MR. TAUGER EXAMINED ME ABOUT -- ON, EARLY ON, AMAZON AND

EBAY SALES AND I WOULD POINT OUT ONE MORE.  THERE WAS

ANOTHER WEBSITE THAT -- SO THOSE ARE TWO ILLUSTRATIONS AND

ALSO A NEW HOME OWNERSHIP BY MS. YUN CHEN, A SINGLE MEMBER LLC.

ADDITIONALLY, I HAVE KNOWLEDGE THAT MS. -- SINGLE MEMBER YUN CHEN HAS ADDITIONAL ASSETS IN OTHER JURISDICTIONS.

MR. TAUGER:  OBJECTION.  LACK OF FOUNDATION. FACTS NOT IN EVIDENCE.

THE ARBITRATOR:  OVERRULED.

YOU KNOW, MR. TAUGER, YOU'RE MAKING A GOOD POINT, BUT I WANT TO HEAR WHAT SHE HAS TO SAY.

MR. TAUGER:  IF I MAY HAVE A STANDING OBJECTION.

THE ARBITRATOR:  THAT'S FINE.

MR. TAUGER:  WHAT SHE KNOWS.

THE ARBITRATOR:  SO YOU'RE TALKING ABOUT THIS NEW HOME OWNERSHIP.  DO YOU KNOW THE VALUE OF THIS NEW HOME? DO YOU KNOW WHAT THE ADDRESS OF THE NEW HOME IS?

MS. LI:  YES.  C-024, IF IT'S ADMITTED ONLY FOR THIS PURPOSE, SHOWS THE NEW HOUSE VALUE AND THE LOCATION.

MR. TAUGER:  OBJECTION.  THE OWNER NAME FOR C-024 IS CHEN TAK NOT YUN CHEN.

THE ARBITRATOR:  SO THE DOCUMENT WILL SPEAK FOR ITSELF.

YOU SAID YOU HAD ADDITIONAL INFORMATION. WHAT WAS THIS?

MS. LI:  AND ALSO JUST FOR THE INFORMATION OF

THIS -- FOR THE INFORMATION OF OPPOSING COUNSEL, CHEN IS A

COMMON LAST NAME AND WHICH ARE REASONABLY ASSUMED TO BE

THE FAMILY MEMBER, AND CHEN TAK ALSO OWNS THE PREVIOUS

HOUSE WHICH COULD BE PART OF YUN CHEN'S.

THE ARBITRATOR:  LET'S MOVE ON FROM THE HOME

OWNERSHIP.

WAS THERE ANY ADDITIONAL INFORMATION THAT

YOU HAD THAT BEARS ON THE QUESTION OF CTC'S ASSETS EITHER

NOW OR AT THE TIME OF THE AWARD?

MS. LI:  YES.  CTC -- CTC CONVERTED OR RATHER

CHANGED IT'S OWNERSHIP TO AN LLC BECAUSE DURING THE

LITIGATION I REPRESENTED THEM, THEY DID NOT WANT OPPOSING

SIDES TO REACH OUT THEIR ASSETS OUTSIDE OF AMERICA.  SO IT

WOULD BE LIMITED LIABILITY COMPANY WITHIN THE STATES WITH

VERY LITTLE ASSETS.  SO THERE ARE POTENTIAL -- OR IN FACT

MUCH LARGER ASSETS RESIDING OUTSIDE OF THIS JURISDICTION.

THE ARBITRATOR:  IS THERE ANYTHING ELSE, MS. LI?

MS. LI:  FROM ALL THE COMMERCIAL CHANNELS CTC

GENERATES REVENUE, WHICH I'M NOT ONLY LIMITED TO THOSE TWO

EXHIBITS SHOWING, THEY ALSO SELL AT WAY -- I BELIEVE IT'S

WAYFAIR, WALMART, ALSO OTHER RETAIL PLACES.  SO I BELIEVE

THERE ARE REVENUES AND PROFIT.

THE ARBITRATOR:  OKAY.  THANK YOU, MS. LI.  I HAVE

NO FURTHER QUESTIONS.

MS. LI:  THANK YOU, YOUR HONOR.

MR. TAUGER:  YOUR HONOR, AFTER THE LUNCH BREAK I WILL JUST GIVE YOU A COUPLE OF REBUTTAL EXHIBITS I SENT TO MS. LI.

THE ARBITRATOR:  OKAY.  THAT'S FINE.

ARE WE READY TO TAKE A LUNCH BREAK FOR AN HOUR OR SO?

MR. TAUGER:  ABSOLUTELY.

THE ARBITRATOR:  SO IT'S 12:07 NOW.  LET'S GO OFF THE RECORD.

(NOON RECESS TAKEN FROM 12:07-1:18 PM)

IRVINE, CALIFORNIA - FRIDAY, APRIL 7, 2023

AFTERNOON SESSION

* * * * *

THE ARBITRATOR:  LET'S GO BACK ON THE RECORD AND LET ME REASK MY QUESTION.

MS. LI, DO YOU HAVE FURTHER WITNESSES YOU WOULD LIKE TO CALL AT THIS TIME?

MS. LI:  I'D LIKE TO CALL THE CORPORATE PRINCIPALS OF APOGEE, IF I MAY.  I IDENTIFIED THEM AS BEING MR. HART AND MR. GULLIVER.

THE ARBITRATOR:  OKAY.  YOU CAN ONLY CALL ONE PERSON AT A TIME.  SO SINCE MR. HART IS HERE, I WOULD SUGGEST WE START WITH MR. HART.  IS THAT OKAY?

MS. LI:  YES.  I'D LIKE TO CLARIFY DOES MR. -- IS MR. GULLIVER GOING TO APPEAR IN THIS HEARING?

MR. TAUGER:  MR. GULLIVER WILL NOT APPEAR.  OUR POSITION IS HE WAS UNDER NO COMPULSION TO DO SO.

MS. LI:  YOUR POSITION IS?  MAY I CLARIFY?

MR. TAUGER:  YEAH, THAT HE WAS UNDER NO COMPULSION TO DO SO.

MS. LI:  HE WAS UNDER COMPULSION?

MR. TAUGER:  UNDER NO COMPULSION TO APPEAR.

MS. LI:  OKAY.  BUT HE IS IDENTIFIED AS A CFO OF APOGEE.

MR. TAUGER:  HE IS IDENTIFIED AS THE CFO OF

APOGEE.

MS. LI:  SO HE'S A PRINCIPAL OR OFFICER AT LEAST, AND HE WAS ALSO IDENTIFIED ON ONE OF THE EXHIBITS OR CORPORATE DOCUMENTS AS A BOARD MEMBER --

MR. TAUGER:  I'VE STATED OUR POSITION ON THAT.

THE ARBITRATOR:  ALL RIGHT.  LET'S START WITH THE EXAMINATION OF MR. HART, AND WE CAN TALK ABOUT THE OTHER WITNESSES LATER.

MS. LI:  OKAY.

THE ARBITRATOR:  SO MR. HART, WOULD YOU MIND TAKING THE WITNESS STAND SO MRS. LI CAN SEE YOUR FACIAL EXPRESSIONS CLEARLY.

MS. LI:  THANK YOU.

THE ARBITRATOR:  OKAY.  THIS TIME I WILL REMEMBER TO ADMINISTER THE OATH.

MR. HART, IF YOU WOULDN'T MIND RAISING YOUR RIGHT HAND.

DO YOU SWEAR THE TESTIMONY YOU ARE GOING TO GIVE IN THIS PROCEEDING SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE TRUTH?

THE WITNESS:  I DO.

THE ARBITRATOR:  THANK YOU VERY MUCH.

MS. LI, ARE YOU PREPARED TO BEGIN?

MS. LI:  YES, I AM, EXCEPT I CAN'T SEE MR. HART'S FACE.

THE ARBITRATOR:  OH, WELL, THAT'S STRANGE.  YOU SHOULD BE ABLE TO BECAUSE HE'S ACTUALLY SITTING IN FRONT OF A CAMERA.

MS. LI:  HE IS?

THE ARBITRATOR:  LET ME GET THE ASSISTANT HERE AND SEE IF WE CAN RESOLVE THAT ISSUE.  JUST A MINUTE.

MR. TAUGER:  THE ARBITRATOR IS GOING TO GET SOMEONE WHO WILL FIX THAT BECAUSE HE IS IN FRONT OF THE CAMERA BUT YOU'RE NOT SEEING IT, SO WE WILL GET THAT FIXED.

MS. LI:  THANK YOU.

(BRIEF PAUSE.)

THE ARBITRATOR:  LET'S GET BACK ON THE RECORD.  IT IS NOW 1:25 P.M. AND WE ARE READY TO PROCEED WITH MS. LI'S DIRECT EXAMINATION OF MR. HART.

ROBERT HART,

CALLED AS A WITNESS AND HAVING BEEN FIRST DULY SWORN WAS EXAMINED AND TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. LI:    Q    MR. HART, COULD YOU IDENTIFY YOURSELF, PLEASE.

A     ROBERT HART.

Q     **HOW ARE YOU RELATED TO THIS CASE?**

A     I AM AN OFFICER AND DIRECTOR OF APOGEE LAW GROUP.

MR. TAUGER:  MR. HART, MAY I ASK YOU TO SPEAK UP BECAUSE I DON'T HEAR WELL OUT OF MY RIGHT EAR.

THE WITNESS:  SURE.

MR. TAUGER:  THANK YOU.

BY MS. LI:    Q    WHO IS APOGEE LAW GROUP, PC?

A    IT IS A FORMER LAW FIRM.  RIGHT NOW IT'S JUST A NONOPERATING LAW FIRM.

Q    NONOPERATING YOU SAID, I NOTE?

A    YES.  IT DOESN'T HAVE -- IT DOES NOT HAVE CLIENTS.  NOBODY IS DOING LEGAL WORK ON BEHALF OF THE FIRM.

Q    OKAY.  WHAT IS A CORPORATE STRUCTURE -- STRIKE THAT.

WHAT WAS THE CORPORATE STRUCTURE OF APOGEE?

A    IT WAS FOUNDED AS A C-CORP, AND IT'S STILL A C-CORP.

Q    OKAY.  AND WHAT IS YOUR ROLE AT APOGEE?

A    CAN YOU GIVE ME A TIME FRAME?

Q    WHAT WAS YOUR ROLE AT APOGEE FROM 2015, SINCE ITS FOUNDATION, 'TIL 2019?

A    I WAS A VICE PRESIDENT AND A MEMBER OF THE BOARD OF DIRECTORS.  I DON'T KNOW EXACTLY WHEN I BECAME PRESIDENT, BUT SOME POINT I BECAME PRESIDENT OF THE FIRM.

Q    OKAY.  SOME POINT -- DOES THAT SOME POINT FALL UNDER THE TIMEFRAME 2015 TO 2019?

A       I DON'T REMEMBER.

Q       WHAT HAS BEEN YOUR ROLE AFTER 2019, MAINLY 2020, UNTIL NOW?

A       CERTAINLY BY 2020 I WAS PRESIDENT, AND WE WERE WINDING UP THE FIRM'S OPERATIONS.  WE STARTED IN JANUARY 1, 2019, AND THAT CONTINUES THROUGH THE PRESENT.

Q       SO YOU STARTED TO SERVE AS PRESIDENT SINCE JANUARY 1, 2019?

A       THAT'S NOT WHAT I SAID.

Q       MAY I CLARIFY WHICH DAY YOU BECAME THE PRESIDENT?

A       I DON'T KNOW.  IT WAS IN THE SUMMER.  I THINK IT WAS MAYBE 2019, THE SUMMERTIME, JULY.  I JUST DON'T REMEMBER.  THAT'S THE BEST DATE I CAN COME UP WITH.

Q       MAYBE THE SUMMER OF 2019?

A       MAYBE.  I REMEMBER IT BEING THE JULY TIMEFRAME.  JUNE/JULY.

Q       OKAY.  WHO ARE THE SHAREHOLDERS OF APOGEE?

A       FRANK RUBIO, GREG GULLIVER, JEFFREY WILK AND MYSELF.

Q       AND ARE THESE STILL THE SHAREHOLDERS OF APOGEE?

A       YES.

Q       OKAY.  WHAT WAS YOUR POSITION AT APOGEE BEFORE -- SORRY.  STRIKE THAT.  YOU SAID YOUR ROLE.

SO WHO ARE THE OFFICERS AT APOGEE?

A    NOW?  TODAY?

Q    YES.  IF YOU MAY, YOU LIKE TO SPECIFY THE TIMEFRAME THERE WERE CHANGES?

A    FROM ITS INCEPTION GREG GULLIVER WAS THE CFO/TREASURER.  FROM ITS INCEPTION JEFFREY WILK WAS THE SECRETARY.  AND FRANK RUBIO WAS THE PRESIDENT FROM THE COMPANY'S INCEPTION UNTIL WE'LL CALL IT THE SUMMER OF 2019.  MAYBE '18, BUT I THINK IT'S 2019.  AND AFTER HE RESIGNED AS AN OFFICER AND DIRECTOR OF THE COMPANY, THEN I TOOK OVER AS PRESIDENT.

Q    AS PRESIDENT?

A    YES.

Q    WHO WAS THE CEO OF APOGEE?

A    WELL, OFFICIAL TITLES LIKE CEO AND CFO DON'T REALLY EXIST.  YOU'VE GOT TO LOOK AT THE ACTUAL STATUTE WITHIN THE STATE.  MOST STATES DON'T DESIGNATE CEOS AND CFOS.  THEY DESIGNATE PRESIDENTS AND TREASURERS AND SECRETARIES.

Q    BUT YOU DID MENTION CFO BEING GREG GULLIVER. THAT'S WHY THE QUESTION OF CEO COMES NATURALLY.

A    FROM A LEGAL PERSPECTIVE, GREG WAS THE TREASURER OF THE COMPANY, BUT HE HAD THE TITLE AND USED THE TITLE AS CFO.

Q    DOES OFFICERS CHOOSE THEIR OWN TITLE FREELY

AT APOGEE?

A     NO.  THE TITLE WAS SET WHEN THE COMPANY WAS OPERATED, BUT MOST COMPANIES TODAY DESIGNATE A CEO, A CFO, A SECRETARY.  LARGER COMPANIES WILL -- MAY HAVE DIFFERENT PEOPLE IN DIFFERENT ROLES SUCH AS PRESIDENT, A SEPARATE PERSON CEO, A SEPARATE PERSON AS THE CHIEF OPERATING OFFICER, A CHIEF FINANCIAL OFFICER, A CHIEF INFORMATION OFFICER, A CHIEF DIVERSITY OFFICER.  SO THERE'S LOTS OF CHIEF TITLES, BUT FROM A LEGAL PERSPECTIVE, THE STATE STATUTES DON'T GET INTO THOSE NUANCES.

Q     OKAY.

A     THEY PRIMARILY RECOGNIZE A PRESIDENT, VICE PRESIDENTS, TREASURERS, AND SECRETARIES.

Q     THANK YOU FOR THE CORPORATE LESSON, BUT I AM ASKING WHO WAS THE CEO OF APOGEE.

MR. TAUGER:  ASKED AND ANSWERED.

THE WITNESS:  FRANK RUBIO WAS THE CEO/PRESIDENT FROM THE TIME THE FIRM WAS STARTED UNTIL HE RESIGNED, AND I BELIEVE THE RESIGNATION WAS IN JUNE OR JULY OF 2019.

BY MS. LI:   Q   OKAY. NOW, MOVING ON.  WHO ARE THE BOARD MEMBERS?

A     THE SAME.  FRANK RUBIO FROM INCEPTION UP UNTIL THE TIME HE RESIGNED.  HE WAS A BOARD MEMBER.  JEFF WILK BOARD MEMBER FROM JANUARY -- THE COMPANY WAS FORMED -- OR I SHOULD SAY THE FIRM STARTED

JANUARY 1, 2015, AND THE COMPANY INCORPORATED IN FEBRUARY, LIKE FEBRUARY 3RD OR SO, MAYBE IT WAS THE 5TH OF 2015. FROM THAT POINT FORWARD JEFFREY WILK HAS ALWAYS BEEN THE SECRETARY.  AND FROM THE TIME OF FORMATION UNTIL TODAY, GREG GULLIVER HAS ALWAYS BEEN A TREASURER AND, YOU KNOW, HE USES THE CFO TITLE.

Q     AND YOU HAVE REPLACED FRANK RUBIO, ACCORDING TO WHAT YOU JUST SAID, IN THE SUMMER OF '19 AS THE PRESIDENT?

A     CORRECT.

Q     MORE OR LESS ACCORDING TO YOUR INTRODUCTORY LESSON ABOUT CORPORATE PRACTICE THAT YOU ARE ALSO -- YOU HAVE BEEN ALSO THE CEO?

A     I'VE NEVER BEEN THE CEO.  I'VE NEVER USED THAT TITLE.  I'VE ALWAYS REFERRED TO MYSELF AS --

Q     RIGHT.  MORE OF TITLE FORMAT IN SUBSTANCE?

A     YES.

Q     NOW, MAY I DIRECT YOUR ATTENTION TO EXHIBIT C-001.

A     OKAY.

Q     PAGE LI 110.  I WILL SHARE ON THE SCREEN JUST TO MAKE SURE THAT WE ARE ON THE SAME PAGE.  001-110 LISTS THE THREE DIRECTORS OF APOGEE.

A     IF YOU SAY SO.

MR. TAUGER:  SORRY.  I DON'T SEE THAT EXHIBIT.  IF

YOU CAN GIVE ME A MINUTE BECAUSE IT'S NOT GETTING SHARED HERE.  IF YOU CAN GIVE ME A MINUTE.

MS. LI:  SURE.  LET'S GIVE SOME TIME.  I ALSO NEED TO BE SHARING THIS.

MR. TAUGER:  THAT WAS PAGE 110?

MS. LI:  YES, CORRECT.

MR. TAUGER:  OKAY.  I GOT IT.  THANK YOU.

BY MS. LI:    Q    OKAY.  SO THESE ARE THE DIRECTORS?

A    I DON'T KNOW WHAT THE DATE OF THAT DOCUMENT IS, BUT THAT REFLECTS THE CURRENT BOARD AS OF TODAY.

**Q    DOES THIS LIST REFLECT THE CURRENT BOARD OF DIRECTORS STRUCTURE?**

A    CURRENT, YES.

MR. TAUGER:  YOUR HONOR, I HAVE TO JUMP IN FOR ONE MOMENT.  EARLIER TODAY --

MS. LI:  (INAUDIBLE)

THE ARBITRATOR:  HOLD ON JUST A MINUTE, MS. LI.  MR. TAUGER WANTS TO SPEAK.

MR. TAUGER:  I'LL PUT YOUR TIMER ON PAUSE.  IT'S MY TIME.

EARLIER TODAY I SAID -- YOU HAD ASKED ME ABOUT HER EXHIBITS, AND I MENTIONED I SKIMMED THEM.

THE ARBITRATOR:  YEAH.

MR. TAUGER:  I ASSUMED THAT THEY WERE ALL OF A

PIECE, FOR EXAMPLE, THIS EXHIBIT STARTS WITH -- WELL, IT

CONTAINS FOUR OR FIVE DIFFERENT UNRELATED DOCUMENTS, AND I

WASN'T AWARE OF THAT.  SO I AM NOT SAYING I MAY NOT OBJECT

TO OTHER ONES BECAUSE I DIDN'T KNOW THIS WAS HERE.  I

DON'T HAVE AN OBJECTION TO THIS.

        THE ARBITRATOR:  BUT YOU HAVEN'T HAD A CHANCE TO

REALLY --

        MR. TAUGER:  I HAVEN'T HAD A CHANCE TO REVIEW IT,

SO I CAN'T SAY I HAVE NO OBJECTIONS.

        THE ARBITRATOR:  OKAY.  ALL RIGHT.  DO YOU NEED A

MINUTE TO FAMILIARIZE YOURSELF WITH THE EXHIBITS?

        MR. TAUGER:  IT WOULD TAKE ME MORE THAN A MINUTE.

THERE'S A LOT OF DOCUMENTS HERE.

        THE WITNESS:   IT'S 110 PAGES.

        THE ARBITRATOR:  OH, I SEE.

            MS. LI, I DON'T KNOW WHERE YOU'RE HEADED

WITH THIS LINE OF QUESTIONING ABOUT THE DIRECTORS.  IS

THAT SO CRUCIAL TO YOUR CASE?

        MS. LI:  NO, YOUR HONOR.  I'M JUST DOING MY

HOMEWORK.  I'M JUST ALSO LAYING FOUNDATION, THEN I WILL

MOVE ON.

        THE ARBITRATOR:  OKAY.

        MS. LI:  AND ALSO JUST TO MAKE SURE THE DOCUMENT

IS NOT BURDENSOME TO MR. TAUGER BECAUSE THEY WERE PRODUCED

BY MY PREDECESSOR, MR. BALOGH, LAST YEAR, AND IT WAS PART

OF THE FILINGS ON APOGEE'S ACTION AGAINST CTC.  AND

EVERYTHING IS A DOCUMENT FROM THE CALIFORNIA SECRETARY OF

STATE, SO THERE'S NO AUTHENTIC -- QUESTIONING TO THE

AUTHENTICITY OF THIS PIECE OF PAPER.

THE ARBITRATOR:  LET ME SAY I'LL GIVE BOTH OF YOU

A CHANCE TO ISSUE POST HOC OBJECTIONS TO ANY OF THESE

DOCUMENTS.

MS. LI:  YES.

MR. TAUGER:  I'M SORRY.  I'M JUST GOING TO RENEW

MY OBJECTION THAT THESE ARE NOT TIMELY PRODUCED, I HAVE

NOT HAD A CHANCE TO REVIEW THEM, AND I CERTAINLY CAN'T DO

IT DURING THE ARBITRATION.

THE ARBITRATOR:  WELL, I AGREE WITH YOU.  I DON'T

REALLY KNOW THAT THE DOCUMENT ITSELF IS THAT MATERIAL AT

THE END OF THE DAY.

MR. TAUGER:  THIS DOCUMENT I AGREE WITH YOU IT

DOESN'T MATTER.  WE'LL STIPULATE IT SAYS WHAT IT SAYS.

BUT THERE'S A WHOLE BUNCH OF DOCUMENTS --

THE ARBITRATOR:  FAIR ENOUGH.  WELL, LET'S MAKE A

LIST OF THOSE DOCUMENTS AS THEY ARISE.  HOW'S THAT?

OKAY.  MS. LI, YOU MAY CONTINUE.

MS. LI:  YES.

**Q     ARE THERE ANY -- WHO IS IN CHARGE OF THE**

**MANAGEMENT OPERATIONS OF APOGEE?**

MR. TAUGER:  OBJECTION.  VAGUE AS TO MANAGEMENT

OPERATIONS.

IF YOU UNDERSTAND, YOU CAN ANSWER.

I'M SORRY.  IT'S NOT A DEPOSITION.

MS. LI:  I BEG YOUR PARDON.  YOU SAID SOMETHING ABOUT MANAGEMENT OPERATIONS?  I DIDN'T HEAR YOU.

MR. TAUGER:  I OBJECTED ON THE GROUNDS THAT IT WAS VAGUE AS TO MANAGEMENT OPERATIONS.

MS. LI:  WAS WHAT?  SPACE?  AGE?

MR. TAUGER:  THE ARBITRATOR NEEDS TO RULE ON MY OBJECTION.

THE ARBITRATOR:  ALL RIGHT.  SO OVERRULED.

IF YOU UNDERSTAND THE QUESTION, MR. HART, YOU CAN ANSWER IT.

MR. TAUGER:  AND I'M SORRY.  I DIDN'T INTEND TO USURP YOUR ROLE.  IT'S JUST HABIT.

THE ARBITRATOR:  THAT'S OKAY.

THE WITNESS:  CAN YOU READ BACK THE QUESTION.  I THINK IT WAS VAGUE, TOO, AND I DON'T EVEN KNOW WHERE TO BEGIN.

MS. LI:  WHAT DID YOU SAY?  OH, I WILL REPEAT.

Q      WHO IS IN CHARGE OF MANAGEMENT AND OPERATIONS AT APOGEE?

A      I THINK YOU JUST LISTED THE THREE PEOPLE THAT MANAGE APOGEE; GREG GULLIVER, ROBERT HART, AND JEFFREY WILK.

Q     OKAY.  I SIMPLY SHOWED AN EXHIBIT THAT WAS FILED IN THE STATE SECRETARY.  I DID NOT ANSWER THE QUESTION FOR THE WITNESS.  I WISH THAT TO BE NOTED.

WITNESS CONFERS HIS ANSWER COMPLIES WITH THAT DOCUMENT.

DO YOU HAVE ANY MEETING MINUTES FROM --

THE ARBITRATOR:  HOLD ON, MS. LI.  MR. TAUGER HAS AN OBJECTION.

MR. TAUGER:  I'M GOING TO WITHDRAW MY OBJECTION.  IT'S HER DIME.  IF SHE WANTS TO MAKE HER TIME MAKING SPEECHES, SHE CAN.

THE ARBITRATOR:  ALL RIGHT.  MS. LI, YOU MAY CONTINUE.

MS. LI:  I CANNOT HEAR YOUR OBJECTIONS.

Q     ARE THERE ANY MEETING MINUTES?

A     YES.

Q     YES.  CAN MEETING MINUTES BE PRODUCED?

A     I THINK IT'S A LITTLE LATE IN THIS ARBITRATION TO BE PRODUCING DOCUMENTS.  YOU SHOULD HAVE ASKED FOR THEM TWO YEARS AGO WHEN YOU STARTED THE ARBITRATION.

Q     I DID ASK THE MEETING MINUTES DURING THE TIME CLAIMANT WAS IN EMPLOYMENT WITH APOGEE, AND IT WAS DENIED ACCESS TO IT.

A     THERE ARE MEETING MINUTES.

Q     OKAY.  I'LL TAKE THIS AS A MOTION TO COMPEL

MEETING MINUTES TO BE PRODUCED.

MR. TAUGER:  OBJECTION.  THE TIME HAS MORE THAN LAPSED TO DO A DISCOVERY MOTION TO COMPEL.

THE ARBITRATOR:  SUSTAINED.  MS. LI, PLEASE MOVE ON.

BY MS. LI:    Q    IS APOGEE IN GOOD STANDING NOW?

A    YES.

Q    OKAY.  BUT WAS APOGEE IN GOOD STANDING IN 2022 AND 2021?

MR. TAUGER:  OBJECTION.  352.

THE ARBITRATOR:  MS. LI.

MS. LI:  WHAT DOES 352 MEAN?

MR. TAUGER:  MORE PREJUDICIAL THAN PROBATIVE.

MS. LI:  WHY IS IT PREJUDICIAL?  I'M SIMPLY ASKING --

MR. TAUGER:  THERE'S AN OBJECTION BEFORE THE TRIBUNAL.

MS. LI:  THIS IS TRIBUNAL --

(OVERTALKING).

THE ARBITRATOR:  MS. LI.  MS. LI.  I DON'T KNOW THAT IT'S REALLY PRODUCTIVE TO REHASH THE ISSUES AROUND APOGEE, WHAT IS IT CALLED, BEING IN GOOD STANDING, SO I WOULD ENCOURAGE YOU TO MOVE ON FROM THESE ISSUES.  THOSE ISSUES HAVE BEEN FULLY BRIEFED AND RULED UPON BY ME.  I

DON'T THINK YOU'RE GOING TO GAIN ANY ADDITIONAL POINTS BY REVISITING THAT HISTORY.

MS. LI:  OKAY.  MOVING ON.  SO WHO HAD CONTROL OF ACCOUNTING PROCESS AT APOGEE?

A    I'M GOING TO OBJECT BECAUSE THAT'S VAGUE, BUT I'LL TRY TO ANSWER IT ANYWAY.

MS. LI:  WITNESS CANNOT OBJECT.

MR. TAUGER:  I OBJECT.  IT'S VAGUE WITH RESPECT TO ACCOUNTING PRACTICE OR ACCOUNTING PROCESS.

MS. LI:  OKAY.

THE WITNESS:  BUT I'LL TRY TO ANSWER IT IN LIGHT OF THE FACT THAT IT'S VAGUE.

SINCE JANUARY 1, 2019, A GROUP OF LAWYERS LEFT APOGEE AND WENT TO WORK FOR ADDYHART.  AND AT THAT POINT APOGEE STARTED WINDING DOWN OPERATIONS.  AND SO WHEN YOU TALK ABOUT MANAGEMENT OF FINANCIALS AND THINGS LIKE THAT, OBVIOUSLY THE CFO, GREG GULLIVER, WAS INVOLVED AND ROBERT HART, AS PRESIDENT, WAS INVOLVED.

BY MS. LI:    Q    WHO HAD ACCOUNTING CONTROLS PRIOR TO THE DEPARTURE OF THESE GROUP OF LAWYERS ON JANUARY 1, 2019?

MR. TAUGER:  OBJECTION.  VAGUE AS TO ACCOUNTING CONTROL.

MS. LI:  WHY IS IT VAGUE ACCOUNTING CONTROL? NAMELY WHO IS IN CHARGE OF --

THE ARBITRATOR:  MS. LI, LET ME INTERJECT.

MR. HART, DO YOU UNDERSTAND THE QUESTION?

THE WITNESS:  WELL, NO, I DON'T.  SO FROM A CORPORATE PERSPECTIVE, SOME OF MS. LI'S QUESTIONS ARE WRONG.  OR IF YOU ANSWER IT WRONG, YOU COULD PROBABLY BE HELD TO PERJURY, SO ACCOUNTING --

THE ARBITRATOR:  CAN YOU REPHRASE YOUR QUESTION, MS. LI?

MS. LI:  OKAY.

**Q     WHO HAD RESPONSIBILITY OF MANAGING ACCOUNTS PAYABLES AND ACCOUNTS RECEIVABLES?**

MR. TAUGER:  OBJECTION.  VAGUE AS TO MANAGING.

MS. LI:  SORRY?

MR. TAUGER:  OBJECTION.  VAGUE AS TO MANAGEABLE -- MANAGING.

THE ARBITRATOR:  CAN YOU ANSWER THE QUESTION, MR. HART?

THE WITNESS:  I'LL TRY.

SO APOGEE WAS A VERY SMALL LAW FIRM, AND AS SUCH, IT HAD OPERATIONS -- I SHOULD SAY PEOPLE WORKING AT A CHICAGO OFFICE AND PEOPLE WORKING OUT OF THE IRVINE, CALIFORNIA, OFFICE.  AND AT ONE POINT IN TIME THERE WAS AN ATTORNEY WORKING OUT OF SAN FRANCISCO.  IT WAS A VIRTUAL FIRM FOR THE MOST PART, BUT AT ONE POINT IN TIME, AND I THINK IT WAS AROUND 2000, WE'LL CALL IT '15 THROUGH MARCH

OF 2017, IT HAD AN OFFICE LOCATED AT 2020 MAIN STREET HERE JUST DOWN THE STREET.

WHO WAS INVOLVED WITH ACCOUNTING?  APOGEE WAS A DECENTRALIZED LAW FIRM WHERE MOST OF THE FUNDS THAT CAME IN FROM CLIENTS GOT DISTRIBUTED OUT PRIMARILY TO THE ATTORNEYS WITH A VERY HIGH PERCENTAGE.  SO THE FIRM WAS SET UP NEVER TO BE A TRADITIONAL LAW FIRM WHERE IT HAD -- YOU KNOW, ESSENTIALLY AN AVERAGE LAW FIRM YOU HAD ONE-THIRD GOING TO THE ATTORNEYS DOING THE WORK, ONE-THIRD GOING TO PARTNER PROFITS, AND ONE-THIRD GOING TO OVERHEAD. APOGEE TRIED TO KEEP ITS COST DOWN AND HAVE A HIGHER PERCENTAGE GOING TO THE ACTUAL ATTORNEYS DOING THE WORK AND THE ORIGINATORS AND THUS IT TRIED TO KEEP ITS OVERHEAD EXTREMELY LOW.  SO THERE WAS NEVER A PROFIT DISTRIBUTED OUT TO THE SHAREHOLDERS.

WHO WAS INVOLVED IN THE ACCOUNTING?  WELL, ALL OF US WERE.  ALL THE OFFICERS, ALL THE OWNERS.  FRANK MANAGED HIS CLIENTS, AND HE HAD MANAGEMENT AUTHORITY AND RESPONSIBILITY OVER MAKING SURE THAT VENDORS WERE PAID FOR AN ACCOUNTS PAYABLE ISSUE, AND HE WAS RESPONSIBLE IN THE ACCOUNTS RECEIVABLE SIDE FOR HIS CLIENTS.

I WAS RESPONSIBLE FOR ACCOUNTS PAYABLE ON MY CLIENTS AND ALSO ACCOUNTS RECEIVABLE ON MY CLIENTS.  AND THE SAME WITH GREG AND JEFF AND THE OTHER PEOPLE THAT WERE INVOLVED.

AT THE END OF THE YEAR WHEN IT WAS TIME TO DO TAXES, ULTIMATELY GREG GULLIVER, WHO WAS THE TREASURER AND CFO, WAS RESPONSIBLE FOR MAKING SURE THAT PERIODICALLY THEY WERE -- WE WERE LOOKING AT THE SPEND, MAKING SURE THAT WE WERE STAYING ON BUDGET, AND THAT WAS HIS ROLE IN ADDITION TO ALL THE ACCOUNTS PAYABLE ISSUES RELATED TO HIS CLIENTS AND ALL THE ACCOUNTS RECEIVABLE ISSUES RELATING TO HIS CLIENTS.

BY MS. LI:    Q    OKAY.  SO THERE WAS NOT -- STRIKE THAT.

WAS THERE A BOOKKEEPER AT APOGEE?

A    THERE WAS FOR A PERIOD OF TIME.  HER NAME WAS TAMMY SCHNEIDER.

Q    **UNTIL WHAT YEAR SHE LEFT OR SHE WAS ASKED TO GO?**

A    I THINK SHE DID THE BOOKKEEPING PROBABLY RIGHT UP UNTIL 2018 OR '19 WHEN WE STARTED WINDING DOWN THE FIRM.  I KNEW I WAS GOING TO BE FORMING ADDYHART IN THE SUMMER OF 2018, SO I ALREADY STARTED WRAPPING UP SOME OF THE ISSUES WITHIN THE FIRM MYSELF.

GREG KNEW THAT WE WERE GOING TO START A NEW FIRM COME JANUARY, AND SO WE WERE ALREADY STARTING TO WRAP THINGS UP.  I CAN'T SPEAK ON BEHALF OF MIKE OR JEFF OR ANY OF THE OTHER ATTORNEYS.

Q    **MAY I CLARIFY THAT FROM WHAT YEAR TO YOUR**

BEST RECOLLECTION THAT THE BOOKKEEPER, TAMMY SCHNEIDER, WORKED AT APOGEE?

A       SOMETIME IN EARLY 2015 UP UNTIL SOMETIME IN 2018 OR '19.

Q       OKAY.  WAS THERE -- WAS THERE SOMEONE WHO'S IN CHARGE OF ISSUING INVOICES?

A    YES.

MR. TAUGER:  OBJECTION.  VAGUE AS TO IN CHARGE OF.

MS. LI:  IN CHARGE OF IS VAGUE?

THE ARBITRATOR:  DO YOU UNDERSTAND THE QUESTION?

BY MS. LI:    Q    OKAY.  DO YOU HAVE AN ACCOUNTANT?

THE ARBITRATOR:  ALL RIGHT.  SO IT SOUNDS LIKE WE HAVE A NEW QUESTION.

THE WITNESS:  WE HAVE MULTIPLE QUESTIONS GOING ON SO...

THE ARBITRATOR:  WE HAVE A NEW QUESTION FROM MS. LI.

DO YOU HAVE AN ACCOUNTANT?

THE WITNESS:  YES.

BY MS. LI:    Q    WHO IS THE ACCOUNTANT?

A    PAUL DUPRE.

Q       DOES THE ACCOUNTANT WORK FULL TIME AT APOGEE?

A    NO.

Q        IS THE ACCOUNTANT THE ONE WHO ARE SUPPOSED
TO ISSUES INVOICES?

A     NO.

Q        WHO WAS DESIGNATED TO ISSUE INVOICES?

MR. TAUGER:  OBJECT -- NEVER MIND.  I WITHDRAW
THAT.

THE WITNESS:  THE BILLING ATTORNEY.  THE
ORIGINATING ATTORNEY WAS RESPONSIBLE FOR GETTING INVOICES
OUT.

BY MS. LI:    Q    CAN YOU CLARIFY IS THE
BILLING ATTORNEY OR THE ORIGINATION ATTORNEY BECAUSE --

A     THEY'RE THE SAME.

Q        -- THESE TWO TERMS ARE DIFFERENT.

A     THEY'RE THE SAME.  SAME PERSON.

Q        ORIGINATION ATTORNEY IS NOT ALWAYS THE
BILLING BECAUSE THE BILLING ATTORNEY COULD BE INVOLVED OR
GROUP OF ATTORNEYS WHO ARE WORKING --

MR. TAUGER:  OBJECTION.  SHE'S ARGUING WITH THE
WITNESS.

MS. LI:  WHAT WAS YOUR OBJECTION?

MR. TAUGER:  YOU'RE ARGUING.

THE WITNESS:  I'M HAPPY TO ANSWER IT.

THE ARBITRATOR:  ALL RIGHT.

MR. TAUGER:  I DIDN'T HEAR THE QUESTION.

THE WITNESS:  OKAY.  I'LL EXPLAIN IT AS A

NARRATIVE BECAUSE MS. LI MAY NOT QUITE UNDERSTAND ENGLISH.

A BILLING ATTORNEY OR AN ORIGINATING ATTORNEY IS THE ATTORNEY THAT HAS THE PRIMARY RESPONSIBILITY BETWEEN THE FIRM AND THE CLIENT.  WORKERS, AND THAT'S PARALEGALS OR ANYBODY BILLING TIME FOR THAT MATTER, I CALL THEM JUST WORKER BEES.  THEY'RE THE PEOPLE THAT ARE ACTUALLY DOING THE WORK AND BILLING ON THAT CLIENT.  BUT THEY'RE NOT THE ORIGINATING ATTORNEY.  IT'S THE ATTORNEY THAT BROUGHT THE CLIENT INTO THE FIRM, AND THE BILLING ATTORNEY IS THE ORIGINATING ATTORNEY.  THEY'RE SYNONYMOUS TERMS WITH THAT ROLE.

YOU'RE THINKING THAT IF IT'S A TIMEKEEPER THAT THEY'RE A BILLING ATTORNEY.  WELL, TECHNICALLY I GUESS WITH THE ENGLISH LANGUAGE BEING AS VAGUE AS IT CAN BE AT TIMES, THE PERSON, WE'LL CALL IT A TIMEKEEPER, WHO IS BILLING AGAINST A PARTICULAR MATTER, WOULD BE AN ATTORNEY OR A PARALEGAL OR A SUPPORT STAFF OR OTHER SERVICE PROVIDER WHO IS ACTUALLY BILLING TIME, BUT I WOULD CALL THEM MORE OF A TIMEKEEPER THAN A BILLING ATTORNEY.

BY MS. LI:    Q    THANK YOU FOR THAT EXPLANATION.

WHAT IS YOUR ANSWER TO MY QUESTION THAT WHO IS IN CHARGE OF ISSUING INVOICES?

A    FOR CATHY TRADING GROUP IT WAS YOU, HOLLY. IT WAS YOU.

Q      SO IN THAT CASE IF I WAS IN CHARGE OF SENDING OUT INVOICES, I SHALL HAVE THE ACCESS TO THE ACCOUNTING SOFTWARE AND GENERATING BILLABLE TIMES FROM ALL THE ATTORNEYS WORKING ON THE CASE THAT'S MAINLY HOLLY LI, ROBERT HART, PERHAPS ONE MORE OTHER PERSON INCLUDING SUB -- NOT SUBCONTRACTORS, LOCAL COUNSELS.

BUT LET ME ASK THIS QUESTION.  ARE ALL THE BILLING ATTORNEYS GIVEN A RIGHT TO RECORD THEIR TIME ON APOGEE'S TIMEKEEPING SOFTWARE?

A      OKAY.  I'M GOING TO OBJECT TO THE QUESTION. I'M GOING TO OBJECT TO THE USE OF THE TERM BILLING ATTORNEYS.  ALL THE TIMEKEEPERS WERE REQUIRED TO GET THEIR TIME INTO SUZANNE INCLUDING YOURSELF AND INCLUDING ME. SHE WAS RESPONSIBLE FOR INPUTTING ALL THIS INFORMATION INTO A SOFTWARE PROGRAM CALLED TABS3.  IT'S A BILLING SOFTWARE THAT'S USED TO GENERATE THE INVOICES.  YOU WERE RESPONSIBLE, I WAS RESPONSIBLE, AND YOU WERE RESPONSIBLE TO INTERFACE WITH SUZANNE AND YET YOU REFUSED, ON A REPEATED BASIS, TO INTERFACE WITH HER.

I THINK SHE'S FROZEN AGAIN.

AND WHEN WE GET A CHANCE, CAN WE TAKE A BIO BREAK.  I'D LIKE THREE MINUTES.  I'D JUST LIKE TO RUN DOWN --

THE ARBITRATOR:  SURE.  SURE.

THE WITNESS:  WHENEVER'S A GOOD TIME.

THE ARBITRATOR:  THAT'S FINE.  I'M GLAD YOU MENTIONED THAT.

SO MS. LI, YOU FROZE FOR A LITTLE BIT.  I DON'T KNOW IF YOU HEARD EVERYTHING THAT MR. HART HAD TO SAY, BUT BEFORE WE TAKE A BIO BREAK --

MS. LI:  I'M TERRIBLY SORRY ABOUT MY NETWORK.  I BROKE DOWN AT THE POINT HE SAID HE'S GOING TO OBJECT.

THE ARBITRATOR:  DO YOU WANT TO FINISH THAT THOUGHT?

THE WITNESS:  NO, I'M FINISHED WITH IT.  LET'S GO AHEAD AND HAVE THE COURT REPORTER READ IT BACK.

THE ARBITRATOR:  OKAY.

MS. LI:  WHAT WAS THE OBJECTION?  I DIDN'T HEAR.

THE ARBITRATOR:  IT WASN'T AN OBJECTION.  WE'RE GOING TO HAVE THE COURT REPORTER READ BACK MR. TAUGER'S TESTIMONY.

MR. TAUGER:  ROBERT HART.

THE ARBITRATOR:  I'M SORRY, MR. HART'S TESTIMONY.

(WHEREUPON THE RECORD WAS READ.)

MS. LI:  IS THERE ANY RECORD THAT I CAN HAVE THE RIGHTS TO SPEAK TO SUZANNE?

THE ARBITRATOR:  OKAY.  SO LET'S TAKE A BREAK FOR A SECOND BECAUSE MR. TAUGER NEEDS TO TAKE A QUICK -- SORRY.  MR. HART NEEDS TO TAKE A QUICK BREAK.

ALL RIGHT.  SO IT'S 1:53 P.M.

WHAT, FIVE MINUTES?

THE WITNESS:  TWO, THREE.

THE ARBITRATOR:  LET'S TAKE A THREE-MINUTE BREAK.
WE'LL COME BACK AT 1:56.

AND WE CAN GO OFF.

(RECESS TAKEN FROM 1:53-1:56 PM)

THE ARBITRATOR:  LET'S GO BACK ON THE RECORD.
IT'S NOW 1:56 P.M.

YOU MAY CONTINUE, MS. LI.

THE WITNESS:  I THOUGHT THERE WAS A QUESTION THAT
WAS PENDING.

THE ARBITRATOR:  WHY DON'T YOU REASK THE QUESTION,
MS. LI.

BY MS. LI:    Q    YES.  MY QUESTION WAS WHO WAS
IN CHARGE OF ISSUING INVOICES?

A     THE ORIGINATING ATTORNEY.  THEY WORK WITH
SUZANNE, AND SUZANNE SENDS OUT A PREBILL.  THE ORIGINATING
ATTORNEY OR BILLING ATTORNEY REVIEWS IT, MAKES SURE IT'S
CORRECT.

**Q     I UNDERSTAND.**

A     MAKES SURE THAT ALL THE THIRD-PARTY INVOICES
AND THINGS LIKE THAT THAT ARE PAID ON THAT MATTER ARE
ATTACHED.  THEY GENERATE A FINAL INVOICE AND THEN THE
ORIGINATING, SLASH, BILLING ATTORNEY SENDS THAT OUT TO
THEIR CLIENTS -- TO THE FIRM'S CLIENT.

Q     YES.  SO UNDER THAT LINE OF PROCESS YOU JUST DESCRIBED, MR. HART, THEN THE BILLING ATTORNEY OR RATHER THE ORIGINATION ATTORNEY, YOU USED THOSE TWO TERMS INTERCHANGEABLY, HAS ACCESS TO APOGEE'S BILLING SOFTWARE POSSIBLY ALSO INVOICE-GENERATION SOFTWARE; CORRECT?

A     CORRECT.  ALL THE ATTORNEYS IN THE FIRM HAD ACCESS TO TABS3.  DIDN'T MEAN THAT THEY USED IT.  OFTEN THEY JUST SENT THEIR TIME TO SUZANNE AND SUZANNE OPENED, YOU KNOW, NEW CLIENT MATTERS, SHE INPUT ALL THE TIME, BUT I ENTERED AND OTHER PEOPLE ENTERED THEIR TIME DIRECTLY INTO THE TABS3 BILLING.  SO THERE WAS NO DENIAL OF A TIMEKEEPER INCLUDING THE PARALEGAL FROM ACCESS TO TABS3.

Q     OKAY.  THEN MR. HART, WHY THE CLAIMANT, MS. LI, HOLLY LI, WAS DENIED SUCH AN ACCESS SINCE DAY ONE?

A     BECAUSE SHE'S A CLIENT.  CLIENTS DON'T HAVE ACCESS TO THE BILLING SYSTEM.  ONLY --

Q     HOLLY LI WAS A CLIENT?

A     I'M SORRY.  I THOUGHT YOU MEANT CATHY TRADING.  YOU WERE NEVER DENIED ACCESS TO TABS3.  YOU'RE REALLY GOOD AT JUST PUSHING OFF RESPONSIBILITY.  I TOLD YOU THROUGHOUT 2016 THAT YOU HAD THE RESPONSIBILITY ON BILLING, AND YOU HAD TO WORK WITH SUZANNE MELLOW.  AND YOU WOULDN'T WORK WITH HER.

SHE WAS TRYING TO RAISE FIVE GIRLS, AND THE ONLY TIME THAT YOU WERE AVAILABLE BECAUSE YOU WERE IN HONG

KONG WAS IN THE EVENING, AND SUZANNE WAS NOT AVAILABLE TO TALK WITH YOU AND THAT DIDN'T GO OVER WELL WITH YOU.  SO WHAT YOU DID --

Q      (INAUDIBLE).

(OVERTALKING).

A      LET ME TELL YOU.  WHAT YOU DID --

Q      **MAY I ASK YOU TO SHOW ME ANY DOCUMENTS?**

A      NO, YOU TRIED --

(OVERTALKING).

THE ARBITRATOR:  MS. LI.  MS. LI.  I'D LIKE TO HEAR THE REST OF MR. HART'S TESTIMONY.

THE WITNESS:  WHAT YOU TRIED TO DO WAS TURN ME INTO YOUR BILLING PERSON.  I WAS RESPONSIBLE FOR ALL OF THAT.  AND I HAD MY OWN CLIENTS, AND I REPEATEDLY TOLD YOU, AND YOU IGNORED MY REQUEST.  YOU, AS THE ORIGINATING ATTORNEY, WERE RESPONSIBLE FOR GETTING THE BILLS OUT, YOU WERE RESPONSIBLE FOR MAKING SURE THAT THE VENDORS WERE PAID, AND I WOULD PAY THEM ON BEHALF OF YOU.  I TOLD YOU THAT, AT NO CHARGE, I WOULD TAKE CARE OF THAT FOR YOU BECAUSE YOU DIDN'T HAVE ACCESS TO THE FIRM'S OPERATIONS ACCOUNT OR THE TRUST ACCOUNT.  AND I SAID I WOULD DO THAT.

Q      **UNDERSTOOD.  I DID NOT HAVE ACCESS.  I WAS NOT GIVEN ACCESS.  THANK YOU, MR. HART.  I WAS NEVER GIVEN ACCESS TO ANY BILLABLE BILLING SOFTWARE, SO CALLED TABS3, I REQUESTED ACCESS.  I DID NOT WANT TO KEEP SECOND**

TIMESHEETS.

MR. TAUGER:  OBJECTION.  MISCHARACTERIZES THE TESTIMONY THAT MR. HART JUST GAVE.

THE WITNESS:  THAT'S NOT TRUE.

THE ARBITRATOR:  SUSTAINED.

MS. LI, YOU CAN ASK MR. HART QUESTIONS, BUT IT'S NOT YOUR ROLE REALLY AT THIS STAGE TO ARGUE WITH HIM OR PROVIDE YOUR OWN TESTIMONY THROUGH HIS EXAMINATION.

MS. LI:  I REPHRASE MY QUESTION.

Q    SO BILLING ATTORNEYS WERE GIVEN ACCESS?

A    YES.

Q    MR. HART, HOW OFTEN DO YOU BILL YOUR TIME AS RECORDED ON YOUR BILLING SOFTWARE AT APOGEE?

A    REGULARLY.

Q    SORRY, WHAT WAS THE ANSWER?

A    REGULARLY.

Q    REASONABLY?

A    REGULARLY.

Q    REGULARLY.  OKAY.  CAN YOU DEFINE REGULARLY, PLEASE?

A    DEPENDS ON THE CLIENT.  THERE'S SOME CLIENTS THAT I'M WORKING ON THAT GET MONTHLY STATEMENTS AND THERE'S CLIENTS THAT I ONLY BILL WHEN THE WORK PROJECT IS FINISHED.  SO IF I'M WORKING ON A LICENSE AGREEMENT AND IT TAKES FOUR, FIVE MONTHS, I'VE QUOTED THAT CLIENT A BUDGET,

THEY WON'T GET AN INVOICE UNTIL THE END OF THAT PROJECT. IF IT'S LITIGATION, IT'S MONTHLY.  IF IT'S A PATENT PROSECUTION MATTER, I MAY START THE MATTER ON MONDAY AND BILL IT ON FRIDAY AND NOT EVEN WAIT UNTIL THE END OF THE MONTH.  IT JUST DEPENDS ON THE CLIENT AND THE TYPE OF WORK THAT'S BEING DONE.

**Q      OKAY.  JUST HANG ON.  FOCUSING ON THE LITIGATION CLIENTS.  YOU SAID THE LITIGATION CLIENT YOU WOULD BILL THEM MONTHLY?**

A      EXCEPT WHEN THEY'RE RUNNING INTO FINANCIAL PROBLEMS; FOR EXAMPLE, I GOT A LITIGATION CLIENT RIGHT NOW.  HIS COMPANY HAS FALLEN ON HARD TIMES BECAUSE OF THE LITIGATION, AND HE ASKED ME TO SLOW DOWN THE PAYMENTS -- I'M SORRY, THE GENERATION OF THE INVOICES, WHICH WE HAVE DONE, AND HE'S PAYING $5,000 A MONTH.  AND AS SOON AS HE GETS THIS CURRENT INVOICE DONE, THEN I'LL SEND HIM ANOTHER ONE TO GET HIM -- TO KEEP HIM UP TO DATE.  BUT I REGULARLY UPDATE HIM AS PART OF MY JOB AS THE ORIGINATING ATTORNEY UPDATE HIM ON HOW MUCH THE SPEND IS, AND I DO THAT ON A MONTHLY BASIS.  I TELL HIM, OKAY, WELL, WE'VE SPENT ABOUT ANOTHER 25,000 FROM THE AMOUNT THAT YOU OWE, AND SO HE SAYS, OKAY, THANKS.  I'M STILL PAYING MY $5,000 A MONTH.

**Q      OKAY.  SO FOR HOURLY-PAYING CLIENTS SPEAKING OF WHICH CTC, CATHY TRADING, IF YOU RECALL, IS AN HOURLY-BILLING CLIENT WHO --**

I'M SORRY.  MR. TAUGER, IS THERE AN ISSUE WITH MY QUESTION?

MR. TAUGER:  NO, I'M JUST HAVING TROUBLE HEARING YOU BECAUSE I DON'T HEAR WELL OUT OF MY RIGHT EAR.

BY MS. LI:    Q    YES.  CATHY TRADING IS AN HOURLY-BILLING CLIENT WHO ALSO DEMANDED THAT THEY PROVIDED -- THEY NEED TO BE PROVIDED INVOICES EVERY MONTH AND BILLABLES EVERY MONTH AND WHAT -- WHY WERE YOU NOT BILLING TIME FROM FEBRUARY THROUGH -- FROM SEPTEMBER 2016 THROUGH FEBRUARY 2017?

A    AS I TOLD YOU, HOLLY, INSIDE OF OUR FIRM EACH LAWYER WAS RESPONSIBLE FOR THEIR OWN CLIENTS AND THEIR OWN BILLING.  WHEN YOU CAME ON, YOU SAID I'VE GOT THIS CLIENT, BUT THEY DON'T HAVE A WHOLE LOT OF MONEY, SO I WANT TO WATCH THE BILLS.  AND I SAID, ALL RIGHT, I WILL HELP YOU.  AND A LOT OF TIMES I HELPED YOU AND I DIDN'T BILL BECAUSE CANDIDLY, YOU KNOW, IT'S YOUR CLIENT.  I'M JUST TRYING TO PROVIDE SOME GUIDANCE TO YOU.  AND I DID THAT THROUGHOUT THE FALL.  AND A LOT OF TIMES I DIDN'T EVEN TRY TO BILL.  AND THEN --

Q    MY QUESTION WAS NOT ABOUT WHAT YOU WERE SAYING.  MY QUESTION WAS -- LET ME REASK THE QUESTION.

A    OKAY.

Q    WHY DID YOU NOT REPORT YOUR BILLABLE TIME FROM SEPTEMBER --

A     I DID.

Q     -- 2016 THROUGH FEBRUARY 2017?

A     I DID.

Q     SUBSEQUENTLY MUCH LATER AFTER CATHY TRADING ENDED THEIR CASE?

A     NO, THAT'S NOT TRUE.

Q     IT WAS IDENTIFIED ON DOCUMENTS.  OKAY.

A     THERE WAS A LOT OF TIME --

Q     I'LL SHOW YOU THE EXHIBIT.

A     YOU DON'T HAVE TO.  THERE WAS A LOT OF TIME THAT I DIDN'T BILL AND DIDN'T FEEL I NEEDED TO BILL.  I WAS TRYING TO HELP YOU, HOLLY.  THIS WAS YOUR CLIENT.  THIS WAS YOUR LITIGATION.  YOU WERE RUNNING IT.

Q     LET ME REPHRASE THE QUESTION AGAIN.

WHY DID APOGEE FAIL TO SEND OUT INVOICES THROUGHOUT THOSE MONTHS?

A     BECAUSE HOLLY LI FAILED IN HER RESPONSIBILITY AS THE ORIGINATING ATTORNEY.  THAT'S WHY.

Q     IT IS MY RESPONSIBILITY, BUT I HAD NO ACCESS TO APOGEE'S TABS3 BILLING SYSTEM NOR I HAD ACCESS TO YOUR BILLABLE RECORDS BECAUSE YOU DENIED ACCESS --

THE ARBITRATOR:  MS. LI, YOU'RE TESTIFYING.  YOUR ROLE AS COUNSEL RIGHT NOW IS REALLY JUST TO ASK THE WITNESS QUESTIONS.

MS. LI:  YES.

Q    LET ME MOVE ON FROM THIS QUESTION AS I KNOW THERE WAS --

SO LET'S ASK -- LET'S FOCUS.

CATHY TRADING WAS ISSUED INVOICE MUCH, MUCH LATER.  THEN AT SOME POINT WHICH APOGEE DECIDED TO PUT FORWARD -- INITIATE AN ARBITRATION PROCEEDING AGAINST CTC, SO WHO MADE THE DECISION TO INITIATE THE ARBITRATION PROCEEDING?

A    AGAINST CATHY TRADING?

Q    YES.

A    THAT WOULD BE GREG GULLIVER AND MYSELF.

Q    WHO WORKED ON THE ARBITRATION PROCEEDING?

THE ARBITRATOR:  CAN YOU REPEAT THE QUESTION, MS. LI?

BY MS. LI:    Q    I SAID WHO WORKED ON THE ARBITRATION PROCEEDING?

A    I DID.

Q    ANYONE ELSE?

A    MAYBE.  I DON'T REMEMBER, BUT I KNOW I DID. I TOOK THE LEAD, AND I DID ALMOST ALL OR ALL THE WORK ON THAT ENFORCEMENT ACTION AGAINST CATHY TRADING.

Q    THE PAPERWORK WAS SIGNED BY ANOTHER ATTORNEY, BUT WE CAN MOVE ON FROM HERE.

A    OKAY.  I'D LIKE TO SEE IT BUT...

Q    WHO --

A     IT MAY HAVE BEEN CRAIG MC LAUGHLIN BECAUSE I'M NOT LICENSED IN CALIFORNIA AND CRAIG IS.  SO HE MAY HAVE ACTUALLY SIGNED THE DOCUMENT OR MAYBE IT WAS RYAN ALEXANDER BECAUSE YOU HAVE TO HAVE LOCAL COUNSEL.

Q     **I ACCEPT THAT.  I DID SEE BOTH NAMES THERE AND BOTH REGISTRATION NUMBERS IN CALIFORNIA, SO I THINK THAT'S REASONABLE.**

**THIS QUESTION IS RELEVANT BECAUSE THERE WAS** A SIGNIFICANT AMOUNT OF MONEY CLAIMED AGAINST THE MONETARY JUDGMENT APOGEE RECEIVED.  THAT'S WHY WE WERE DISCUSSING THIS.

SO WHO MADE THE DECISION TO ENFORCE OR NOT TO ENFORCE THE JUDGMENT THAT APOGEE OBTAINED AGAINST CATHY TRADING?

A     YOUR QUESTION IS --

Q     **LET ME REPHRASE.**

A     YEAH.

Q     **WHO MADE THE DECISION TO NOT ENFORCE THE MONETARY JUDGMENT AGAINST CATHY TRADING?**

MR. TAUGER:  OBJECTION.  ASSUMES FACTS NOT IN EVIDENCE.

THE WITNESS:  WHEN?

THE ARBITRATOR:  MS. LI, I THINK YOU NEED TO REPHRASE THAT QUESTION.

MS. LI:  OKAY.  I WILL REPHRASE.

Q     DID YOU -- REPHRASE THAT AGAIN.

MR. HART, DID YOU MAKE A DECISION ABOUT TAKING A STEP TO ENFORCE THE JUDGMENT CONFIRMED BY CALIFORNIA COURT AGAINST CATHY TRADING?

A     I'M GOING TO OBJECT AS VAGUE.  SO LET ME TRY TO GIVE A DIALOGUE NARRATIVE ANSWER BECAUSE THE QUESTIONS ARE KIND OF MISSING THE MARK.

CATHY TRADING AND I, WHICH WAS MS. YUN CHEN, ENGAGED A SERIES OF DIALOGUE SOMEWHERE AROUND AUGUST THROUGH DECEMBER.  AND THAT DIALOGUE --

MR. TAUGER:  OF WHAT YEAR?

BY MS. LI:    Q   EXCUSE ME, WHICH YEAR?

A     2017.

MR. TAUGER:  THANK YOU.

THE WITNESS:  MS. LI WAS NO LONGER WORKING WITH APOGEE, AND I WAS ASKING MS. CHEN IF SHE COULD PAY THE 300 -- AT THAT TIME 360, 80,000, WHATEVER IT WAS.  AND SHE SAID SHE COULDN'T.  THAT SHE DIDN'T HAVE THAT KIND OF MONEY.  AND I SAID WOULD YOU BE WILLING TO DO A PAYMENT PLAN.  AND SHE SAID SHE WOULD.  AND SHE SAID I'LL SEND -- I SAID HOW MUCH, AND SHE SAID 10,000 A MONTH.  AND I SAID, OKAY, THAT WILL WORK.  YOU NEED TO START MAKING PAYMENTS TO APOGEE.

AND I KNOW THERE WAS SOME CORRESPONDENCE AT SOME POINT WHERE, MS. LI, YOU TRIED TO CONTACT HER AND

HAVE SOME OF THAT MONEY DIVERTED OVER TO YOURSELF.  AND I TOLD MS. --

MS. LI:  OBJECTION.  I'M SORRY.  IT'S NOT MY TIME FOR OBJECTION.

THE WITNESS:  IT'S NOT, SO JUST LISTEN.  SO WHAT I DID WAS I SAID THAT'S IMPROPER, AND THAT SHE SHOULD PAY APOGEE, AND APOGEE WOULD, IN TURN, PAY MS. LI.  AND SHE MISSED MULTIPLE PAYMENTS.  I THINK SHE MISSED OCTOBER. SHE MISSED NOVEMBER.

AND I CONFRONTED HER AND, YOU KNOW, SHE HAD SUCH A VISCERAL HATRED TOWARDS MS. LI THAT SHE JUST COULDN'T COME AROUND TO PAYING.  AND I SAID, WELL, THIS IS GOING TO GO NOWHERE, SO I TALKED WITH MR. GULLIVER, AND WE AGREED TO GO AHEAD AND INITIATE THE JAMS PROCEEDING AGAINST CATHY TRADING WHICH HAPPENED ON DECEMBER 20, 2017.

BY MS. LI:    Q    DID YOU FINISH --

A     WELL, THAT'S THE START OF THE ENFORCEMENT. IF YOU WANT ME TO CONTINUE, I WILL.

Q     WHEN YOU STATE -- ONE STATEMENT THAT YOU MADE WAS, MR. HART, YOU SAID SHE MISSED SOME OF THE PAYMENTS.  DOES THAT MEAN SHE DID MAKE SOME PAYMENT?

A     NO, SHE MISSED THEM ALL, BUT FIRST SHE WAS GOING TO MAKE THE OCTOBER PAYMENT.  SHE MISSED THAT.  AND I TALKED TO --

Q     OCTOBER WHICH YEAR?

A      2017.  WE'RE STILL IN THE 2017 CALENDAR YEAR.  SO I ASKED HER TO MAKE -- IN SEPTEMBER I ASKED HER TO MAKE THE OCTOBER.  SHE DIDN'T DO.  SO I SAID CAN YOU MAKE THE NOVEMBER.  SHE SAID, YES, I CAN MAKE THE NOVEMBER.  SHE FAILED THAT.  AND SO AT THAT POINT, YOU KNOW, EVERY TIME I TALKED WITH HER, SHE JUST HATED YOU SO BADLY THAT, YOU KNOW, I JUST KNEW THERE WAS A BREAKDOWN AND SHE WAS NEVER GOING TO PAY BECAUSE SHE KNEW THAT IF SOME OF THAT MONEY CAME INTO APOGEE, IT WOULD BE TURNED OVER TO YOU, AND SHE HAD SUCH A VISCERAL HATRED OF YOU THAT SHE SAID, THAT'S IT.  AND I SAID, OKAY, THEN WE'LL GO TO ARBITRATION.

THAT'S WHY I DIDN'T STICK AROUND AND WAIT VERY LONG.  IT TOOK A FEW WEEKS TO DRAFT UP THE COMPLAINT. WE FILED IT ON FEBRUARY 20, 2017, AND DECIDED TO MOVE FORWARD WITH ENFORCEMENT.

**Q      SO DID YOU MOVE FORWARD WITH ENFORCEMENT AFTER YOU RECEIVED THE JUDGMENT FROM THE CALIFORNIA DISTRICT COURT?**

A      WELL, LET ME EXPLAIN THE JAMS PROCEEDING. SHE STARTED TO PARTICIPATE --

**Q      I DID NOT ASK -- I DID NOT ASK THE JAMS PROCEEDING.**

A      I THINK IT'S IMPORTANT.

**Q      I AM ASKING A QUESTION IF I AM THE ONE**

INTERROGATING.  I'M THE ONE WHO IS EXAMINING YOU.  NOT YOU ARE EXAMINING ME.  YOU SAID A LOT OF BAD WORDS TOWARDS ME, HATRED SO FORTH AND SO ON, BUT THAT'S NOT RELEVANT.  SO WHEN SOMEONE HAS A HATRED, THEY HAVE TO PAY MONEY. EVERYBODY HAS A HATRED SOMETIMES IF THEY HAVE TO FULFILL A PIECE OF CONTRACT.  SO LET IT BE THIS WAY.

MR. TAUGER:  DOES SHE HAVE A QUESTION?

BY MS. LI:   Q   I'M ASKING A SPECIFIC QUESTION ABOUT DID YOU -- DID YOU MAKE ANY EFFORT TO ENFORCE THE MONETARY JUDGMENT CONFIRMED BY CALIFORNIA COURT DISTRICT COURT?

A   YES.

MR. TAUGER:  JUST TO CLARIFY, THAT'S THE UNITED STATES DISTRICT COURT OF CALIFORNIA.  IT'S NOT CALIFORNIA COURT.

THE WITNESS:  YES.

MS. LI:   WELL, I'M SURE MR. HART KNOWS WHICH COURT WE ARE TALKING ABOUT.

WE'RE JUST TALKING ABOUT THE CONFIRMED MONETARY JUDGMENT WHICH IS A PIECE OF --

MR. TAUGER:  OKAY.  WE'RE GOOD.  LET HIM ANSWER.

THE WITNESS:  I SAID YES.

BY MS. LI:   Q   YOU DID?

A   YES.

Q   WHAT TYPE OF ENFORCEMENT EFFORT DID YOU PUT

FORWARD?

A       THIS IS WHERE YOUR QUESTIONS GLOSS OVER A TIME PERIOD THAT YOU WANT TO CONVENIENTLY IGNORE.  WHICH WAS --

Q       I'M SORRY.  LET ME REFRAME MY TIME WORK THEN.  I'M ASKING SPECIFICALLY AFTER JANUARY 2020 YOU OR APOGEE RECEIVE THE MONETARY JUDGMENT.  WHAT TYPE OF ENFORCEMENT EFFORT DID YOU PUT FORWARD?

A       OKAY.  WE FILED FOR JAMS ENFORCEMENT DECEMBER 20, 2017.  WE GOT A JUDGMENT AGAINST CATHY TRADING COMPANY I BELIEVE IT WAS JUNE 28, 2018.  I CONTINUED TO TALK WITH MS. CHEN BECAUSE I HAD THIS $402,000 JUDGMENT, AND SHE WASN'T INTERESTED, SHE WASN'T COOPERATING, SHE WASN'T RESPONDING.

SO I THEN -- THE NEXT SUMMER, THIS WAS -- I'M GOING TO GET THE DATE WRONG, BUT IT'S JUNE OF 2019. I'M GOING TO GET THE DATE WRONG.

Q       MAY I JUST CLARIFY THAT YOU SAID YOU CONTINUED TO TALK WITH MS. CHEN DURING THE ARBITRATION PROCEEDING PRIVATELY?

A       YEAH, SHE PARTICIPATED, AND I TRIED TO GET HER TO PAY.

Q       UNDERSTOOD.  BUT YOU SAID YOU CONTINUED TO TALK TO HER AFTER YOU FILED THE ARBITRATION PROCEEDING. WHAT WAS THE PURPOSE OF THE CONTINUED DISCUSSION?

A       WELL, TO CONTINUE WITH THE DISCUSSION WAS ONCE WE INITIATED THE JAMS ARBITRATION, BOTH SIDES HAD TO PAY THE JAMS ARBITRATION FEE TOGETHER.  AND CATHY TRADING WOULDN'T CONTRIBUTE, AND JAMS TOLD ME THAT THEY WOULD STOP THE PROCEEDING UNLESS I PAID APOGEE'S PART AND CATHY TRADING'S PART.  SO I HAD TO PAY BOTH OF THE FEES OUT OF MY POCKET, APOGEE'S POCKET, BUT IT WAS REALLY COMING OUT OF MY POCKET.  AND SO I DID THAT BECAUSE I WAS MIFFED BECAUSE SHE STIFFED, YOU KNOW, APOGEE AND ALL OF US, MYSELF, WALLET, YOURSELF, TO THE TUNE OF 300 AND SOME THOUSAND DOLLARS, AND SHE WASN'T EVEN ATTEMPTING TO MAKE ANY PAYMENTS.

SO ONCE WE GOT THE JAMS AWARD, I CAME UP WITH THE MONEY, I HIRED CRAIG MC LAUGHLIN, AND HE WENT INTO THE DISTRICT COURT, AND HE FILED FOR CONFIRMATION OF THE JAMS AWARD IN U.S. DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA.

HOWEVER, IN AUGUST, I BELIEVE IT WAS, YOUR COUNSEL, JASON LADEMORE, REACHED OUT TO ME.  WE ENTERED INTO SOME CORRESPONDENCE THAT'S ACTUALLY IN THE -- PROBABLY IN YOUR EXHIBITS, AND I KNOW IT'S IN OUR EXHIBITS, AND I MADE THE OFFER THAT YOU GO AHEAD AND TAKE OVER ENFORCEMENT ONCE WE GOT THE DISTRICT COURT JUDGMENT.

AND ON OCTOBER 7, 2018 OR '19, I THINK IT'S '19, BUT I KNOW IT'S OCTOBER 7TH, JASON LADEMORE -- I'M

SORRY, NOT JASON.  JASON BALOGH.  SORRY.  I HAD --
LADEMORE WAS COUNSEL ON THE OTHER SIDE IN THE CATHY
TRADING LAWSUIT.

Q       YEAH, OPPOSING COUNSEL.

A       JASON BALOGH REACHED OUT TO ME IN AUGUST AND
MADE A WHOLE BUNCH OF ALLEGATIONS AND STUFF AND I SAID,
LISTEN, WE'RE ENFORCING THIS.  AND THIS IS THE LETTER
WHERE I RESPONDED TO HIM AND SAID IF YOU WANT TO TRACK
WHAT'S GOING ON IN THE DISTRICT COURT, GO TO PACER AND YOU
CAN FOLLOW ALONG.  WE'RE TRYING TO GET THIS JUDGMENT
CONFIRMED.  AND --

Q       THIS IS IN DOCUMENT C-022 YOU SAID YOU HAVE
AN ONGOING COLLECTION EFFORT?

A       YES, WE DID.

Q       CORRECT.

A       AND I TOLD HIM THAT, AND I TOLD YOU THAT
THAT WE WERE CONTINUING TO PURSUE COLLECTIONS AND
ENFORCEMENT OF THE JUDGMENT.  AND I SAID, YOU KNOW, REALLY
HOLLY'S GOT THE BIGGEST STAKE OF THE FUNDS AND I SAID --

Q       MAY I JUST INTERRUPT, PLEASE.

        MY QUESTION WAS NOT THIS COMPLICATED.  MY
QUESTION WAS DIRECTED TO AFTER JANUARY 2020.

A       AND I'M ANSWERING THAT, BUT YOU HAVE TO LET
ME ANSWER BECAUSE WE'RE BACK IN OCTOBER ON OCTOBER 7TH.
BECAUSE YOU WILL SEE JASON BALOGH'S EMAIL BACK TO ME

SAYING WE ACCEPT.  AND WHAT WAS WE ACCEPT?  IT WAS THAT WE

WOULD GO AHEAD AND TAKE OVER COLLECTIONS ONCE THE DISTRICT

COURT HAD FINISHED UP AND CONFIRMED THE ARBITRATION AWARD.

SO IN OUR MIND THAT'S WHAT WAS GOING TO HAPPEN.

SO DID WE NEED TO NOW GO AND TRY TO ENFORCE

THE JUDGMENT AGAINST CATHY TRADING?  NO, BECAUSE THAT WAS

COMING TO HOLLY LI TO GO AND ENFORCE AND THAT --

Q       CORRECT.

A       AND THAT WAS THE AGREEMENT THAT JASON AND I

HAD REACHED ON OCTOBER 7TH.

Q       WHY DID YOU STOP COMMUNICATION WITH JASON

BALOGH ON OCTOBER 2021?

A       I NEVER DID.  THAT'S THE THING.  I KNOW YOU

SAY --

Q       YOU NEVER RESPONDED TO ANY EMAILS.

MR. TAUGER:  CAN HE ANSWER THE QUESTIONS?

THE ARBITRATOR:  YEAH.

THE WITNESS:  AND I'LL TELL YOU, I HAD A NUMBER OF

CONVERSATIONS WITH JASON, AND JASON, AT TIMES, WAS VERY

FRUSTRATED WITH YOU.  AND I SAID, LISTEN, WE DON'T TRUST

HOLLY.  SHE STOLE MONEY FROM US.  AND I'M SURE SHE HATES

ME AND DOESN'T TRUST ME.  AND I SAID THAT'S ONE OF THE

BIGGEST PROBLEMS WE HAVE.  HOW DO WE GET THE JUDGMENT

MOVED OVER TO ALLOW HOLLY TO GO AND ENFORCE THIS.

AND GREG GULLIVER AND I SPENT A LOT OF TIME,

AND WE BANTERED BACK AND WE WERE ON THE PHONE WITH JASON IN THE FALL OF 2019.  THIS IS SEVERAL MONTHS BEFORE WE GOT THE DISTRICT COURT JUDGMENT -- I'M SORRY.  I GOT THE YEAR WRONG.  THIS WAS IN THE FALL OF 2020 BECAUSE WE GOT THE DISTRICT COURT JUDGMENT JANUARY 10TH OF 2021.

AND WE WERE ON THE PHONE WITH JASON AND I SAID, YOU KNOW, LISTEN, WHY DON'T WE DO THIS.  THIS IS OUR PROPOSAL TO YOU.  WE TRUST YOU.  WE'VE NOW BEEN IN CONVERSATION WITH JASON FOR OVER A YEAR.  I SAID, WHY DON'T YOU, AND YOUR FIRM, REPRESENT APOGEE AND WE WILL BE YOUR CLIENT AND YOU AND HOLLY CAN GO AND ENFORCE THIS JUDGMENT AGAINST CATHY TRADING.  AND WHEN YOU DO, THE MONEY WILL COME INTO YOUR CLIENT TRUST ACCOUNT AND THE WAY THIS IS GOING TO WORK IS APOGEE IS YOUR CLIENT, SO IF YOU SCREW IT UP, WE GOT A MALPRACTICE CLAIM AGAINST YOU AND YOU GOT BAR PROBLEMS BECAUSE WE'RE GOING TO BE YOUR CLIENT.  BUT YOU'RE GOING TO GO TO THE ENFORCEMENT ACTION ON BEHALF OF HOLLY.

AND BY THE WAY, WHEN YOU GET MONEY IN, IT'S GOT TO BE PAID OUT ACCORDING TO THIS FORMULA.  AND THE FORMULA WAS HOLLY DOESN'T GET ANY MONEY UNTIL SHE'S REPAID THE AMOUNT OF MONEY THAT GOES TO APOGEE.

SHE ALSO HAS TO MAKE SURE THAT HILL WALLACK, WHICH WAS THE LOCAL COUNSEL DEALING WITH THE CATHY TRADING LAWSUIT, THAT THEY GOT PAID.  I WAS ADAMANT -- IN FACT, I

WANTED HILL WALLACK TO BE PAID BEFORE I GOT PAID OR APOGEE
GOT PAID BECAUSE THEY WERE OWED 20-SOME THOUSAND DOLLARS
AND THIS IS -- THIS IS A LAW FIRM THAT I HAD A
RELATIONSHIP WITH, AND I WANTED TO PRESERVE THAT
RELATIONSHIP WITH.  SO I --

          MS. LI:  MAY I MOVE ON?  YOUR HONOR, THE WITNESS
HAS BEEN MUMBLING AROUND DIFFERENT DATES AND DIFFERENT
FACTS THAT WAS NOT ASKED.

          THE ARBITRATOR:  OKAY.  SO --

          MS. LI:  THE WITNESS IS TRYING --

          THE ARBITRATOR:  MS. LI, BEFORE YOU CONTINUE, LET
ME JUST MAKE A COUPLE OF REMARKS.

               SO THIS IS VERY HELPFUL, MR. HART, BUT I AM
MINDFUL OF THE FACT THIS IS REALLY HER EXAMINATION.  YOU
CAN ALWAYS GET INTO THIS DETAIL WHEN MR. TAUGER DOES YOUR
DIRECT.

               SO LET'S TRY TO STICK AS MUCH AS POSSIBLE TO
MS. LI'S QUESTIONS FOR NOW.

          MS. LI:  I NEED TO ADD MORE TIME IF MR. HART IS
GOING TO USE UP ALL OF MY TIME.

          THE ARBITRATOR:  FAIR POINT.

          MS. LI:    MR. HART HAS BEEN SPEAKING ABOUT
ALMOST -- MAYBE THE COURT REPORTER WILL KNOW, SEVEN
MINUTES.  THE QUESTION ONLY DEMANDED ONE ANSWER; THAT IS,
WHETHER OR NOT YOU PUT FORWARD ENFORCEMENT EFFORT.

I GATHERED FROM ALL THE MUMBLING ABOUT THE EVENTS, THERE WERE NO ENFORCEMENT EFFORTS ACCORDING TO WHAT YOU JUST SAID.  BUT LET ME MOVE ON --

MR. TAUGER:  OBJECTION.  MISCHARACTERIZES THE TESTIMONY.

THE ARBITRATOR:  SUSTAINED.

BY MS. LI:    Q    OKAY.  MOVE ON TO THE NEXT QUESTION.

I DIRECT YOUR ATTENTION TO C-022, LI 189. I'LL SHARE THE DOCUMENTS WITH YOU.  LET'S GO TO C-001.  I APOLOGIZE.  BECAUSE MY TIME HAS BEEN USED UP, I NEED TO MOVE ON TO C-1, LI 48.

MR. TAUGER:  YOUR HONOR, WE'LL STIPULATE TO MS. LI HAVING AN ADDITIONAL SEVEN MINUTES.

THE ARBITRATOR:  THANK YOU.  DOES ANYONE HAVE ANY RESTRICTIONS ON TIME IN TERMS OF STAYING PAST 5:00 P.M. PACIFIC TODAY?

MR. HART:  NO.

MR. TAUGER:  NO.

MS. LI:  I DON'T HAVE.

THE ARBITRATOR:  OKAY.  SO MS. LI, I WANT TO MAKE SURE THAT YOU HAVE ENOUGH TIME TO PRESENT YOUR CASE, AND I THINK WE CONSERVATIVELY ESTIMATED THE NUMBER OF MINUTES FOR TODAY, SO I'M HAPPY TO GIVE YOU SOME EXTRA TIME, AND MR. TAUGER HAS GRACIOUSLY ALSO AGREED TO THAT.  SO DON'T

FEEL LIKE YOU NEED TO, YOU KNOW, SKIP OVER SOMETHING

BECAUSE OF THE EXTENDED ANSWER WE GOT FROM MR. HART.

PLEASE DO CONTINUE AS YOU ORIGINALLY INTENDED.

MS. LI:  THANK YOU, YOUR HONOR.  I'LL PRESERVE THE

PREVIOUS QUESTION.  I WILL STILL STAY ON EXHIBIT C-1, PAGE

27 WHICH I WILL PULL UP RIGHT NOW.

THE ARBITRATOR:  OKAY.  SO WE'RE LOOKING AT C-013.

MS. LI:  OH, I'M SORRY.  I PICKED THE WRONG SHARE.

STOP SHARING.  WHEN YOU'RE RAMBLING ON ABOUT TIME, IT'S

VERY DIFFICULT.

I WILL GET BACK TO C-013 BECAUSE THAT WAS A

DOCUMENT IMPORTANT AS WELL.

SO NOW I'M SHARING THIS DOCUMENT WITH YOU

WHICH IS THE SHEET MR. HART JUST DISCUSSED.

MR. TAUGER:  I'M SORRY, WHICH DOCUMENT ARE WE

LOOKING AT NOW?

THE ARBITRATOR:  WE DON'T KNOW YET.

MS. LI:  CAN YOU SEE IT?  IT'S LI 48.

MR. TAUGER:  C-48.

MS. LI:  NOT C-1.  L-I 48.

MR. TAUGER:  OKAY.

MS. LI:  THIS SHEET.

MR. TAUGER:  YEAH, GOT IT.  THAT'S 001, PAGE 48.

MS. LI:  MR. HART WAS TALKING ABOUT A DISTRIBUTION

SHEET.  HE DIDN'T SAY A DISTRIBUTION SHEET, BUT THIS IS A

PARTICULAR DISTRIBUTION SHEET GENERATED BY MR. HART AND

MR. GULLIVER THAT WAS SENT TO ME REPEATEDLY AND ALSO

SEND --

        MR. TAUGER:  OBJECTION.  LACK OF FOUNDATION.

        MS. LI:  LACK OF FOUNDATION?  THIS IS A SHEET YOUR

WITNESS JUST DISCUSSED.  IT'S BEEN DISCUSSED.

        Q     MR. HART, CAN YOU IDENTIFY THE MOST LEFT --
LAST AND SECOND TO LAST LINE.  IT SAYS --

        THE ARBITRATOR:  HOLD ON, MS. LI.  WE HAVE AN

OBJECTION AS TO FOUNDATION.  CAN YOU ASK THE WITNESS TO

LAY A FOUNDATION ON THIS DOCUMENT SO THAT WE'RE SURE THAT

HE'S FAMILIAR WITH THIS DOCUMENT.

        MS. LI:  YES, YOUR HONOR.  I JUST ASSUMED BECAUSE

MR. HART WAS TALKING ABOUT THE DISTRIBUTION SHEET, I

UNDERSTOOD -- I IMAGINE EVERYBODY KNEW.

        Q     BUT MR. HART, CAN YOU READ THIS SHEET AND
TELL ME WHAT IT IS ABOUT?

        A     I CAN BARELY READ IT.

        Q     MAKE IT BIGGER NOW.

        THE ARBITRATOR:  BY THE WAY, MS. LI, WHAT IS THE

EXHIBIT NUMBER BECAUSE THE TAB SAYS C-001, BUT ACTUALLY

YOUR C-001 IS A COMPLETELY DIFFERENT --

        MR. TAUGER:  IF YOU GO TO PAGE 27, LI 027.

        MS. LI:  L-I 000048.

        MR. TAUGER:  48?  I APOLOGIZE.  IT'S SOMETHING

ELSE.  THIS GETS TO MY OBJECTION.

MS. LI:  ACTUALLY, MR. TAUGER, THE SHEET ON 27, 48 AND 49, THEY ARE THE SAME.

MR. TAUGER:  OKAY.  I'M ON -- I WENT TO 49.  I'M NOW ON 48.  FINE.

MS. LI:  YES.  49 IS RIGHT AFTER THIS.

MR. TAUGER:  LET'S ALL LOOK AT 48.  HOW'S THAT?

THE ARBITRATOR:  OKAY.

MS. LI:  THEY ARE SOMEWHAT DUPLICATES.  I APOLOGIZE.  THIS -1 WAS PART OF THE INITIAL DISCLOSURE EXCHANGE TO YOU IN ONE LUMP SUM BATCH.  IT'S NOT THE WAY I PREFER TO DO IT, BUT IT WAS DONE THIS WAY NOT UNDER MY CONTROL, BUT I AM RESPONSIBLE FOR IT ANYHOW.

LET'S FOCUS ON 48.

Q     NOW, MR. HART, CAN YOU READ THE SHEET?

A     I CANNOT.  BUT I THINK I KNOW WHAT IT IS.

Q     WHAT IT IS?

A     IT'S VERY SMALL, BUT I THINK THAT THIS WAS -- THIS MAY HAVE BEEN THE WORKSHEET THAT WAS ENTERED INTO THE JAMS ARBITRATION PROCEEDING AGAINST CATHY TRADING.

Q     THANK YOU.  THAT'S MY UNDERSTANDING AS WELL. IT WAS COMMUNICATED TO ME IT WAS SENT TO YOU SEVERAL TIMES BY THE CFO AND PRESIDENT OF APOGEE.

AND AT THE BOTTOM OF THIS SHEET, I'M ZOOMING

IN ON THE BOTTOM HERE.  DO YOU READ THE ITEMS FROM -- I
ALSO SAY THE TIME HERE.  AFTER -- TOTAL AFTER COSTS.  CAN
YOU READ THESE LAST ONE, TWO, THREE, FOUR, FIVE, FIVE
LINES STARTING FROM IPA PAYMENTS TO APOGEE?

A      OKAY.  IPA PAYMENTS TO APOGEE, 25,000.

Q      AND NEXT LINE?

A      REMAINDER DUE APOGEE.

Q      AND WHAT AMOUNT?

A      $15,116.

Q      AND THE LAST NEXT LINE?

A      AMOUNT DUE HYL.  THAT'S YOU.  $280,088.59.

Q      AND THE LAST LINE?

A      281,780 BASED ON ARBITRATION AWARD.

Q      THANK YOU.

       NOW, MAY I MOVE ON TO C-013.  I'M SORRY.  I
HAVE TO STOP SHARING AND RESHARING SINCE MY COMMAND OF
SHARING IS NOT THAT --

       MR. TAUGER:  YOUR HONOR, I HATE TO DO THIS.  I
ALSO NOW NEED A BIO BREAK.

       THE ARBITRATOR:  THAT'S FINE.

       MS. LI:  I'D LIKE TO MOVE TO EXHIBIT --

       THE ARBITRATOR:  ALL RIGHT.  SO MS. LI, MS. LI,
MR. TAUGER ALSO NOW NEEDS TO USE THE RESTROOM, AND WE HAVE
BEEN GOING ON FOR A LITTLE BIT OVER AN HOUR SINCE WE CAME
BACK FROM THE LUNCH BREAK.  SO THIS MIGHT BE A GOOD TIME

TO TAKE A 10-MINUTE BREAK.  OKAY?

MS. LI:  ALL RIGHT, YOUR HONOR.  THANK YOU.

THE ARBITRATOR:  SO IT'S 2:30 P.M. NOW.  WE CAN GO OFF THE RECORD.  LET'S BE BACK BY 2:40.

(RECESS TAKEN 2:30-2:42 PM)

THE ARBITRATOR:  BACK ON THE RECORD.  IT'S NOW 2:42 P.M.

AND MS. LI, YOU HAVE 45 MINUTES REMAINING.

MS. LI:  THANK YOU, YOUR HONOR.  I WILL PRESERVE SOME TIME FOR REDIRECT.

THE ARBITRATOR:  YES.

MS. LI:  AS I ALSO UNDERSTOOD, MR. GULLIVER IS NOT GOING TO TESTIFY TODAY, OR IS HE GOING TO?

MR. TAUGER:  I'VE ALREADY ADVISED YOU HE WILL NOT BE TESTIFYING TODAY.

MS. LI:  IN THAT CASE, I WILL MAKE A NOTATION OF WHAT WAS ON THE WRITTEN RECORD, BUT THAT WOULD BE --

LET'S MOVE ON TO EXHIBIT C-13.  I'LL SHARE THE SCREEN.

SO EXHIBIT 13 IS A COMMUNICATION BETWEEN MR. HART AND ME DATED NOVEMBER 28, 2016.  THIS IS PERTAINING TO THE SLOW BILLING REPORT, MR. HART'S BILLABLE TIME, AND ISSUING INVOICES.  THIS IS ALSO PERTAINING TO THE WRITTEN CONFIRMATION AND WRITTEN --

MR. TAUGER:  OBJECTION.  DOCUMENT SPEAKS FOR

ITSELF.  WE DON'T NEED HER SUMMARY.

THE ARBITRATOR:  SO SUSTAINED.

MS. LI, WE CAN READ THE DOCUMENT.  IS THERE A POINT THAT YOU'RE TRYING TO MAKE WITH THIS DOCUMENT OR JUST SUMMARIZE?  WHAT'S THE POINT YOU'RE TRYING TO MAKE WITH THIS DOCUMENT?

BY MS. LI:    Q    THE POINT IS, MR. HART, DO YOU RECOGNIZE THIS IS AN EMAIL FROM YOU DIRECTED TO ME ON NOVEMBER 28, 2016?

A     YES.

**Q     CAN YOU READ IN SILENCE WITH ME, BUT I'LL READ OUT LOUD.  SUZANNE AND I ARE FINISHING THEM UP AND YOU WILL HAVE THEM SHORTLY?**

A     YES.  I HAD GIVEN UP AT THAT POINT.

MR. TAUGER:  THERE'S NO QUESTION PENDING, MR. HART.

BY MS. LI:    Q    YOU BOTH SPOKE.  I DON'T -- I DID NOT EVEN HEAR.  YOU BOTH MADE COMMENTS OR OBJECTIONS OR ANYTHING BECAUSE YOU WERE BOTH LEAD COUNSEL AT THIS POINT.

MR. TAUGER:  I REMINDED MR. HART THAT YOU HADN'T ASKED A QUESTION YET.  HE SHOULD WAIT FOR YOUR QUESTION.

MS. LI:  EXCUSE ME.  I DID NOT HEAR WHAT YOU SAID. IT'S NOT THAT I -- I'M TRYING TO LISTEN TO IT.

MR. TAUGER:  I UNDERSTAND.  I JUST -- I REMINDED

MR. HART WAIT UNTIL YOU ASK A QUESTION BEFORE HE GAVE AN ANSWER.  IT'S MORE EFFICIENT THAT WAY.

MS. LI:  OKAY.  THANK YOU.  THANK YOU.

Q       MR. HART, CAN YOU GO FURTHER TO THE DOCUMENTS AS I'M POINTING OUT NOW HERE IN THE MIDDLE OF THE PAGE CAN YOU READ WITH ME SILENTLY STARTING WITH, HI, ROBERT.  HOPE YOU HAD A GOOD HOLIDAY.  I DIDN'T RECEIVE ANYTHING FROM YOU LAST WEDNESDAY.  AS A RESULT OF THESE REPEATED DELAY, I AM PLANNING TO SEND OUT MY TIME AND INVOICES ALONG WITH THE EXPENSES TO THE CLIENT BY THE END OF COB, WHICH STANDS FOR CLOSE OF BUSINESS.  IF I DON'T RECEIVE THESE INVOICES FROM YOU, YOU CAN TAKE YOUR TIME TO WORK ON WHATEVER YOU NEED TO DO AT OUR OWN PACE.  WE CAN WORK OUT THE DETAILS OF REIMBURSEMENTS AND FEE SHARING LATER WHEN YOU HAVE THE INVOICES.  THANK YOU.  BEST REGARDS.  HOLLY LI.

THE ARBITRATOR:  IS THERE A QUESTION, MS. LI?

MS. LI:  NO, I DON'T HAVE QUESTION.  I JUST WANTED WITNESS TO IDENTIFY THIS DOCUMENT AND READ SILENCE WITH ME.

GO ON TO THE NEXT -- BOTTOM OF THIS PAGE.  IT SAYS, STARTING ON NOVEMBER 23, 2016, AT 5:41 P.M. ROBERT HART WROTE, I AM STILL WORKING ON THEM.  I'VE HAD A HECTIC DAY WITH OTHER CLIENT ISSUES, SO I HAVE TO WORK THIS IN BETWEEN THOSE CALLS AND TASKS.  AS SOON AS THEY

ARE DONE, YOU WILL HAVE THEM.

SO MOVING ON TO THE NEXT PAGE.

Q      MR. HART, CAN YOU READ THE TOP LINE TOGETHER WITH ME SILENTLY.  HI, ROBERT AND SUZANNE.  WHAT IS THE STATUS OF THIS AS I HAVE NOT HEARD FROM ANYONE SINCE MONDAY.  I PROMISED THE CLIENT THAT WE WILL BE SENDING THIS BEFORE THE END OF THIS WEEK AFTER SHE REPEATED REQUEST -- SUPPOSED TO BE REPEATEDLY REQUEST.  IF I DO NOT HEAR FROM YOU BY FRIDAY, I WILL HAVE TO SEND HER MY BILLABLES TO HER AS THESE REPEATED DELAYS DO NOT MAKE US LOOK GOOD.  THANKS FOR YOUR UNDERSTANDING.  HOLLY LI.

ALL RIGHT.  THAT'S THE END OF SHARING ABOUT EXHIBIT C-13.

NOW, I LIKE TO MOVE ON TO EXHIBIT C-1, LI 82.

A      WHAT WAS THE LAST EXHIBIT?

THE ARBITRATOR:  013.

MR. TAUGER:  C-13.

THE WITNESS:  OKAY.

MR. TAUGER:  I'M SORRY, WE'RE BACK ON C-1.  WHAT PAGE DID YOU REFERENCE?

MS. LI:  I REFER TO PAGE 82, PLEASE.

MR. TAUGER:  EIGHTY-TWO.  GOT IT.  I WILL STIPULATE TO THE ADMISSIBILITY OF THIS PAGE.

THE ARBITRATOR:  ALL RIGHT.  THANK YOU.

IS THERE A QUESTION, MS. LI?

MR. TAUGER:  SHE'S FROZEN AGAIN.

THE ARBITRATOR:  OH, I SEE.

(BRIEF PAUSE.)

THE ARBITRATOR:  MS. LI, YOU WERE FROZEN FOR ABOUT 20 SECONDS.  CAN YOU START FROM THE BEGINNING, PLEASE.

MR. HART:  SHE'S FROZEN AGAIN.

THE WITNESS:  I'M SORRY.  I OBVIOUSLY DON'T HAVE THE GOOD EQUIPMENTS.

THE ARBITRATOR:  YOU WERE FROZEN FOR ABOUT 15, 20 SECONDS, SO CAN YOU START FROM THE TOP.

MS. LI:  YES.  I'D LIKE TO RESHARE THIS DOCUMENT THAT I INTRODUCED, EXHIBIT C-1, PAGE 82.

MR. GULLIVER TESTIFIED THAT -- I LIKE TO INTRODUCE THIS EXHIBIT WHICH SHOWS MR. GULLIVER'S STATEMENT HERE.  I'D LIKE TO READ OUT LOUD SECOND PARAGRAPH.

JUST SO WE ARE CLEAR, IF WE DO RECOVER ANY FUNDS FROM CATHY TRADING, WE WILL BE DOING AN OFFSET BASED ON THE FUNDS THAT YOU OWE APOGEE.  WE WILL ALSO BE APPLYING A 10 PERCENT PREJUDGMENT INTEREST AMOUNT WHICH IS THE STATUTORY AMOUNT IN CALIFORNIA WHICH IS THE GOVERNING LAW IN APOGEE'S CONTRACT WITH US -- WITH YOU.  WE WILL APPLY THE 10 PERCENT PREJUDGMENT INTEREST FROM THE TIME OF THE MISAPPROPRIATION TO THE DATE FUNDS ARE RECEIVED FROM

CATHY TRADING.

I DON'T HAVE TO EXPLAIN.  AS YOUR HONOR NOTED, EVERYBODY CAN READ THIS DOCUMENTS, BUT I'D LIKE TO INTRODUCE IT INTO EVIDENCE.

MR. TAUGER:  I WITHDRAW THE OBJECTION.

THE ARBITRATOR:  IT'S HER TIME.

MR. TAUGER:  IT'S HER TIME.

MS. LI:  NOW, I'D LIKE TO MOVE ON TO C-91.  I'M TOTALLY SORRY.  C-1 PAGE 91.  LET ME KNOW WHEN YOU GET IT. I WILL PUT IT UP ON THE SCREEN.

THE ARBITRATOR:  YEAH, WE HAVE IT.

MS. LI:  OKAY.  NOW, I ALSO LIKE TO READ OUT LOUD THIS PIECE OF DOCUMENT.  MR. HART CAN READ SILENTLY WITH ME.

ON THE TOP -- ACTUALLY, I WOULD RATHER START IN THE MIDDLE PART.

MR. TAUGER:  YOUR HONOR, IN THE INTEREST --

THE ARBITRATOR:  HANG ON, MS. LI.  THERE'S AN OBJECTION.

MR. TAUGER:  IN THE INTEREST OF EFFICIENCY, I WILL STIPULATE TO THE ADMISSIBILITY OF THIS PAGE.  I DON'T KNOW WHY SHE WANTS MR. HART TO READ IT.  SHE'S NOT ASKING HIM ANY QUESTIONS, BUT I'LL ALLOW HER TO REFER TO IT IN HER FINAL BRIEF ANYWAY.

THE ARBITRATOR:  MS. LI, I THINK WE WENT OVER THIS

MANY TIMES IN THE PAST.  THERE'S NO NEED TO WASTE YOUR

PRECIOUS MINUTES SIMPLY READING THE TEXT OF DOCUMENTS THAT

CAN BE READ BY ME AFTER THE FACT.  SO TO THE EXTENT YOU

HAVE OTHER MORE IMPORTANT MATTERS TO TURN TO, I WOULD

SUGGEST THAT YOU DO THAT.  OF COURSE IT'S YOUR CHOICE.

I'M NOT GOING TO TELL YOU NOT TO DO THIS, BUT IT WOULD

SEEM TO ME THAT YOU MIGHT HAVE BIGGER FISH TO FRY.

        MS. LI:  OKAY.  I WOULD LIKE TO ASK A QUESTION TO

THE WITNESS.

        OKAY.  WE DON'T HAVE TO GO ON THIS PIECE.

WE CAN MOVE ON TO THE SAME EXHIBIT, PAGE 89, PLEASE.  HERE

I'M PUTTING UP ON THE SCREEN.

        **Q     MR. HART, YOU SAID ON JANUARY -- I'M SORRY,**

**MAY 23, 2018.  HERE STARTING WITH ALSO.  ALSO, I BELIEVE**

**SHE IS IN A SINGLE MEMBER LLC WHICH IS EASIER TO PIERCE**

**THE CORPORATE VEIL.  CAN YOU CONFIRM THAT CATHY TRADING IS**

A SINGLE MEMBER LLC?  THIS IS PART OF YOUR STATEMENT TO

ME, YOUR QUESTION.

        DID YOU -- NOW, FIRST IS, DID YOU BELIEVE

IT'S EASIER TO HEAR THE -- PIERCE THE CORPORATE VEIL WHEN

YOU MADE THE STATEMENT?

        MR. TAUGER:  I'M SORRY, CAN I HAVE THE QUESTION

READ BACK?

        MR. HART:  I THINK THERE'S A COMPOUND QUESTION

THERE.

THE ARBITRATOR:  CAN YOU READ BACK THE QUESTION?

MS. LI:  YES, YOU MADE THAT STATEMENT WHICH IS A QUESTION POSED TO ME ASKING ME WHETHER CATHY TRADING WAS THE SINGLE MEMBER LLC AND EASY TO PIERCE THE CORPORATE VEIL.  THAT'S YOUR QUESTION.  MY QUESTION --

MR. TAUGER:  OBJECTION.  MISCHARACTERIZES THE DOCUMENT.  THE DOCUMENT SPEAKS FOR ITSELF.  MR. HART SAID I BELIEVE SHE'S IN A SINGLE MEMBER LLC.  QUITE A DIFFERENCE.

MS. LI:  OKAY.  YES, MR. HART SAID IT'S EASIER TO PIERCE THE CORPORATE VEIL.

Q     MR. HART, DO YOU BELIEVE IT'S EASY TO PIERCE THE CORPORATE VEIL FOR A SINGLE MEMBER CORPORATION?

A     IT DEPENDS ON THE STATE.

Q     OKAY.  DID YOU BELIEVE WHAT YOU SAID IN THIS EMAIL WAS CORRECT?

A     I DON'T KNOW, HOLLY.  THE ISSUE OF A SINGLE MEMBER LLC IS SOMETHING THAT YOU'VE TOLD ME REPEATEDLY.  I DON'T KNOW THAT FOR A FACT.  IT CERTAINLY DIDN'T COME UP IN THE JAMS ARBITRATION.  BUT THE ONLY -- MY ONLY BASIS FOR THAT ASSUMPTION WAS BECAUSE YOU SAID REPEATEDLY THAT CATHY TRADING GROUP, LLC, WAS A SINGLE MEMBER LLC, AND YOU'VE SAID IT TODAY.

Q     YES.  I DID NOT ASK THAT QUESTION.  I ASKED WHETHER YOU BELIEVE IT'S EASY TO PIERCE THE CORPORATE VEIL

FOR SINGLE MEMBER LLC?

A     WELL, THAT'S A DIFFERENT QUESTION, AND I JUST ANSWERED THAT, AND I SAID IT DEPENDS ON THE STATE.

Q     YOU ANSWERED DEPENDING ON THE STATE, BUT I'M ASKING A GENERAL QUESTION.  DO YOU BELIEVE IT'S EASY OR NOT?

A     IT DEPENDS ON THE STATE.

Q     OKAY.  I TAKE THAT AS AN ANSWER.

NOW, IN THIS EMAIL YOU ALSO SAID -- I THINK YOU WERE THINKING OR YOU ARE AMENDING THE COMPLAINT AS WE DISCUSSED SEVERAL WEEKS AGO AND ADDING CLAIM AGAINST MS. CHEN PERSONALLY.

DID YOU AMEND THE CLAIM?  DID YOU AMEND THE ARBITRATION COMPLAINT TO ADD HER PERSONALLY?

A     I DID NOT.

Q     WHY NOT?

A     WELL, I NEVER REALLY COULD UNDERSTAND WHETHER OR NOT SHE WAS A SINGLE MEMBER LLC, AND IT WAS GOING TO TAKE AWAY FROM THE EASINESS OF GETTING A JUDGMENT AGAINST CATHY TRADING.  AS I SAID, IT DEPENDS UPON THE STATE OF INCORPORATION AS TO WHETHER OR NOT THE STATE LAW SAYS THAT LLCS IN THAT STATE ARE SET UP FOR SINGLE MEMBER OR TWO OR MORE MEMBERS.  IF IT'S A SINGLE MEMBER, THEN IT'S VERY HARD TO PIERCE IT UNLESS THEY VIOLATE THE CORPORATE RESPONSIBILITIES; FOR EXAMPLE, THEY'RE

COMMINGLING FUNDS --

Q    I'M SORRY.  MR. HART, I DO NOT NEED TO HAVE ANOTHER CORPORATE LESSON.  I'M SORRY.  THANK YOU FOR THE EFFORTS TO TRY TO EXPLAIN ABOUT SINGLE MEMBER LLC, BUT I UNDERSTAND THAT YOUR STATEMENT MEANT TO SAY -- I'M SORRY. I ALSO DON'T NEED TO GO ON.

LET'S MOVE ON TO EXHIBIT 14.

MR. HART, DO YOU READ THIS DOCUMENT?  CAN YOU SEE IT CLEARLY?

MR. TAUGER:  I'M SORRY, IS THAT C-14?

MR. HART:  YEAH.

BY MS. LI:    Q    WHAT DOES THIS DOCUMENT SHOW YOU?

A    SPEAKS FOR ITSELF.

Q    OKAY.  OTHER THAN SPEAKS FOR ITSELF, WHAT DOES IT SPEAK?

A    I DON'T KNOW.  I DON'T KNOW WHAT THE ORIGIN OF IT IS.

Q    OKAY.

A    I'M ONLY SEEING PART OF THE DOCUMENT.

Q    OKAY.  THE ORIGIN OF THIS DOCUMENT IS A MARYLAND REGISTER OF STATE REGISTRATION OF CATHY TRADING, LLC.

MR. TAUGER:  WE'LL STIPULATE TO THE ADMISSIBILITY AND AUTHENTICITY OF THIS DOCUMENT.

THE WITNESS:  IT'S A PUBLIC RECORD, AND IT SPEAKS FOR ITSELF.

MS. LI:  YEAH.

**Q     SO THIS DOCUMENT SHOWS CATHY TRADING HAS ONE PRINCIPAL OFFICER, HAS ONE REGISTERED AGENT, HAS --**

A     I DISAGREE.

**Q     -- ACTIVE STATUS.**

A     I DISAGREE.

**Q     YOU DISAGREE?  I'M NOT ASKING YOUR AGREEMENT OR NOT.**

MR. TAUGER:  IN THAT CASE I OBJECT.  GROSSLY MISCHARACTERIZES THIS DOCUMENT.

THE ARBITRATOR:  SUSTAINED.

BY MS. LI:     Q     OKAY.  I WOULD MOVE ON TO -- MOVE ON TO THE SETTLEMENT DISCUSSION YOU'RE HAVING WITH CATHY TRADING OR RATHER ITS SINGLE MEMBER, YUN CHEN.  DID YOU PERSONALLY -- STRIKE THAT.

DID APOGEE RECEIVE ANY MONEY FROM CATHY TRADING?

A     YES.

**Q     DO YOU KNOW HOW MUCH MONEY APOGEE RECEIVED?**

A     I DON'T KNOW, BUT THE FUNDS CAME IN IN 2016 AND THERE MAY HAVE BEEN SOME FUNDS COME IN IN 2017, BUT I DON'T BELIEVE THEY DID.  BUT ALL OF THE MONEY THAT CAME IN WAS DISTRIBUTED OUT TO THE TIMEKEEPERS INCLUDING YOURSELF.

Q    DID APOGEE RECEIVE ANY PAYMENT AFTER JANUARY 2020 FROM CTC?

A    NO.

Q    DID APOGEE RECEIVE ANY MONEY THAT WILL REDUCE THE OBLIGATIONS UNDER THAT JUDGMENT FOR CTC?

A    NO.

Q    DID ANYONE RECEIVE ANY PAYMENT THAT WILL REFUSE THE OBLIGATIONS OF THAT MONETARY JUDGMENT FOR CTC?

A    I'M GOING TO OBJECT THAT IT'S VAGUE, AND I'LL TRY TO ANSWER IT.

Q    YOUR LAWYER IS NOT OBJECTING.

A    I'M COUNSEL OF RECORD, HOLLY, SO I CAN OBJECT.  I'LL TRY TO ANSWER YOUR QUESTION, BUT YOU SAID ANYONE.  I DON'T KNOW.  BUT I WILL TELL YOU THAT THE AMOUNT OF MONEY THAT WAS OBTAINED IN THE JAMS AWARD LATER ENFORCED BY THE DISTRICT COURT PLUS WHATEVER INTEREST HAS ACCRUED, IT STILL ACCRUED.  THERE'S NO MONEY THAT'S EVER COME INTO APOGEE AND NO MONEY HAS COME TO ROBERT HART, GREG GULLIVER, FRANK RUBIO OR JEFFREY WILK INDIVIDUALLY.

Q    BUT WAS THERE MONEY -- I'M ASKING, HAS THERE BEEN ANY PAYMENT MADE THAT WILL REDUCE CTC'S OBLIGATIONS UNDER THAT MONETARY JUDGMENT?

A    OKAY.  I DON'T KNOW --

MR. TAUGER:  OBJECTION.  CUMULATIVE OR ELSE VAGUE.

THE WITNESS:  I DON'T KNOW IF ANY PAYMENT WAS

MADE.  I KNOW THAT NO PAYMENT WAS RECEIVED.

BY MS. LI:     Q     AGAIN, I REPHRASE MY QUESTION.

THE ARBITRATOR:  MS. LI, I THINK YOU GOT A PRETTY COMPREHENSIVE ANSWER TO YOUR QUESTION.  I DON'T KNOW WHAT REASKING THE SAME QUESTION IS GOING TO ACHIEVE HERE.  IS THERE SOMETHING YOU'RE TRYING TO GET AT?

MS. LI:  YES, I WOULD LIKE TO KNOW IF CTC'S OBLIGATION IS BEING REDUCED UNDER THAT MONETARY --

THE ARBITRATOR:  I THINK THE ANSWER YOU GOT PRETTY CLEARLY WAS, NO.

MS. LI:  OKAY.

Q     NOW MAY I CLARIFY ONE FURTHER ISSUE WHICH IS THE ADMISSION -- REQUEST FOR ADMISSION THAT -- MR. HART, YOU ANSWERED FOR APOGEE ON REQUEST FOR ADMISSION, I WILL READ OUT, ADMIT THAT APOGEE DOES NOT HAVE ANY CORPORATE ASSET TO SATISFY MONETARY JUDGMENT.  AND YOUR ANSWER WAS ADMITTED PREVIOUSLY AND LATER ON AMENDED AS DENIED.

MR. TAUGER:  I'M SORRY.  OBJECTION. MISCHARACTERIZES THE DOCUMENT.  WHY DON'T YOU READ THE ENTIRE ANSWER RATHER THAN SAYING DENIED.  READ OUR AMENDED RESPONSE.

MS. LI:  IN THE INTEREST OF TIME --

MR. TAUGER:  NO, NOT IN THE INTEREST OF TIME, MS. LI.  YOU'RE TRYING TO MISCHARACTERIZE THE TESTIMONY,

AND YOU CAN'T DO THAT.  PLEASE READ THE ENTIRE RESPONSE.
IT'S ONE PARAGRAPH.

          MS. LI:  I WILL READ OUT TO -- RESPONDENT OBJECTS
TO THE TERM MONETARY JUDGMENT IN THAT IT IS OPEN-ENDED AND
NONSPECIFIC.  AFTER CONFERRING WITH CLAIMANT AND
DETERMINING THAT HER DEFINITION OF ASSET WAS INTENDED TO
INCLUDE RESPONDENT'S JUDGMENT AGAINST CTC, RESPONDENT
ADMITS THAT IT OWNS SUCH AN ASSET BUT PLACES THE VALUE OF
THIS ASSET AS A ZERO GIVEN THAT ITS MONETARY WORTH IS
EXTREMELY SPECULATIVE AND NEARLY IMPOSSIBLE TO VALUE.
GIVEN CLAIMANT'S CLARIFICATION AND TO THE EXTENT THAT
IMPLIED INTO THIS REQUEST IS THAT ANY JUDGMENT MEANS THE
AMOUNT AMENDED BY CLAIMANT IN HER DEMAND RESPONDENT
RESPONDS DENIED.

          MR. TAUGER:  THANK YOU.

          MS. LI:  YEAH.

          Q     NOW, THE VALUE OF THE JUDGMENT AGAINST CTC
CAN YOU EXPLAIN WHY IS NEARLY IMPOSSIBLE TO VALUE?  IT HAS
A MONETARY VALUE INDICATED THERE.

          A     IT DOESN'T HAVE A MONETARY VALUE.  IT HAS
MONETARY AMOUNT OF THE JUDGMENT.  ITS VALUE IS HIGHLY
SPECULATIVE, AND THE REASON WHY IT'S HIGHLY SPECULATIVE IS
BECAUSE I DON'T KNOW IF WE'RE GOING TO EVER BE ABLE TO
COLLECT IT AGAINST CATHY TRADING.  AND IF I DON'T KNOW
THAT I'VE GOT CERTAINTY THERE, THEN IT'S AMBIGUOUS AND

IT'S SPECULATIVE.

I ALSO -- YOU HAD SAID THAT YOU EXPLAINED HOW CATHY TRADING WAS MOVING PRODUCT INTO THE UNITED STATES AND HOW SHE WAS MOVING FUNDS OFFSHORE TO CHINA, AND I DON'T KNOW HOW BIG HER BANK ACCOUNT IS.  I DON'T KNOW IF SHE'S TRYING TO ACCUMULATE ASSETS IN THE UNITED STATES AS A PART OF CATHY TRADING OR WHETHER IT'S AN LLC, IT'S A PASS-THROUGH ENTITY, SO SHE CAN MOVE THE MONEY TO HER PERSONALLY.

IF I SELL THE JUDGMENT TO A THIRD PARTY TO TRY TO COLLECT, USUALLY IT'S ABOUT $.50 ON THE DOLLAR.  BUT BEFORE I DO THAT, I HAVE TO COME TO YOU AND SAY, LISTEN, THIS MUCH IS OWED TO YOU.  ARE YOU WILLING TO TAKE $.50 ON THE DOLLAR.  THEN I HAVE TO TURN TO MYSELF AND SAY, IS THAT ACCEPTABLE.  AND THEN I HAVE TO TURN TO THE OWNERS OF APOGEE AND SAY IS THAT ACCEPTABLE AND LASTLY --

Q    OKAY.  THANK YOU, MR. HART.  I ACCEPT YOUR ANSWER AS THE VALUE.

DID YOU REFUSE TO ASSIGN THE MONETARY JUDGMENT TO HOLLY LI, THE CLAIMANT?

A    I DID UNDER -- WHAT YOU WANT, WHICH IS JUST YOU WANT THE JUDGMENT TO RUN WITH IT, AND WE DON'T TRUST YOU.  YOU STOLE MONEY FROM US.

Q    NO.  I'M ASKING YOU DID YOU REFUSE TO ASSIGN?

A       NOT IF -- THERE WERE CONDITIONS ON IT.  WE DID NOT REFUSE TO ASSIGN.  WE REFUSED TO ASSIGN --

MR. TAUGER:  YOU'VE ANSWERED THE QUESTION.

MS. LI:  I'M SORRY.  ONLY ONE ANSWER IS NEEDED. ONLY ONE SENTENCE.

MR. TAUGER:  I AGREE WITH MS. LI.

MR. HART:  I'M A TERRIBLE CLIENT.  WHAT CAN I SAY.

BY MS. LI:   Q    DID YOU STOP TALKING TO MR. BALOGH ON OCTOBER 2020?

A       I DID NOT.

**Q       DID YOU SEND EMAIL COMMUNICATIONS TO HIM AFTER HE SENT REPEATED COMMUNICATIONS TO YOU?**

A       I TALKED WITH HIM ON A NUMBER OF OCCASIONS, AND THE LAST TIME I SPOKE WITH HIM WAS IN DECEMBER OF 2020.

THE ARBITRATOR:  OKAY.  LET ME JUST NOTE, MS. LI, YOU HAVE 20 MINUTES LEFT.

MS. LI:  I'D LIKE TO RESERVE MY TIME.  THIS IS MY LAST QUESTION.  THANK YOU.

THE ARBITRATOR:  ALL RIGHT.  ARE YOU FINISHED?

MS. LI:  YES, I FINISH THE DIRECT OF MR. HART.

THE ARBITRATOR:  OKAY.  GREAT.  ARE YOU READY TO PROCEED WITH YOUR EXAMINATION?

MR. TAUGER:  I REQUEST A BRIEF RECESS MAYBE 10 MINUTES.

THE ARBITRATOR:  LET'S TAKE A QUICK 10-MINUTE
BREAK.  IT IS NOW 3:08.  LET'S GET OFF THE RECORD.

                    (RECESS TAKEN FROM 3:08-3:24 PM)

THE ARBITRATOR:  ALL RIGHT.  OKAY.  SO CAN WE GET
BACK ON THE RECORD, MS. LI?

MS. LI:  YES, I AM READY.

THE ARBITRATOR:  LET'S GET BACK ON THE RECORD.
IT'S NOW 3:24 P.M.

        MR. TAUGER, YOUR WITNESS.

MR. TAUGER:  THANK YOU.  START MY TIMER.  LET ME
START MY TIMER.

        MS. LI, I'M GOING TO DEPEND ON YOUR TIMER
BECAUSE MINE, FOR SOME REASON, IS NOT WORKING.

MS. LI:  I'LL START MINE NOW.

MR. TAUGER:  THANK YOU.

                    CROSS-EXAMINATION

BY MR. TAUGER:    Q    MR. HART, YOU UNDERSTAND
YOU'RE STILL UNDER OATH?

A    YES.

Q    WHO'S CUSTODIAN OF RECORDS AT APOGEE?

A    I AM.

Q    OKAY.  HAVE YOU REVIEWED ALL OF THE
RESPONDENT'S EXHIBITS THAT WE HAVE STIPULATED IN PLACE OF
THE RECORD?

A    I HAVE.

Q       OKAY.  WITH RESPECT TO THE EXHIBITS THAT
CONSIST OF EMAILS THAT WERE SENT TO OR RECEIVED BY APOGEE,
DO THEY REPRESENT TRUE AND CORRECT COPIES THAT ARE
MAINTAINED IN THE REGULAR COURSE OF BUSINESS AT APOGEE?

A       THEY DO.

Q       I JUST WANT TO COVER ONE THING.  WHEN WAS
APOGEE FORMED?

A       THE CORPORATION ITSELF WAS FORMED IN EARLY
FEBRUARY OF 2015.

Q       WHEN YOU WERE DISCUSSING MS. LI JOINING
APOGEE, DID YOU EVER TELL HER YOU WERE GOING TO START A
LAW FIRM OR WAS APOGEE ALREADY UP AND RUNNING?

A       APOGEE HAD BEEN UP AND RUNNING FOR 15 MONTHS
OR SO, 14 MONTHS.

Q       I WANT TO CLARIFY AN ANSWER THAT YOU GAVE TO
ONE OF HER QUESTIONS.  YOU HAD MENTIONED IN TERMS OF
DISCUSSING WHAT WAS DONE WITH CLIENT FUNDS WHEN THEY CAME
IN, YOU SAID AS FUNDS CAME IN, APOGEE PAID A HIGHER
PERCENTAGE TO THE ATTORNEYS THAN WAS NORMAL.  WHEN YOU
WERE MENTIONING FUNDS THAT CAME IN, YOU WEREN'T TALKING
ABOUT -- WHERE WERE THOSE FUNDS DEPOSITED?  LET'S SAY
THAT.

A       WELL, IT DEPENDS.  CLIENTS COULD PUT ON
RETAINER FUNDS THAT WERE HELD IN THE APOGEE IOLTA ACCOUNT,
OR THEY'RE PAYING INVOICES.  AND IF THEY'RE PAYING

INVOICES, THE FUNDS CAME INTO THE APOGEE OPERATIONS ACCOUNT.

Q     HOW MANY TIMES DID CLIENTS PAY AN APOGEE ATTORNEY DIRECTLY RATHER THAN TAKING MONEY AND HAVING IT DEPOSITED INTO THE CLIENT TRUST ACCOUNT, THE IOLTA ACCOUNT.

A     CAN YOU REPHRASE YOUR QUESTION?

Q     HOW MANY TIMES -- I DON'T KNOW OF ANOTHER WAY TO ASK IT.

HOW MANY TIMES WERE ATTORNEYS PAID DIRECTLY BY THE CLIENT?

A     ONCE.

Q     AND WHAT WAS THAT ONE OCCASION?

A     THAT ONE OCCASION WAS WHEN HOLLY, MS. LI, DIRECTED CATHY TRADING TO HAVE CATHY TRADING SEND, I THINK IT WAS LITTLE OVER $205,000, TO HER CONSULTING FIRM.

Q     OKAY.  I'D LIKE YOU TO LOOK AT EXHIBITS 2 THROUGH 11.  AND I'M SORRY, THAT'S RESPONDENT'S 2 THROUGH 11.

MS. LI:  CAN YOU REPEAT?  NUMBER 2 THROUGH 11?

MR. TAUGER:  TWO THROUGH ELEVEN.

MS. LI:  OKAY.  THANK YOU.

BY MR. TAUGER:    Q    WHAT ARE THOSE DOCUMENTS, MR. HART?

A     THESE DOCUMENTS REPRESENT NEGOTIATIONS

BETWEEN MS. LI AND MYSELF REGARDING HER OFFER LETTER.

Q     AND COULD YOU PLEASE IDENTIFY WHICH DOCUMENTS, IF ANY, REFLECT CHANGES, ADDITIONS, OR CLARIFICATIONS THAT WERE REQUESTED BY MS. LI?

A     THEY'RE IN HERE.  ONE OF THE CHANGES, I KNOW JUST LOOKING AT THIS PAGE, WAS THAT SHE WANTED SOME ADDITIONAL EXAMPLES ADDED --

Q     TO BE CLEAR, I'M JUST ASKING YOU TO IDENTIFY THE DOCUMENTS, IF ANY, THAT REFLECT CHANGES, ADDITIONS, OR CLARIFICATIONS THAT WERE REQUESTED BY MS. LI.  YOU DON'T NEED TO TELL ME SPECIFICALLY.

A     YES, THERE WAS RESPONDENT'S EXHIBIT 4, RESPONDENT'S EXHIBIT 5, 6.  I THINK THAT'S ULTIMATELY -- SOME OF THAT IS IN 7, 8, 9, 10.  ULTIMATELY 11, I BELIEVE, IS THE FINAL VERSION.

Q     CAN YOU IDENTIFY ALL THE INSTANCES IN WHICH MS. LI TOLD YOU SHE DIDN'T UNDERSTAND A TERM IN THE EMPLOYMENT -- THE OFFER TO JOIN APOGEE, EXHIBIT NO. 1?

A     SHE NEVER DID THAT.

Q     SHE NEVER ASKED YOU ABOUT THE MEANING OF COLLECTED FUNDS?

A     NO.

Q     SHE NEVER ASKED YOU ABOUT THE MEANING OF 1099?

MS. LI:  OBJECTION.

THE WITNESS:  NO.

MS. LI:  OBJECTION.  YOU ARE SPECULATING AND FURTHERMORE YOU SPEAK -- YOU ACTUALLY CHANGED THE FACTS. THE WITNESS EARLY ON TESTIFIED THERE WERE -- I'M NOT ALLOWED TO DO SPEAKING OBJECTIONS.

THE ARBITRATOR:  OVERRULED, MS. LI.

YOU MAY PROCEED.

BY MR. TAUGER:   Q   LOOKING AT EXHIBIT RESPONDENT'S 1.  IN THE FIRST PARAGRAPH, THERE'S MENTION OF EQUITY AND NONEQUITY PARTNER.  DO YOU SEE THAT?

A    I DO.

**Q    CAN YOU EXPLAIN THE DIFFERENCE BETWEEN AN EQUITY AND NONEQUITY PARTNER IN THE CONTEXT OF THIS DOCUMENT?**

A    APOGEE IS A CORPORATION, SO THERE ARE NO PARTNERS.  SO I WAS TRYING TO EQUATE WHAT HER TITLE WOULD BE, AND THIS IS AN HONORARY TITLE, BECAUSE IT'S NOT RECOGNIZED AS AN OFFICIAL TITLE INSIDE A CORPORATION WHICH WAS PARTNER.  IN THIS SENSE SHE WAS GOING TO BE A NONEQUITY PARTNER WHICH MEANS SHE'D NEVER HAVE OPPORTUNITY TO RECEIVE PROFITS NOR WOULD SHE EVER HAVE TO MAKE CAPITAL CONTRIBUTIONS TO THE FIRM IF THE FIRM NEEDED MONEY FOR CASH FLOW PURPOSES.

**Q    CAN YOU TAKE A LOOK AT RESPONDENT'S 6, PLEASE.**

A    OKAY.

Q    TAKE A LOOK AT THE TOP SENTENCE.  DO YOU SEE THAT?

A    YES.

Q    WHY DID YOU INCLUDE THAT SENTENCE?

A    TO POINT OUT THAT EVEN THOUGH WE'RE TALKING ABOUT PARTNERS AND THINGS LIKE THAT, APOGEE IS A CORPORATION.

Q    LET'S GO BACK TO EXHIBIT 1, AND I APOLOGIZE FOR JUMPING BACK AND FORTH LIKE THIS.

I'D LIKE YOU TO LOOK AT THE LAST SENTENCE OF THE FIRST PARAGRAPH.  AND EXPLAIN WITHIN THE CONTEXT OF THIS DOCUMENT WHAT IS THE DIFFERENCE BETWEEN A CONTRACT 1099 ATTORNEY AND AN EMPLOYEE AT APOGEE?

A    IT MEANS THAT THERE WERE NO EMPLOYEES.  I BELIEVE THAT AT ONE TIME THERE WAS AN EMPLOYEE AND THAT WAS -- ACTUALLY TWO, SUZANNE MELLOW AND MARA RODRIGUEZ I BELIEVE AT ONE POINT IN TIME WERE ON PAYROLL, AND THEY WERE CONSIDERED EMPLOYEES.  BUT AT NO TIME WAS ANY ATTORNEY IN THE FIRM, INCLUDING THE OWNERS OF THE FIRM, EVER EMPLOYEES.

Q    LOOKING AT THE BOTTOM PARAGRAPH AT PAGE 1, YOU TALKED A LITTLE BIT ABOUT IT ON YOUR DIRECT EXAMINATION BY MS. LI.  WHAT IS MEANT BY ORIGINATION?

A    THIS IS MONEY THAT IS ALLOCATED AS FAR AS

COLLECTIONS GO THAT GOES TO THE FIRM -- TO THE ATTORNEY

THAT IS BRINGING IN A CLIENT TO THE FIRM.  IT'S

ORIGINATION.  AND THERE'S RESPONSIBILITIES FOR THAT

ORIGINATION.

**Q      WHO'S RESPONSIBLE FOR THE WORK THAT MS. LI PERFORMED?**

A     MS. LI.

**Q      DID -- WHAT POLICIES DID APOGEE HAVE REGARDING DIRECT SUPERVISION OF MS. LI IN REVIEW OF HER WORK, IF ANY?**

A     UP UNTIL THE VERY END, WE DIDN'T HAVE ANY.
I KIND OF KEPT TRACK ON WHAT WAS GOING ON IN THE LAWSUIT
BECAUSE, LIKE I SAID, WE'RE A DECENTRALIZED FIRM AND I HAD
THE MOST EXPERIENCE IN THE FIRM WITH RESPECT TO
LITIGATION.  BUT UP UNTIL MID-FEBRUARY I DIDN'T PROVIDE A
LOT OF SUPERVISION.  I PROVIDED GUIDANCE IF SHE HAD
QUESTIONS, BUT I DIDN'T PROVIDE SUPERVISION.

**Q      WAS SHE WORKING INDEPENDENTLY OR UNDER DIRECT SUPERVISION?**

A     SHE WAS WORKING INDEPENDENTLY.

**Q      TAKE A LOOK AT THE NEXT -- I'M SORRY.  I'M NOT GOING TO ASK THAT.**

**TAKE A LOOK AT PAGE 4 IN THE SECOND PARAGRAPH.  GIVE ME JUST A MOMENT TO SCROLL DOWN HERE.**

**THERE'S A REFERENCE IN THERE -- THIS, OF**

COURSE, IS NOT MY HIGHLIGHTED COPY, AND I APOLOGIZE FOR MY FUMBLING HERE.

OKAY.  IT'S THE SECOND PARAGRAPH AFTER THE EXAMPLE THAT'S GIVEN ABOVE, AND IT SAYS THE FIRM WILL PAY FOR MALPRACTICE.  DO YOU SEE THAT?

A     YES.

Q     OKAY.  THERE'S A REFERENCE TO MARKETING MATERIAL.  WHAT IS THAT?

A     AS PART OF THE MONEY THAT APOGEE WAS TAKING FROM COLLECTIONS, IT COVERED COSTS SUCH AS MALPRACTICE INSURANCE AND ALSO WEBSITE MAINTENANCE, WEBSITE CHANGES AND ALSO IF WE DID FIRM BROCHURES OR MARKETING MATERIALS.

Q     AND WHEN THIS DOCUMENT WAS DRAFTED AND SIGNED, WAS THE CONTEMPLATION -- WHAT DID APOGEE CONTEMPLATE WITH RESPECT TO DEVELOPING MARKETING MATERIAL FROM MS. LI?

A     MS. LI WAS LOCATED IN HONG KONG.  I HAD CHINESE CLIENTS.  SHE HAD CHINESE CLIENTS AND SAID THAT SHE NEEDED MARKETING MATERIALS THAT WERE TRANSLATED INTO CHINESE SO THAT SHE COULD MORE EASILY GET CHINESE COMPANIES THAT HAD LEGAL ISSUES IN THE UNITED STATES.

Q     TAKE A LOOK AT EXHIBIT 18, RESPONDENT'S 18.

A     OKAY.

Q     WHAT IS WWW.GOAPOGEE.COM AS REFERENCED HERE?

A     THAT WAS THE WEBSITE THAT WHEN PEOPLE

GOOGLED APOGEE LAW GROUP, THIS IS THE WEBSITE THAT IT
WOULD TAKE THEM TO.

Q     HOW DID THE WEBSITE IDENTIFY MS. LI?

A     I BELIEVE IT IDENTIFIED HER AS A PARTNER.

Q     WITH RESPECT TO -- WITHDRAW THAT.

LET'S GO BACK TO EXHIBIT 1.  AND LET'S GO TO
PAGE 5.

MS. LI:  I'M SORRY, WHICH EXHIBIT ARE YOU ON?

MR. TAUGER:  EXHIBIT NUMBER 1, PAGE 5.

MS. LI:  OKAY.  THANK YOU.

BY MR. TAUGER:    Q    IF YOU LOOK AT THE THIRD
PARAGRAPH.

MS. LI:  I'M SORRY, YOUR EXHIBIT 185?

MR. TAUGER:  NO.  MY EXHIBIT 1, AND I THINK I GAVE
YOU THE WRONG PAGE REFERENCE.  JUST A MOMENT, PLEASE.

MS. LI:  EXHIBIT 1, CORRECT?

MR. TAUGER:  EXHIBIT 1.

Q     OKAY.  I'M ON PAGE 4, AND I'M AT THE BOTTOM
PARAGRAPH ABOVE THE TABLE, AND THERE'S A REFERENCE TO
SUPPORT STAFF.  DO YOU SEE THAT?

MS. LI:  THERE IS A REFERENCE TO?

MR. TAUGER:  I'M ASKING MR. HART IF HE SEES THAT.

MS. LI:  OKAY.  I CAN'T HEAR YOU.

MR. TAUGER:  THERE'S A REFERENCE TO SUPPORT
STAFFING.  THAT'S WHAT I ASKED HIM IF HE SEES THAT.  DID

YOU HEAR THAT?  I'M ASSUMING YOU DID.  I'M GOING TO GO ON.

BY MR. TAUGER:    Q    WHAT DOES SUPPORT STAFFING MEAN, MR. HART?

A    HOLLY HAD AN OFFICE IN HONG KONG, AND SHE SAID THAT SHE NEEDED SOME SUPPORT STAFFING AND ASKED WHETHER OR NOT APOGEE WOULD PAY FOR THAT, SO WE NEGOTIATED BLOCKS OF TIME, AND THAT'S REPRESENTED AT THE BOTTOM OF PAGE 4 OF EXHIBIT 1, AND WE AGREED TO THE LEVEL OF STAFFING THAT SHE -- THAT APOGEE WAS WILLING TO PAY AND WHAT SHE SAID SHE NEEDED.

Q    WHO SELECTED THE STAFF THAT WORKED AT THE HONG KONG OFFICE OF MS. LI?

A    MS. LI.

Q    AND WHO HIRED THEM?

A    MS. LI.

Q    AND WHO PAID THEM?

A    I DON'T KNOW WHO PAID THEM.  I KNOW APOGEE PAID MS. LI FOR THESE SERVICES, BUT I DON'T KNOW WHO ACTUALLY PAID THE SUPPORT STAFF.

Q    APOGEE DIDN'T PAY THE SUPPORT STAFF DIRECTLY?

A    THAT'S CORRECT.

Q    THERE'S ALSO REFERENCE --

MS. LI:  OBJECTION.  IT'S CONTRARY TO THE DOCUMENT SHOWING.

THE WITNESS:  YOU KNOW WHAT, LET ME STRIKE THAT.

MS. LI:  IT SAYS --

THE WITNESS:  WE'RE TALKING ABOUT SOMETHING --

THE ARBITRATOR:  LET ME JUST HEAR MS. LI'S OBJECTION.  WHAT IS YOUR OBJECTION, MS. LI?

MS. LI:  YES, BECAUSE MR. HART IS SAYING SOMETHING CONTRARY FROM WHAT THE DOCUMENT READS.  THE DOCUMENT ON THE BOTTOM PART READS, APOGEE WILL ALSO PROVIDING WEEK BY WEEK -- ARE ALSO PROVIDING SOME SUPPORT STAFFING FOR YOU IN HONG KONG AND ALSO IN SOUTHERN CALIFORNIA BASED ON THE TABLE BELOW.

THE WITNESS:  I CAN CLARIFY THIS.

MS. LI:  YEAH.  WHAT IS THIS SPEAKING CONTRARY TO EVIDENCE?

THE ARBITRATOR:  OVERRULED.

MR. HART, WHY DON'T YOU EXPLAIN.

THE WITNESS:  SO JUST, YOU KNOW, THIS IS A NUMBER OF YEARS, AND I HAVEN'T LOOKED AT THESE RECORDS, BUT WE MAY HAVE WRITTEN A CHECK OR TWO DIRECTLY TO HER OFFICE.  I DON'T REMEMBER, BUT I DO REMEMBER THAT AT ONE POINT IN TIME WE PAID HER DIRECTLY FOR SUPPORT STAFF.

BY MR. TAUGER:    Q    AND BY HER YOU MEAN MS. LI?

A    MS. LI.

AND THEN WE WERE ALSO PROVIDING SUPPORT

STAFF IN SOUTHERN CALIFORNIA.  MS. LI HAD MENTIONED THAT

SHE HAD A BUNCH OF CLIENTS THAT HAD A PATENT PORTFOLIO.

WE HAD A PARALEGAL HERE IN IRVINE, CALIFORNIA, THAT

SPECIALIZED IN PATENT PROSECUTION, DOCKETING, AND

PARALEGAL SUPPORT, AND SO THAT'S WHAT IS PART OF MS. LI'S

OBJECTION THAT WE WERE PROVIDING THAT AS WELL.  WE ALSO

HAD A BILLING SPECIALIST THAT WAS PROVIDING BILLING

INVOICING FOR THE CLIENTS AS WELL.

Q     THANK YOU.  IF YOU WILL TURN TO PAGE 5 OF EXHIBIT 1.  LOOK AT THE SECOND PARAGRAPH.  WHAT DOES THE REFERENCE TO DOCKETING MEAN?

A     DOCKETING IS -- WHEN YOU'RE FILING PATENT AND TRADEMARKS, THERE'S A VARIETY OF DEADLINES THAT COME UP DURING YOUR INTERACTION WITH THE PATENT OFFICE OR THE TRADEMARK OFFICE.  THOSE CALENDARS HAVE DEADLINES AND REMINDERS.  MOST FIRMS HAVE MULTIPLE DOCKETING SYSTEMS. THEY OFTEN HAVE AN ACTUAL DATABASE, LIKE WE DID AT APOGEE, AND THEY ALSO HAVE THEIR OWN CALENDAR SYSTEMS USUALLY IN OUTLOOK OR EXCEL OR SOMETHING LIKE THAT.

SO MALPRACTICE INSURANCE REQUIRES MULTIPLE DOCKETING SYSTEMS, AND THAT'S THE SUPPORT THAT WE WERE HAVING.  AND LIKE I SAID, MARA RODRIGUEZ WAS THE PARALEGAL WHO HANDLED THAT FOR ALL THE ATTORNEYS IN THE FIRM.

Q     TAKE A LOOK AT PAGE 5, THE SIXTH PARAGRAPH DOWN, AND IT BEGINS, ANY CLIENTS BROUGHT INTO THE FIRM OR

DEVELOPED BY YOU DURING YOUR WORK.

WITH RESPECT TO THOSE CLIENTS WHO WERE BROUGHT INTO THE FIRM IN THE CONTEXT OF THIS AGREEMENT, WHOSE CLIENTS WERE THEY?

A       THEY WERE THE FIRM'S CLIENTS.

Q       AND WHAT WOULD BE NECESSARY FOR APOGEE TO ESTABLISH A CLIENT RELATIONSHIP WITH THE FIRM CLIENT?

A       WELL, MALPRACTICE INSURANCE REQUIRED THAT WE RUN CONFLICTS, THAT WE ACTUALLY GET THE NAME, ADDRESS, CONTACT INFORMATION SO WE CAN GET AN ENGAGEMENT AGREEMENT PUT IN PLACE BETWEEN THE LAW FIRM AND THE CLIENT.

Q       WITH RESPECT TO THE TERM DEVELOPED IN THAT PARAGRAPH, WHAT WAS THAT INTENDED TO CONVEY?

A       IT WAS INTENDED TO CONVEY THAT ONCE MS. LI CAME ON BOARD WITH THE FIRM, THAT SHE WOULD BE WORKING HER NETWORK OF CONTACTS SO THAT SHE COULD FURTHER DEVELOP HER CLIENT BASE.

Q       HOW MANY FIRM CLIENTS -- SORRY.  HOW MANY CLIENTS DID MS. LI BRING INTO THE FIRM, AND THAT IS TO SAY CLIENTS THAT ENGAGED APOGEE FOR REPRESENTATION AS YOU DESCRIBED?

A       JUST ONE.

Q       AND WHO WAS THAT?

A       CATHY TRADING GROUP, LLC.

Q       LET'S TAKE A LOOK AT --

MS. LI:  OBJECTION.

MR. TAUGER:  I HAVEN'T SAID ANYTHING YET OTHER THAN --

THE ARBITRATOR:  WHAT IS THE OBJECTION, MS. LI?

MS. LI:  I'M SORRY.  I WAS -- MR. HART'S ANSWER WAS CONTRARY TO THE TRUTH.

THE ARBITRATOR:  OKAY.  YOU CAN CROSS-EXAMINE HIM ON THAT LATER, MS. LI.

BY MR. TAUGER:   Q   TAKE A LOOK AT RESPONDENT'S 14.  AND I APOLOGIZE.  I'M NOT FEELING WELL TODAY.

MS. LI:  WHICH ARE YOU INTRODUCING?  SORRY.

MR. TAUGER:  I BEG YOUR PARDON?

MS. LI:  WHICH EXHIBIT?

MR. TAUGER:  FOURTEEN.

AND AGAIN, I WANT TO PUT ON THE RECORD, I APOLOGIZE I'M NOT FEELING WELL TODAY.  I MAY HAVE SAID OR RESPONDED IN A WAY I SHOULDN'T HAVE.

**Q   WHAT IS THIS DOCUMENT, MR. HART?**

**DO YOU HAVE IT THERE?**

A   THIS IS THE -- YES, I DO.

**Q   OKAY.**

A   THIS IS THE ENGAGEMENT AGREEMENT BETWEEN APOGEE LAW GROUP AND CATHY TRADING, LLC.

**Q   IF YOU LOOK AT PAGE 47, WHICH IS THE SECOND**

PAGE IN ON THIS EXHIBIT, LOOK AT SECTION 4.  WHAT DOES THE TERM "FIRM ATTORNEYS" MEAN IN THE CONTEXT OF THIS ENGAGEMENT LETTER?

A       THE ATTORNEYS THAT WOULD POSSIBLY BE WORKING ON LITIGATION MATTERS FOR THIS CLIENT.

Q       AND DOES IT IDENTIFY WHO THESE FIRM ATTORNEYS WOULD BE?

A       YES.

Q       WHO ARE THEY?

A       MS. LI AND MYSELF.

Q       COULD YOU TELL ME WHERE IN THIS DOCUMENT THERE'S ANY REFERENCE TO IP ADVANTAGES?

A       THERE'S NOT.

Q       TAKE A LOOK AT PAGE 50, THE THIRD PARAGRAPH. AND IT BEGINS, ALL PAYMENTS, DO YOU SEE THAT?

A       I DO.

Q       WHAT IS THE PURPOSE OF THESE INSTRUCTIONS?

A       THEY'RE TO INSTRUCT THE CLIENT THAT ALL PAYMENTS OR INVOICES WILL BE SENT TO THIS ADDRESS.  WE ACCEPTED CHECKS, CREDIT CARD PAYMENTS, AND WIRE TRANSFERS.

Q       OKAY.  AND GET TO THE PAGE HERE.  LOOKING AT THE LAST PAGE, THE ENDORSEMENTS.  WHO SIGNED ON BEHALF OF APOGEE LAW GROUP?

A       I BELIEVE I DID AND MS. LI DID.

Q       OKAY.  I'D LIKE TO TURN TO EXHIBIT 23, R-23.

I FEEL LIKE I'M CALLING BINGO, R-23.

A     IT APPEARS TO BE MAYBE MISSING.

Q     IT MAY BE MISSING.  THAT'S WHAT I WAS AFRAID OF.

A     WAIT.  WAIT.  IF IT'S A JULY 18TH LETTER, THEN I HAVE IT.

Q     IT IS JULY 18, 2016, LETTER.

A     IT'S JUST NOT MARKED WITH THE RESPONDENT'S STICKER ON IT.

Q     THE ONE I HAVE IS.

IT SAYS VIA EMAIL DELIVERED MS. YUN CATHY CHEN?

A     YES.

Q     WHAT ARE THESE DOCUMENTS?

A     THIS LOOKS LIKE ONE OF THE TRANSMITTAL LETTERS FROM APOGEE TO CATHY TRADING REGARDING AN INVOICE FOR SERVICES RENDERED.

Q     AND TAKE A LOOK AT PAGE 2 OF 2 RIGHT AT THE TOP.  WHO -- TO WHOM WAS YUN CATHY CHEN AND CATHY TRADING GROUP SUPPOSED TO SEND HER PAYMENTS?

A     APOGEE LAW GROUP IN IRVINE, CALIFORNIA.

Q     OKAY.  LET'S LOOK AT PAGE 62 IN THIS EXHIBIT.  I'M SORRY.  YOU DID THAT.

LET'S LOOK FURTHER IN.  THERE'S A NUMBER OF -- I'M ON PAGE 63, AND THESE LOOK TO ME LIKE BILLING

STATEMENTS THAT WERE FORWARDED TO THE CLIENT; IS THAT CORRECT?

A     YES.

Q     WHO IS H-Y-L WHO'S REFERENCED HERE?

A     MS. LI.

Q     AND WHO IS R-P-H WHO'S REFERENCED HERE?

A     THAT'S ME.

MR. TAUGER:  AND MS. LI, CAN YOU HEAR ME BECAUSE I JUST HEARD THE AMPLIFICATION FOR ME JUST WENT OUT.  CAN YOU HEAR ME?

MS. LI:  I DIDN'T HEAR ALL OF THEM, BUT YOU SEEM TO BE -- ARE YOU ON R-23 AND 24?

MR. TAUGER:  I AM ON R-23.

MS. LI:  OKAY.  THANKS FOR ASKING.

BY MR. TAUGER:    Q    LOOK AT PAGE 65 OF R-23. THIS HAS COME UP BEFORE.  WHO IS HILL WALLACK, LLP?

A     THEY'RE A LAW FIRM IN NEW JERSEY.

Q     AND WHAT WAS THEIR ROLE INITIALLY IN THE CATHY TRADING MATTER FOR WHICH THIS IS A BILLING STATEMENT?

A     HAD A RELATIONSHIP WITH ERIC ABRAHAM, AND HE WAS LOCAL COUNSEL THROUGHOUT THE CATHY TRADING LAWSUIT FROM START TO FINISH.

Q     AND WHAT WAS THE UNDERSTANDING AS TO THE SCOPE OF HIS RESPONSIBILITIES WHEN HE WAS FIRST BROUGHT ON

AS LOCAL COUNSEL?

A       HE WOULD PROVIDE LOCAL COUNSEL.  SO AN ATTORNEY FROM HIS FIRM WOULD ATTEND COURT HEARINGS, THEY WOULD TAKE CARE OF FILINGS IF NEEDED, WHATEVER NEEDED TO BE DONE.

Q       WERE THEY RESPONSIBLE FOR ACTUALLY CONDUCTING THE LITIGATION OR DRAFTING DOCUMENTS THAT WERE FILED IN THE LITIGATION?

A       NO, BUT THEY REVIEWED DOCUMENTS THAT WERE FILED IN THE LITIGATION.

Q       DID THE SCOPE OF HILL WALLACK'S INVOLVEMENT CHANGE DURING THE REPRESENTATION OF CATHY TRADING GROUP?

A       YES.

Q       HOW DID IT CHANGE?

A       WELL, ONCE I DISCOVERED THAT MS. LI WAS BILLING CATHY TRADING DIRECTLY FROM IP ADVANTAGES, MY ALARM BELLS WERE GOING OFF LIKE CRAZY.  AND I DON'T KNOW IF YOU WANT ME TO GET INTO THAT.

Q       NOT YET, BUT WHAT I WOULD LIKE TO KNOW IF THE SCOPE CHANGED, WHY DID IT CHANGE?

A       YEAH, SO I REALIZED THAT I HAD A ROGUE ATTORNEY, AND THAT I HAD TO SPEND A LOT MORE TIME SEEING WHAT SHE WAS DOING IN THE LAWSUIT, SO I DID.  AND THE MORE SHE AND I TALKED, AND WE TALKED THREE TO FIVE TIMES A WEEK USUALLY IN THE EVENING PACIFIC TIME SOMEWHERE 7:00 TO

9:30, THAT TIMEFRAME, ALMOST EVERYDAY, AND THE MORE I TRIED TO UNDERSTAND AND COME UP TO SPEED ON WHERE SHE WAS IN THE LITIGATION, THE MORE I WAS CONCERNED.  AND WE HAD A NUMBER OF ARGUMENTS.

AND AT SOME POINT SHE KEPT PUSHING A MOTION TO DISMISS.  AND I TOLD HER IT WAS FRIVOLOUS, AND SHE JUST WOULD NOT LISTEN TO ME.  AND SHE KEPT PRESSING IT BECAUSE SHE SAID I'M PRESSING IT AND MS. CHEN IS PRESSING IT.  I THINK THEY WANTED TO GET THE CASE DISMISSED.  AND I SAID BUT IT'S FRIVOLOUS, AND WE'RE GOING TO LOSE, AND WE'RE PROBABLY GOING TO GET SANCTIONED.

AND AT THAT POINT WHEN SHE WOULD NO LONGER TAKE MY ADVICE, I CALLED ERIC ABRAHAM AND SAID, I NEED YOU TO STEP UP AND PLAY A MORE ACTIVE ROLE IN THIS CASE BECAUSE HOLLY WON'T LISTEN TO ME, AND I THINK WE'RE ALL GOING TO GET SANCTIONED ON THIS.

**Q       AND WHAT MORE ACTIVE ROLE DID HE ULTIMATELY ASSUME?**

A       HE STARTED DIGGING IN ON THE CASE.  HE WAS INVOLVED IN FAR MORE CALLS.  AS YOU CAN SEE, EVEN ON THIS INVOICE THAT I HAVE ON PAGE 65, YOU SEE CLS.  CLS IS THE ASSOCIATE, CHRISTINA SALARENO, AND ERIC ABRAHAM.  ERIC HAD VERY LITTLE TIME ON THIS INVOICE.  IT WAS PRIMARILY CHRISTINA DOING THE WORK.  LATER INVOICES HE PLAYED A MUCH MORE ACTIVE ROLE, SO I WANTED HIM AT ANY COURT HEARINGS, I

WANTED HIM TO BE A PART OF MORE CALLS, AND I NEEDED HIM TO CONVINCE MS. LI TO DROP THIS ISSUE OF THE MOTION TO DISMISS.

Q    WHAT ULTIMATELY HAPPENED WITH RESPECT TO THAT MOTION TO DISMISS?

A    ULTIMATELY I THINK THE -- IF MY MEMORY IS CORRECT, EITHER THE MOTION GOT FILED OR WAS THREATENED TO BE FILED, AND JASON LADEMORE, WHO WAS COUNSEL FOR INTELINK THAT'S THE DEFENDANT -- I'M SORRY, THAT WAS THE PLAINTIFF IN THE CATHY TRADING LAWSUIT, HE STEPPED IN AND WROTE CORRESPONDENCE AND INFORMED MS. LI THAT IF SHE PROCEEDED WITH THE MOTION OR DIDN'T WITHDRAW IT, HE WAS GOING TO SEEK SANCTIONS AGAINST EVERYBODY.

Q    YOU MENTIONED INTELINK.  JUST FOR CLARIFICATION --

MS. LI:  OBJECTION.  IRRELEVANT.

THE ARBITRATOR:  OVERRULED.

BY MR. TAUGER:    Q    YOU MENTIONED INTELINK. JUST FOR CLARIFICATION, TO YOUR KNOWLEDGE THERE'S NO RELATIONSHIP BETWEEN THE OPPOSING PARTY IN THE CATHY TRADING LITIGATION AND WHERE MS. LI MIGHT CURRENTLY BE EMPLOYED?

A    IRONICALLY INTELINK WAS THE PLAINTIFF IN THE CATHY TRADING LAWSUIT WHICH HAS THE SAME TRADE NAME AS MS. LI'S CURRENT LAW FIRM.

MS. LI:  I MUST POINT OUT IT'S NOT THE SAME.

MR. TAUGER:  YOU MUST OBJECT OR NOT SAY ANYTHING. DO YOU HAVE AN OBJECTION?

MS. LI:  I DO BECAUSE WITNESS MISCHARACTERIZES THE TRADE NAMES.

THE ARBITRATOR:  MS. LI, YOU CAN MAKE THAT POINT IN YOUR REDIRECT.

MR. TAUGER:  THANK YOU.

THE ARBITRATOR:  I'M JUST WANTING TO MAKE SURE THAT I JUST FOLLOWED THIS TESTIMONY.  SO ARE YOU SAYING, MR. HART, THAT INTELINK WAS THE PLAINTIFF IN THIS CASE WHERE YOUR FIRM REPRESENTED CTC AS THE DEFENDANT?

THE WITNESS:  I THINK THE CORRECT NAME OF THE COMPANY WAS INTELINK PRODUCTS, BUT WE ALL CALLED IT INTELINK.

THE ARBITRATOR:  OKAY.  AND ARE YOU SAYING THAT INTELINK PRODUCTS IS MS. LI'S CURRENT -- NO.

THE WITNESS:  NO, ABSOLUTELY NOT.  I WANT TO DISTINGUISH BETWEEN HER LAW FIRM, WHICH IS INTELINK, AND I DON'T KNOW WHAT THE ACTUAL NAME IS, BUT I KNOW WE CALL IT INTELINK.

THE ARBITRATOR:  I SEE.  BUT THEY'RE DIFFERENT.

THE WITNESS:  THEY'RE VERY DIFFERENT, BUT THEY JUST HAPPEN TO HAVE THE SAME SHORTENED TRADE NAME WHICH IS EVEN MORE IRRELEVANT BUT IRONIC.  MR. RUBIO NOW WORKS FOR

THAT SAME LAW FIRM.

THE ARBITRATOR:  ALL RIGHT.  THAT WAS HELPFUL.

THE WITNESS:  AND THERE'S NO CONNECTION WHATSOEVER.  THAT WAS THE ONLY POINT I WAS TRYING TO MAKE.

THE ARBITRATOR:  OKAY.

MS. LI:  IT'S NOT THE SAME NAME.  I'LL REFRAIN.

MR. TAUGER:  LET'S LOOK AT EXHIBIT 24.

THE WITNESS:  I DON'T THINK I HAVE THAT.

MR. TAUGER:  WELL, THAT'S NOT GOOD.

Q     I'LL REPRESENT TO YOU THAT WHAT I'M LOOKING AT HERE ARE BILLING RECORDS, AND I WANT TO ASK YOU IF I SAW THE TERM "STRESS ENGINEERING SERVICES" ON A BILLING RECORD FOR CATHY TRADING GROUP, WOULD THAT HAVE ANY MEANING TO YOU?  DO YOU UNDERSTAND WHAT THAT REFERS TO?

A     I DO.

Q     WHAT IS STRESS ENGINEERING?

A     AND I HAVE IT HERE IN FRONT OF ME.  I HAVE A DOCUMENT LISTED AS STRESS ENGINEERING.  STRESS ENGINEERING WAS AN EXPERT THAT WAS BROUGHT INTO THE CATHY TRADING LAWSUIT AND REPRESENTED THIS CATHY TRADING CITE.

Q     OKAY.  WHO WAS RESPONSIBLE FOR COMMUNICATING WITH STRESS ENGINEERING?

A     MS. LI.  SHE WAS LEAD COUNSEL.

Q     WHO RETAINED STRESS ENGINEERING?

A     IT WAS EITHER MS. LI OR MYSELF.  I KNOW THAT

THEY HAD INTERACTIONS WITH HER BUT BECAUSE OF THE TIME DIFFERENCES BETWEEN THE U.S. AND HONG KONG, I KNOW I SPOKE WITH THEM ON SEVERAL OCCASIONS.

Q      AND WHO PAID STRESS ENGINEERING?

A      APOGEE.

Q      NOW, THIS IS A MORE GENERAL QUESTION.  I'M GOING TO ASK YOU TO BE CONCISE.  HOW WOULD YOU CHARACTERIZE MS. LI'S TENURE WITH APOGEE?

A      WELL, CERTAINLY THE LAST THREE, FOUR MONTHS WAS VERY CONTENTIOUS.

Q      I'M ASKING ABOUT HER ENTIRE TENURE.  HOW WOULD YOU CHARACTERIZE THAT?

A      IT STARTED OFF FINE, BUT BY SEPTEMBER OF 2016, I WAS INCREASINGLY FRUSTRATED.  SHE WAS BEING PAID ORIGINATION.  SHE WASN'T DOING THE ORIGINATION PERFORMANCE AS THE OTHER ATTORNEYS IN THE FIRM.  I BECAME VERY FRUSTRATED.  I HAD A FULL-TIME PRACTICE WITH MY OWN CLIENTS, MY OWN LITIGATION, AND YET MS. LI ROUTINELY WAS PUSHING HER ADMINISTRATIVE WORK OFF TO ME.

Q      MS. LI, IN HER DIRECT TESTIMONY EARLIER TODAY, ALLEGED THAT YOU HAD MISSED FILING DEADLINES.  DO YOU RECALL THAT?

A      I KNOW THAT'S THE ALLEGATION.

Q      DO YOU KNOW WHAT INCIDENT OR INCIDENTS SHE'S REFERRING TO?

A     YES.

Q     **WHAT INCIDENT WAS THAT?**

A     IT CAME UP EARLIER TODAY.  THERE WAS A COMPANY CALLED -- I CALLED IT JOURVE AND MS. LI CONTACTED ME, AND I BELIEVE THAT THE DATE WAS FEBRUARY 7, 2017.  IT WAS ONE OF OUR EVENING CALLS, AND SHE WAS A BIT IN A PANIC.  AND MS. LI SAID, I HAVE A PATENT APPLICATION.  IT'S A PROVISIONAL.  IT NEEDS TO BE CONVERTED TOMORROW IS THE DEADLINE.  AND THE ATTORNEY THAT WAS HANDLING IT CAN'T DO IT OR WON'T DO IT.

MR. TAUGER:  I'M GOING TO INTERRUPT FOR YOU A MOMENT AND JUST ASK THE ARBITRATOR.

I DON'T KNOW YOUR BACKGROUND.  DO YOU KNOW ABOUT PROVISIONAL PATENT VERSUS UTILITY PATENTS?

THE ARBITRATOR:  NO.

BY MR. TAUGER:     Q     IF YOU COULD EXPLAIN A LITTLE ABOUT THAT, PLEASE.

A     IN THE UNITED STATES CLIENTS' LAWYERS CAN FILE WHAT'S CALLED A PROVISIONAL PATENT APPLICATION WHICH IS A LITTLE BIT LIKE AN OPTION CONTRACT.  AND YOU CAN FILE MULTIPLE ONES OF THEM.  THE FILING FEE IS VERY, VERY SMALL.  I THINK IT'S 130, 150 BUCKS, SOMETHING LIKE THAT.  YOU FILE THE APPLICATION.  YOU HAVE ONE YEAR FROM THAT DATE, OF THAT FILING DATE, TO GET YOUR UTILITY APPLICATION ON FILE OR YOU LOSE YOUR RIGHTS TO THAT PATENT.

BY MR. TAUGER:    Q    AND THAT WAS WHAT MS. LI HAD TALKED TO YOU ABOUT WAS THE CONVERSION OF A PROVISIONAL PATENT TO A UTILITY PATENT?

A    YES.

Q    OKAY.  PLEASE GO ON.

A    THE PROCESS, DEPENDING ON THE QUALITY OF THE PROVISIONAL, CAN TAKE ANYWHERE FROM 30 TO 50 HOURS.

Q    AND WHEN DID MS. LI TELL YOU WAS THE DEADLINE FOR GETTING THE UTILITY FILED?

A    APPROXIMATELY 24 HOURS BEFORE THE DEADLINE WAS DUE.

Q    WHAT WOULD HAVE HAPPENED IF THAT DEADLINE WAS MISSED?

A    CLIENT WOULD HAVE LOST THEIR RIGHTS.

Q    THERE'S NO WAY -- IS THERE ANY WAY TO REDEEM A LATE UTILITY FILING ON A PROVISIONAL PATENT CONVERSION?

A    NO.

Q    THERE'S NO EXTENSION OF TIME?

A    NO.

MS. LI:  OBJECTION.  ALL THREE SPECULATIONS. THERE ARE.  THERE ARE MANY WAYS TO --

THE ARBITRATOR:  OVERRULED, MS. LI.  YOU CAN REHABILITATE THAT ISSUE ON YOUR REDIRECT.

MS. LI:  THANK YOU.

BY MR. TAUGER:    Q    SO WHAT DID YOU TELL

MS. LI?

A     I TOLD HER -- AFTER SHE PLEADED WITH ME, I
TOLD HER I WOULD CLEAR MY DOCKET FOR THE NEXT DAY.  I
WOULD GET UP VERY EARLY IN THE MORNING, AND I WOULD START
ON IT AND WE'D TRY TO GET IT ON FILE, TRY TO GET SOMETHING
ON FILE.

Q     AND YOU MENTIONED THIS IS JOURVE,
J-O-U-R-V-E?

A     YES.

Q     AND DO YOU KNOW WHO THE PRINCIPAL OR THE
INVENTOR FOR JOURVE WAS?

A     NOT OFF THE TOP OF MY HEAD.

Q     IF I SAID HER FIRST NAME WAS HOPE, WOULD
THAT REFRESH YOUR RECOLLECTION?

A     I DON'T KNOW IF HOPE WAS THE INVENTOR, BUT
SHE WAS CERTAINLY PART OF JOURVE.

Q     OKAY.  DID YOU GET THE UTILITY FILED IN
TIME?

A     YES.

Q     WHAT TIME DID YOU GET IT FILED?

A     THE DEADLINE IS MIDNIGHT EASTERN TIME, AND I
BELIEVE I HAD 13 MINUTES OR SO BEFORE THE DEADLINE.
THAT'S WHEN IT WAS FILED.

Q     NOW EARLIER TODAY WE LOOKED AT A REBUTTAL
DOCUMENT WHICH WAS IDENTIFIED AS R-201 IF I RECALL

CORRECTLY.  LET ME OPEN IT UP.

THE ARBITRATOR:  YES.

BY MR. TAUGER:   Q   THAT WAS AN ENGAGEMENT AGREEMENT THAT MS. LI AUTHENTICATED BETWEEN IP ADVANTAGES AND MS. HOPE PORTER AT A COMPANY CALLED HOPPA, INC.  IF YOU HAD KNOWN OF THE EXISTENCE OF THIS DOCUMENT, WOULD YOU HAVE PERFORMED THAT WORK FOR MS. LI?

A   NO.  I DID THE WORK AS A FAVOR TO MS. LI BECAUSE I KNEW SHE WAS DESPERATE BECAUSE JOURVE WAS GOING TO LOSE THEIR RIGHTS AT MIDNIGHT ON FEBRUARY 8TH.

Q   WAS JOURVE A FIRM CLIENT?

A   NO.

Q   DID MS. LI EVER PREPARE OR DISCUSS OR CREATE AN ENGAGEMENT AGREEMENT BETWEEN APOGEE AND JOURVE?

A   NOT THAT I KNOW OF.

Q   WHO WAS RESPONSIBLE FOR GETTING THAT UTILITY PATENT APPLICATION FILED?

A   WELL, ULTIMATELY SHE PUSHED IT OFF ON ME, AND I GOT IT TIMELY FILED.

Q   BUT WHOSE RESPONSIBILITY WAS IT UP TO 24 HOURS BEFORE YOU FILED IT?

A   THAT WAS MS. LI.

Q   OKAY.  THE APPLICATION THAT YOU FILED MINUTES BEFORE THE DEADLINE, WAS IT COMPLETE?

A   NO.

Q    WHAT WAS INCOMPLETE ABOUT IT?

A    I'D HAVE TO LOOK AT THE ACTUAL DOCUMENTS, BUT I DON'T REMEMBER WHETHER OR NOT I PAID THE FILING FEE THEN OR NOT, BUT I KNOW IT WAS MISSING A DECLARATION BECAUSE I WAS STILL CHANGING WHAT WE CALL THE DETAILED DESCRIPTION OF THE PATENT APPLICATION RIGHT UP UNTIL RIGHT BEFORE I FILED IT.

Q    AND THAT DECLARATION WHO WOULD HAVE HAD TO -- WHO WOULD HAVE BEEN THE DECLARANT?

A    THAT WOULD HAVE BEEN THE INVENTOR.

Q    IT'S NOT SOMETHING YOU COULD HAVE DRAFTED AND SIGNED?

A    NO.

Q    AND NOT SOMETHING MS. LI COULD HAVE DRAFTED AND SIGNED?

A    NO, BECAUSE IT'S AN AFFIRMATION THAT THE INVENTOR HAS LOOKED AT THE PATENT APPLICATION, AND THEY AGREED THAT THIS IS THEIR INVENTION, AND IT'S THEIR DECLARATION AND THAT GOES WITH THE FILE.

AND BY THE WAY, IT'S NOT UNUSUAL FOR A PATENT APPLICATION TO BE FILED WITHOUT A DECLARATION.  IT HAPPENS ALL THE TIME.

Q    BY THE WAY, MR. HART, ARE YOU A PATENT ADMITTEE, A PATENT BAR ADMITTEE?

A    I AM.

Q    AND IS PART OF YOUR PRACTICE PATENT PROSECUTION?

A    IT IS.

Q    HOW LONG HAVE YOU BEEN DOING IT?

A    THIRTY-THREE YEARS OR SO.

Q    CAN YOU GIVE US JUST A ROUGH ESTIMATE OF HOW MANY PATENTS YOU'VE PROSECUTED?

A    I COULDN'T, BUT I WILL TELL YOU THAT I WAS INVOLVED IN THE PROSECUTION OF PROBABLY 1,000, 2,000 BECAUSE I WAS IN-HOUSE AND LOOKED AT A LOT.  I MAY NOT HAVE DRAFTED THEM, BUT I REVIEWED THEM AND EDITED THEM FROM OTHER ATTORNEYS WHEN I WAS IN-HOUSE.  I CERTAINLY DID IT WHEN I WAS IN PRIVATE PRACTICE.  PART OF MY PRACTICE WAS THAT A SECOND ATTORNEY TAKE A LOOK AT ALL PATENT APPLICATIONS THAT WERE FILED.

Q    AND IN YOUR CURRENT PROVISION WITH ADDYHART, DO YOU PROSECUTE PATENTS FOR CLIENTS?

A    UNFORTUNATELY I DO.

Q    OKAY.

A    AND THE REASON IS IT'S VERY LOW MARGIN.  YOU CAN'T MAKE ANY MONEY ON IT.

Q    WHAT HAPPENED AFTER THE FILING?  WHAT HAPPENED NEXT ON THIS PROJECT?

A    WHAT HAPPENED NEXT WAS I FILED IT.  MS. LI BLEW A GASKET BECAUSE AS PART OF THE FILING AT THE 11TH

HOUR, YOU FILL OUT AN ONLINE FORM AT THE PATENT OFFICE,

YOU ATTACH DOCUMENTS TO IT, AND THEN YOU SUBMIT IT.  AND

IN MY RUSH --

         **Q      I'M GOING TO STOP YOU ONLY BECAUSE THE**

**PROSECUTOR -- I'M TALKING TOO MUCH PATENT RIGHT NOW -- THE**

**ARBITRATOR HAS ALREADY RULED THAT THAT PARTICULAR PORTION**

**OF THIS IS OUT OF BOUNDS FOR THIS ARBITRATION.**

         MS. LI:  OBJECTION.  OPPOSING COUNSEL IS LEADING

TO THE DISCUSSION ABOUT THIS PIECE OF EVIDENCE, BUT THEN

HE STOPPED ALLOWING INTRODUCTION OF THIS PIECE OF

EVIDENCE.  I DON'T QUITE GET IT.  ARBITRATOR ALREADY RULED

ON THAT CONFERENCE CALL THAT THE APPLICATION WHEREBY

MR. HART ASSERTED HIS OWN NAME AS THE INVENTOR.

         MR. TAUGER:  MS. LI, I'M GOING TO ASK YOU TO MAKE

AN OBJECTION AND NOT DO A SPEECH BECAUSE YOU'RE CUTTING

INTO MY TIME.  DO YOU HAVE AN OBJECTION?

         MS. LI:  I DO HAVE AN OBJECTION ON --

         MR. TAUGER:  THEN PLEASE STATE WHAT IT IS SO THAT

THE ARBITRATOR CAN RULE ON IT.

         MS. LI:  IT'S NOT RELEVANT.

         MR. TAUGER:  I AGREE.  WHICH IS WHY I WITHDREW IT.

         THE ARBITRATOR:  SO IT'S OVERRULED, AND LET'S

CONTINUE.

         BY MR. TAUGER:    Q    WHAT HAPPENED NEXT WITH

RESPECT TO THE PATENT AND TRADEMARK OFFICE, THE PTO?

A      WE RECEIVED A NOTICE OF MISSING PARTS BECAUSE THE DECLARATION WAS NOT FILED.

Q      DOES THE NOTICE OF MISSING PARTS PREJUDICE THE APPLICANT FOR UTILITY PATENT IN ANY WAY?

A      NO.  IT HAPPENS ALL THE TIME.

Q      WHAT ARE THE CONSEQUENCES OF A NOTICE OF MISSING PARTS BEING SERVED, RATHER, BY THE PATENT AND TRADEMARK OFFICE?

A      YOU HAVE TO FILE AND ADDRESS THE NOTICE WITHIN A PARTICULAR TIME.  I THINK IT'S ONE OR TWO MONTHS.

Q      AND ARE YOU SAYING THERE'S A DEADLINE IN WHICH YOU HAVE TO RESPOND TO THE NOTICE OF MISSING PARTS?

A      THERE'S TWO DEADLINES.  THE FIRST DEADLINE IS THERE'S NO FEE INVOLVED.  AND IF YOU MISS THAT EVERY MONTH AFTER THAT DEADLINE, YOU HAVE AN ARITHMETICALLY INCREASING FEE UP TO -- I THINK ON NOTICE OF MISSING PARTS IT'S FOUR, FIVE MONTHS.

Q      WHO FILED -- ULTIMATELY FILED THE RESPONSE TO THE NOTICE OF MISSING PARTS?

A      GREG GULLIVER OR MYSELF DID.  ONE OF THE TWO.

Q      MS. LI DIDN'T?

A      NO, NOT TO MY KNOWLEDGE.

Q      WAS IT FILED WITHIN THE FIRST TIME PERIOD WHERE THERE WOULD NOT BE A LATE FEE ASSESSED OR LATER THAN

THAT?

A    THERE WAS A LATE FEE ASSESSED.

Q    AND IS THAT --

A    IT'S NOT A LATE FEE.  IT'S ACTUALLY AN EXTENSION-OF-TIME FEE.  WE DON'T CALL THEM LATE FEES.  IF YOU NEED EXTRA TIME, YOU JUST WAIT AND YOU COME IN AND YOU FILE YOUR FEE WHICH IS AN EXTRA EXTENSION-OF-TIME FEE.

Q    OKAY.  THANK YOU FOR THE EDUCATION BECAUSE I'M NOT A PATENT PROSECUTOR, SO I DON'T KNOW THIS.

WAS IT FILED WITHIN THE FREE PERIOD, OR WAS IT FILED WITHIN THE PERIOD THAT REQUIRED PAYMENT FOR AN EXTENSION OF TIME?

A    FILED WITHIN THE PERIOD OF TIME THAT REQUIRED A FEE.

Q    AND WHY WAS THAT?

A    I DON'T REMEMBER EXACTLY, BUT MARA RODRIGUEZ, WHO WAS THE PATENT PARALEGAL, HAD LEFT AND GONE TO ANOTHER FIRM, AND I BELIEVE THAT IT WASN'T PROPERLY DOCUMENTED -- DOCKETED AND SO BY THE TIME IT WAS IDENTIFIED AS AN ISSUE, WE WERE IN THE EXTENSION-OF-TIME FEE.

Q    WHO PAID THAT FEE?

A    APOGEE.

Q    I'M SORRY?

A    APOGEE.

Q    WAS THERE ANY PREJUDICE RESULTING TO THIS JAURVE, J-A-U-R-V-E, [SIC}] THAT WE DON'T KNOW HOW TO PRONOUNCE?

A    NO.

Q    OKAY.  YOU MENTIONED THERE WAS A DOCKETING GAP.  WHO'S RESPONSIBLE FOR DOCKETING THIS CLIENT?  THIS ISN'T AN APOGEE CLIENT, RIGHT?

A    MS. LI IS INVOLVED IN THAT.  SHE'S PRIMARILY RESPONSIBLE.

Q    OKAY.  AND AT ANY TIME DID THIS JOURVE OR HOPE PORTER BECOME A CLIENT OF APOGEE?

A    TO MY KNOWLEDGE THERE WAS NEVER AN ENGAGEMENT AGREEMENT PUT IN PLACE BETWEEN APOGEE AND JOURVE.

Q    OKAY.  LET'S TAKE A LOOK AT RESPONDENT'S 25.

MS. LI:  I MISSED THE CONVERSATION FOR ABOUT 20 SECONDS.  I FROZE AGAIN.

MR. TAUGER:  I'M SORRY, WHAT?

THE ARBITRATOR:  SHE MISSED THE LAST 20 SECONDS OF EXCHANGE.  MAYBE THE COURT REPORTER CAN READ THAT BACK.

THE WITNESS:  I DON'T REMEMBER WHAT I SAID.

THE ARBITRATOR:  CAN YOU READ BACK MAYBE THE LAST 20 SECONDS.

(WHEREUPON THE RECORD WAS READ.)

BY MR. TAUGER:    Q    ACTUALLY, BEFORE WE TAKE

A LOOK AT RESPONDENT'S 25, I'M JUST GOING TO ASK YOU ONE FINAL QUESTION.

UP UNTIL YOU FILED THE PROVISIONAL TO UTILITY CONVERSION DOCUMENTS, WAS THERE ANY REASON WHY THIS CLIENT -- THIS NONCLIENT OF APOGEE WOULD HAVE BEEN DOCKETED ON APOGEE'S DOCKETING SYSTEM?

A    NO, IT WAS ONE OF MY FRUSTRATIONS WITH MS. LI.  SHE SAID SHE HAD THIS PATENT PORTFOLIO SHE WAS BRINGING OVER TO THE FIRM, BUT SHE NEVER GAVE ME A LIST OF THE CASES, THE LIST OF THE CLIENTS SO THAT WE COULD GET THEM ONBOARDED AND INTO THE DOCKETING SYSTEM.

**Q    WHAT WOULD GETTING THEM ONBOARDED HAVE REQUIRED?**

A    I NEED TO KNOW THE NAME OF THE CLIENT, ADDRESS, CONTACT INFORMATION, ALL THE INCOMING INFORMATION SO IF THEY HAVE A PATENT PORTFOLIO OR TRADEMARK PORTFOLIO, THEY HAVE SERIAL NUMBERS, THEY HAVE FILING DATES ALL THE INFORMATION SO THAT WE CAN INPUT THAT INTO OUR ELECTRONIC DATABASE THAT'S CALLED A DOCKETING SYSTEM.

**Q    DOES APOGEE SUPPORT NONCLIENTS OF THE FIRM FOR ITS ATTORNEYS?**

A    NO, AND OUR LIABILITY GOES THROUGH THE ROOF WHEN WE'VE GOT A SITUATION LIKE THIS WHICH IS WHY I WAS SO CONCERNED.

**Q    WHY DOES YOUR LIABILITY GO THROUGH THE ROOF?**

A     BECAUSE WE HAVE NO ENGAGEMENT AGREEMENT IN PLACE, AND MALPRACTICE INSURANCE REQUIRES AN ENGAGEMENT BE PUT IN PLACE.  I DON'T HAVE ANY CONTACT WITH THIS FIRM.  I DON'T -- YOU KNOW, I GOT THE ADDRESS EVENTUALLY FROM HOPE PORTER, BUT WE JUST DON'T KNOW ANYTHING ABOUT THEM.

Q     DID YOU EVER GET PAID FOR THE WORK THAT YOU DID FOR THIS CLIENT?

A     NO.

Q     DID YOU EVER SEND APOGEE BILLS?

A     I THINK THEY MAY HAVE GOTTEN ONE INVOICE, BUT I KNOW WE GENERATED THE INVOICE, BUT THIS TIME I WAS FIGHTING WITH HOLLY OR SHE WAS FIGHTING WITH ME SO MUCH THAT I KNOW AT SOME POINT I JUST THREW UP MY HANDS AND SAID, ALL RIGHT, I'LL EAT ALL THE FEES.  I WILL NOT BILL YOU -- I WON'T TAKE ANY MONEY ON THIS.  YOU KEEP IT ALL. AND I SAID, BUT I WILL NEVER DO ANY MORE PATENT WORK WITH YOU.

Q     DO YOU KNOW WHETHER MS. LI BILLED THIS CLIENT FROM IP ADVANTAGES; AND IF SO, IF SHE RECEIVED ANY PAYMENT?

A     I HAVE NO CLUE.

Q     PLEASE TAKE A LOOK AT RESPONDENT'S 25.

A     OKAY.

Q     THIS IS PAGE 95 THROUGH PAGE 101, SIX DOCUMENTS.  WHAT ARE THEY?

A     THESE ARE INVOICES FROM IP ADVANTAGES TO CATHY TRADING.

Q     AND HOW DID YOU GET THESE?

A     ULTIMATELY MS. LI SENT THEM, I BELIEVE, IN AROUND MID-FEBRUARY OF 2017.

Q     COULD YOU TAKE A LOOK AT -- I'M SORRY.  HOW DID SHE SEND THEM TO YOU?

A     AS I REMEMBER, IT WAS EMAIL.

Q     OKAY.  WOULD YOU TAKE A LOOK AT EXHIBIT RESPONDENT'S 26.

A     GIVE ME A MINUTE.  SINCE I WAS THE PARALEGAL THAT SCREWED THIS NOTEBOOK UP, I TAKE FULL RESPONSIBILITY.

OKAY.  I'M WITH YOU.

Q     I'M THE PARALEGAL THAT MADE THE COPIES, SO I SHARE IN THAT RESPONSIBILITY.

MS. LI:  I'M SORRY.  WHICH DOCUMENTS?

THE WITNESS:  R-26.

MR. TAUGER:  WE'RE JUST JOKING AROUND A LITTLE BIT WHICH WE SHOULDN'T DO.

MS. LI:  WHICH PAGE?

MR. TAUGER:  R-26.

MS. LI:  OKAY.

BY MR. TAUGER:   Q    WHAT IS THAT, MR. HART?

A     I BELIEVE THAT THIS IS THE EMAIL THAT -- WHERE HOLLY IS SENDING ME THE IP ADVANTAGES INVOICES FOR

THE FIRST TIME.

Q     WHEN DID YOU FIRST LEARN THAT MS. LI WAS INVOICING APOGEE CLIENTS FROM HER IP ADVANTAGES CONSULTING COMPANY AND DIRECTING PAYMENT TO BE SENT TO HER?

A     FEBRUARY 15, 2017.

Q     AND THAT WAS THE DATE OF THE EMAIL?

A     YES.

Q     OKAY.  HAD YOU, AT ANY TIME PRIOR TO LEARNING THAT MS. LI HAD BEEN DIVERTING FUNDS FROM AN APOGEE CLIENT TO HER PERSONAL ACCOUNTS, AUTHORIZED HER TO BILL FROM HER PERSONAL COMPANY?

A     ABSOLUTELY NOT.

Q     OKAY.  WHAT ACTION WOULD YOU HAVE TAKEN HAD YOU KNOWN SHE WAS DOING THIS?

A     I WOULD HAVE IMMEDIATELY STOPPED IT WHICH IS WHAT I DID WHEN I SAW THIS.

Q     OKAY.  LET'S GO BACK TO EXHIBIT 26 WHICH IS THE EMAIL.

A     OKAY.  I WAS ON THAT.

Q     AND MS. LI HAS PRESENTED THE SAME DOCUMENT UNDER HER EXHIBIT NUMBER WHERE SHE HAS SAID THIS DOCUMENT REPRESENTS A MODIFICATION TO EXHIBIT R-001.  WOULD YOU AGREE WITH THAT ASSESSMENT?

A     ABSOLUTELY NOT.

Q     AT THE VERY TOP DO YOU SEE WHERE IT SAYS,

"OKAY"?

A    YEAH.

Q    WHAT DID YOU MEAN BY "OKAY"?

A    I WISH -- IN HINDSIGHT I PROBABLY SHOULD HAVE WRITTEN A MORE LENGTHY LETTER, BUT WHEN I SAW THIS, I REACHED OUT TO MY PARTNERS, AND I WAS DUMBFOUNDED.  AND MY OKAY WAS REALLY IT SHOULD HAVE BEEN PRONOUNCED MORE LIKE OKAY.  I HAD ALARM BELLS GOING OFF LEFT AND RIGHT ON THIS EMAIL BECAUSE SO MANY THINGS THAT ARE GOING WRONG.

FIRST OF ALL, IT'S IN VIOLATION OF THE CONTRACT THAT WE HAD WITH MS. LI.

SECOND THING WAS I NOW HAVE A COMPLETE MESS ON MY HANDS BECAUSE THIS REPRESENTED -- THIS IS IN FEBRUARY AND THE INVOICES, I BELIEVE, REPRESENTED THE MONTHS -- WELL, MULTIPLE MONTHS IN HERE, DECEMBER, JANUARY, MARCH, SO IT'S MULTIPLE MONTHS.  BUT I'M SITTING HERE THINKING IF THERE'S A MALPRACTICE CLAIM, WHAT DO WE DO BECAUSE WE'RE -- APOGEE'S PAYING FOR MALPRACTICE INSURANCE.  WHEN THE INSURANCE COMPANY SEES THAT WE NOW HAVE A CLAIM THAT CAME UP DURING THIS TIME, THEY'RE GOING TO DENY THE CLAIM BECAUSE THEY'RE GOING TO SAY, WELL, THIS WAS NOT BILLED THROUGH APOGEE.  THIS IS NOT AN APOGEE ISSUE.  THIS IS AN IP ADVANTAGES, AND CATHY TRADING IS GOING TO SAY, I DON'T CARE.  YOU GUYS WERE COUNSEL OF RECORD, AND SO I'VE GOT NOW A MALPRACTICE MESS.  I HAVE A

CLIENT RELATIONS MESS.  I HAVE AN INTERNAL MESS WITH POLITICS INSIDE OF MY FIRM BECAUSE I'M THE ONE THAT RECOMMENDED THAT HOLLY COME ON BOARD, AND SHE'S ALREADY DIVERTED 205,000 TRANSFER.

CALL IT WHAT YOU WANT, BUT SHE TOOK THAT MONEY, AND APOGEE'S BEEN PAYING EXPENSES OUT OF ITS POCKET TO COVER FOR MALPRACTICE HER OWN CLERICAL WORK THAT'S BEING DONE IN HONG KONG.  SO WE'RE -- IT'S COSTING US MONEY, SO I HAVE AT LEAST THREE OR FOUR DIFFERENT POLITICAL ISSUES I NOW HAVE TO DRAFT.

AND I WAS SO DUMBSTRUCK BECAUSE RARELY DO YOU EVER SIT IN A COURTROOM AND HAVE A PERRY MASON MOMENT WHERE SOMEBODY ADMITS ON THE WITNESS STAND, OH, YOU'RE RIGHT.  I SHOT THE VICTIM.  BUT I LOOKED AT THIS AS THIS IS, I SHOT THE VICTIM, AND SHE'S ADMITTED THAT SHE'S MISAPPROPRIATED $205,000.  THAT'S NOT 50 BUCKS HERE OR A REIMBURSEMENT ON SOMETHING OUT OF PETTY CASH.  THAT'S $205,000.  THAT'S A TREMENDOUS AMOUNT OF MONEY.

THE ARBITRATOR:  SO THAT WAS HELPFUL, MR. HART. LET ME JUST PAUSE FOR A SECOND AND ASK MR. TAUGER, ULTIMATELY WHAT DOES IT MATTER WHETHER THIS WAS OR WASN'T AN AMENDMENT?  YOU KNOW, I DON'T THINK MS. LI DENIES THAT SHE IS ONLY ENTITLED TO A FRACTION OR A PERCENTAGE OF THE AMOUNTS THAT WERE RECOVERED BY HER.  SO CAN YOU HELP ME UNDERSTAND A LITTLE BETTER WHY THIS IS ALL --

MR. TAUGER:  YES, I'LL MAKE A PROFFER.

THE ARBITRATOR:  YEAH.

MR. TAUGER:  THE EVIDENCE THEY'RE GOING TO PRESENT IS GOING TO SHOW THAT THE STICKING POINT IN NEGOTIATING AN ASSIGNMENT OF THE CLAIM TO MS. LI WAS BECAUSE APOGEE DIDN'T TRUST HER BECAUSE SHE WAS A THIEF AND SHE LIED AND SHE STOLE FROM THE FIRM.

THE ARBITRATOR:  I SEE.

MS. LI:  OBJECTION TO THIS COMMENT.

THE ARBITRATOR:  OVERRULED, MS. LI.  YOU WILL GET A CHANCE TO ADDRESS IT ON YOUR REDIRECT.  OKAY.

MR. TAUGER:  I'M ALSO GOING TO ASK, BY THE WAY, THERE'S A REFERENCE HERE TO DELAYED INVOICES AND MS. LI TESTIFIED THAT IT WASN'T THESE INVOICES THAT WERE ATTACHED TO THE EMAIL, SO I WANT TO ASK ABOUT THAT.

THE ARBITRATOR:  OKAY.  FAIR ENOUGH.  YOU MAY PROCEED.

BY MR. TAUGER:    Q    THIS IS ACTUALLY A GOOD TIME TO DO THAT.

MR. HART, MS. LI REFERENCES A LITTLE HISTORY OF THESE DELAYED INVOICES.  DO YOU KNOW WHAT SHE'S TALKING ABOUT THERE?

A    I DON'T KNOW, BUT FROM ALL THE FALL THROUGH THE WINTER I KEPT ASKING HER ABOUT THE INVOICES, AND SHE KEPT SAYING YOU GOT TO GET THE INVOICES OUT, YOU GOT TO

GET THE INVOICES OUT.  AND I'M SAYING, BUT YOU'RE NOT WORKING WITH SUZANNE.  AND COME TO FIND OUT, SHE'S ALREADY BILLED THESE INVOICES OUT ON HER OWN.  AND SO ONCE AGAIN, WE'RE BACK TO A CLIENT-RELATIONS ISSUE.

SHE COULD HAVE EASILY PUT THESE INVOICES ON APOGEE LETTERHEAD AND SENT IT AND MAYBE IT WOULD BE MORE EXCUSABLE, BUT SHE DIDN'T.  SHE PUT IT ON IP ADVANTAGES' LETTERHEAD, SO NOW THE CLIENT THINKS THAT IP ADVANTAGES IS REPRESENTING HER NOT APOGEE.  THAT'S GOING TO CREATE A PROBLEM.  CREATE A PROBLEM FOR THE MALPRACTICE INSURANCE COMPANY, AND IT'S JUST GENERAL CONFUSION LEADING UP TO WHAT THE HECK DO I DO WITH THIS PROBLEM THAT I HAVE.

Q     PRIOR TO THESE INVOICES THAT WERE ISSUED BY IP ADVANTAGES, WE HAD EARLIER LOOKED AT SOME OTHER INVOICES THAT MS. LI HAD SENT OUT THAT WERE ON APOGEE LETTERHEAD, AND WERE SIGNED BY MS. LI AND DIRECTED PAYMENT TO APOGEE'S ACCOUNT NOT TO IP ADVANTAGES.  DID YOU HAVE ANY PROBLEMS WITH HER SENDING THOSE OUT LIKE THAT?

A     NO, THAT'S WHAT AN ORIGINATING ATTORNEY DOES.

Q     OKAY.  WHAT DID APOGEE ULTIMATELY DECIDE TO DO AFTER RECEIVING HER ADMISSION THAT SHE HAD BEEN SENDING -- SHE HAD BEEN DIVERTING MONEY TO HER PRIVATE ACCOUNT?

A     I REACHED OUT TO MS. CHEN AND SAID, YOU

KNOW, I ASKED KIND OF WHAT HER SIDE WAS AND SHE ADMITTED

THAT MS. LI HAD INSTRUCTED HER TO PAY THE 205,000 DIRECTLY

TO HER OWN CONSULTING FIRM.

AND THIS IS ANOTHER POINT THAT'S AN ISSUE.

MS. LI REPRESENTED THAT IP ADVANTAGES WAS A CONSULTING

FIRM.  IT WAS NOT A LAW FIRM.  IN MOST STATES YOU HAVE TO

REGISTER YOUR LAW FIRM WITH THE STATE BAR.  I KNOW THAT

WASN'T DONE BECAUSE SHE KEPT REFERRING TO IT AS A

CONSULTING FIRM AND YET SHE'S DOING ALL THIS LEGAL WORK

INSIDE OF THIS ENTITY.  SO THAT WAS A SEPARATE ISSUE.

BUT IN MY DISCUSSIONS WITH MS. YUN CHEN, SHE

WAS VERY CONCERNED THAT APOGEE WAS NOW GOING TO INVOICE

HER FOR THE $205,000 AND SHE'D HAVE TO PAY --

Q     I APPRECIATE WHERE YOU'RE GOING WITH THIS,
BUT I'D LIKE YOU TO KEEP YOUR ANSWERS TO JUST THE
QUESTIONS THAT I'M ASKING IF YOU CAN.

A     OKAY.

Q     LOOK AT EXHIBIT R-22.

A     TELL ME WHAT THAT IS.

Q     THAT IS AN EMAIL FROM YOU TO MS. LI THAT
STARTS -- THE SECOND PARAGRAPH STARTS, PLEASE, START
LOOKING FOR A NEW LAW FIRM.

A     OKAY.

Q     WHAT WERE YOU INTENDING TO CONVEY BY THIS
EMAIL?

A        WELL, THIS EMAIL WAS SENT ON MONDAY, JUNE 19TH, SO I HAD BEEN DEALING WITH HOLLY MESSES FOR THREE MONTHS OR SO, AND I HAD REACHED MY BREAKING POINT WITH HER.  AND I SAID, YOU KNOW, ESSENTIALLY WHAT IT SAYS.  YOU KNOW, WE'RE DONE.  I LOST MY PATIENCE.  I HAVE A VERY HIGH TOLERANCE FOR PROBLEMS AND SOMETIMES THAT GETS ME IN TROUBLE, BUT I PUT UP WITH ALL THE NONSENSE, ALL THE FIGHTING AND ALL THE BICKERING THAT I COULD TAKE WITH HOLLY, AND I JUST COULDN'T DO IT ANYMORE, AND I SAID WHAT IT SAYS HERE, WE'RE DONE.  CONSIDER OUR SEPARATION EFFECTIVE JULY 1ST.

BECAUSE SHE REPRESENTS CATHY TRADING IN A LAWSUIT, AND YOU CAN'T JUST FIRE A LAWYER WITHOUT HAVING PROBLEMS.  I WAS NOT COUNSEL OF RECORD IN THE CATHY TRADING LAWSUIT NOR DID I WANT TO BE.  SO I KNEW SHE COULDN'T JUST DISAPPEAR.  LIKE, IF YOU'RE IN A BIG FIRM AND YOU HAVE THREE OR FOUR ATTORNEYS THAT HAVE MADE ENTRY OF APPEARANCE ON A LITIGATION, IF YOU FIND MISCONDUCT, YOU FIRE THE LAWYER, BUT THE OTHER LAWYERS WERE, YOU KNOW, CONTINUE ON.  THEY'RE STILL COUNSEL OF RECORD.  I WAS NOT COUNSEL OF RECORD.  THE LAW FIRM THAT WAS COUNSEL OF RECORD WAS APOGEE WITH HOLLY LI AND ALSO HILL WALLACK.

Q        AND MR. HART, AGAIN, I'M GOING TO ASK YOU -- I KNOW YOU HAVE A LOT YOU WANT TO SAY.  BUT I'LL ASK YOU TO STICK TO THE QUESTIONS I ASK.  IT WILL BE BETTER FOR

EVERYONE.

A      OKAY.

Q      IS IT YOUR CONTENTION THAT MS. LI'S TESTIMONY -- WHAT IS YOUR OPINION THAT MS. LI'S TESTIMONY THAT THIS WAS NOT INTENDED TO TERMINATE HER BUT WAS YOU AND SHE JUST ARGUING?

A      SHE'S WRONG.

MS. LI:  OBJECTION.  MISCHARACTERIZING MY TESTIMONY.

THE ARBITRATOR:  OVERRULED.

MR. TAUGER:  IT'S OVERRULED.  I'M GOING TO GO ON.

Q      PLEASE LOOK AT RESPONDENT'S 20.

MS. LI:  TWENTY.  OKAY.

BY MR. TAUGER:    Q    WHAT IS THIS?

A      AFTER I SENT THE EMAIL TO MS. LI, I SENT THIS EMAIL TO THE PRINCIPALS OF APOGEE.

Q      WHAT WAS YOUR PURPOSE IN COMMUNICATING TO THE PRINCIPALS OF APOGEE?

A      WELL, THEY KNEW THAT I HAD HAD A LOT OF DIFFICULTIES MANAGING MS. LI AND ALSO INTERACTING WITH MS. LI AND I WANTED THEM TO KNOW THAT I HAD FINALLY REACHED MY BREAKING POINT THAT THERE WAS NO REHABILITATION OF THIS RELATIONSHIP.

Q      AND THEN FINALLY I'D ASK YOU TO LOOK AT EXHIBIT 21, R-21.  WE'VE LOOKED AT THIS PREVIOUSLY.  THIS

IS MS. LI'S RESIGNATION LETTER.  DO YOU SEE IT?

A     YES.

Q     IS THIS RECEIVED BEFORE OR AFTER YOU HAD SENT THE EMAIL ADVISING HER THAT THE RELATIONSHIP OF APOGEE WOULD END ON JULY 1ST?

A     THIS CAME AFTER, AND IT WAS THE NEXT DAY FOR ME.

Q     OKAY.  WHY DID YOU GIVE HER UNTIL JULY 1ST?  WHY NOT TELL HER TO GET OUT IMMEDIATELY?

A     WELL, LIKE I SAID, I WASN'T COUNSEL OF RECORD IN THE CATHY TRADING LAWSUIT, SO WE NEED TO GET IN FRONT OF THE CLIENT AND SAY, YOU KNOW, SHE'S GOT TO GO FIND A NEW HOME AND DO IT QUICKLY.

Q     MS. LI TESTIFIED IN HER DIRECT OR LATER TODAY THAT YOU ASKED HER TO STAY ON AND HELP WITH THINGS THROUGH AUGUST.  IS THAT TRUTHFUL?

A     ABSOLUTELY A LIE.

Q     DID YOU ASK HER TO STAY ON BEYOND JULY 1ST?

A     NO, SHE BEGGED ME TO STAY ON, BUT BECAUSE SHE SAID SHE WAS SO HEAVILY INVOLVED WITH THE CATHY TRADING LAWSUIT, SHE DIDN'T HAVE TIME TO FIND A NEW LAW FIRM TO GO TO.

Q     AND DID YOU ALLOW HER TO STAY ON?

A     RELUCTANTLY I DID.

Q     OKAY.  TAKE A LOOK -- I'M SORRY.  WITHDRAW

THAT.

AS OF TODAY, DOES CATHY TRADING OWE MONEY TO APOGEE?

A     YES.

Q     ABOUT HOW MUCH?

A     ROUGH NUMBER, HALF A MILLION.

Q     LET'S TALK ABOUT WHAT APOGEE HAS DONE TO COLLECT IT.  I THINK EARLIER YOU TESTIFIED ON MS. LI'S QUESTIONING THAT YOU WERE SPEAKING WITH YUN CHEN TO ARRANGE A PAYMENT PLAN, AND I'M NOT GOING TO GO INTO THAT BECAUSE WE COVERED THAT QUITE WELL.

WAS YUN CHEN COOPERATIVE WHEN YOU DISCUSSED THESE THINGS WITH HER?

A     IN THE FALL OF 2016 HER INTERACTIONS WITH ME WERE VERY PROFESSIONAL, AND SHE WAS VERY CORDIAL.

Q     DID THAT CHANGE?

A     NOT REALLY TOWARDS ME.  SHE WAS ALWAYS CORDIAL, AND SHE WAS ALWAYS PROFESSIONAL EVEN IN THE JAMS ARBITRATION.

Q     WOULD YOU TAKE A LOOK AT EXHIBIT R-27 AND I'M ON -- WHAT PAGE AM I ON?  152.

CAN YOU IDENTIFY WHAT THIS IS?

A     PAGE 152?

Q     YEAH.

A     YES.  THIS IS AN EMAIL THAT MS. CHEN SENT TO

ME COMMUNICATING THAT MS. LI HAD REACHED OUT DIRECTLY TO HER.

Q    IN TERMS --

MS. LI:  SORRY.  WHICH EXHIBIT ARE YOU LOOKING?

MR. TAUGER:  152 IS THE -- I'M SORRY.  THE EXHIBIT IS 27 AND THE PAGE IS 152.

MS. LI:  OKAY.  I DON'T FIND 152 THAT'S WHY. EXHIBIT IS 27, CORRECT?

MR. TAUGER:  YES.

MS. LI:  OKAY.

BY MR. TAUGER:    Q    NOW, I WANT TO CLARIFY. YOUR TESTIMONY WAS JUST THAT THE EMAIL -- YOU UNDERSTOOD THE EMAIL TO BE THAT MS. CHEN WAS TELLING YOU THAT MS. LI HAD REACHED OUT TO HER.  DID IT DO MORE THAN THAT?

A    YEAH, IT'S A HALF-PAGE EMAIL.

Q    OKAY.  TAKE A LOOK AT PAGE 151 WHICH IS YOUR RESPONSE -- WELL, WHAT IS THAT?

A    THIS IS MY EMAIL.  AND IF YOU NOTICE ON PAGE 152, MS. CHEN WROTE AN EMAIL TO ME AND TO HOLLY, AND ON PAGE 151 THIS IS MY RESPONSE BACK TO MS. CHEN AND ALSO SEPARATELY ADDRESSING HOLLY.

Q    WHAT IS YOUR UNDERSTANDING OF MS. CHEN'S REACTION AFTER SHE RECEIVED THIS EMAIL?

A    SHE WAS EVEN MORE UPSET THAN SHE WAS PREVIOUS TO THAT WITH MS. LI.

Q    WAS SHE UPSET WITH YOU OR APOGEE?

A    NO.

Q    WHO WAS SHE UPSET WITH?

A    MS. LI.

Q    ALL RIGHT.  TAKE A LOOK AT RESPONDENT'S 78.

MS. LI:  OBJECTION TO THE PREVIOUS QUESTION ACTUALLY.  I WAS LOOKING AT MY RECORDS.  THAT'S SPECULATION COMPLETELY.  AND MISCHARACTERIZATION AND HEARSAY.  MISCHARACTERIZING SOMEONE ELSE, THIRD PERSON, THROUGH YOUR IMPERSONATED FEELING, AND YOU'RE ALSO COMMENTING ABOUT SOMEONE ELSE.

THE ARBITRATOR:  OVERRULED, MS. LI.  OVERRULED.

MS. LI:  THANK YOU.

BY MR. TAUGER:    Q    ARE WE ON 78?

A    NO, I'M NOT, BUT I WILL BE.  JUST BEAR WITH ME.

MS. LI:  WHICH EXHIBIT YOU ARE LOOKING?

MR. TAUGER:  78.

THE WITNESS:  OKAY.

BY MR. TAUGER:    Q    I'D LIKE YOU TO GO TO PAGE 304.

A    OKAY.

Q    WHAT IS THIS DOCUMENT?

A    THIS IS A BAR COMPLAINT THAT MS. YUN CHEN FILED ON BEHALF OF CATHY TRADING AGAINST MS. HOLLY LI.

Q    DO YOU KNOW THE RESULT OF THE BAR COMPLAINT?

A    YES.

Q    WHAT WAS THAT RESULT?

A    THE NEW JERSEY LAWYERS' FUND INVESTIGATED AND I BELIEVE THAT THIS ONE HAD TO DO WITH THE $205,000 THAT MS. LI HAD MISAPPROPRIATED FROM APOGEE LAW GROUP.

Q    BUT DO YOU KNOW THE RESULT -- MS. LI WAS ESSENTIALLY ACQUITTED, RIGHT?

A    THEY DISMISSED THE BAR COMPLAINT.  THEY DISMISSED IT BECAUSE I WAS CALLED AND INTERVIEWED ON THIS AND I --

Q    I JUST NEED THE RESULT.

A    IT WAS RESOLVED IN MS. LI'S FAVOR.

Q    OKAY.  THAT'S ALL I WANTED TO GET ON THE RECORD.

NOW, I'LL REPRESENT TO YOU THAT THIS BAR COMPLAINT THAT WAS FILLED OUT BY YUN CHEN, AND IF YOU LOOK THROUGH IT, DO YOU SEE ANY INDICATION THAT MS. YUN CHEN WAS CONCERNED WITH APOGEE'S CONDUCT?

A    NO.

Q    WHAT WAS SHE CONCERNED WITH IN THIS DOCUMENT?

A    IF MY MEMORY IS CORRECT, SHE WAS CONCERNED THAT SHE WAS OUT $205,965 BECAUSE SHE HAD PAID IP ADVANTAGES THIS AMOUNT OF MONEY INSTEAD OF APOGEE.

Q      AND IN ANTICIPATION OF AN OBJECTION, I'M GOING TO SAY THIS IS NOT OFFERED FOR THE TRUTH OF THE MATTER ASSERTED THEREIN BUT MERELY THAT THIS WAS SAID BY MS. YUN CHEN AND REFLECTS HER STATE OF MIND.

MS. LI:  IT'S HEARSAY.

MR. TAUGER:  AND THAT'S WHY I JUST RESPONDED.

THE ARBITRATOR:  OVERRULED.

BY MR. TAUGER:    Q    DID MS. CHEN FILE A BAR COMPLAINT OF ANY KIND AGAINST APOGEE?

A      NO.

Q      AGAINST YOU?

A      NO.

Q      AGAINST ANYONE AT APOGEE OTHER THAN MS. LI?

A      NO.

Q      OKAY.  LET'S TAKE A LOOK AT EXHIBIT 83.

A      AND YOU SHOULD ALSO NOTE THAT THE BAR COMPLAINTS WERE FILED AFTER THE JAMS COMPLAINT WAS FILED.

Q      OKAY.

A      I'M SORRY, WHAT EXHIBIT?

Q      83.

MS. LI:  THAT'S WRONG.  THAT'S THE WRONG DATE.

A      I THINK THAT WAS THE CASE.

MR. TAUGER:  I'M SORRY, WHAT?

THE ARBITRATOR:  MS. LI, YOU CAN ADDRESS THIS ON YOUR REDIRECT.

MS. LI:  I WILL.

BY MR. TAUGER:    Q    TAKE A LOOK AT 83, MR. HART, AND TELL ME WHAT THIS IS.

A    I'M GOING TO NEED A FEW MINUTES, AND I ALSO NEED SOME HELP WITH IDENTIFYING WHAT DOCUMENT YOU'RE TALKING ABOUT BECAUSE --

Q    I'LL TELL YOU IT HAS A COVER PAGE THAT SAYS CONTENTS, COMPLAINT LETTER, LAW FIRM AND LAWYER INFORMATION, RECORD OF EMAIL COMMUNICATION WITH LAWYER, RULE 11 SANCTIONS LETTER, INVOICE AND SO ON.  IT'S FROM THE OFFICE OF ATTORNEY ETHICS.

A    I DON'T HAVE THAT DOCUMENT.

Q    HAVE YOU SEEN THAT BEFORE?

A    I DON'T HAVE THE DOCUMENT, SO I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

Q    HAVE YOU SEEN IT BEFORE TODAY?

A    I THINK I KNOW THE DOCUMENT YOU'RE TALKING ABOUT AND THE ANSWER IS, YES, BUT I DON'T HAVE THAT DOCUMENT.

Q    OKAY.  NO, I GOT THAT YOU DON'T HAVE IT. I'M JUST ASKING IF YOU RECOLLECT WHAT DOCUMENT I'M TALKING ABOUT.

A    YES, I DO.

Q    OKAY.  WHAT DOCUMENT IS THAT?  WHAT IS IT?

A    THAT'S THE SECOND BAR COMPLAINT THAT MS. YUN

FILED AGAINST MS. LI.

Q      AND AGAIN, HOW DID THIS ONE RESULT?  DID IT RESULT IN ANY DISCIPLINE OF MS. LI?

A      NOT TO MY KNOWLEDGE.

Q      OKAY.  THE COMPLAINT DID NOT -- WITHDRAW THAT.

YOU'VE READ THAT COMPLAINT, AND I'LL REMIND YOU, YOU READ IT LAST NIGHT.

A      I DID.

Q      DID YOU FIND ANY COMPLAINTS BY MS. YUN CHEN ABOUT APOGEE?

A      NO.

Q      HOW ABOUT YOU?

A      NO.

Q      FRANK RUBIO?

A      NO.

Q      GREG GULLIVER?

A      NO.

Q      JEFFREY WILK?

A      NO.

Q      ANYBODY ELSE AT APOGEE?

A      NO.

Q      WHAT WAS SHE COMPLAINING ABOUT?

A      MS. HOLLY LI.

Q      OKAY.  THANK YOU.

YOU'VE TALKED A LOT ABOUT GETTING THE JAMS AWARD AGAINST CATHY TRADING, AND YOU'VE HEARD MS. LI COMPLAIN ABOUT NOT BEING ALLOWED TO PARTICIPATE.

FIRST, LET ME ASK YOU THIS.  TO WHOM DID CATHY TRADING OWE MONEY, YOU OR MS. LI?

A      NEITHER ONE OF US.  SHE OWED MONEY TO APOGEE LAW GROUP.

Q      I'M SORRY.  WHEN I SAY YOU, I MEAN APOGEE.

MS. LI:  I NEED TO OBJECT.  THE QUESTION IS --

BY MR. TAUGER:    Q    TO WHOM DID CATHY TRADING OWE MONEY MS. LI, YOU, OR APOGEE LAW GROUP?

A      APOGEE LAW GROUP.

Q      AND THANK YOU FOR THE CORRECTION, MS. LI.

MS. LI HAS COMPLAINED ABOUT NOT BEING ALLOWED TO PARTICIPATE IN THE ARBITRATION.  WHY WAS THAT?

A      MY DISCUSSIONS WITH MS. YUN CHEN WAS THAT SHE HAD A VISCERAL REACTION TO MS. LI.  SHE REALLY DID NOT LIKE THIS WOMAN AND THROUGHOUT THE DISCUSSIONS THAT WAS REPEATED THAT SHE WAS VERY, VERY UPSET WITH MS. LI.  AND I THINK THAT'S EVIDENT OF HER STATE OF MIND BECAUSE SHE FILED NOT ONE BUT TWO BAR COMPLAINTS.

Q      BUT THE QUESTION IS WHY DIDN'T YOU ALLOW, IF YOU DIDN'T ALLOW, MS. LI TO PARTICIPATE IN THE ARBITRATION?

A      THERE'S TWO REASONS.

Q      WHAT ARE THEY?

A      FIRST, THIS WAS A COLLECTION MATTER.  TO ME IT WAS A ROUTINE MATTER.  ALL WE'RE GOING TO DO INITIATE A JAMS ARBITRATION, GO IN, SHOW THE INVOICES.  SHE HAD TO EITHER SAY THESE INVOICES ARE WRONG, THEY'RE FRAUDULENT, THEY'RE, YOU KNOW, MADE UP, WHATEVER THEY MAY BE, THOSE WERE HER DEFENSES.  SHE WAS VERY LIMITED WHAT SHE COULD DEFEND AGAINST.

AND THE SECOND ISSUE WAS -- AND I WANTED TO KEEP IT THAT WAY.  SO MS. LI WAS NO LONGER WORKING FOR APOGEE.  THERE WAS NO REASON TO INJECT HER INTO THAT COLLECTION EFFORT BECAUSE IF I WAS TRYING TO WORK OUT A SETTLEMENT, WHICH I DID TRY TO DO WITH MS. CHEN, IT WOULD JUST GET POISONED EVERY TIME SHE SAW OR TALKED OR HAD TO LISTEN TO MS. LI.

Q      AND JUST TO CLARIFY, THAT'S YUN CHEN; IS THAT CORRECT?

A      THAT'S YUN CHEN.

MR. TAUGER:  AT THIS TIME I WANT TO PUT INTO THE RECORD THESE ARE REBUTTAL EXHIBITS, AND I SENT THEM TO MS. LI AND GIVING THEM TO THE ARBITRATOR.

MS. LI:  I'M SORRY, WHAT IS THIS THAT YOU SENT ME? IS IT RECENT?

MR. TAUGER:  YEAH.  I SENT IT TO YOU BEFORE THE LUNCH BREAK.

MS. LI:  BUT WE ARE ALLOWED TO INTRODUCE NEW EVIDENCE?

THE ARBITRATOR:  THEY'RE REBUTTAL EXHIBITS, MS. LI.

MS. LI:  OH, OKAY.  I DIDN'T SEE HIS EMAIL.

MR. TAUGER:  THESE ARE A COUPLE WEBSITES MS. LI HAD MENTIONED THAT CHEN TAK CHEN, WHO WAS REFERENCED ON ONE OF HER DOCUMENTS, WAS IN SOME WAY RELATED TO YUN CHEN, AND THESE DOCUMENTS ESTABLISH THAT CHEN IS THE FOURTH OR FIFTH MOST COMMON SURNAME IN CHINA AND THAT THERE ARE 74,775,602 PEOPLE IN THE WORLD THAT BEAR THE NAME CHEN, AND I WILL PROVIDE THEM TO THE ARBITRATOR.

THE ARBITRATOR:  OKAY.  SO MS. LI, DO YOU HAVE A COPY OF THESE DOCUMENTS?

MS. LI:  YEAH, I JUST FOUND IT.  I FOUND MR. TAUGER'S EMAIL REGARDING THESE SURNAMES.

THE ARBITRATOR:  SO I THINK WE SHOULD -- IT'S ALMOST PROBABLY TIME FOR A BREAK ANYWAY.

MR. TAUGER:  SURE.

THE ARBITRATOR:  SO MS. LI, MAYBE DURING THE BREAK YOU CAN JUST QUICKLY LOOK OVER THESE EXHIBITS AND TELL ME IF YOU HAVE ANY OBJECTIONS.

IS THIS JUST ONE ENTIRE EXHIBIT, MR. TAUGER, OR ARE YOU SEPARATING THEM OUT?

MR. TAUGER:  THEY'RE TWO WEBSITES.  WE CAN CALL IT

A COMPOSITE EXHIBIT.

THE ARBITRATOR:  OKAY.  SO THAT WOULD BE OUR 202, I GUESS, BUT LET'S GIVE MS. LI A CHANCE TO --

MS. LI:  AND I ALSO I WOULD LIKE --

THE ARBITRATOR:  MS. LI, LET ME FINISH MY SENTENCE, PLEASE.

I'M GOING TO GIVE YOU A CHANCE OVER THE BREAK TO REVIEW AND LET ME KNOW IF YOU HAVE ANY OBJECTIONS.

MR. TAUGER:  AND I MIGHT AS WELL GIVE YOU THIS AS WELL BECAUSE NOW HER EXHIBIT IS IN PLACE.  THIS IS A REPORT FROM THE MARYLAND SECRETARY OF STATE IN A SEARCH FOR MONTGOMERY COUNTY ON THE PROPERTY AT 150 LULLABY COURT IN GERMANTOWN, MARYLAND, SHOWING THE OWNERSHIP FROM GOING BACK FROM 2013 THROUGH 2023, YUN CHEN IS NOT MENTIONED. SOMEONE NAME CHEN TAK IS MENTIONED, AND THAT'S RELEVANT.

THE ARBITRATOR:  OKAY.  GREAT.

MS. LI, THIS IS A REAL PROPERTY DATA SEARCH DOCUMENT.  IT'S ONLY ONE PAGE.  PROVISIONALLY I'LL JUST GIVE THIS A NUMBER OF RESPONDENT'S 203.

(WHEREUPON EXHIBIT R- 203 WAS MARKED FOR IDENTIFICATION.)

THE ARBITRATOR:  AGAIN, MS. LI, YOU LOOK OVER THIS DURING THE BREAK.

I JUST WANT TO NOTE THAT MR. TAUGER YOU HAVE

54 MINUTES LEFT.  SO LET'S GO OFF THE RECORD NOW.  IT'S 4:39 P.M.  LET'S GO OFF.  LET'S COME BACK AT, LET'S SEE, 4:50.  4:50 P.M.

MS. LI:  YES.  I JUST WOULD LIKE TO CLARIFY THAT MR. TAUGER HAS 40 MINUTES --

(RECESS 4:39-4:55 PM)

THE ARBITRATOR:  LET'S GO BACK ON THE RECORD.  SO BACK ON THE RECORD.  LET ME JUST RECAP THE CONVERSATION WE JUST HAD.

MR. TAUGER WISHES TO INTRODUCE AS EXHIBIT R-202 TWO WEBSITES RELATING TO THE CHINESE FAMILY NAME CHEN.  MS. LI DOES NOT HAVE ANY OBJECTION TO THESE TWO EXHIBITS.

FINALLY, THERE'S A ONE-PAGE REAL PROPERTY DATA SEARCH WHICH WAS ALSO SHARED WITH MS. LI.  IT SOUNDS LIKE SHE'S REVIEWED IT.  DOES NOT HAVE AN OBJECTION.  IS THAT CORRECT, MS. LI?

MS. LI:  CORRECT.

THE ARBITRATOR:  AND WE WILL MARK THAT DOCUMENT, THAT ONE-PAGE DOCUMENT, R-203.

(WHEREUPON EXHIBIT R-203 WAS MARKED FOR IDENTIFICATION.)

THE ARBITRATOR:  SO IT'S NOW 4:55 P.M.

MR. TAUGER, YOU MAY RESUME.

MR. TAUGER:  THANK YOU.

Q    MR. HART, YOU TALKED ABOUT THE JAMS ARBITRATION THAT APOGEE DID AGAINST CATHY TRADING AND THAT RESULTED IN A JUDGMENT.  HOW MUCH MONEY DID APOGEE SPEND ON THAT ARBITRATION?

A    WELL, WE DIDN'T HAVE AN ATTORNEY'S FEES PROVISION IN THE SYSTEM, BUT I PROBABLY HAD 20,000 OF MY TIME PLUS I HAD TO PAY APOGEE'S FEES, AND AS I SAID EARLIER, WHEN MS. CHEN STARTED, SHE DID NOT PAY HER SIDE OF THE JAMS ARBITRATION, AND JAMS TOLD ME FOR US TO PROCEED, I COULDN'T JUST GET A DEFAULT, I HAD TO NOW PAY HER PART AND THEN THAT WOULD BE TACKED ONTO ANY AWARD, AND THAT'S WHAT HAPPENED.  SO I HAD TO PAY BOTH SIDES.

Q    SO IS IT CORRECT THAT THE AWARD INCLUDED THE JAMS FEES?

A    UH-HUH.

Q    DID THE AWARD INCLUDE THE $20,000 WORTH OF YOUR TIME?

A    NO.

Q    AND THAT WAS PAID BY APOGEE?

A    WELL, NO.  NOBODY PAID IT BECAUSE THE TIME THAT I SPENT ON IT WAS JUST GOING TO GET BILLED TO WHOM? APOGEE?  WE DID STRUCTURE IT WITH PROFITS SO THAT THE FIRM WOULD THEN PAY ME FOR WORK THAT I WAS DOING ON BEHALF OF THE FIRM, SO I DIDN'T GET PAID.

Q    I THINK THE ECONOMIC TERM FOR THAT IS

OPPORTUNITY CLAUSE; IS THAT RIGHT?

A    SOMETHING LIKE THAT.

Q    OKAY.  YOU MENTIONED THE JAMS ARBITRATION. HOW LONG DID THAT TAKE?

A    FILED IN DECEMBER AND I THINK WE HAD A JUDGMENT -- I DON'T REMEMBER THE ACTUAL YEAR.

Q    I DON'T NEED THE DATE.  I JUST NEED TO KNOW HOW LONG.  THREE DAYS?

A    OH, THE HEARING ITSELF OR THE WHOLE THING?

Q    NO, THE FILING, THE ARBITRATION.

A    IT WAS EITHER SIX MONTHS OR 18 MONTHS.  I DON'T REMEMBER.

Q    OKAY.  AFTER YOU GOT THE JUDGMENT, YOU TOOK IT TO THE DISTRICT COURT TO BE CONFIRMED; IS THAT CORRECT?

A    I DID.

Q    AND HOW LONG DID IT TAKE TO GET THE DISTRICT COURT TO CONFIRM IT?

A    I THINK IT WAS SEVEN TO NINE MONTHS.

Q    AND I THINK YOU MENTIONED THAT YOU HAD HIRED CRAIG MC LAUGHLIN TO DO THAT?

A    YES.

Q    OKAY.  HOW MUCH DID IT COST APOGEE TO GET THE DISTRICT COURT SCHEDULING CONFIRMED?

A    THREE TO FIVE THOUSAND DOLLARS.  I DON'T REMEMBER THE EXACT AMOUNT, BUT I THINK IT'S ACTUALLY IN

THE ORDER.

Q    AFTER -- I'M SORRY.  NOT AFTER.  WHILE YOU WERE TALKING WITH MR. BALOGH AND WHILE YOU WERE WORKING ON THE JAMS ARBITRATION AND GETTING IT CONFIRMED BY THE DISTRICT COURT, WERE THERE ANY OTHER AVENUES OF COLLECTION THAT YOU WERE PURSUING?

A    YES.

Q    WHAT WAS THAT?  WHAT WERE YOU DOING?

A    I HAD REACHED OUT TO A LADY IN MARYLAND. HER NAME WAS LYNN PRIMO.  SHE WAS REPRESENTED TO ME BY ONE OF THE PROCESS SERVERS WHEN WE FILED THE INITIAL JAMS COMPLAINT THAT MS. PRIMO WAS A COLLECTIONS ATTORNEY, VERY GOOD REPUTATION IN THE MARYLAND AREA, SO I REACHED OUT TO HER RIGHT AFTER THE COMPLAINT WAS FILED AND THEN ONCE AGAIN ONCE WE HAD THE DISTRICT COURT ACTION -- SOMETIME DURING THE DISTRICT COURT ACTION BECAUSE I SAID TO HER THAT, OKAY, NOW WE'VE GOT THE JAMS AWARD AND NOW WE'RE IN DISTRICT COURT AND SHE SAID, YEAH, YOU GOT TO DO IT.  I SAID, YEAH, I KNOW.  WE'RE DOING THAT.  WE'RE WAITING ON JUDGMENT.  AS SOON AS WE HAVE IT, WE WANT TO GO AHEAD AND BEGIN COLLECTIONS.  I KNOW IT WAS BEFORE OCTOBER 7TH.

Q    I'M NOT INTERESTED IN DATES.  THAT'S OKAY.

A    OKAY.

Q    I'M GLAZING OVER AS I HEAR DATES.  THAT'S JUST WHO I AM.

WHAT DID MS. PRIMO SAY WITH RESPECT TO POTENTIAL COSTS THE FIRST TIME YOU SPOKE WITH HER WHILE THE ARBITRATION WAS GOING ON?

A      THREE TO $4,000 WOULD BE WHAT IT WOULD RUN TO DO THE COLLECTIONS AND THEN THAT WAS -- GOT A DIFFERENT NUMBER LATER.

Q      WAS THERE ANY CHANGE IN WHAT SHE QUOTED YOU OR ESTIMATED FOR YOU WHEN YOU SPOKE WITH HER THE SECOND TIME AFTER YOU HAD GOTTEN THE JUDGMENT?

A      WELL, AFTER I GOT THE JAMS AWARD, YES, BUT IT WAS BEFORE THE DISTRICT COURT JUDGMENT.  I BELIEVE IT WAS SOMEWHERE PROBABLY AROUND AUGUST OR EARLY SEPTEMBER I HAD TALKED WITH MS. PRIMO AGAIN, AND I LAID OUT THE ISSUES IN MORE DETAIL AND SHE SAID, OH, WOW.  THIS IS GOING TO BE COMPLEX.  AND I SAID GIVE ME AN IDEA OF HOW MUCH IT'S GOING TO COST AND SHE QUOTED ME $40,000.

Q      OKAY.  WHAT WAS YOUR REACTION WHEN SHE QUOTED $40,000?

A      WELL I HAD ALREADY PAID A TON OF MONEY FOR THE JAMS ARBITRATION.  I HAD ALREADY PAID A BUNCH FOR CRAIG TO GO AHEAD AND TRY TO GET THE AWARD CONFIRMED.  AND 40,000 WAS A LOT OF MONEY.  SO WHEN JASON BALOGH REACHED OUT TO ME AND SAID, YOU KNOW, WE'D LIKE TO GO AND ENFORCE THIS, OF COURSE THAT'S WHAT I SAID, WHY DON'T YOU GUYS GO. I PUT ENOUGH MONEY INTO IT.

Q      WE'LL TALK ABOUT THAT IN A MOMENT.  I JUST WANTED TO KNOW WHAT YOUR RESPONSE WAS.

LET ME ASK YOU THIS.  DID APOGEE HAVE $40,000 IN ITS OPERATING ACCOUNTS TO PURSUE THIS COLLECTION AT THAT POINT?

A      NO.

Q      IF MS. LI HADN'T CONVERTED THE $205,000, IF IT HAD BEEN SITTING IN THE CLIENT TRUST ACCOUNT AT APOGEE --

MS. LI:  OBJECTION.  MISCHARACTERIZES --

MR. TAUGER:  I HAVEN'T ASKED A QUESTION YET.

THE ARBITRATOR:  OVERRULED.

BY MR. TAUGER:   Q    IF MS. LI HADN'T MISAPPROPRIATED THE $205,000 AND INSTEAD IT WAS SITTING IN APOGEE'S OPERATING ACCOUNT OR CLIENT TRUST ACCOUNT, WOULD THAT HAVE CHANGED YOUR ASSESSMENT AS TO THE ADVISABILITY OF EMPLOYING SOMEONE LIKE MS. PRIMO AT 40,000 OR MORE TO ENFORCE THE JUDGMENT?

A      IN THE CLIENT TRUST ACCOUNT, NO, BECAUSE THAT'S NOT APOGEE FUNDS.

Q      WELL, WOULD YOU HAVE BEEN ABLE TO ACCESS THAT $205,000 BECAUSE THE DEBT THAT CATHY OWED WAS MORE THAN THAT?

A      WELL, OF COURSE, BUT THAT'S WHY IT WOULDN'T HAVE BEEN SITTING THERE.  IF THE FUNDS WERE IN THE

OPERATING ACCOUNT, WE WOULD HAVE MADE DISBURSEMENTS TO THE

PEOPLE THAT WERE OWED AND WHATEVER WAS LEFTOVER WOULD BE

USED TO HIRE MS. PRIMO.

Q       OKAY.  AND I THINK YOU -- PLEASE CORRECT ME

IF I'M MISCHARACTERIZING YOUR TESTIMONY.  THAT'S WHY YOU

WERE AT THAT POINT INTERESTED IN SPEAKING WITH JASON

BALOGH ABOUT ASSIGNING THE -- OR HAVING -- I'M SORRY,

ASSIGNMENT IS THE WRONG WORD.  YOU WERE DISCUSSING MS. LI

ENFORCING THE JUDGMENT HERSELF; IS THAT RIGHT?

A       CORRECT.  UP TO THAT POINT MS. LI HAD NOT

PAID ONE DIME TOWARDS COLLECTING THIS MATTER.  APOGEE HAD

AND I HAD THROUGH CAPITAL CONTRIBUTIONS TO THE FIRM.  SO I

WAS VERY EXCITED FOR HER TO TAKE OVER AT THIS POINT AND

START SPENDING HER OWN MONEY ON IT.

Q       OKAY.  BEFORE WE GET INTO THAT, I JUST WANT

TO ASK YOU ONE QUICK QUESTION.  DID I EVER HAVE A

RELATIONSHIP OF ANY KIND WITH APOGEE?

A       YES.

Q       WHAT WAS THAT RELATIONSHIP?

A       YOU WERE ONE OF THE 1099 ATTORNEYS AT

APOGEE.

Q       DID I EVER BRING IN ANY CLIENTS TO APOGEE?

A       YES.

Q       AND WHO IS RESPONSIBLE FOR MAKING SURE THAT

MY CLIENTS ARE TIMELY BILLED?

A    YOU WERE.

Q    WHO WAS RESPONSIBLE FOR MAKING SURE THAT THE INFORMATION REQUIRED TO BILL THEM WAS AVAILABLE?

A    YOU WERE.

Q    AND DID I DO THAT?

A    YES.

Q    OKAY.  DID ANYONE ELSE AT APOGEE EVER DECIDE -- IN FACT, LET ME BROADEN IT OUT.

HAVE YOU EVER HEARD OF ANY ATTORNEY IN A 1099 CONTRACT ATTORNEY RELATIONSHIP WHO DECIDED TO HAVE A CLIENT SEND THE MONEY TO THEM DIRECTLY RATHER THAN TO THE FIRM FOR WORK THAT THE FIRM PERFORMED?

A    NOT IN MY 33 YEARS.

Q    OKAY.  LET'S LOOK AT R-87.

MS. LI:  CAN YOU REPEAT THE NUMBER, PLEASE.

MR. TAUGER:  YES, IT'S R-087.

MS. LI:  OKAY.

BY MR. TAUGER:    Q    THERE'S A LOT OF ALLEGATIONS GOING BACK AND FORTH IN THIS LETTER.  DO YOU AGREE WITH MR. BALOGH'S LEGAL INTERPRETATION?

A    WHICH ONE?

Q    ANY OF THEM.  HE TALKS ABOUT CALIFORNIA LABOR CODE, HE TALKS ABOUT FEE SPLITTING.  HE TALKS ABOUT A LOT OF THINGS.

YOU KNOW WHAT, I'LL WITHDRAW THAT.

A       I HAVE A WRITTEN RESPONSE SO THAT'S MY ANSWER.

Q       ALL RIGHT.  THAT'S GOOD.

AMONG -- I'M SORRY.  WITHDRAW THAT.

WHAT I'M LOOKING FOR IS -- HERE WE GO. BOTTOM OF 436.

MS. LI:  436?

MR. TAUGER:  436 IN THAT EXHIBIT.

MS. LI:  I'M SORRY.  PAGE 436, CORRECT?

MR. TAUGER:  PAGE 436 IN EXHIBIT 87.

MS. LI:  OKAY.

BY MR. TAUGER:   Q   DO YOU SEE HE OFFERS AN ALTERNATIVE AND HE THINKS THAT MS. LI WILL EITHER ACCEPT IMMEDIATE PAYMENT OF $281,780 OWED TO HER.

BY THE WAY, IN YOUR PROFESSIONAL OPINION AND ON BEHALF OF APOGEE, HOW MUCH DID APOGEE OWE MS. LI AT THE POINT OF THIS LETTER?

A       I HAVE NO IDEA.

Q       HOW MUCH MONEY DID YOU -- DID APOGEE OWE HER AT THAT POINT?

A       I DON'T KNOW.  I DON'T KNOW IF THIS NUMBER IS CORRECT.  THIS IS HIS NUMBER.

Q       OKAY.  LET ME REPHRASE THE QUESTION AND LET'S GO BACK TO -- YOU DON'T HAVE TO LOOK AT THE EXHIBIT, BUT WE'RE TALKING ABOUT THE MEANING OF COLLECTED FUNDS IN

RESPONDENT'S 1, YOU DON'T HAVE TO LOOK AT IT, WHEN DOES THE OBLIGATION TO PAY A 1099 CONTRACT ATTORNEY LIKE MS. LI OR LIKE MYSELF ACCRUE?

A      ONCE THE FUNDS ARRIVE FROM THE CLIENT, THEN THOSE FUNDS ARE DISBURSED TO THE ATTORNEYS.

Q      OTHER THAN THE MONEY THAT HAD ALREADY BEEN -- WITHDRAW THAT.

THE MONEY THAT WAS IN THE JAMS ARBITRATION, HAD ANY OF THAT MONEY ARRIVED FROM CATHY TRADING?

A      NO.

Q      SO HOW MUCH DID APOGEE OWE MS. LI BASED ON THE JUDGMENT AWARD?

A      ZERO.

Q      THANK YOU.

THE ALTERNATIVE THAT'S OFFERED IS HE SAYS YOUR CONFIRMATION ALLOWING US TO TAKE OVER THE COLLECTION EFFORTS.  DO YOU SEE THAT?

A      NO.

Q      THAT'S THE BOTTOM PARAGRAPH ON 436, AND IT'S THE SECOND PHRASE -- THE SECOND CONDITION AFTER THE DEMAND THAT YOU PAY 281,780 TO HER.

A      OKAY.

Q      SO YOU SEE WHERE IT SAYS WHERE YOUR CONFIRMATION ALLOWING US TO TAKE OVER THE COLLECTION EFFORTS?

A    YES.

Q    OKAY.  WHAT DID YOU THINK ABOUT THAT?

A    IT WAS A JOKE.

Q    WELL, WHAT ABOUT ALLOWING HER TO TAKE OVER THE COLLECTION EFFORTS?

A    THAT WAS A JOKE.

Q    WHY WAS IT A JOKE?

A    BECAUSE SHE WAS A THIEF.  I DIDN'T TRUST HER.  I KNEW THAT IF WE ASSIGNED WITHOUT ANY INSTRUCTIONS THE JUDGMENT AWARD TO HER FOR COLLECTIONS, WE'D NEVER SEE A DIME NOR WOULD HILL WALLACK SEE A DIME.

Q    TAKE A LOOK AT RESPONDENT'S 88.  AND WHAT IS RESPONDENT'S 88?

A    THAT WAS MY EMAIL RESPONSE BACK TO JASON.

Q    OKAY.  IF YOU LOOK AT THE BOTTOM PARAGRAPH, WHAT DOES THAT DISCUSS?

A    A FRIVOLOUS CLAIM AGAINST APOGEE?

Q    NO.  BOTTOM PARAGRAPH -- I'M SORRY, ON 439, THE NEXT PAGE.

A    OH.  BOTTOM PARAGRAPH OF MY RESPONSE OR THE BOTTOM PARAGRAPH OF THE PAGE?

Q    BOTTOM PARAGRAPH OF YOUR RESPONSE TO MR. BALOGH WHICH IS ON PAGE 439.

MS. LI:  SORRY.  CAN I CLARIFY YOU ARE LOOKING AT 88?

MR. TAUGER:  I'M LOOKING AT 88, AND I'M LOOKING AT PAGE 439.  IT'S THE TOP OF 439.  IT'S THE REST OF MR. HART'S RESPONSE TO MR. BALOGH.

MS. LI:  OKAY.

BY MR. TAUGER:   Q   WHAT DOES THAT PARAGRAPH DISCUSS?

A    IT WAS MY COMMENT BACK TO MR. BALOGH.  SINCE THEY WERE SO INTERESTED IN A FIGHT, I WOULD OFFER UP A COMPROMISE SO THAT MS. LI -- LET'S SEE.  IT SAYS I WILL OFFER UP A COMPROMISE.  SINCE YOU'RE NOW LEADING THE CHARGE TO BATTLE ON HOLLY'S BEHALF AND, OH, SO EAGER FOR A FIGHT, WE WILL LET YOU TAKE OVER COLLECTION EFFORTS, SEE THE LAWSUIT FILED IN THE DISTRICT COURT IN LOS ANGELES, PROVIDED THAT ANY FUNDS RECEIVED FROM CATHY TRADING ARE DIRECTED TO A MUTUALLY AGREED NEUTRAL THIRD-PARTY TRUST ACCOUNT FOR DISBURSEMENTS, LEFT PAREN, BASED UPON HOLLY'S PREVIOUS MISAPPROPRIATION SHE CAN'T BE TRUSTED, RIGHT PAREN, AND NUMBER TWO, BOTH APOGEE AND HILL WALLACK HAS APPROVED -- WILL HAVE APPROVAL ON ANY SETTLEMENT OFFERS FOR LESS THAN THE FULL AMOUNT OF THE JAMS AWARD WHICH IS WHAT WE WOULD DO WITH HOLLY AS WELL AS IF WE CONTINUE THE FIGHT AND GET A SETTLEMENT.

BECAUSE THAT'S WHAT I SAID EARLIER.  WHAT'S THE AWARD WORTH?  IT'S WORTH ZERO BECAUSE I HAVE TO GO TO EACH OF THE PARTIES AND SAY IF I SELL THIS AWARD OR GET A

PARTIAL COLLECTION, I NEED TO GET THEIR APPROVAL THAT THEY

AGREE TO IT.  DOES HOLLY AGREE?  DOES HILL WALLACK?  DO I

AGREE AND DOES APOGEE AGREE.  THERE'S FOUR PARTIES

INVOLVED.

Q    TAKE A LOOK AT R-89.

A    OKAY.

Q    WHAT IS THIS EMAIL?

A    THIS WAS JASON'S RESPONSE TO MY SEPTEMBER

16TH EMAIL.

Q    AND IN IT DOES HE AGREE TO YOUR PROPOSAL

THAT WAS STATED IN THE EXHIBIT WE JUST LOOKED AT?

A    YEAH.  HE SAID WE AGREE TO TAKE OVER YOUR

COLLECTION EFFORTS.  AND HE FURTHER SAYS I UNDERSTAND YOU

DO NOT WANT TO USE HOLLY'S TRUST ACCOUNT.  WE CAN USE MY

OFFICE TRUST ACCOUNT.  IS THAT ACCEPTABLE?  IT'S LIKE,

YEAH, YOU KNOW.

Q    AND DID YOU COMMUNICATE THAT WAS ACCEPTABLE

TO MR. BALOGH?

A    YEAH.

Q    OKAY.  MS. LI HAS CLAIMED IN HER -- BOTH HER

EXAMINATION OF YOU AND HER TESTIMONY THIS MORNING THAT

THERE WAS NO FURTHER COMMUNICATION FROM YOU TO MR. BALOGH

AFTER THIS EMAIL; IS THAT CORRECT?

A    THAT'S INCORRECT.

Q    OKAY.  WHAT HAPPENED?

A    WE CONTINUED TO TALK.

Q    HOW DID --

MS. LI:  OBJECTION.  MISCHARACTERIZATION.  I'M SPEAKING NOW AS AN ATTORNEY TO MYSELF.  YOU ARE MISCHARACTERIZING AND, IN FACT, MISSTATE THE WITNESS TESTIMONY.  SHE WAS NOT REFERRING TO THIS EMAIL.  SHE WAS REFERRING TO ANOTHER EMAIL.

THE ARBITRATOR:  OKAY.

MR. TAUGER:  I DON'T CARE WHICH EMAIL.  THE QUESTION WAS DID YOU CONTINUE TO COMMUNICATE WITH MR. BALOGH AFTER OCTOBER OF 2019?

A    YES.

Q    OKAY.  AND HOW DID THAT -- WHAT FORM DID THAT COMMUNICATION TAKE?

A    WE HAD A NUMBER OF CALLS AND THERE MAY HAVE EVEN BEEN EMAILS, BUT I DO KNOW THAT MY LAST CONVERSATION WITH MR. BALOGH WAS IN -- IT WAS BEFORE CHRISTMAS OF DECEMBER 2020 AND I SAID TO MR. BALOGH, YOU KNOW, WHAT'S THE -- WHERE ARE WE?  WHERE IS THE STATUS?  WE'VE BEEN TALKING FOR OVER A YEAR ON THIS.  AND HE SAID I'M STILL WAITING TO HEAR BACK FROM HOLLY.  I SAID, IT'S NOT THAT HARD TO UNDERSTAND.  WE DON'T TRUST HER.  SHE DOESN'T TRUST US.  WE'RE OKAY WITH YOU TAKING OVER AND THE MONEY COMING INTO YOUR CLIENT TRUST ACCOUNT, AND YOU ARE RESPONSIBLE FOR MAKING THE DISBURSEMENTS.

MS. LI:  OBJECTION.  IT'S ALL HEARSAY, BUT CONTINUE, PLEASE.

THE ARBITRATOR:  OVERRULED.

THE WITNESS:  THAT WAS MY TESTIMONY.  I MEAN, THAT WAS MY STATEMENTS.

MS. LI:  YOU ARE TELLING THE COURT --

THE ARBITRATOR:  OVERRULED, MS LI.

MS. LI:  -- WHAT YOU SAID, HE SAID, WHO SAID.

THE ARBITRATOR:  LET'S MOVE ON.

MS. LI:  OKAY.

THE WITNESS:  AND SO THE WAY WE LEFT IT I SAID, WHEN YOU HEAR BACK FROM MS. LI, LET US KNOW.  SOMETIMES THERE WAS A MONTH OR TWO THAT WENT BY WITHOUT US HAVING A CONVERSATION.  THE NEXT THING THAT HAPPENED AFTER THAT WAS THE JAMS COMPLAINT FOR THIS CASE.

BY MR. TAUGER:    Q    THAT WAS THE --

A     THAT WAS THE RESPONSE.

**Q     WAS THAT THE RESPONSE YOU HAD FROM MR. BALOGH?**

A     IN MY LAST CONVERSATION.

MR. TAUGER:  I HAVE NO FURTHER QUESTIONS.

THE ARBITRATOR:  OKAY.  GREAT.

SO YOU HAVE 36 MINUTES REMAINING, MR. TAUGER.  IT IS NOW 5:13 P.M.

MS. LI, ARE YOU PREPARED TO DIVE RIGHT INTO

YOUR REDIRECT?

MS. LI:  YOUR HONOR, I'M NEVER FULLY PREPARED, BUT IF I MAY HAVE THE CHANCE TO DO IT NOW, I MAY AS WELL DO IT.

MR. TAUGER:  I'M OKAY IF SHE'D LIKE A SHORT BREAK BECAUSE I NEED A CUP OF COFFEE BADLY.

MS. LI:  I DON'T NEED A SHORT BREAK, BUT IF YOU DO NEED ONE, I CAN ACCOMMODATE.

MR. TAUGER:  FIVE MINUTES.

THE ARBITRATOR:  LET'S TAKE A FIVE-MINUTE BREAK THEN.  SO WE'LL RECONVENE AT, LET'S SAY, 5:20 P.M. CALIFORNIA TIME.  WE'RE OFF THE RECORD.

(RECESS TAKEN FROM 5:14-5:18 PM)

THE ARBITRATOR:  LET'S GET BACK ON THE RECORD. IT'S NOW 5:18 P.M.

MS. LI, YOU HAVE 20 MINUTES, AND YOU MAY BEGIN.

MS. LI:  YES.

REDIRECT EXAMINATION

BY MS. LI:    Q    SO MR. HART, YOU TESTIFIED THAT YOU WERE WILLING TO ASSIGN OR RATHER GIVING THE RIGHT TO ENFORCE THE MONEY JUDGMENT TO MR. BALOGH AT ONE POINT. SINCE TAUGER HAS AN ISSUE WITH THE DATE, I WOULD RATHER JUST PUT A ROUGHLY TIMEFRAME THAT WAS END OF 2020; CORRECT?

A      WRONG.

Q      **SORRY, WHAT DID YOU SAY?**

A      NO.  WRONG.

Q      **SO YOU DID NOT WANT TO ASSIGN OR TRANSFER THE RIGHTS TO ENFORCE THAT JUDGMENT TO MR. JASON BALOGH; CORRECT?**

A      WRONG.

MR. TAUGER:  OBJECTION.  MISCHARACTERIZES THE TESTIMONY.

THE ARBITRATOR:  SUSTAINED.

THE WITNESS:  WRONG.

BY MS. LI:    Q    WHAT IS RIGHT THEN?

A      WHAT IS RIGHT IS STARTING IN SEPTEMBER --

Q      **NO NEED FOR A LONG ANSWER BECAUSE I ONLY HAVE 20 MINUTES.**

**YOU ANSWERED MY QUESTION -- I SAID YOU DID NOT WANT TO ASSIGN THE RIGHTS TO ENFORCE.**

MR. TAUGER:  OBJECTION.  MISCHARACTERIZES THE TESTIMONY, ARGUMENTATIVE, AND YOU'RE BADGERING THE WITNESS.

MS. LI:  YOU DID --

THE WITNESS:  CAN YOU STOP THE CLOCK?

MS. LI:  YOU DID AGREE TO TRANSFER TO MR. BALOGH.

THE ARBITRATOR:  MS. LI, LET'S TALK FOR A SECOND. MR. HART IS ASKING TO STOP THE CLOCK.

MS. LI:  OH, STOP THE CLOCK.

THE ARBITRATOR:  HOLD ON.

THE WITNESS:  I KNOW I JUST SAW IT.  IT WAS AN EMAIL WHERE I SAID THAT -- OH, HERE IT IS.  FROM OCTOBER 7TH --  ARE WE ON THE RECORD?

MR. TAUGER:  WHAT DOCUMENT ARE YOU LOOKING AT?

THE WITNESS:  I'M LOOK LOOKING AT R-089.

FROM OCTOBER 7, 2019, UNTIL TODAY, WELL, ACTUALLY IT WAS PROBABLY WE ENDED IT AFTER THE JAMS ARBITRATION, I HAD BEEN WILLING TO ASSIGN THIS JUDGMENT OVER TO MS. LI FOR ENFORCEMENT WITH SOME CONDITIONS.  SO WE'LL CALL IT FROM OCTOBER 7, 2019, UNTIL MARCH OF 2021, THAT OFFER WAS ON THE TABLE AND STAYED ON THE TABLE.

NOW, IF YOU'RE TALKING ABOUT AN OUTRIGHT ASSIGNMENT WITH NO CONDITIONS, NO, I WAS NOT WILLING TO DO THAT.  BUT IF IT HAD CONDITIONS SUCH AS USING JASON BALOGH'S TRUST ACCOUNT AND HE WAS GOING TO MAKE THE DISBURSEMENTS, THAT WAS NOT A PROBLEM.  AND THAT STAYED ON THE TABLE UP UNTIL THIS ARBITRATION.

BY MS. LI:   Q   SO YOU TESTIFIED, AGAIN, YOU WERE WILLING TO ASSIGN THAT JUDGMENT.  LET'S SKIP THE PART THAT YOU HAVE HATRED AGAINST ME OR WHATEVER ALLEGATIONS WERE FORWARD, BUT IF IT'S JASON BALOGH OR OTHER EQUIVALENT THIRD PARTY YOU TRUSTED ACCOUNT, YOU WERE WILLING TO; CORRECT?

A CORRECT. FROM OCTOBER 7TH UNTIL THE ARBITRATION.

Q I UNDERSTAND UNTIL THIS ARBITRATION. SO THROUGHOUT THIS ARBITRATION PROCEEDING YOU WERE NOT WILLING TO ASSIGN THAT JUDGMENT; CORRECT?

A THAT'S NOT TRUE. I THINK THAT JASON WAS STILL REPRESENTING YOU IN DECEMBER OF LAST YEAR. I'M TALKING ABOUT DECEMBER OF 2021. AND I THINK MR. TAUGER PUT A SETTLEMENT OFFER ON THE TABLE FOR HIM AT THAT POINT IN TIME. SOMEWHERE DECEMBER TO JANUARY OF 2022 I KNOW THERE WAS A SETTLEMENT OFFER OFFERED UP TO YOU TO TAKE OVER, ONCE AGAIN ON PRETTY MUCH THE SAME TERMS, AND AROUND THAT TIME YOU EITHER DIDN'T GET BACK TO HIM OR --

Q I MUST INTERRUPT BECAUSE IT'S MY EXAMINATION. SO THANK YOU FOR THE LENGTHY ANSWER, BUT I NEVER WAS INFORMED ABOUT ANY SETTLEMENT OFFER.

SECONDLY -- SECONDLY, WHEN WAS APOGEE BECOME UNSUSPENDED AT FTB?

MR. TAUGER: OBJECTION. RELEVANCE.

MS. LI: SORRY. THIS IS A LEADING QUESTION. LET ME PUT IT THIS WAY.

Q APOGEE WAS NOT ACTIVE REVIVED UNTIL FEBRUARY -- LATE -- END OF JANUARY 2023.

THE ARBITRATOR: MS. LI, I THINK WE'VE ALREADY GONE OVER THE SUSPENSION STATUS ISSUE.

MS. LI:  CORRECT.

AND MR. HART, YOU KNEW THAT APOGEE WOULD NOT BE ABLE TO ASSIGN OR TRANSFER ANY JUDGMENT OR ANY ASSET WHILE IT'S IN SUSPENSION; CORRECT?

A    THAT'S NOT TRUE.  WE COULD HAVE SIGNED THE JUDGMENT DURING THAT TIME THE COMPANY WAS SUSPENDED.

Q    **YOUR COUNSEL, MR. TAUGER, HAD AGREED DURING THE PROCEEDING THAT A SUSPENDED CORPORATION CANNOT ASSIGN A FEE.**

MR. TAUGER:  YOUR HONOR, WE SHOULDN'T BE ARGUING LAW.  THIS IS FACT FINDING.

THE WITNESS:  I THINK THAT'S WRONG.  IF THAT'S WHAT HAPPENED, I DON'T KNOW --

MR. TAUGER:  I DIDN'T ARGUE THAT.

THE ARBITRATOR:  MS. LI, IF THERE'S SOME KIND OF CORRESPONDENCE FROM MR. TAUGER THAT YOU'RE REFERRING TO, PLEASE SHARE IT WITH US.  OTHERWISE THIS IS SOUNDING A LOT LIKE ARGUMENT.

MS. LI:  YES, I WILL MOVE ON.

Q    **SO CAN I JUST DO LAST QUESTION THAT -- IS IT CORRECT TO SAY THAT STARTING FROM THIS ARBITRATION PROCEEDING THAT APOGEE OR ITS PRINCIPALS ARE NOT WILLING TO ASSIGN THE JUDGMENT?**

A    TODAY?

Q    **STARTING FROM THE ARBITRATION UNTIL NOW,**

YES, AS OF SPEAKING RIGHT NOW.

A       I JUST TESTIFIED THAT'S NOT TRUE.

Q       I'M ASKING APOGEE IS NOT WILLING TO ASSIGN, CORRECT OR NOT?

A       THAT'S UNTRUE, HOLLY.  YOU GOT TO LISTEN TO MY ANSWER.

Q       SO APOGEE IS WILLING TO ASSIGN?

A       NOT TODAY, BUT WE WERE LAST DECEMBER AND JANUARY WHEN WE TALKED SETTLEMENT.

Q       I SAID -- OKAY.  LET'S JUST TALK ABOUT TODAY.  IS APOGEE WILLING TO ASSIGN THE JUDGMENT OR NOT?

A       NO.

Q       OKAY.  NOW, MOVING ONTO EXHIBIT R-86.  IF I MAY, I'D LIKE TO CALL YOUR ATTENTION TO USE YOUR EXHIBIT R-86.  THIS IS THE EXHIBIT SHOWING THE DISTRIBUTION AMONG THE PARTIES.  I'M SORRY.  WITHDRAW THE WORD PARTIES.  BUT AMONG HYL, APOGEE, AND LOCAL COUNSELS.  BEAR IN MIND WE HAD GONE THROUGH THIS EXHIBIT BECAUSE IT WAS ALSO PRODUCED IN MY EXHIBIT.  I BELIEVE IT'S UNDER C-001 ON SECOND PAGE. NOW, UNDER THIS IT SAYS AMOUNT DUE TO HOLLY 280,000 PLUS 80 CHANGE.

NOW LET'S GO BACK TO EXHIBIT R-93.  ON THIS EXHIBIT IT READS HOLLY 165,685.  25 PAY NOW OR 40 PAY OUT OF COLLECTION.  JASON D-I-F-F, DOT, IN JUDGMENT.  I ASSUME THIS MEANS DIFFERENCE IN JUDGMENT OR SOMEHOW.  $134,083

PLUS CHANGE.

THERE IS A DISCREPANCY OF ROUGHLY $120,000;

CORRECT?

MR. TAUGER:  OBJECTION.

THE WITNESS:  I DON'T HAVE THE DOCUMENT IN FRONT OF ME, BUT I HAVE SEEN THAT.

MS. LI:  OH, I SHALL SHARE.  I THOUGHT MR. TAUGER SHARED WITH YOU BECAUSE IT'S YOUR EXHIBIT.  THAT'S WHY I USED YOUR EXHIBIT.

THE WITNESS:  AS I SAID, MY SOON-TO-BE TERMINATED PARALEGAL SCREWED UP THE NOTEBOOK, AND THERE'S EXHIBITS MISSING.

MS. LI:  MR. ARBITRATOR, DO YOU HAVE THE DOCUMENTS IN FRONT OF YOU?

THE ARBITRATOR:  I DO HAVE THE DOCUMENT IN FRONT OF ME.  I THINK IT WOULD BE HELPFUL FOR MR. HART TO BE ABLE TO FOLLOW ALONG, THOUGH, AND --

MS. LI:  OKAY.  I'M GOING TO TRY --

THE ARBITRATOR:  I'LL JUST STOP YOUR TIME FOR A MINUTE, MS. LI, AND WHAT I'D ASK IS, YOU KNOW, YOU'RE POINTING TO A LOT OF NUMBERS AND NAMES AND IT'S REALLY UNCLEAR TO ME HOW I'M SUPPOSED TO BE READING THIS, YOU KNOW, WHAT THESE NUMBERS MEAN.  SO MAYBE YOU CAN ASK THE WITNESS TO WALK ME THROUGH THAT.

MS. LI:  BECAUSE I DID NOT HAVE A CHANCE TO

DOWNLOAD ALL THE EXHIBITS FROM THE OPPOSING SIDE, IT'S

ACTUALLY ON MY GOOGLE DRIVE.  I WILL ATTEMPT TO SHARE, BUT

I'M NOT SURE I CAN SHARE, BUT MS. POTTER SHOULD HAVE GIVEN

MS. PARK A COPY OF IT.

       MR. TAUGER:  LET ME PRINT IT OUT.

       THE ARBITRATOR:  IT'S ONE OF YOUR EXHIBITS, SO YOU

GUYS SHOULD HAVE IT, RIGHT?

       MS. LI:  YEAH.  BUT EVEN WITHOUT EXHIBIT, THIS IS

ONLY ASSISTANT OF MY -- MY POINT IS THAT I'D LIKE TO NOW

SHARE MY SCREEN FOR A PRIOR DOCUMENT THAT I --

       MR. TAUGER:  HE'S GOT IT, HOLLY.  MS. LI.  YOU CAN

ASK HIM ABOUT IT.

       THE WITNESS:  I'M FAMILIAR WITH THIS DOCUMENT.

       BY MS. LI:    Q    YES.

       A    WHAT'S YOUR QUESTION?

       **Q    SO YES, THERE IS A DISCREPANCY; CORRECT?**

       A    THERE'S AN ERROR IN IT.

       **Q    THE ERROR MADE --**

       A    I DON'T THINK YOU'RE ENTITLED TO $165,085.20

I BELIEVE THAT NUMBER IS IN ERROR.  BUT I HAVEN'T LOOKED

AT THIS DOCUMENT IN A LONG TIME, SO I'D LIKE TO ACTUALLY

GO BACK AND LOOK AT THIS DOCUMENT BECAUSE I THINK THIS

DOCUMENT WAS SENT TO YOUR FORMER COUNSEL, MR. BALOGH, AND

AS YOU CAN SEE, THERE'S AN INTEREST AND DEFAULT -- DEFAULT

JUDGMENT $402,000 FROM JAMS AND THERE'S INTEREST AND

THERE'S COSTS AND I'D HAVE TO GO BACK AND TAKE A LOOK AT

THE NUMBERS.  I DON'T HAVE A LOT OF CONFIDENCE, AND THESE

ARE THE NUMBERS ON PAGE 456.  I DON'T KNOW WHAT EXHIBIT

THAT IS.  BUT --

          MR. TAUGER:  IT'S EXHIBIT 93.

          THE WITNESS:  OKAY.

          MR. TAUGER:  YEAH.

          THE WITNESS:  OKAY.  I HAVE TO TAKE A LOOK AT THE

EXACT NUMBER.  EXHIBIT 93 DID YOU SAY?

          MR. TAUGER:  YEAH.

          THE WITNESS:  SO EXHIBIT 93, PAGE 456, I DON'T

BELIEVE THE 165 NUMBER IS ACCURATE, BUT ONCE AGAIN, I'D

HAVE TO GO BACK THROUGH AND LOOK AT THESE NUMBERS CLOSELY.

AND IT'S BEEN AT LEAST A YEAR, IF NOT LONGER, MAYBE TWO

YEARS, SINCE I ACTUALLY SAW THIS DOCUMENT.  SO I JUST

DON'T THINK THE DOCUMENT --

     BY MS. LI:    Q    OKAY.  THANK YOU.  THAT'S

ENOUGH.  YOU'RE WELCOME TO GO BACK AND CHECK.

               HOWEVER, I'D LIKE TO REVERIFY YOUR EXHIBIT

86.  WAS THAT NUMBER MORE ACCURATE OR NOT ACTUALLY --

STRIKE THE WORD MORE.  IS THAT NUMBER ACCURATE?

     A     I DON'T KNOW.  I HAVEN'T LOOKED AT THIS

NUMBER SINCE THE DISTRICT COURT.

     Q     MR. TAUGER CAN POINT OUT THAT NUMBER WAS

280,000 PLUS CHANGE.

MR. TAUGER:  I'M NOT GOING TO POINT OUT ANYTHING.

THE WITNESS:  I HAVE IT HERE IN FRONT OF ME.  I DON'T --

BY MS. LI:    Q    IT'S AMOUNT DUE TO HOLLY, HYL.  IS THIS NUMBER ACCURATE?

A    I DON'T KNOW.  I HAVEN'T LOOKED AT THESE NUMBERS IN QUITE SOME TIME.  I'M PRETTY SURE THAT THE 165 NUMBER IN EXHIBIT 93 IS NOT ACCURATE.  BUT ONCE AGAIN, I HAVE TO GO BACK AND LOOK THROUGH ALL OF THE NUMBERS AND SEE, YOU KNOW, WHAT -- IT'S HELPFUL TO HAVE THE SPREADSHEET AND ACTUALLY GO THROUGH THE NUMBERS AND THE FORMULAS TO MAKE SURE IT'S ACCURATE.

Q    OKAY.  LET'S MOVE ON.  LET'S MOVE ON.  I WANT TO LOOK INTO THE RECORD, AND YOU WILL VERIFY AND EXPLAIN WHY THERE'S $120,000 DISCREPANCY.

AND ALSO I WOULD LIKE TO GO BACK.  YOU TESTIFIED THAT YOUR LAST CONVERSATION WITH MR. BALOGH WAS SOME POINT AT LATE OCTOBER -- LATE 2020.  AND TO YOUR RECOLLECTION YOU SAID THE DECEMBER BILL, BUT LET ME REMIND YOU I HAVE THE LAST COMMUNICATION BETWEEN MY LAWYER AND YOU THAT WAS IN OCTOBER.  THE REASON WHY IS BECAUSE NOW I HAVE TO TAKE -- THE REASON WHY IS BECAUSE THE LAST PIECE OF COMMUNICATION BETWEEN YOU AND MR. BALOGH WAS ON OCTOBER 21ST, AND I SHARE MY SCREEN.  IT'S SHOWING ON C- --

MR. TAUGER:  OBJECTION.  IS THERE A QUESTION SOMEWHERE IN THIS?

MS. LI:  -- 19.

THE ARBITRATOR:  MS. LI, WHERE ARE YOU HEADED WITH THIS LINE OF INQUIRY?

MS. LI:  I'M JUST TRYING TO POINT OUT THE LAST COMMUNICATION WAS INDEED IN 2020.  THAT MR. HART STOPPED COMMUNICATING WHEN MR. BALOGH, MY LAWYER, DEMANDED AN EXPLANATION TO THE 120,000 DISCREPANCY.

MR. TAUGER:  OBJECTION.  NOT ONLY DOES IT MISCHARACTERIZE THE TESTIMONY.  MR. HART DIRECTLY CONTRADICTED WHAT YOU ARE ASSERTING NOW.

THE WITNESS:  AND I SAID IT WAS A TELEPHONE CALL.

THE ARBITRATOR:  YEAH.  SO MS. LI, I THINK YOU SHOULD MOVE ON.  YOU HAVE SEVEN MINUTES OR SO LEFT.

MS. LI:  OKAY.  I'LL STOP SHARING THE SCREEN. HERE IS WHAT MR. BALOGH SAID.  BUT I'LL STOP SHARING.

MOVING ON TO EXHIBIT -- WELL, WE'RE NOT MOVING ON TO ANY EXHIBITS SINCE I DON'T HAVE ENOUGH TIME.

MR. HART, YOU WROTE TO ME IN 20 -- THIS IS SHOWING MY EXHIBIT 6, C-6.  YOU WROTE TO ME THAT THEN YOU AND I CAN WORK OUT WITH MS. CHEN HOW SHE CAN PAY YOUR COMPENSATION DIRECTLY AND SHE CAN SEPARATELY PAY APOGEE AND MY COMPENSATION DIRECTLY FOR APOGEE; ISN'T IT CORRECT?

A    I DON'T KNOW WHAT EXHIBIT WE'RE LOOKING AT.

I'D LIKE TO SEE IT.

MR. TAUGER:  IT'S EXHIBIT 6.

THE WITNESS:  BUT I DON'T HAVE EXHIBIT 6.

MS. LI:  I WILL SHOW YOU NOW.  I WILL SHOW YOU.
MY EXHIBIT 6.

DO YOU ALSO SEE THAT WITH RESPECT TO SEVERAL
SERIAL NUMBERS OF APPLICATIONS APOGEE WISHES TO WITHDRAW
AND YOU PREVIOUSLY TESTIFIED THAT THERE WAS ONLY ONE
CLIENT THAT I TRANSFERRED TO APOGEE.  THERE WERE SEVERAL
SERIAL NUMBERS THAT APOGEE IS UNABLE TO HEAR, UNABLE TO
WITHDRAW -- OR WITHDRAW FROM THE REPRESENTATION; IS THAT
CORRECT?

A     YES.  HOLLY, YOU HAVE TO REMEMBER YOU WERE
SUCH A DISAGREEABLE PERSON, THAT I LIKE TO BLOCK THINGS
OUT OF MY DEALINGS WITH YOU, SO IF I WAS OFF BY ONE OR
TWO, SO BE IT.  I ADMIT IT, OKAY?

Q     I'M SORRY.  ON THIS DOCUMENT DIDN'T YOU SAY
THAT WE CAN GO EACH OUR WAYS AND I ALSO WILL REMIND YOU
DIDN'T YOU SAY THIS BEFORE I TOLD YUN CHEN TO PAY ME AND
SEPARATELY FROM APOGEE ONLY FROM MY OWN FEES?

AND NEXT QUESTION IS IN C-6 ALSO STATE HERE
DIDN'T YOU SAY, HOWEVER, SUFFICE IT TO SAY, I DO HAVE
AUTHORITY TO SIGN CHECK ON THE CLIENT PLUS ACCOUNT AND AS
WELL AS THE OPERATION ACCOUNT MEANING AT APOGEE WHEN I
POSE THE QUESTION, WAS THAT CORRECT?

A    I ALREADY TESTIFIED THAT I HAD SIGNATORY AUTHORITY ON THE BANK ACCOUNTS.

Q    AND YOU ALSO TESTIFIED THAT YOU HAD GOOD CONVERSATIONS WITH MS. CHEN; CORRECT?

A    YEAH.

Q    DID SHE SPEAK ENGLISH VERY WELL IN YOUR UNDERSTANDING OF HER ENGLISH?

A    HER ENGLISH WAS ROUGH, BUT IT WAS -- I COULD COMMUNICATE WITH HER.  IT WASN'T BAD.

Q    OKAY.  WOULD IT BE SUFFICE TO SAY THAT YOU COULD HAVE NEGOTIATED A SETTLEMENT AGREEMENT WITH HER ON PAYMENT REDUCE AMOUNT OF SETTLEMENT OUT OF THAT MONETARY JUDGMENT?

A    AS I SAID, TO ACCEPT AN AMOUNT THAT WAS LESS THAN WHAT WE WENT FOR, WOULD HAVE REQUIRED YOUR APPROVAL, THE WALLACK'S APPROVAL, MY APPROVAL, AND APOGEE'S APPROVAL.

Q    AND DID YOU REACH OUT TO ANY ONE OF THESE PARTIES FOR APPROVAL, YOU DIDN'T; CORRECT?

A    NO, BECAUSE I WAS TRYING TO GET THE FULL AMOUNT.  THAT'S WHAT YOU WOULD WANT.  THAT'S WHAT HILL WALLACK WANTED AND THAT'S WHAT I WANTED.

Q    I NEVER RECEIVED ANY QUESTIONS IN TERMS OF SETTLEMENT WITH YUN CHEN OR CTC THAT WAS NOT BEING PROPOSED; CORRECT?

A    BECAUSE WE NEVER GOT TO THAT POINT.  I WAS TRYING TO GET HER TO PAY THE FULL AMOUNT.

**Q    BUT YOU EARLY ON TESTIFIED YOU DID NOT WISH TO PUT FORWARD THE ENFORCEMENT EFFORT BECAUSE THE ATTORNEY YOU CONTACTED IN MARYLAND COST 30 OR $40,000.**

MR. TAUGER:  OBJECTION.  MISCHARACTERIZES THE TESTIMONY.

THE WITNESS:  I DON'T THINK I TESTIFIED TO THAT.

BY MS. LI:    Q    I SPEAK -- I HAVE NOTES HERE. YOU SAID LYNN PRIMO QUOTED U.S. DOLLAR 40,000 AFTER YOU OBTAINED THE JUDGMENT FROM THE CALIFORNIA COURT.

A    THAT'S NOT WHAT I SAID.

**Q    BUT IN ANY CASE, YOU HAVE NOT PAID -- YOU HAVE NOT PAID THE CHEAPER CHOICE WHICH IS JASON BALOGH WHO OFFERED A CONTINGENCY SERVICE TO ENFORCE THE JUDGMENT ON BEHALF OF APOGEE, HILL WALLACK, HOLLY LI --**

MR. TAUGER:  OBJECTION.  MISCHARACTERIZES THE TESTIMONY.  ARGUMENTATIVE.

THE ARBITRATOR:  SUSTAINED.  MS. LI, YOU HAVE TWO MINUTES LEFT.

BY MS. LI:    Q    YES.  MR. HART, YOU WERE NOT LICENSED TO PRACTICE IN NEW JERSEY OR ANY DISTRICT COURTS IN NEW JERSEY; CORRECT?

A    WHEN?

**Q    CORRECT?**

A     WHEN?

MR. TAUGER:  OBJECTION.  VAGUE AS TO TIME.

Q     ANYTIME?  ARE YOU -- YOU WERE NOT?

A     I WAS AT ONE TIME PRACTICING IN THE U.S. DISTRICT COURT FOR NEW JERSEY.

Q     YOU WERE QUALIFIED TO PRACTICE IN THE DISTRICT COURT OF NEW JERSEY?

A     YES.

Q     OTHER THAN PRO HAC VICE BASIS?

A     YEAH, ON A PRO HAC VICE BASIS.

Q     OKAY.  OTHER THAN PRO HAC VICE YOU WERE NOT QUALIFIED TO PRACTICE THERE; CORRECT?

A     THAT'S CORRECT.

Q     AND THE CASE OF CATHY TRADING IS PENDING IN THE DISTRICT COURT OF NEW JERSEY; CORRECT?

A     CORRECT.  I STIPULATED EARLIER THAT I WASN'T EVEN COUNSEL OF RECORD IN THAT LAWSUIT.

Q     YOU WERE PRO HAC VICE ADMITTED.

A     OH, WAS I?  OKAY.  I STAND CORRECTED.  I THOUGHT I WASN'T EVEN COUNSEL OF RECORD.  I HAVE TO GO BACK AND CHECK.

Q     AND MR. HART, ALSO YOU TESTIFIED THAT I WAS A THIEF, BUT IF A THIEF STEALS SOMETHING, WOULD THEY ACTUALLY TELL YOU FIRST THAT I'M GOING TO STEAL YOUR WALLET THEREFORE I WILL ASK FOR INFORMATION.  WHEN YOU

SAYS, OKAY, I WILL DO IT.  IS THAT A GOOD UNDERSTANDING AS A THIEF?

A     I DON'T KNOW.  I'M NOT A THIEF, SO I CAN'T SPEAK ON BEHALF OF THEM.

**Q     WELL, YOU CHARACTERIZE WITH ME AS A THIEF, BUT I ASK FOR ALL WRITTEN INFORMATIONS AND WRITTEN INSTRUCTIONS ON HOW TO CARRY OUT THE FUNCTION AND WHEN DEALING WITH CERTAIN PERSON WHO DOES NOT FOLLOW THE BAR ASSOCIATION'S GUIDELINES.**

A     HOLLY, YOU HAD AN OPPORTUNITY --

(OVERTALKING).

**Q     -- CERTAIN THINGS IS THAT A THIEF.**

A     HOLLY, YOU HAD AN OPPORTUNITY TO ISSUE THOSE INVOICES ON APOGEE LETTERHEAD.  YOU DIDN'T.

**Q     MR. HART, LET ME REMIND YOU I DON'T WANT TO GO INTO THE EXHIBITS, BUT YOU CAN SEE EXHIBIT IS 4 THROUGH 567.  IT SHOWS THAT YOU REFUSED TO ENTER YOUR TIME.  I WAS NOT ALLOWED TO ENTER TIME ON APOGEE'S DOCUMENT.**

MR. TAUGER:  OBJECTION.  ARGUMENTATIVE.

MS. LI:  IS THAT CORRECT?

THE WITNESS:  THAT'S WRONG.

THE ARBITRATOR:  OKAY.  LET HIM JUST ANSWER THE QUESTION.

BY MS. LI:

**Q     THE DOCUMENT SHOWED THAT YOU DID NOT REVIEW**

YOUR TIME.  IF I WERE INVOICING CATHY TRADING OR WHOEVER

ON APOGEE'S LETTERHEAD, I WOULD BE STEALING BECAUSE I

WOULD BE STEALING FROM THE CLIENT.  I WOULD BE TELLING

THEM THAT SEVERAL LAWYERS DID NOT ENTER THEIR TIME.  I

ISSUE AN INVOICE ON THEIR BEHALF.  I WOULD BE ISSUING

INVOICE ON EVERYBODY.

THE ARBITRATOR:  MS. LI, YOUR TIME IS UP.

MS. LI:  OKAY.

THE ARBITRATOR:  SO WE REALLY NEED TO PROCEED TO

MR. TAUGER'S I GUESS --

MR. TAUGER:  I'LL USE A FRACTION OF MY REMAINING

TIME.

THE ARBITRATOR:  ARE YOU READY TO START NOW?

MR. TAUGER:  YES.

RECROSS EXAMINATION

BY MR. TAUGER:    Q    MR. HART, WHY ISN'T

APOGEE WILLING TO ASSIGN THE COLLECTION EFFORTS TO MS. LI

TODAY?

A    WE JUST DON'T TRUST MS. LI.

Q    HOW MUCH HAS APOGEE SPENT ON THIS

LITIGATION?

A    YOU MEAN THIS ARBITRATION?

Q    I MEAN THIS ARBITRATION.

A    I HAVE TO GO CHECK THE RECORDS, BUT I THINK

WE PAY NOT JUST APOGEE'S ARBITRATION FEES, WE PAY MS. LI'S

ARBITRATION AND I THINK THAT'S SOMEWHERE 25,000 OR SO PLUS
ATTORNEYS' FEES, SO WE'RE PROBABLY SOMEWHERE UP IN THE 40,
$50,000 AREA.

Q   DOES APOGEE OWE ADDYHART MONEY FOR MY
SERVICES?

A   YES.

Q   DOES APOGEE OWE ADDYHART MONEY FOR SUE
TUCKER'S SERVICES, THAT'S OUR PARALEGAL?

A   YES.

Q   OKAY.  DID YUN CHEN MAKE A SETTLEMENT OFFER
TO YOU DURING THE JAMS ARBITRATION PROCEEDING?

A   NO.  I MADE SETTLEMENT OFFERS TO HER.

Q   AND DID SHE ACCEPT ANY OF THEM?

A   NO.

Q   OKAY.  WHO LITIGATED THE CATHY TRADING CASE
IN NEW JERSEY?  WHO WAS THE ACTUAL ATTORNEY -- SORRY.  NOT
ATTORNEY OF RECORD BUT FIRST CHAIR?

A   MS. LI.

Q   OKAY.  MS. LI SAID WHAT SHE WOULD TELL YOU
FIRST THAT THEY WERE STEALING OR SOMETHING TO THAT EFFECT.
DID MS. LI TELL YOU FIRST THAT SHE WAS GOING TO MISDIRECT
MONEY FROM APOGEE -- FROM CATHY TRADING TO HER -- TO IP
ADVANTAGES?

A   NO.

MR. TAUGER:  I HAVE NO FURTHER QUESTIONS.

THE ARBITRATOR:  OKAY.  SO IT'S 5:43 P.M.  LET'S GO OFF THE RECORD.

(RECESS TAKEN FROM 5:43-5:53 PM)

THE ARBITRATOR:  WE'RE BACK ON THE RECORD.  IT'S 5:53 P.M.  I'LL TRY TO BE AS BRIEF AS POSSIBLE.

MS. LI:  I WILL JUST GET MY NOTEBOOK.  SORRY.

THE ARBITRATOR:  OKAY.

MS. LI:  YES.

THE ARBITRATOR:  OKAY.  GREAT.  SO MR. HART, LET ME ASK YOU, WE WERE TALKING ABOUT WHO'S IN CHARGE OF BILLING, AND YOU SAID IT WAS THE ORIGINATION ATTORNEY WHO HAS THE RESPONSIBILITY FOR ISSUING THE BILLS AND SO ON AND ACQUAINTING THEMSELVES WITH THE SOFTWARE.  IS THERE ANY WRITTEN POLICY THAT LAYS THAT ALL OUT, OR WAS THAT JUST AN ORAL UNDERSTANDING AMONG --

A     IT'S AN ORAL UNDERSTANDING.  THE FIRM ONLY HAD FIVE OR SIX LAWYERS.  WE DIDN'T HAVE AN ABILITY TO PUT WRITTEN POLICIES IN PLACE.  EVERYBODY KNEW KIND OF WHERE THEY STOOD, AND HOLLY HAD BEEN COMMUNICATED THAT THIS IS HOW WE OPERATED BEFORE SHE EVEN JOINED.  AND SHE HAD AN ABILITY TO WORK WITH SUZANNE, BUT SHE DIDN'T WANT TO.  IT WAS ALL PRETTY CUT AND CLEAR.  EVERYBODY ELSE COULD FOLLOW THE RULES BUT HOLLY.

THE ARBITRATOR:  ALL RIGHT.  MS. LI, CAN YOU HEAR MR. HART WELL?

MS. LI:  I CAN HEAR AS MUCH AS ALL THESE ACCUSATIONS, BUT I HAVE VERY CORDIAL RELATIONSHIP WITH SUZANNE, AND I HAVE NOT MET HER.

(OVERTALKING).

THE ARBITRATOR:  THE QUESTION WAS REALLY JUST IF YOU COULD HEAR HIM CLEARLY.

MS. LI:  OH, THANK YOU, YOUR HONOR.  I CAN HEAR HIM MOST OF THE TIME, BUT NOT WHEN HE MUMBLES.

THE ARBITRATOR:  ALL RIGHT.  SO THE OTHER QUESTION I HAVE IS ABOUT THE ARBITRATION AWARD AND THE CONFIRMATION PROCEEDING.  SO WERE THEY OPPOSED BECAUSE I THINK ONE WAS A DEFAULT JUDGMENT; IS THAT RIGHT?

A     YES.  SO WHEN WE FILED THE ARBITRATION PROCEEDING AGAINST CATHY TRADING, MS. CHEN PARTICIPATED AND SHE ENDED UP FILING A MOTION TO DISMISS.  AND RIGHT UP TO THE FINAL HEARING AS SHE WAS PARTICIPATING, SHE DIDN'T SHOW UP TO THE FINAL HEARING AND SO THE ARBITRATOR, SINCE WE HAD PAID FOR THE ARBITRATION, SAID, WELL, WHY DON'T YOU GO AHEAD AND PUT YOUR CASE ON AND WHEN YOU TURN TO MS. CHEN TO PUT HER CASE ON FOR CATHY TRADING, THERE'S NOBODY GOING TO BE THERE, SO YOUR CASE IS GOING TO BE IT.  THAT'S ALL I'LL RULE ON.

THE ARBITRATOR:  RIGHT.

THE WITNESS:  AND THAT'S WHAT SHE DID.

THE ARBITRATOR:  I SEE.

THE WITNESS:  WHEN WE TOOK THAT INTO THE DISTRICT COURT PLACE, SHE DID NOT PARTICIPATE.  AND SO I GUESS YOU COULD CALL IT A DEFAULT, BUT IT TAKES QUITE A FEW MONTHS FOR IT TO GO THROUGH THE DISTRICT COURT, BUT ESSENTIALLY THERE'S FEW GROUNDS TO APPEAL ON AND SO SHE DIDN'T SHOW UP OR PARTICIPATE IN THAT.

THE ARBITRATOR:  OKAY.  GOT IT.  AND WHAT DOES YOUR ESTIMATE, MR. HART, OF THE NET AMOUNT THAT CTC OWES APOGEE UNDER THE JUDGMENT THAT YOU GOT FROM THE DISTRICT COURT BECAUSE I KNOW THAT THERE'S SOME MONEY THAT HAD BEEN PAID TO IP ADVANTAGES AND YOU CLAIM A PORTION OF THAT MONEY AS WELL, BUT SETTING THAT ASIDE ASSUMING YOU GET ALL THAT MONEY EVENTUALLY, RIGHT, FROM MS. LI, WHAT'S THE REMAINDER THAT YOU WOULD -- THAT APOGEE IS ENTITLED TO AND FROM WHICH YOU WOULD THEN GIVE MS. LI HER SHARE AND THE FIRM WOULD KEEP THEIR SHARE?

A    THE BEST WAY TO DESCRIBE THIS IS LET'S PUT ASIDE THE IP ADVANTAGES INVOICES FOR 205,000.  WHAT WENT INTO THE JAMS ARBITRATION WAS EVERYTHING AFTER THAT THAT HAD NOT BEEN PAID.  SO IT WAS UNPAID.

THE ARBITRATOR:  OH, I SEE.

THE WITNESS:  THE 400 SOME THOUSAND DIDN'T INCLUDE ANY OF THE 205,000.

THE ARBITRATOR:  THAT'S HELPFUL TO KNOW.

THE WITNESS:  BUT IN THE SPREADSHEET I ACCOUNTED

FOR ALL OF THE CHARGES WHICH IS WHY IT SHOWS UP IN THE SPREADSHEET.

THE ARBITRATOR:  OKAY.

THE WITNESS:  SO THE 402,000 IN THE JAMS PROCEEDING WAS THE AMOUNT THAT SHE OWED APOGEE IN TOTAL THAT SHE HAD NOT PAID.

THE ARBITRATOR:  SHE MEANING CHEN?

THE WITNESS:  SHE MEANING CATHY TRADING, MS. CHEN. SO THAT'S THE FULL AMOUNT.  BUT SINCE THEN WE GOT ADDITIONAL, YOU KNOW, COSTS AND FEES AND THE JAMS WE GOT IT IN I THINK THE DISTRICT COURT AS WELL PLUS THERE'S POST-JUDGMENT INTEREST AND SO THAT'S HOW I GOT TO THE HALF MILLION AND THAT'S A ROUGH NUMBER.  I'M JUST THINKING WE GOT THAT DECISION JANUARY 10, 2021, SO ROUGHLY TWO YEARS AT 10 PERCENT ON WE'LL CALL IT 400,000, MAKE THE NUMBERS, THAT'S 480,000 AND IT'S PROBABLY SLIGHTLY MORE THAN THAT SO 490,000.

THE ARBITRATOR:  I SEE.  SO THE 205,000 THAT IP ADVANTAGES BILLED AND APPARENTLY COLLECTED YOU'RE SAYING THAT APOGEE STILL GETS A PORTION OF THAT; IS THAT RIGHT?

THE WITNESS:  RIGHT.  SO OF THAT 205,000, MS. LI GOT PART OF THAT.

THE ARBITRATOR:  YEAH.

THE WITNESS:  AND THEN OF THAT APOGEE WAS GOING TO GET PART OF THAT.

THE ARBITRATOR:  YES.

THE WITNESS:  AND MS. LI PAID PART OF THAT.

THE ARBITRATOR:  THE 25,000, RIGHT?

THE WITNESS:  I DON'T REMEMBER THE EXACT NUMBERS, BUT IT WAS ROUGHLY ABOUT 25 GRAND -- I'M SORRY, 50 GRAND. SHE PAID 25 AND THERE WAS 25 TO GO AND THEN SHE RE -- WELL, SHE SAID SHE WAS GOING TO PAY IT, AND SHE DIDN'T PAY IT.  AND THEN SHE SAID, WELL, I'LL ESCROW IT.  WE DON'T KNOW.  SHE JUST NEVER PAID.  AND THAT WAS PART OF THE DECISION YOU ALREADY RULED ON.

THE ARBITRATOR:  GOT IT.  YES.  THAT AMOUNT WAS SOMETHING LIKE 25,000 OR SOMETHING.  IT WAS A FIVE-FIGURE AMOUNT?

THE WITNESS:  IT WAS 25,000 PLUS INTEREST.

THE ARBITRATOR:  THAT'S STILL OWED ON THE $205,000 THAT BILLED BUT THEN THE --

MS. LI:  MAY I INTERJECT?

THE COURT:  HOLD ON, MS. LI.

BUT THE 402,000 OR SO WHICH CAME FROM THE ARBITRATION AWARD AND THEN WAS CONFIRMED AND IS ACCRUING POST-JUDGMENT INTEREST, SO IT'S NOW ABOUT 500,000, THAT'S COMPLETELY SEPARATE FROM THAT AMOUNT?

THE WITNESS:  THAT'S CORRECT.  AND THAT'S WHY MS. CHEN WAS SO UPSET BECAUSE IN HER MIND, AND I TRIED TO TELL HER OTHERWISE, BUT SHE JUST HAD IT IN HER MIND, THAT SHE

HAD PAID MS. LI 205,000 AND NOW WE WERE COMING AFTER HER

FOR ANOTHER 205,000 ON THE SAME INVOICES AND I KEPT SAYING

WE'VE CREDITED YOU THAT.  YOU DON'T WORRY ABOUT THAT.

THAT'S A DISPUTE BETWEEN MS. LI AND APOGEE.  WE'VE ALREADY

CREDITED THAT.  WE'RE TALKING ABOUT THE 400,000 --

ACTUALLY WHEN WE FIRST STARTED IT WAS LIKE 380, 360,

SOMETHING LIKE THAT.  I SAID THAT IS THE AMOUNT OF MONEY

THAT YOU OWE.

THE ARBITRATOR:  THAT'S HELPFUL.

MS. LI, YOU HAD SOMETHING YOU WANTED TO SAY?

MS. LI:  YES.  I'D LIKE TO CLARIFY TO BE HONEST,

YOUR HONOR, THROUGHOUT THIS PROCESS I HAD LOOKED AT

RECORDS AND APOGEE HAD CONTINUOUSLY USING THE 25K AS A

FIGURE THAT I -- SUPPOSEDLY I OWE OR RATHER CONVERTED BUT

IN FACT IT'S NOT CONVERTED.  AND I DISCOVERED THAT THE

AMOUNT SHOULD HAVE BEEN 15K.  IT WAS IDENTIFIED ON THE

EXHIBIT WE JUST DISCUSSED.  IT WAS ON EXHIBIT 89, 90 I

WOULD BE VERY GLAD TO POINT OUT.

NOW, IF THERE ARE ANY NUMBER DISCREPANCIES,

I HAVE NO QUESTION NOW SORTING IT OUT RIGHTFULLY IF IT'S

RIGHTFULLY BELONGING TO APOGEE, PLEASE, GO AHEAD.  AND IF

IT RIGHTLY BELONGS TO ME AND THAT SHOULD ALSO BE THE

CORRECT NUMBER NOT MORE EXTRA.

BUT THIS IS LESS OF AN ISSUE RATHER THAN THE

REMAINDER OF -- RATHER WE SAY 500K.

AND MR. HART LIKE TO USE THE ACCUSATIONS AS ANGRY OR WHATSOEVER. MS. CHEN HAD A VERY CORDIAL RELATIONSHIP WITH ME BECAUSE SHE DOESN'T SPEAK ENGLISH WELL ENOUGH TO CONVERT -- TO CONVERSE WITH ANY GOOD ENGLISH PERSON WHO DOESN'T SPEAK CHINESE. SHE NEEDS TO SPEAK CHINESE. THAT'S WHY SHE NEEDS A NEW JERSEY LAWYER WHO WORK WELL VERSED IN IP CASES, DEFENSIVE ACTIONS WHO SPOKE ENGLISH AND THIS IS HOW I GOT AROUND TO REPRESENT HER AND WON HER CASE. THE REASON WHY SHE COULD AFFORD IS BECAUSE SHE GENERATED, IN 2016, $1 MILLION REVENUE FROM --

(OVERTALKING).

THE ARBITRATOR: OKAY. SO MS. LI, THIS IS REALLY BEYOND THE SCOPE OF MY QUESTION. BUT I THINK THAT WHAT YOU -- WHAT WOULD BE HELPFUL FOR ME, SINCE YOU ARE THE ONE CLAIMING THE PERCENTAGE OF THE JUDGMENT AGAINST CTC, IS FOR YOU TO WALK ME THROUGH THESE SPREADSHEETS THAT WERE SHOWN. I THINK ONE WAS IN EXHIBIT C-001 AND THEN THERE WAS ANOTHER ONE SHOWING THE 165.

FRANKLY, A LOT OF THOSE NUMBERS JUST KIND OF WENT OVER MY HEAD. I COULD NOT REALLY FOLLOW THAT. SO IN YOUR POST-HEARING BRIEFS, TO THE EXTENT YOU ARE CLAIMING SOME OF THAT, YOU REALLY NEED TO BE ABLE TO WALK ME THROUGH EXACTLY WHAT THESE DOCUMENTS ARE SAYING, WHAT YOU THINK YOU ARE ENTITLED TO IN TERMS OF A SUM OF MONEY. AND YOU NEED TO REALLY BE ABLE TO LAY THAT OUT FOR ME CLEARLY.

OKAY.  I'M NOT GOING TO DWELL ON THAT ANYMORE.

LET ME ALSO ASK MR. HART ABOUT -- SO YOU TALKED ABOUT MS. PRIMO AND YOU TALKED WITH HER AGAIN AND SHE SAID, WOW, THIS IS GOING TO BE MORE COMPLEX MAYBE $40,000 OR SO.  WAS THAT LIKE A FLAT FEE SHE WAS CHARGING? WAS SHE ALSO GOING TO GET A PERCENTAGE OF THE RECOVERY?

THE WITNESS:  THERE'S NO PERCENTAGE.  THAT WAS JUST A ROUGH BUDGET OF HOW MUCH SHE THOUGHT IT WOULD TAKE TO GO AFTER CATHY TRADING'S BANK ACCOUNTS AND TO GO AFTER AND TRY TO GET COLLECTION OUT OF AMAZON.  A LOT OF HER PRODUCTS ARE SOLD ON AMAZON, SO WE WOULD HAVE TO GO TO AMAZON AND TRY TO GET -- I GUESS A GOOD WORD IS A GARNISHMENT OF SOMEHOW SO THAT IF MONEY CAME IN FROM PRODUCT SALES, THEY'D GET DIVERTED FROM HER ACCOUNT AND INTO APOGEE'S ACCOUNT.

THE ARBITRATOR:  GOT IT.  SO SHE CHARGED BY THE HOUR ESSENTIALLY?

THE WITNESS:  SHE DID.  THAT WAS JUST A BUDGET ESTIMATE.

THE ARBITRATOR  I SEE.

OKAY.  NOW, DO YOU HAVE ANY REASON TO BELIEVE IT'S ACTUALLY GOING TO BE MORE THAN 40,000?

THE WITNESS:  WELL --

THE ARBITRATOR:  -- BASED ON FURTHER DEVELOPMENTS

IN THE CASE?

THE WITNESS:  I DON'T KNOW, BUT I'D SAY PROBABLY MORE AND THE REASON IS WE HAD TROUBLE -- WE HAD SOME TROUBLE, BUT NOT A LOT OF TROUBLE, GETTING HER INTO JAMS AND THEN SHE JUST STOPPED PARTICIPATING.  AND THEN AS YOU HAVE SEEN -- BECAUSE SHE DIDN'T SHOW UP TO THE FINAL HEARING, SHE DIDN'T SHOW UP --

THE ARBITRATOR:  OH, SHE MEANING CHEN?

THE WITNESS:  YEAH, MS. CHEN.  AND THEN YOU SEE THE DOCUMENTS THAT MS. LI HAS BROUGHT IN IN THE LAST SEVERAL MONTHS TRYING TO GET HER TO A DEPOSITION, TRYING TO GET HER TO COME AND TESTIFY HERE, AND SHE'S IGNORED DOCUMENTS, THE DOCUMENTS AND SUBPOENAS AND THINGS, SO I SUSPECT IF WE TRY TO NOW GO AFTER HER, I SUSPECT SHE'LL BE JUST AS EVASIVE AS SHE'S BEEN WITH MS. LI.  I DON'T KNOW, BUT I'M -- I'M LEERY HOW MUCH MONEY I'VE SPENT.

THE ARBITRATOR:  RIGHT.  IF SHE DOESN'T SHOW UP, SHE'LL PROBABLY JUST NOT BE ABLE TO PRESENT HER DEFENSES TO ENFORCEMENT, AND I WOULD HAVE THOUGHT THAT WOULD MAKE ENFORCEMENT EASIER FOR YOU.

THE WITNESS:  IT IS BUT IT HELPS TO HAVE AN ASSET HEARING AND HAVE HER SHOW UP SO YOU CAN ACTUALLY FIND OUT ABOUT THE BANK ACCOUNTS.

THE ARBITRATOR:  IF SHE GETS NOTICE AND SHE DOESN'T SHOW UP THOUGH --

THE WITNESS:  IT'S A DEFAULT.  THE DISTRICT COURT DOESN'T DO ANYTHING.

MR. TAUGER:  IF I CAN JUMP IN TOO.  THE EVIDENCE OF RECORD AND THE EVIDENCE THAT ACTUALLY BOTH PARTIES HAVE SUBMITTED, MS. YUN CHEN DOES NOT OWN THE PROPERTY AT LULLABY COURT, AND THAT WAS THE REBUTTAL EXHIBIT I GAVE. THE AMAZON STUFF IS FROM A COMPANY CALLED WANTBA.  IT'S NOT YUN CHEN.

THE ARBITRATOR:  I UNDERSTAND THAT.

MR. TAUGER:  IDENTIFYING THE ASSETS WOULD BE AN EXTRAORDINARY CHALLENGE AT THIS POINT.

THE ARBITRATOR:  RIGHT.  BUT IT SOUNDS LIKE MS. PRIMO IS --

MS. LI:  MAY I SPEAK?

THE ARBITRATOR:  HOLD ON, MS. LI.  I'M NOT DONE.

MS. PRIMO IS OFFERING HER SERVICES TO DO JUST THAT FOR 40,000 AND CHANGE.  SO WHAT'S THE CONCERN? IS THE CONCERN THAT SHE WOULD CHARGE YOU THIS MONEY AND STILL NOT BE ABLE TO COLLECT ULTIMATELY?

MR. TAUGER:  YES.

THE WITNESS:  YEAH.  I'VE ALREADY SPENT A LOT OF MONEY GOING AFTER THIS.  MS. LI DIDN'T CONTRIBUTE ANY MONEY TO THE JAMS, ANY MONEY TOWARDS THE DISTRICT COURT, AND THEN SHE TURNED AROUND AND BROUGHT US HERE.  THIS HAS ALL COST A LOT OF MONEY.

THE ARBITRATOR:  I SEE.  SO IT'S, I THINK, PARTLY A FUNCTION OF THE FACT THAT SHE'S NOT CHARGING YOU AS A PERCENTAGE?

THE WITNESS:  RIGHT.

THE ARBITRATOR:  SO THAT IF YOU DIDN'T RECOVER ANYTHING, YOU WOULDN'T PAY HER ANYTHING.  SHE'S ACTUALLY CHARGING YOU BY THE HOUR AND THAT OPENS UP THE RISK THAT SHE WOULD CHARGE YOU FOR ALL THIS WORK AND THEN YOU NEVER ACTUALLY --

THE WITNESS:  AND I'M OUT EVEN MORE MONEY.

THE ARBITRATOR:  OKAY.  ALL RIGHT.  MS. LI, YOU WANTED TO SAY SOMETHING?

MS. LI:  YES.  I'D LIKE TO CORRECT A FEW COMMENTS THAT OPPOSING COUNSELS ACTUALLY SAY.

FIRST OF ALL, IT'S SELF-FULFILLING COMMENT THAT FROM WITNESS, SLASH, COUNSEL THAT THIS IS -- MR. HART HAD A VERY CORDIAL RELATIONSHIP WITH MS. YUN CHEN, THE OWNER OF CTC AND WANTBA.  IT WAS EASY FOR HIM TO STRIKE A SETTLEMENT DEAL WITH MS. YUN CHEN.  SO I FOUND THAT VERY SELF-FULFILLING AND CONTRADICTING, NUMBER ONE.

NUMBER TWO, THE ENFORCEMENT PROCESS IS NOT DONE BY -- SIMPLY BY ASSESSING HER HOME OR ANYONE'S HOME.  IT'S DONE BY GARNISHING THE, AS MR. HART IDENTIFIED, AS ECOMMERCE CHANNELS.  IF THERE IS A REGISTERED DULY OBTAINED MONETARY JUDGMENT, IT'S RELATIVELY EASY TO GO

INTO THESE ECOMMERCE ACCOUNT TO SIMPLY FROZEN THESE

DEFENDANT'S ACCOUNT.  I HAVE DONE NUMEROUS LITIGATIONS ON

ECOMMERCE COMPANY WHO DEFAULTED.

THE ARBITRATOR:  OKAY.

MS. LI:  SO WHEN WE OFFER THE ENFORCEMENT PROCESS

ON A CONTINGENCY BASIS WITH MR. BALOGH, IT IS NOT

REASONABLE, AT LEAST FOR MR. HART AND APOGEE, TO REFUSE.

THE ARBITRATOR:  OKAY.  MS. LI, YOU MADE THAT

POINT BEFORE.  IS THERE ANYTHING ELSE YOU WANTED TO RAISE

IN RESPONSE TO WHAT MR. HART JUST SAID TO MY QUESTION?

MS. LI:  YES.  ONE MORE POINT.

THE ARBITRATOR:  SO MS. LI, THIS IS NOT AN

INVITATION TO MAKE GENERAL POINTS.  IF THERE'S SOMETHING

THAT YOU WANTED TO RESPOND TO BASED ON WHAT MR. HART

ANSWERED FROM MY QUESTION, THEN I'M GIVING YOU THAT

OPPORTUNITY.  BUT OTHERWISE THIS IS NOT A FREE FORUM KIND

OF DISCUSSION.

MS. LI:  JUST ONE MINOR -- NOT MINOR, BUT ONE

POINT FOR QUICKLY.  MR. HART SAID I DID NOT CONTRIBUTE TO

THE ARBITRATION PROCEEDING COST AGAINST YUN CHEN.  AND IN

FIRST PLACE I WAS NOT THE ONE WHO HAD MADE ALL OF US ENTER

THAT POSITION.  I WAS DILIGENTLY PURSUING CLIENTS AND

REPORTING TO CLIENTS ESPECIALLY WITH THEIR BUDGETING

PURPOSE.

THE ARBITRATOR:  OKAY.

MS. LI:  APOGEE WAS THE ONE WHO DELAYED AND REFUSED TO FOLLOW ALL OF THE BAR ASSOCIATION'S RULES AND FAILED TO ISSUE INVOICES TIMELY.

THE ARBITRATOR:  OKAY.  ARE YOU FINISHED?

MS. LI:  YES, I FINISH.  THANK YOU.

THE ARBITRATOR:  LET ME ASK ANOTHER QUESTION, MR. HART.

SO YOU KNOW, THERE WAS THESE REMARKS, YOU KNOW, ABOUT, I GUESS, CTC BEING A, QUOTE, UNQUOTE, DEADBEAT.  WHAT KIND OF INVESTIGATION, IF ANY, DID YOU DO AS TO CTC'S FINANCIAL CONDITION?

THE WITNESS:  WE LOOKED AT WHAT PRODUCTS WERE BEING SOLD ON AMAZON.  AND AS MS. LI SAID AT ONE TIME SHE SAID THAT SALES OF CATHY TRADING WERE A MILLION DOLLARS A YEAR AND THAT -- I NEVER GOT ANY INFORMATION ONLINE ANYWHERE TO ANY OF MY SOURCES THAT IT WAS MORE THAN THAT. SHE'S KIND OF A NICHE PLAYER, LOW COST PLAYER AND SO SHE WAS NOT A MAJOR PLAYER.

TODAY, YOU KNOW, SEVERAL YEARS LATER, I HAVE NO IDEA WHAT HER REVENUES ARE AND OF COURSE ONCE -- ONCE WE HAD A ROUGH AGREEMENT WITH JASON ON ENFORCEMENT, WE STOPPED ALL THAT ACTIVITY BECAUSE WE'RE, YOU KNOW, JUST THROWING GOOD MONEY AFTER BAD.

THE ARBITRATOR:  OKAY.

THE WITNESS:  LET ME BE FAIR TO HOLLY ON ONE

POINT.  SHE DIDN'T CONTRIBUTE TO THE JAMS ARBITRATION, BUT

I NEVER ASKED HER TO EITHER.  SO, YOU KNOW, I DON'T WANT

YOU TO THINK THAT --

THE ARBITRATOR:  I UNDERSTAND.

THE WITNESS:  -- I ASKED HER AND SHE REFUSED.  I

NEVER ASKED HER.  I THOUGHT THIS WAS AN APOGEE ISSUE, WE

WERE GOING AFTER IT, AND WE DID.

THE ARBITRATOR:  MS. LI, LET ME ASK YOU A

QUESTION.  I GUESS MR. BALOGH WAS REPRESENTING YOU IN THIS

ARBITRATION AT THE BEGINNING; IS THAT RIGHT?

MS. LI:  CORRECT, YOUR HONOR.

THE ARBITRATOR:  ACTUALLY, YOU KNOW WHAT, I HAVE

TO WITHDRAW THAT QUESTION.

OKAY.  I THINK THAT'S ALL I HAVE FOR NOW IN

TERMS OF QUESTIONS.

I DO NEED TO PROCEED TO ASK YOU TWO FINAL

QUESTIONS.  IF YOU WOULD LIKE SOME TIME TO THINK ABOUT

THIS, WE CAN TAKE ANOTHER BREAK.  I WANT TO MAKE SURE THAT

THE RESPONSE I GET FROM YOU IS ACCURATE.

SO THE TWO QUESTIONS I WOULD LIKE TO ASK

ARE, NUMBER ONE, DOES EITHER SIDE HAVE ANY FURTHER

EVIDENCE THAT IT WISHES TO PRESENT IN THIS HEARING BESIDES

THE EXHIBITS THAT WE ALL KNOW ABOUT ALREADY, AND I THINK

YOU'RE GOING TO MEET AND CONFER ABOUT WHETHER YOU

STIPULATE TO INTRODUCING ALL OF THEM.

MR. TAUGER:  I THINK WE'VE ALREADY STIPULATED RIGHT, MS. LI, WE'LL BOTH ENTER ALL OF OUR EXHIBITS.

THE ARBITRATOR:  SO REALLY THE QUESTION IS IS THERE ANYTHING ELSE YOU WISH TO PRESENT.

AND THE SECOND QUESTION IS HAS EACH PARTY HAD A FULL AND FAIR OPPORTUNITY THROUGHOUT THIS ARBITRATION TO PRESENT THE CASE IT WISHED TO PRESENT.

AND I'D LIKE A YES OR NO ANSWER TO EACH OF THEM, AND IF IT'S A, NO, I'D LIKE TO UNDERSTAND WHY YOU'RE RESPONDING NO.

IS THAT SOMETHING THAT YOU ARE PREPARED TO ANSWER NOW, MS. LI, OR DO YOU NEED A FEW MINUTES TO COLLECT YOUR THOUGHTS?

MS. LI:  UM, I CAN ANSWER THE SECOND QUESTION FIRST, IF I MAY?

THE ARBITRATOR:  SURE.

MS. LI:  I FELT I DID NOT HAVE THE FULL OPPORTUNITY TO DISCOVER WHETHER APOGEE DOES OR DOES NOT HAVE ANY ASSETS BECAUSE I BELIEVE MY CASE IS SUPPORTED BY STRONG EVIDENCE THAT I'M ENTITLED TO COMPENSATIONS FROM AN EMPLOYER WHO HAD NOT PAID MY SERVICE AND MY WORK FAIRLY. NO MATTER WHAT NUMBER THAT WOULD BE, I DESERVE TO BE COMPENSATED JUST AS A BASIC FAIRNESS POINT OF VIEW WITH EVEN LAYPERSONS.  AND I DO NOT KNOW UNTIL THIS DAY IF APOGEE CAN COMPENSATE OR CANNOT.

AND NOW WITH SECOND QUESTION WHICH IS YOUR HONOR'S FIRST QUESTION, HAVE ANY FURTHER EVIDENCE.  AFTER HAVING GONE THROUGH THIS LENGTHY PROCESS, BECAUSE YUN CHEN HAD AVOIDED TO TESTIFY IN THIS TRIAL IN THIS FINAL HEARING, DURING DEPOSITIONS I DID SPEND SIGNIFICANT AMOUNT OF MONEY TO TRY TO SUBPOENA TO SERVE HER MULTIPLE TIMES.  I MAY OR MAY NOT, AND I CAN'T DECIDE JUST YET BECAUSE WE JUST HAD THIS HEATED HEARING, THAT I MAY PRESENT EVIDENCE ON HER ASSETS INVESTIGATIONS, BUT THAT IS ALSO VERY COSTLY AND I'M NOT SURE IF I SHOULD BEAR THE BURDEN TO DO SO.  BUT WITH REGARDS TO WHETHER THIS PIECE OF EVIDENCE SHOULD BE OFFERED, I NEED TO DO SOME FURTHER THINKING.

THE ARBITRATOR:  ALL RIGHT.  SO IT SOUNDS LIKE YOU'RE SAYING YOU ARE UNSURE WHETHER YOU WOULD LIKE TO ADDUCE ADDITIONAL EVIDENCE REGARDING CTC'S FINANCIAL CONDITION, AND YOU FEEL THAT YOU DID NOT HAVE ADEQUATE DISCOVERY OF APOGEE'S FINANCIAL CONDITION.

OKAY.  MR. TAUGER.

MR. TAUGER:  WE HAVE NO ADDITIONAL EVIDENCE, AND WE BELIEVE WE'VE RECEIVED A FULL AND FAIR HEARING.

MR. HART:  EXCEPT FOR THE PAYMENT OF THE ARBITRATION FEES.

MR. TAUGER:  I'M SORRY.  THAT'S CORRECT.  EXCEPT FOR PAYMENT OF ARBITRATION FEES, BUT WE WILL BRIEF THAT AS PART OF OUR FINAL BRIEF ALSO ALONG WITH OUR MOTION FOR

SANCTIONS.

THE ARBITRATOR:  OKAY.  ALL RIGHT.  SO I WILL TAKE THOSE ANSWERS UNDER ADVISEMENT.  LET ME JUST SEE IF I CAN GIVE YOU SOME FEEDBACK OR SOME THOUGHTS, AT LEAST, ON THE POST-TRIAL BRIEFS SO AS TO, YOU KNOW, TRY TO HELP THIS BE AS FOCUSED AS POSSIBLE.

SO I HAVE MR. TAUGER'S BRIEF, AND I HAVE MS. LI'S BRIEF.  LET ME START WITH MR. TAUGER.

SO -- YOU KNOW WHAT, I THINK WHAT I MIGHT DO IS JUST COLLECT MY THOUGHTS AND SEND YOU SOME GUIDANCE ABOUT THE POST-HEARING BRIEFS.  I THINK THAT MIGHT BE BETTER THAN MY TRYING TO DO THIS OFF THE CUFF RIGHT NOW. THERE ARE CERTAIN ISSUES THAT WERE BRIEFED IN THE PREHEARING BRIEFS THAT I DON'T THINK I REALLY NEED MORE BRIEFING ON, SO I WANTED TO KIND OF MINIMIZE ANY DUPLICATION WITH EFFORT.

AND I THINK THERE ARE OTHER ISSUES WHERE I FELT THEY WERE MAYBE NOT AS FULLY BRIEFED AS POSSIBLE.  IT COULD HAVE BEEN JUST BECAUSE WE WERE WAITING FOR THIS EVIDENCE TO COME IN.  BUT WHY DON'T YOU GIVE SOME TIME TO FORMULATE SOME GUIDANCE TO YOU.  HOPEFULLY THAT WILL MAKE THINGS A LITTLE BIT MORE EFFICIENT.  WE'LL BE WAITING FOR THE TRANSCRIPT ANYWAY, RIGHT?

HOW LONG WILL IT TAKE APPROXIMATELY FOR THE TRANSCRIPT?

THE COURT REPORTER:  USUALLY IT'S TEN BUSINESS DAYS.

THE ARBITRATOR:  OKAY.  SO THE POST-TRIAL BRIEFS PROBABLY WON'T BE DUE FOR, YOU KNOW, AT LEAST FOUR WEEKS, I IMAGINE, FROM NOW, SO WE STILL HAVE SOME TIME.

YEAH.  OKAY.  SO APART FROM THAT, I DON'T HAVE ANYTHING ELSE.  IS THERE ANYTHING ELSE THAT EITHER OF YOU WOULD LIKE TO RAISE BEFORE WE ADJOURN THE PROCEEDING TODAY?

MS. LI?

MS. LI:  I WOULD JUST LIKE TO FOLLOW UP THAT POINT THAT WE DISCUSSED EARLIER, THE DECLARATION OF MR. RUBIO.

THE ARBITRATOR:  YES.  OKAY.  DID YOU SHARE THAT DECLARATION WITH MR.  --

MS. LI:  I DID.

MR. TAUGER:  YES, I HAVE THAT DECLARATION.

THE ARBITRATOR:  YES.  DO YOU HAVE ANY RENEWED OBJECTIONS OR DIFFERENT OBJECTIONS TO THE DECLARATION OTHER THAN WHAT YOU ALREADY MENTIONED?

MR. TAUGER:  FIRST OF ALL, I DON'T LIKE THE FORM IN WHICH IT WAS PRODUCED.  IT WASN'T JUST A DECLARATION, BUT IT WAS ATTACHED TO A BRIEF THAT HAS ALREADY BEEN REJECTED ON THE POINTS THAT IT RAISED THAT MS. LI WROTE.

I ALSO -- I'M VERY UNCLEAR ON WHAT SHE'S ATTEMPTING TO POSE WITH THAT.  SHE ARGUED IN HER BRIEF

THAT THIS WAS A DEMONSTRATION OF MR. HART'S UNTRUTHFULNESS BECAUSE MR. RUBIO SAID AS FAR AS -- I THINK THE QUOTE WAS, AS FAR AS I'M AWARE, ROBERT HART WAS A RESIDENT OF SOUTHERN CALIFORNIA OR ORANGE COUNTY OR SOMETHING.  AND IT'S, FIRST OF ALL, HEARSAY.  IT'S, SECOND OF ALL, NOT EVEN A STATEMENT OF FACT.  IT'S JUST SAYING AS FAR AS I'M AWARE.  AND THAT ISSUE HAS ALREADY BEEN DISCUSSED AD NAUSEAM HERE WHICH IS WHY THE INDIVIDUAL DEFENDANTS WERE DISMISSED.

AND FRANKLY, I'M NOT A MIND READER, AND I DON'T KNOW WHAT MS. LI IS GOING TO DO WITH THAT, BUT MY CONCERN IS THAT SHE'S GOING TO TRY AND USE THE FACT OF THE ADMISSION OF THE DECLARATION TO SOMEHOW JUSTIFY GOING AFTER THE INDIVIDUAL DEFENDANTS IN STATE COURT.

THE ARBITRATOR:  THE ADMISSION OF THE DECLARATIONS IS A MEANS TO GO AFTER THE INDIVIDUALS IN STATE COURT.  OKAY.  I'M NOT SURE THAT I FOLLOW THAT, BUT HERE'S WHAT I THINK I WOULD PROPOSE.

MS. LI, WHY DON'T YOU SEND MY CASE MANAGER A COPY OF THE DECLARATION.  I'D LIKE TO JUST SEE IT.

MS. LI:  YOUR HONOR, I SENT TO ALL THREE OF YOU.

THE ARBITRATOR:  OKAY.  I HAVEN'T CHECKED MY EMAIL TODAY.

MS. LI:  AND MR. BONEY -- IN FACT, IT WAS UPLOADED BACK IN NOVEMBER.

THE ARBITRATOR:  YOU KNOW, I'M NOT GOING TO BE ABLE TO FIND IT IF IT WAS UPLOADED IN NOVEMBER, BUT IF YOU SENT IT TO ME, THAT'S FINE.  SO I'LL READ IT AND, YOU KNOW, AND GIVE YOU MY THOUGHTS ABOUT IT WHEN I GET BACK TO YOU ABOUT THE POST-HEARING BRIEFS.

YOU KNOW, I THINK YOU'RE MAKING SOME GOOD POINTS, MR. TAUGER.  YOU HAVE ANOTHER CHANCE TO CROSS-EXAMINE THE WITNESS OR THE DECLARANT, SO THERE'S A LIMITED PROBATIVE VALUE TO THE DECLARATION TO BEGIN WITH, BUT I ALSO WANT TO MAKE SURE THAT MS. LI FEELS THAT SHE HAS HAD THE OPPORTUNITY TO ADDUCE ALL THE EVIDENCE THAT SHE WANTED TO ADDUCE.

MR. TAUGER:  MAY I ASK --

MS. LI:  MAY I JUST RESPOND.

THE ARBITRATOR:  HOLD ON JUST A MINUTE, MS. LI. MR. TAUGER SPOKE FIRST.  LET ME LET HIM START AND THEN YOU'LL GET A CHANCE.

MR. TAUGER:  MAY I AT LEAST ASK FOR A PROFFER OF WHY SHE BELIEVES THIS SHOULD BE ADMISSIBLE AND WHAT SHE THINKS IT STANDS FOR?

THE ARBITRATOR:  SURE.  I WAS GOING TO SUGGEST THAT THAT MIGHT BE SOMETHING WE MAKE PART OF THE POST-HEARING BRIEFS, BUT WE CAN ASK MS. LI NOW.

SO MS. LI, IN ADDITION TO RAISING YOUR POINT, CAN YOU ANSWER MR. TAUGER'S QUESTION AS TO WHAT IS

THE PURPOSE OF INTRODUCING THE DECLARATION OF MR. RUBIO?

MS. LI:  YES, BUT I MUST FIRST CORRECT A CHARACTERIZATION OF THIS WITNESS.  IT'S NOT A WITNESS -- IN FACT -- WELL, HE WOULD BE A WITNESS.  HE WAS ALSO A PRINCIPAL OF APOGEE.  HE WAS.

THE ARBITRATOR:  YES.

MS. LI:  SO YEAH, I OFFER THE DECLARATION BECAUSE AS PART OF THE PRINCIPAL AND ALSO IF I HAD CHANCE TO EXAMINE THE PRINCIPALS, NOT JUST ONE HERE TODAY, THAT I WOULD HAVE A BETTER UNDERSTANDING OF APOGEE'S MANAGEMENT ACCOUNTING, INVOICING OR WHETHER -- YOU KNOW, FINANCIAL CONDITIONS, BUT I DON'T.  I DON'T HAVE THE CHANCE.

MR. TAUGER:  I DON'T BELIEVE THE DECLARATION SAYS ANYTHING ABOUT APOGEE'S FINANCIAL.

MR. HART:  ALSO, MR. RUBIO WAS NOT A DIRECTOR OR OFFICER AT THAT TIME.

THE ARBITRATOR:  RIGHT.  SO I THINK IT WILL BE HELPFUL FOR ME TO READ THE DECLARATION FIRST.  I'M KIND OF --

MS. LI:  WOULD YOU LIKE ME TO SHARE?

THE ARBITRATOR:  NO, THAT'S FINE.  I THINK I'LL JUST LOOK AT IT.  YOU KNOW, I HAVE QUESTIONS ABOUT THE PROBATIVE VALUE OF IT TO BEGIN WITH, BUT I FEEL LIKE I SHOULD AT LEAST READ IT AND THEN GIVE YOU MY THOUGHTS ABOUT ITS VALUE AND ITS ADMISSIBILITY.  OKAY?

MS. LI: IT HAS ONE MORE IMPORTANT THING IT MENTIONED THERE AS TO HOW THEY DIVIDE -- THEY BEING APOGEE OR MR. RUBIO AND MR. HART PROVIDING CLIENTS AND SEPARATED ACCOUNTS, ET CETERA. THAT'S WHY I FOUND RELEVANT.

THE ARBITRATOR: OKAY. THANK YOU FOR THAT, MS. LI.

MR. TAUGER, ANYTHING ELSE?

MR. TAUGER: NOTHING FURTHER FROM ME. THANK YOU.

THE ARBITRATOR: OKAY. SO IT'S 6:22 P.M. I THINK THAT CONCLUDES OUR HEARING FOR TODAY.

WE CAN GO OFF THE RECORD.

(PROCEEDINGS CONCLUDED AT 6:22 P.M.)

REPORTER'S CERTIFICATE

*   *   *

HOLLY Y. LI                          )
                                     )  JAMES REFERENCE NO.
                                     )   1200058273
            CLAIMANT,                )
                                     )  ARBITRATOR:
                                     )  HIRO N. ARAGAKI, ESQ.
        VS.                          )
                                     )
APOGEE LAW FIRM,  P.C., ET AL.,  )
                                     )
            RESPONDENT.              )
_____)

I, LISA A. AUGUSTINE, RPR, CSR #10419, CERTIFIED

SHORTHAND REPORTER FOR THE STATE OF CALIFORNIA, DO HEREBY

CERTIFY THAT THE FOREGOING PAGES 1 THROUGH 282, INCLUSIVE,

COMPRISE A FULL, TRUE AND CORRECT TRANSCRIPT OF THE REMOTE

PROCEEDINGS AND TESTIMONY TAKEN IN THE MATTER OF THE

ABOVE-ENTITLED CAUSE ON FRIDAY, APRIL 7, 2023.

DATED THIS 22ND DAY OF APRIL, 2023

*Lisa Augustine*

_____

LISA A. AUGUSTINE, CSR #10419

**$**

**$.50**
169:11,14

**$1**  266:10

**$120,000**
40:6 43:16
248:2
251:15

**$134,083**
247:25

**$15,116**
154:9

**$165,085.20**
249:19

**$20,000**
228:16

**$200,000**
35:24

**$205,000**
173:16
209:16,18
212:13
219:5
232:7,14,
22 264:15

**$205,965**
219:24

**$228,000**
46:14

**$280,000**
40:2

**$280,088.59**

154:11

**$281,780**
235:14

**$4,000**  231:4

**$40,000**
231:16,18
232:4
255:5
267:6

**$402,000**
39:25
144:13
249:25

**$470,000**
39:24

**$5,000**
135:15,22

**$50,000**
259:3

**-**

**-1**  153:10

**0**

**000048**
152:24

**000111**  22:18
23:6

**000152**  63:18

**000189**  36:20
37:13
95:17

**00091**  96:21

**000976**  12:8

**001**  56:8
151:23

**001-110**
115:22

**00474**  12:8

**013**  158:17

**02**  102:12

**022**  37:9
80:5

**027**  152:23

**1**

**1**  49:23,24
50:2 56:13
64:3,7,16
74:5,9
112:6,8
115:1
122:13,21
174:18
175:9
176:9,22
179:6,9,
14,16,17
180:8
182:10
236:1

**1,000**  199:9

**10**  66:10
159:21,24
170:24
174:14

263:14,15

**10,000**
140:21

**10-MINUTE**
48:7 155:1
171:1

**101**  205:24

**1099**  64:24
65:2,15,
16,17 66:8
91:5
174:24
176:14
233:20
234:10
236:2

**10:26**  47:24
48:10

**10:36**  48:8

**10:37**  48:10,
13

**10TH**  148:5

**11**  173:18,
19,20
174:14
221:10

**110**  115:21
116:5
117:14

**11:31**  87:17

**11:31-11:35**
87:19

**11:35**  87:21

**11:37** 89:4

**11TH** 199:25

**120,000**
42:13
252:9

**120K** 98:19

**12:07** 107:8

**12:07-1:18**
107:10

**13** 155:20
196:22

**130** 194:22

**14** 104:6
164:7
172:14
184:10

**15** 37:5
46:1 83:23
86:17 87:3
123:25
159:10
172:13
207:5

**150** 104:7
194:22
226:13

**151** 217:16,
20

**152** 216:21,
23 217:5,
6,7,19

**15K** 265:16

**15TH** 23:4

**16** 8:13
9:21 22:15

**160,000** 40:8

**165** 250:12
251:7
266:18

**165,685**
247:23

**16TH** 23:4
239:9

**17** 87:1

**18** 113:9
178:22
186:7
229:11

**185** 179:13

**189** 150:9

**18TH** 186:5

**19** 80:10
115:8
125:17
126:4
145:24,25
252:3

**19TH** 213:2

**1:25** 110:14

**1:53** 130:25

**1:53-1:56**
131:6

**1:56** 131:4,
8

**1ST** 80:20

213:11
215:5,8,18

---

**2**

---

**2** 173:17,
18,20
186:18

**2,000** 199:9

**20** 24:10
45:22
83:18
141:15
142:15
144:10
159:6,10
170:17
203:16,19,
23 214:12
242:16
243:15
252:20

**20,000** 228:6

**20-SOME**
149:2

**2000** 123:25

**2009** 18:2,
12

**201** 73:6,7

**2013** 226:15

**2015** 74:5,9
111:19,25
115:1,2
126:3
172:9

**2016** 17:21
18:19
20:7,14
22:1,7
23:11,17
24:6 47:1
62:3,20
132:21
136:9
137:2
155:21
156:9
157:22
165:22
186:7
193:14
216:14
266:10

**2017** 22:15
23:4 24:7,
10,21
80:10
124:1
136:10
137:2
140:13
141:15
142:1,15
144:10
165:23
194:5
206:5
207:5

**2018**
125:17,19
126:4
144:11

**HOLLY Y. LI vs APOGEE LAW FIRM, P.C., ET AL.**
Hearing on 04/07/2023                        Index: 2019..3RD

145:24
161:14

**2019** 29:20
31:8 32:13
41:8
111:20,25
112:2,6,8,
13,15
113:9
114:19
122:13,21
144:16
148:2
240:11
244:8,12

**202** 226:2

**2020** 31:11
32:6
39:13,14
43:11
98:24
112:3,4
124:1
144:6
146:22
148:4
166:2
170:9,15
240:18
242:24
251:18
252:7

**2021** 44:10
121:10
147:12
148:5
244:12

245:8
263:14

**2022** 8:5
121:10
245:10

**2023** 4:1
9:24
52:20,22
86:17 87:3
108:1
226:15
245:23

**203** 226:20,
21

**205,000**
209:4
212:2
262:18,23
263:18,21
265:1,2

**20TH** 83:20

**21** 82:25
83:3,18
214:25

**21ST** 44:9
251:24

**23** 157:22
161:14
185:25

**24** 16:12,16
187:12
192:7
195:10
197:20

**25** 16:9,12,
15 203:15
204:1
205:22
247:23
264:5,6

**25,000**
135:21
154:5
259:1
264:3,12,
14

**25K** 265:13

**26** 16:9,12,
15 206:10
207:17

**26TH** 45:22

**27** 151:6
152:23
153:2
217:6,8

**28** 62:3,20
144:11
155:21
156:9

**28.84** 85:24
86:20

**280,000**
46:16
247:20
250:25

**281,780**
154:13
236:21

**290,000** 40:2

**2:30** 155:3

**2:30-2:42**
155:5

**2:40** 155:4

**2:42** 155:7

_____

**3**
_____

**3** 4:20 92:5

**30** 20:10,11
21:1,16,18
24:1 195:7
255:5

**300** 140:16
145:10

**304** 218:21

**33** 234:13

**352** 16:17
26:11 27:7
36:7
121:11,13

**36** 241:23

**360** 140:17
265:6

**380** 265:6

**3:08** 171:2

**3:08-3:24**
171:3

**3:24** 171:8

**3RD** 115:2

HOLLY Y. LI vs APOGEE LAW FIRM, P.C., ET AL.
Hearing on 04/07/2023                           Index: 4..7:00

---

**4**

---

**4**  9:24
101:24
174:12
177:23
179:18
180:8
185:1
257:16

**4/4**  54:9

**4/4/2023**
54:17

**4/5**  54:21

**40**  28:14
227:5
247:23
259:2

**40,000**
231:22
232:17
255:10
267:23
269:17

**400**  80:13
262:22

**400,000**
263:15
265:5

**402,000**
263:4
264:19

**436**  235:6,
7,8,9,10

236:19

**439**  237:18,
23  238:2

**45**  155:8

**456**  250:3,
11

**47**  184:25

**470,000**  40:1

**48**  150:12
151:18,20,
23  152:25
153:2,5,7,
14

**480**  46:12

**480,000**
263:16

**49**  153:3,4,
6

**490,000**
263:17

**4:39**  227:2

**4:39-4:55**
227:6

**4:50**  227:3

**4:55**  227:23

**4TH**  9:6,11
10:16
11:12  14:3
50:20
52:18  54:3
103:12

---

**5**

---

**5**  52:22
101:24
174:13
179:7,9
182:9,24

**50**  185:14
195:7
209:16
264:5

**500,000**
264:21

**500K**  265:25

**54**  227:1

**567**  257:17

**5:00**  150:16

**5:13**  241:24

**5:14-5:18**
242:13

**5:18**  242:15

**5:20**  242:11

**5:41**  157:22

**5:43**  260:1

**5:43-5:53**
260:3

**5:53**  260:5

**5TH**  9:8,16
10:7  11:12
50:24
52:16,24
115:2

---

**6**

---

**6**  32:13
174:13
175:24
252:21
253:2,3,5

**62**  186:22

**63**  186:25

**65**  56:15
187:15
189:21

**6:00**  9:6
55:4,5

**6:22**  281:9,
12

---

**7**

---

**7**  4:1  108:1
145:24
174:14
194:5
244:8,12

**70**  36:1

**74,775,602**
225:11

**776**  53:13,
16,18

**78**  218:5,
14,18

**7:00**  9:6
188:25

---

**7TH** 145:25
146:24
147:10
230:21
244:5
245:1

---
**8**
---

**8** 174:14

**80** 247:21

**80,000**
140:17

**82** 158:15,
22 159:13

**83** 220:15,
20 221:2

**86** 250:20

**87** 235:10

**88** 237:12,
13,25
238:1

**89** 161:11
265:17

**8:00** 9:6

**8:30** 8:23
9:15

**8TH** 197:10

---
**9**
---

**9** 174:14

**90** 265:17

**91** 96:21
160:9

**93** 250:5,9,
11 251:8

**95** 205:24

**991** 46:11

**9:09** 4:4

**9:23** 54:9,
17

**9:30** 8:17
16:23
189:1

---
**A**
---

**A.M.** 4:4
16:23
47:24
55:4,5
87:17 89:4

**ABILITY**
13:20 50:3
260:17,21

**ABRAHAM**
187:21
189:13,22

**ABSOLUTELY**
96:14
107:7
191:18
207:12,24
215:17

**ABSOLVE** 92:3

**ABSOLVED**

91:21

**ACCEPT** 139:5
147:1
169:17
235:13
254:14
259:13

**ACCEPTABLE**
169:15,16
239:15,17

**ACCEPTED**
185:20

**ACCESS** 51:8
120:23
129:2
132:4,7,
12,14,16,
19 133:20,
22,23,24,
25 134:10
137:19,20,
21 232:21

**ACCOMMODATE**
242:8

**ACCOUNT**
73:18
101:7,20
133:21
148:13
169:5
172:24
173:2,5,6
211:17,24
232:8,15,
19 233:1
238:16

239:14,15
240:24
244:17,24
253:23,24
267:15,16
271:1,2

**ACCOUNTANT**
126:12,19,
21,23
127:1

**ACCOUNTED**
262:25

**ACCOUNTING**
19:20
37:21
122:4,9,
19,22,24
123:6
124:3,16
129:3
280:11

**ACCOUNTS**
123:10,11
124:20,21,
22,23
125:6,7
207:10
232:4
254:2
267:10
268:23
281:4

**ACCRUE** 236:3

**ACCRUED**
166:17

**ACCRUING**
264:20

**ACCUMULATE**
169:6

**ACCURATE**
59:18
250:12,20,
21 251:5,
8,12
273:19

**ACCURATELY**
57:15

**ACCUSATIONS**
90:8 261:2
266:1

**ACHIEVE**
167:6

**ACKNOWLEDGE**
9:25 12:22

**ACQUAINTING**
260:13

**ACQUIRE**
89:17

**ACQUITTED**
219:8

**ACT** 21:12

**ACTED** 23:25
45:24
93:10

**ACTION** 118:1
138:21
148:17
207:13
230:15,16

**ACTIONS**
18:22
24:15,19
37:19
266:7

**ACTIVE** 165:7
189:14,17,
25 245:22

**ACTIVITY**
272:22

**ACTUAL** 99:16
113:16
124:12
182:17
191:20
198:2
229:6
259:16

**AD** 278:7

**ADAMANT**
148:25

**ADD** 4:25
29:5,11
93:5
149:19
163:14

**ADDED** 174:7

**ADDING**
163:11

**ADDITION**
19:17 90:7
125:6
279:24

**ADDITIONAL**

25:19
47:18
105:4,23
106:7
122:1
150:14
174:7
263:10
275:15,19

**ADDITIONALLY**
105:3

**ADDITIONS**
174:3,9

**ADDRESS** 72:9
78:23
88:9,10,11
90:7 93:24
97:10
104:8
105:16
183:9
185:19
201:9
204:15
205:4
210:11
220:24

**ADDRESSING**
12:14
97:13
217:21

**ADDUCE**
100:12
275:15
279:11,12

**ADDYHART**

35:20
122:14
125:18
199:16
259:4,7

**ADEQUATE**
10:3 20:19
275:16

**ADEQUATELY**
79:10

**ADJOURN**
277:8

**ADMINISTER**
109:15

**ADMINISTRATIVE**
193:19

**ADMISSIBILITY**
34:12,25
104:5
158:24
160:21
164:24
280:25

**ADMISSIBLE**
67:6
279:19

**ADMISSION**
4:14 34:18
40:20
43:18
167:14,15
211:22
278:13,15

**ADMIT** 60:18
73:2 76:25

102:18
167:16
253:16

**ADMITS** 168:8
209:13

**ADMITTED**
73:8,17
78:16
89:10
105:17
167:18
209:15
212:1
256:18

**ADMITTEE**
198:24

**ADMITTING**
7:4

**ADOBE** 10:2

**ADVANCE**
27:13
67:25

**ADVANTAGES**
18:13
23:16
66:16
68:11,16,
24 69:5,9,
13,22
89:11
101:25
102:5
185:12
188:16
197:4

205:19
206:1,25
207:3
208:23
211:8,14,
17 212:5
219:25
259:23
262:11,18
263:19

**ADVANTAGES'**
211:7

**ADVICE**
189:13

**ADVICES**
66:22

**ADVISABILITY**
232:16

**ADVISED**
54:21
155:14

**ADVISEMENT**
276:3

**ADVISING**
215:4

**ADVISORY**
18:12,16,
17 66:18,
20 90:4

**AFFIDAVITS**
15:17

**AFFIRMATION**
198:16

**AFFORD** 266:9

**AFRAID** 186:3

**AFTERNOON**
108:2

**AFTERNOON/
EARLY** 8:16

**AGE** 119:8

**AGENT** 104:7
165:5

**AGREE** 47:16
56:25
83:11
118:13,16
170:6
200:21
207:23
234:20
239:2,3,
10,12
243:23

**AGREED** 39:18
50:8 58:16
141:14
150:25
180:8
198:18
238:15
246:7

**AGREEMENT**
21:17
25:5,10,
11,14
36:1,16,17
45:9 46:25
56:7,20
57:19,21,
22,24

58:4,5,12,
23 59:4,14
60:6,9
61:4 65:5,
9,14 66:6
68:10,20,
24 69:7,21
76:8,23
90:24 92:2
99:23
100:20,21
134:24
147:9
165:9
183:3,10
184:23
197:4,14
203:13
205:1
254:11
272:21

**AGREEMENTS**
35:23
36:17
59:6,8

**AGREES** 83:9

**AHEAD** 4:12
70:13
77:12 97:8
130:11
141:14
145:22
147:2
230:20
231:21
261:19
265:21

**ALARM** 188:17
208:8

**ALBEIT** 5:2

**ALERT** 91:17

**ALEXANDER**
139:4

**ALLEGATION**
39:5
193:23

**ALLEGATIONS**
33:12
35:21
36:13
38:20
41:11
146:6
234:19
244:22

**ALLEGED**
193:21

**ALLOCATED**
176:25

**ALLOCATION**
98:19

**ALLOWED** 77:8
79:3 89:10
91:14
175:5
223:3,15
225:1
257:18

**ALLOWING**
200:10
236:16,24

237:4

**ALRIGHTY**
59:24

**ALTERATION**
25:5,12,14
92:6

**ALTERED**
25:12

**ALTERNATIVE**
235:13
236:15

**AMAZON** 86:2,
5,8 104:23
267:11,12,
13 269:7
272:13

**AMBIGUOUS**
168:25

**AMEND** 163:13

**AMENDED**
167:18,21
168:13

**AMENDING**
163:10

**AMENDMENT**
58:1,6,7,
12,23
59:4,14
63:21
209:22

**AMENDMENTS**
58:4

**AMERICA**
89:18

90:11
106:13

**AMERICAN**
90:11

**AMICABLE**
35:17
44:12
46:20

**AMOUNT** 88:8
135:21
139:9
148:22
154:8,11
159:21,22
166:15
168:13,21
209:18
219:25
229:25
238:20
247:20
251:4
254:12,14,
21 255:2
262:8
263:5,9
264:11,13,
22 265:7,
16 275:5

**AMOUNTS** 36:2
37:23
209:24

**AMPLIFICATION**
187:9

**ANGELES**
238:13

**ANGER** 38:20

**ANGRY** 266:2

**ANSWERING**
146:23

**ANSWERS**
212:15
276:3

**ANTICIPATION**
220:1

**ANYMORE** 11:7
28:19
44:11,13
66:19 82:8
213:9
267:2

**ANYONE'S**
270:22

**ANYTIME**
256:3

**APOGEE** 4:7
12:20
17:20,21,
25 19:9,
15,18,23,
25 20:6,8,
14,21,22,
24 21:22
22:2,7
23:19,20
24:1,9,15,
25 25:6,8,
10 28:13,
18 29:14,
17 33:4
37:17,24

38:9,16
43:10
45:6,7,8,
24 46:4,6,
13,14,15
47:1,3,9
51:11,12
57:15,25
58:16 65:7
66:2,4,8
72:12,16
73:16,22
74:4,9,11,
23 75:2,5,
18,21
76:7,22
77:4 79:12
80:25
81:9,19
82:20 83:5
89:13,14
91:21
92:15
93:9,12
94:8 97:4,
12,18,21
98:5,16
101:19
104:1
108:9,24
109:1
110:24
111:5,14,
17,19
112:18,22,
24 113:1,
14 114:1,
15 115:23

118:24
119:22,24
120:22
121:6,9,23
122:4,14,
15 123:19
124:3,11
125:11
126:2,24
134:13
137:15
138:5
139:10,13
140:16,23
141:7
142:9
144:7
145:9
148:10,14,
22 149:1
153:24
154:4,5,7
159:20
165:18,21
166:1,4,18
167:15,16
169:16
171:20
172:2,4,7,
11,12,13,
18,24
173:1,3
174:18
175:15
176:7,14
177:8
178:9,14
179:1

180:6,9,
17,20
181:8
182:17
183:6,20
184:24
185:23
186:16,21
193:5,8
197:14
202:23,25
203:7,11,
13 204:5,
20 205:9
207:3,10
208:22
210:5
211:6,9,
15,21
212:12
213:22
214:16,18
215:5
216:3,7
218:1
219:6,25
220:9,13
222:11,21
223:6,8,
11,12
224:11
228:2,3,
19,22
229:22
232:3,9,20
233:11,17,
21,22
234:7

235:16,19
236:11
237:17
238:18
239:3
245:17,22
246:2,22
247:3,7,
11,17
252:23,24
253:7,9,
10,20,24
255:16
257:14
258:17,20
259:4,7,22
262:9,14
263:5,20,
24 265:4,
13,21
271:7
272:1
273:6
274:18,25
280:5
281:2

APOGEE'S
37:15,19
38:17
47:10
57:14 75:7
97:22
118:1
129:9
132:4
137:20
145:5,7
159:23

204:6
208:18
209:6
211:17
219:19
228:7
232:15
254:16
257:18
258:2,25
267:16
275:17
280:10,14

**APOLOGIZE**
8:15 10:18
11:22 12:4
17:13 28:8
36:22,24
42:19
43:25
45:17
54:14
60:17
68:19
71:18
96:12
150:11
152:25
153:10
176:9
178:1
184:10,17

**APPARENTLY**
263:19

**APPEAL**  262:5

**APPEARANCE**
4:21

213:18

**APPEARS**
56:11
59:12
63:19
64:16
186:2

**APPLICANT**
201:4

**APPLICATION**
194:7,19,
23,24
197:17,23
198:6,17,
21 200:12

**APPLICATIONS**
199:15
253:7

**APPLY**  42:2
159:24

**APPLYING**
159:21

**APPROVAL**
26:1
238:19
239:1
254:15,16,
17,19

**APPROVED**
238:19

**APPROXIMATELY**
195:10
276:24

**APRIL**  4:1

9:24 10:7
20:7,14
47:1 50:24
52:18,22
103:12
108:1

**ARBITRAL**
13:22
39:24

**ARBITRATION**
27:9
28:16,24
29:11,18
31:4 33:5
40:7 42:2,
14 44:10,
16,25
45:23 46:4
74:25
75:19
76:8,22
77:5 79:3,
4,8,9,12
82:19
94:10
103:7
118:12
120:18,20
138:6,7,
12,16
142:12
144:19,24
145:2,3
147:3
153:20
154:13
162:20

163:14
200:7
216:19
223:15,24
224:4
228:2,4,9
229:3,10
230:4
231:3,20
236:8
244:10,19
245:2,3,4
246:21,25
258:22,23,
25 259:1,
11 261:10,
13,18
262:19
264:20
271:20
273:1,10
274:7
275:22,24

**ARBITRATOR**
4:5 5:5,7,
25 6:7,9,
18 7:6,17,
23 8:6,8,
11 9:4,10,
17 10:13,
22 11:6,
10,15,20,
23 13:3,14
14:9,11,
14,15,18,
23 15:10,
24 16:3,
18,23

**HOLLY Y. LI vs APOGEE LAW FIRM, P.C., ET AL.**
Hearing on 04/07/2023                Index: ..ARBITRATOR

| | | | |
|---|---|---|---|
| 17:11,15 | 74:19 | 121:4,12, | 190:17 |
| 18:9 20:9, | 76:2,4,10, | 21 123:1, | 191:6,9, |
| 15 22:21 | 13 77:2,4, | 7,16 | 16,22 |
| 23:1 26:3, | 20 78:6,9, | 126:10,13, | 192:2,5 |
| 20 27:2,4, | 23 81:13 | 17 127:23 | 194:12,15 |
| 9,20 28:9 | 82:11,15 | 129:24 | 195:22 |
| 29:7,23,25 | 83:2,7 | 130:1,8, | 197:2 |
| 30:11,14, | 85:11 | 12,14,18, | 200:6,11, |
| 18,23 | 87:13,17, | 22 131:3, | 19,22 |
| 31:24 | 20 88:1,4, | 7,12 | 203:19,22 |
| 32:4,9,18, | 6,11,16,23 | 133:10 | 209:19 |
| 25 33:7,16 | 89:1,4 | 134:5 | 210:2,8, |
| 35:4,9 | 91:25 | 137:22 | 10,16 |
| 36:8 37:2, | 92:25 | 138:13 | 214:10 |
| 4,8 38:2,6 | 93:20 | 139:23 | 218:12 |
| 39:4,9 | 95:3,7,10, | 147:17 | 220:7,24 |
| 40:11,22 | 18 96:4,8, | 149:9,11, | 224:21 |
| 41:1,17 | 20 97:8 | 21 150:6, | 225:3,12, |
| 42:1,20 | 99:10,12 | 15,21 | 13,17,20 |
| 43:3,5,23 | 100:14,16 | 151:7,17 | 226:2,5, |
| 44:7,19 | 101:15 | 152:9,20 | 17,23 |
| 46:21 | 103:2,5,20 | 153:8 | 227:7,19, |
| 47:16,24 | 104:4,16 | 154:20,22 | 23 232:12 |
| 48:6,11 | 105:8,12, | 155:3,6,11 | 240:8 |
| 49:5 50:5, | 14,21 | 156:2 | 241:3,7,9, |
| 10 51:7, | 106:5,17, | 157:17 | 22 242:10, |
| 18,20,23 | 23 107:4,8 | 158:17,25 | 14 243:10, |
| 52:6 53:7, | 108:4,11 | 159:3,5,10 | 24 244:2 |
| 17,20 | 109:6,10, | 160:6,11, | 245:24 |
| 54:8,20 | 14,22 | 18,25 | 246:15 |
| 55:17 60:2 | 110:1,5,7, | 162:1 | 248:13,15, |
| 63:6,9 | 13 116:18, | 165:13 | 19 249:6 |
| 65:22 | 24 117:6, | 167:4,10 | 252:4,14 |
| 67:10,14, | 10,15,22 | 170:16,20, | 255:19 |
| 24 68:5 | 118:5,13, | 22 171:1, | 257:22 |
| 71:14,19 | 19 119:9, | 4,7 175:6 | 258:7,9,13 |
| 72:25 | 11,16 | 181:4,15 | 260:1,4,7, |
| 73:2,7,17 | 120:6,11 | 184:4,7 | 9,24 |

261:5,9,
17,23,25
262:7,21,
24 263:3,
7,18,23
264:1,3,
11,15
265:9
266:12
267:17,21,
25 268:8,
17,24
269:9,12,
15 270:1,
5,11
271:4,8,
12,25
272:4,6,24
273:4,8,12
274:3,16
275:13
276:2
277:3,13,
17 278:15,
22 279:1,
15,21
280:6,17,
21 281:5,9

**ARBITRATOR'S**
102:15

**AREA** 19:19
230:13
259:3

**ARGUE** 71:15
74:19 82:5
134:7
246:14

**ARGUED**
277:25

**ARGUING** 82:6
127:18,21
214:6
246:10

**ARGUMENT**
47:14,17
81:21 82:1
246:18

**ARGUMENTATIVE**
81:22
91:24
243:19
255:18
257:19

**ARGUMENTS**
189:4

**ARISE** 118:20

**ARISES** 15:8

**ARITHMETICALLY**
201:15

**ARRANGE**
216:10

**ARRANGEMENTS**
23:25

**ARRIVE** 236:4

**ARRIVED**
236:9

**ASCERTAIN**
7:8

**ASIA** 19:11,
14 66:16

68:15
69:5,9,13,
22 89:12

**ASKS** 53:8

**ASPECTS**
27:25

**ASSERT** 41:23

**ASSERTED**
33:11
41:21
93:18
200:13
220:3

**ASSERTING**
252:12

**ASSESSED**
201:25
202:2

**ASSESSING**
270:22

**ASSESSMENT**
207:23
232:16

**ASSET** 18:12
66:22
167:17
168:6,8,9
246:3
268:21

**ASSETS** 66:23
89:17
103:5
104:13,17
105:4

106:8,13,
15,16
169:6
269:10
274:19
275:9

**ASSIGN**
169:19,25
170:2
242:21
243:4,17
244:10,21
245:5
246:3,8,23
247:3,7,11
258:17

**ASSIGNED**
10:6 237:9

**ASSIGNING**
233:7

**ASSIGNMENT**
46:8 210:5
233:8
244:15

**ASSIST** 80:21

**ASSISTANCE**
28:23

**ASSISTANT**
110:5
249:9

**ASSOCIATE**
21:3 91:6
189:22

**ASSOCIATION**
21:10 29:4

81:9,19

**ASSOCIATION'S**
257:9
272:2

**ASSUME** 78:15
189:18
247:24

**ASSUMED**
106:2
116:25
152:13

**ASSUMES**
139:20

**ASSUMING**
180:1
262:12

**ASSUMPTION**
162:21

**ASTONISHING**
20:23

**ATTACH** 200:2

**ATTACHED**
131:23
210:14
277:22

**ATTEMPT**
249:2

**ATTEMPTING**
145:11
277:25

**ATTEMPTS**
15:22

**ATTEND** 188:3

**ATTENTION**
14:3 21:24
23:5 29:19
92:13
103:22
115:18
150:9
247:14

**ATTORNEY** 5:2
32:24
56:15
64:25
65:2,16,17
66:9 71:15
91:12,13
123:23
127:7,8,
11,15,16
128:2,3,8,
9,10,13,
17,19
131:16,18,
24 132:2,3
133:16
135:18
137:18
138:23
173:4
176:14,20
177:1
188:3,22
194:9
199:14
211:19
221:11
230:12
234:9,10
236:2

240:4
255:4
259:16,17
260:11

**ATTORNEY'S**
228:5

**ATTORNEYS**
4:24
124:6,9,12
125:24
127:17
129:4,8,12
132:6
134:10
172:19
173:10
182:23
185:2,4,7
193:16
199:12
204:21
213:17
233:20
236:5

**ATTORNEYS'**
259:2

**AUDIO** 14:17

**AUGUST** 24:21
41:7 140:9
145:18
146:5
215:16
231:12

**AUGUSTINE**
17:15
31:25

**AUTHENTIC**
118:3

**AUTHENTICATED**
32:21
197:4

**AUTHENTICITY**
40:16
118:4
164:25

**AUTHORITY**
124:18
253:23
254:2

**AUTHORIZED**
101:19
207:10

**AVENUES**
230:5

**AVERAGE**
124:8

**AVOIDED**
275:4

**AWARD** 29:18
39:24
74:24
75:19 77:5
103:7
106:9
145:13,16
147:3
154:13
166:15
223:2
228:11,13,
16 230:17

231:10,21
236:12
237:10
238:20,24,
25  261:10
264:20

**AWARDS**  13:22

**AWARE**  117:3
278:3,7

**AWHILE**  70:14

---

**B**

---

**BACK**  14:23
24:12
28:15
31:23
48:8,12
53:23
63:24
75:24  76:2
87:20
90:21
108:4
110:13
119:17
130:11,15
131:4,7
146:24,25
148:1
151:11
154:25
155:4,6
158:20
161:23
162:1
171:5,7

176:9,10
179:6
203:20,22
207:17
211:4
217:20
226:15
227:2,7,8
234:19
235:24
237:14
238:7
240:21
241:12
242:14
245:13
247:22
249:22
250:1,13,
18  251:9,
16  256:21
260:4
278:25
279:4

**BACKGROUND**
194:13

**BAD**  45:25
47:12
51:18
143:2
254:9
272:23

**BADGERING**
243:19

**BADLY**  142:7
242:6

**BALANCE**
23:19

**BALOGH**  31:20
32:5,7,20
33:2,12,24
39:16
40:15
41:11,13,
19  44:5
95:25
96:11
117:25
146:1,5
147:12
170:9
230:3
231:22
233:7
237:23
238:3,7
239:18,22
240:11,17,
18  241:19
242:22
243:5,23
244:23
249:23
251:17,23
252:8,17
255:14
271:6
273:9

**BALOGH'S**
32:13
146:25
234:20
244:17

**BANK**  169:5
254:2
267:10
268:23

**BANTERED**
148:1

**BAR**  21:9,11
29:1,4,13
148:16
198:24
212:7
218:24
219:1,9,16
220:8,16
221:25
223:21
257:8
272:2

**BARELY**
152:18

**BASE**  183:17

**BASED**  18:15,
16  56:15
63:25
154:13
159:19
181:10
236:11
238:16
267:25
271:14

**BASIC**  274:23

**BASICALLY**
29:16
31:12

36:14
38:19

BASIS  14:5
  15:5
  129:19
  135:20
  162:20
  256:9,10
  271:6

BATCH  153:11

BATES  11:16

BATTLE
  238:11

BEAR  59:16
  87:11 89:3
  218:15
  225:11
  247:17
  275:10

BEARS  106:8

BED  13:10

BEES  128:6

BEG  48:23
  100:22
  119:4
  184:13

BEGGED
  215:19

BEGIN  4:9
  13:25
  16:6,24
  17:2 47:20
  109:23
  119:19

230:21
242:17
279:9
280:23

BEGINNING
  31:11,25
  32:6 159:6
  273:10

BEGINS
  182:25
  185:15

BEHALF  52:10
  111:10
  125:23
  133:18
  148:18
  185:22
  218:25
  228:23
  235:16
  238:11
  255:16
  257:4
  258:5

BEHAVIOR
  47:11

BELIEVED
  23:23
  25:16

BELIEVES
  279:19

BELLS  188:17
  208:8

BELONGING
  265:21

BELONGS
  265:22

BENEFIT  45:8
  46:13

BESTOWED
  90:13

BICKERING
  213:8

BIG  169:5
  213:16

BIGGER
  152:19
  161:7

BIGGEST
  146:19
  147:23

BILL  22:10
  134:12,23
  135:4,9
  136:17,20
  137:11
  205:14
  207:11
  234:3
  251:19

BILLABLE
  21:5,25
  29:15
  129:3
  133:24
  136:24
  137:21
  155:22

BILLABLES
  136:8

158:10

BILLED  46:10
  205:18
  208:22
  211:3
  228:21
  233:25
  263:19
  264:16

BILLING
  19:20 21:1
  22:4 80:20
  127:7,11,
  16 128:2,
  5,7,10,13,
  16,18,19
  129:8,11,
  15 131:18,
  24 132:2,
  4,11,16,22
  133:13,24
  134:10,13
  136:9,13
  137:20
  155:22
  182:7
  186:25
  187:19
  188:16
  192:11,12
  260:11

BILLS  133:16
  136:15
  205:9
  260:12

BINGO  186:1

BIO 129:21
130:5
154:19

BIT 13:4
28:4 76:21
79:22
130:3
154:24
176:23
194:6,20
206:18
276:22

BLANKET
13:18

BLEW 199:25

BLOCK 253:14

BLOCKS 180:7

BOARD 109:4
111:22
114:21,23,
24 116:11,
12 183:15
209:3

BONEY 54:18
278:24

BOOKKEEPER
125:11
126:1

BOOKKEEPING
125:16

BOTTOM
153:25
154:1
157:21

176:22
179:18
180:7
181:8
235:6
236:19
237:15,18,
20,21,22

BOUND 57:21,
22,24 58:5

BOUNDS 200:7

BOY 27:1

BREACH 58:6
100:20
101:3

BREACHED
25:11 47:3
58:1,2

BREACHING
45:9

BREAK 7:14,
15,18 16:5
47:19
48:1,7
87:14
88:21 94:1
99:14,22
107:1,5
129:22
130:5,22,
24 131:3
154:19,25
155:1
171:2
224:25

225:18,20
226:8,24
242:5,7,10
273:18

BREAKDOWN
142:7

BREAKING
213:3
214:22

BRIEFED
121:25
276:13,18

BRIEFING
276:15

BRIEFLY 33:8
42:8

BRIEFS 78:15
99:6
266:21
276:5,11,
14 277:3
279:5,23

BRING 183:19
233:22

BRINGING
177:2
204:9

BROADEN
234:8

BROADER
89:16

BROCHURES
178:12

BROKE 130:7

BROUGHT 14:3
28:25
72:11,12
128:9
182:25
183:3
187:25
192:19
268:10
269:24

BUCKS 194:22
209:16

BUDGET 21:9
125:5
134:25
267:9,19

BUDGETING
271:23

BUNCH 12:9
118:18
146:6
182:2
231:20

BURDEN
275:10

BURDENSOME
117:24

BUSINESS
157:11
172:4
277:1

BUSY 21:25

BUY 86:20

## C

C- 251:25

C-00 37:12
102:6

C-001 30:23,
25 59:9
96:21 99:9
115:19
150:10
152:21,22
247:19
266:17

C-002 22:18
23:2
58:15,21
59:2 84:5,
6 85:16
92:24
101:24
102:9

C-003 101:24
102:9,10

C-005 24:11

C-01 12:6

C-010 59:19,
22 60:8
61:13

C-013 61:24,
25 63:13
151:7,11
154:15

C-014 104:18

C-015 103:23

104:18

C-016 85:21

C-019 43:8,9

C-020 40:14

C-021 32:13
35:6

C-022 34:10,
13,14
35:19
37:13
95:16
146:12
150:9

C-024
105:17,19

C-1 150:12
151:5,20
158:14,20
159:13
160:9

C-13 155:18
158:13,18

C-14 103:23
164:10

C-17 86:25

C-21 33:21

C-24 16:9

C-48 151:19

C-6 252:21
253:21

C-91 160:8

C-CORP

111:15,16

CALENDAR
142:1
182:18

CALENDARS
182:15

CALIFORNIA
4:1,22
12:23
17:23
18:1,8
26:12,24
37:18
55:6,8,10
78:14
83:23 92:8
94:13
108:1
118:2
123:22
139:2,6
140:4
142:18
143:10,14
145:17
159:22
181:10
182:1,3
186:21
234:22
242:12
255:11
278:4

CALL 7:12
12:1 23:5
36:16
71:20 88:2

103:22
108:7,8,11
113:8
123:25
128:6,15,
19 191:20
198:5
200:12
202:5
209:5
225:25
244:12
247:14
252:13
262:3
263:15

CALLED 18:13
21:23
52:10
92:12
110:17
121:23
129:15
133:24
189:13
191:14
194:4,19
197:5
204:19
219:10
269:7

CALLING 7:4
186:1

CALLS 157:25
189:20
190:1
194:6

240:15

**CAMERA**
  110:3,9

**CANDIDLY**
  136:17

**CAPITAL**
  175:21
  233:12

**CARD**  185:20

**CARE**  4:8
  133:19
  188:4
  208:24
  240:9

**CARRY**  257:7

**CASE**  5:23
  13:20
  23:17
  24:14,20
  25:20 26:5
  27:18,25
  35:12 42:8
  51:21
  79:25
  92:8,12
  110:23
  117:18
  129:1,4
  137:5
  150:22
  155:16
  165:11
  189:9,14,
  19 191:11
  220:22

241:15
255:13
256:14
259:15
261:19,20,
21 266:9
268:1
274:7,19
278:19

**CASE-BY-CASE**
  14:5 15:5

**CASE-IN-CHIEF**
  16:25

**CASES**  18:25
  19:22,23
  204:10
  266:7

**CASH**  175:23
  209:17

**CATCH**  20:11

**CATHY**  18:21
  19:22
  21:14
  25:17
  35:23 36:2
  37:17,20
  74:25
  75:19
  77:5,25
  79:4,7
  93:15
  96:23
  102:5
  103:5,16,
  17 104:8,
  13 128:24

132:18
135:24
136:5
137:4
138:4,9,21
139:13,19
140:4,8
141:15
144:10
145:3,5
146:2
147:6
148:12,24
153:20
159:19
160:1
161:16
162:3,22
163:20
164:22
165:4,16,
18 168:24
169:3,7
173:15
183:24
184:24
186:11,16,
19 187:19,
22 188:12,
16 190:10,
20,24
192:13,19,
20 206:2
208:23
213:12,14
215:11,20
216:2
218:25

223:2,5,10
228:2
232:22
236:9
238:14
256:14
258:1
259:15,22
261:14,20
263:8
267:10
272:14

**CAUSED**  29:16

**CENTRAL**
  37:18
  145:16

**CEO**  5:9
  38:23 39:6
  113:14,15,
  21 114:3,
  6,15
  115:13,14

**CEO/PRESIDENT**
  114:17

**CEOS**  113:17

**CERTAINTY**
  168:25

**CERTIFICATES**
  15:18

**CETERA**  22:17
  25:24
  38:21
  39:25
  41:12 72:4
  89:25

281:4

**CFO** 108:23,
25 113:15,
20,24
114:3
115:6
122:17
125:3
153:24

**CFO/TREASURER**
113:6

**CFOS** 113:18

**CHAIR** 259:17

**CHALLENGE**
269:11

**CHANCE** 6:19
9:20 81:14
88:12
117:6,8
118:6,11
129:21
210:11
226:3,7
242:3
248:25
279:7,17
280:8,12

**CHANGE** 53:2
74:14
188:12,14,
20 216:16
231:7
247:21
248:1
250:25

269:17

**CHANGED**
106:11
175:3
188:20
232:16

**CHANGING**
198:5

**CHANNELS**
106:18
270:24

**CHARACTER**
78:1

**CHARACTERIZATI
ON** 280:3

**CHARACTERIZE**
193:8,12
257:5

**CHARACTERIZED**
78:2

**CHARGE**
118:23
119:21
122:25
126:6,8,9
128:23
129:1
131:15
133:19
238:11
260:10
269:18
270:8

**CHARGED**
267:17

**CHARGES**
263:1

**CHARGING**
267:6
270:2,7

**CHARITABLE**
82:22

**CHEAPER**
255:14

**CHECK** 21:11
181:19
250:18
253:23
256:21
258:24

**CHECKED**
278:22

**CHECKS**
185:20

**CHEN** 98:13
103:17
104:7,21
105:1,4,20
106:1,3
140:8,16
144:12,19
163:12
165:16
186:12,19
189:8
211:25
212:11
216:9,12,
25 217:13,
19,20

218:24
219:17,18
220:4,8
222:10
223:16
224:13,16,
18 225:7,
8,9,11
226:15,16
227:12
228:8
252:22
253:19
254:4,24
259:10
261:14,20
263:7,8
264:24
266:2
268:8,9
269:5,8
270:17,19
271:20
275:3

**CHEN'S** 106:4
217:22

**CHICAGO**
123:21

**CHICKENS**
57:13

**CHIEF** 114:6,
7,8,9

**CHINA** 19:14
169:4
225:10

**CHINESE**

49:10
178:18,20
227:11
266:5,6

CHOICE  161:5
255:14

CHOOSE
113:25

CHRISTINA
189:22,24

CHRISTMAS
240:17

CIGARETTE
48:4

CITE  192:20

CITED  92:16

CITING  26:12

CLAIM  54:20
76:25
148:15
163:11,13
208:17,20,
21 210:5
237:17
262:11

CLAIMANT
5:21 22:18
73:16
120:22
132:13
168:5,13
169:20

CLAIMANT'S
168:11

CLAIMED
139:9
239:20

CLAIMING
266:15,21

CLAIMS  76:21

CLARIFICATION
45:11,14
168:11
190:15,19

CLARIFICATIONS
174:4,10

CLARIFIED
33:9

CLARIFY
15:24
51:14
52:14 54:2
58:20
64:10,12
83:1
108:14,18
112:10
125:25
127:10
143:13
144:18
167:13
172:15
181:12
217:11
224:16
227:4
237:24
265:11

CLAUSE  229:1

CLEAR  52:20
102:1
159:18
174:8
196:3
260:22

CLERICAL
209:7

CLERK  22:4

CLIENT  21:2,
7 22:11
23:10,18
38:16
68:11,15,
21,22
69:22
70:16 72:8
89:14
91:8,13,
18,19
101:6
128:4,8,9
131:25
132:9,15,
17 134:21,
25 135:5,
8,11,25
136:6,14,
17 137:12
148:11,13,
14,17
157:10,24
158:6
170:7
172:17
173:5,11

177:2
183:7,11,
17 185:5,
18 187:1
195:14
197:11
203:6,7,11
204:5,14
205:7,19
207:10
209:1
211:8
215:12
232:8,15,
19 234:11
236:4
240:24
253:9,23
258:3

CLIENT'S
21:13
23:15

CLIENT-
RELATIONS
211:4

CLIENTS
18:25
20:20,21
68:12,25
80:25
89:12 90:2
111:10
124:5,18,
21,23
125:7,8
131:25
132:15

133:14
134:21,23
135:8,23
136:12
172:23
173:3
178:18
182:2,8,25
183:2,4,5,
18,19,20
193:18
199:17
204:10
207:3
233:22,25
271:22,23
281:3

CLIENTS'
194:18

CLOCK  76:3,4
243:22,25
244:1

CLOSE  157:11

CLOSELY
250:13

CLOSING
47:13

CLS  189:21

CLUE  205:21

CO-FOUNDED
19:1

COB  157:11

CODE  234:23

COFFEE  242:6

COFOUNDED
18:13

COLLEAGUE
87:16

COLLECT
87:14
90:13,22
91:8,15,16
168:24
169:11
216:8
269:19
274:13
276:10

COLLECTED
28:20 31:7
36:2 56:3,
5,9,16,19,
20,23
57:1,5,17
64:1,5,11,
16,20
90:21,23,
24 91:21,
23 92:2
174:21
235:25
263:19

COLLECTING
90:10,23
91:4,20
233:11

COLLECTION
31:18
37:15
77:14

90:23
95:23
146:13
224:2,12
230:5
232:5
236:16,24
237:5
238:12
239:1,13
247:24
258:17
267:11

COLLECTIONS
93:15
97:11
146:17
147:2
177:1
178:10
230:12,21
231:5
237:10

COLUMN  85:24
86:19

COMBAT  80:23
82:1

COMBATIVE
81:21

COMMAND  10:1
154:16

COMMENT
210:9
238:7
270:15

COMMENTING
218:11

COMMENTS
156:18
270:13

COMMERCIAL
106:18

COMMINGLING
164:1

COMMON  106:2
225:10

COMMUNICATE
25:3 38:22
93:16
94:18
239:17
240:10
254:9

COMMUNICATED
19:6 24:24
77:22
92:11 97:3
153:23
260:19

COMMUNICATING
25:17
192:21
214:17
217:1
252:8

COMMUNICATION
8:3 23:3
24:4 25:4
29:3,12,19
30:25

31:15
32:22 34:5
36:15
39:12
40:14
41:4,6,10
43:9,14
44:9,17
45:1,2
58:15
60:18 63:3
81:3 82:2
93:12
98:22
101:23
147:11
155:20
221:9
239:22
240:14
251:20,23
252:7

**COMMUNICATIONS**
22:3,9
29:2 31:2
32:7 33:4
39:2
92:14,19
94:22 95:6
96:3
170:11,12

**COMPANIES**
66:23
69:25
103:25
114:3,4
178:21

**COMPANY**
17:24
18:22
72:15
89:15
106:14
113:10,23
114:2,24
115:1
135:12
144:11
191:14
194:4
197:5
207:4,11
208:19
211:11
246:6
269:7
271:3

**COMPANY'S**
89:21
113:8

**COMPEL**
120:25
121:3

**COMPELLING**
12:25

**COMPENSATE**
274:25

**COMPENSATED**
47:2
274:23

**COMPENSATION**
252:23,24

**COMPENSATIONS**
274:20

**COMPLAIN**
223:3

**COMPLAINED**
223:14

**COMPLAINING**
222:23

**COMPLAINT**
142:14
163:10,14
218:24
219:1,9,17
220:9,17
221:8,25
222:5,7
230:12,14
241:15

**COMPLAINTS**
29:1
220:17
222:10
223:21

**COMPLETE**
37:21
54:14
80:20
197:24
208:12

**COMPLETED**
100:13

**COMPLETELY**
152:22
218:8
264:22

**COMPLETION**
23:13

**COMPLEX**
231:15
267:5

**COMPLIANCE**
8:18

**COMPLICATED**
146:21

**COMPLIES**
120:4

**COMPONENTS**
94:4

**COMPOSITE**
12:10
226:1

**COMPOUND**
161:24

**COMPREHENSIVE**
167:5

**COMPROMISE**
238:9,10

**COMPULSION**
108:17,19,
21,22

**CONCERN**
13:18
57:11
269:17,18
278:12

**CONCERNED**
189:3
204:24
212:12

**CONCERNS**
219:19,21,
23

21:21

**CONCISE**
193:7

**CONCLUDED**
281:12

**CONCLUDES**
47:21
88:13
281:10

**CONCLUSION**
26:5
46:21,23

**CONDITION**
236:20
272:11
275:16,17

**CONDITIONS**
170:1
244:11,15,
16 280:12

**CONDUCT**
22:12
47:12
79:12 90:6
93:3
219:19

**CONDUCTING**
188:7

**CONFER**
273:24

**CONFERENCE**
8:13
200:12

**CONFERRED**
38:15

**CONFERRING**
168:5

**CONFERS**
120:4

**CONFIDENCE**
250:2

**CONFIDENT**
25:4

**CONFINE**  61:7
81:12

**CONFIRM**
49:19 93:3
161:16
229:17

**CONFIRMATION**
145:15
155:24
236:16,24
261:10

**CONFIRMED**
140:3
143:10,19
146:11
147:3
229:14,23
230:4
231:21
264:20

**CONFLICTS**
35:17

183:9

**CONFRONT**
33:11

**CONFRONTED**
141:10

**CONFUSION**
211:11

**CONNECTICUT**
18:16

**CONNECTION**
6:21 69:23
192:3

**CONSCIENCE**
38:14

**CONSENT**  6:6

**CONSEQUENCES**
201:6

**CONSERVATIVELY**
150:23

**CONSIDERABLE**
88:8

**CONSIDERATION**
96:6

**CONSIDERED**
176:19

**CONSIST**
172:2

**CONSISTENT**
24:8

**CONSISTENTLY**
82:19

**CONSTITUTE**

61:20

**CONSTITUTES**
58:11,22
59:4,14
62:21
63:1,14,21
100:20

**CONSTRUCTION**
57:5

**CONSULTANTS**
66:21

**CONSULTING**
35:23 36:1
173:16
207:3
212:3,5,9

**CONSUME**  7:23

**CONTACT**
21:21
140:25
183:10
204:15
205:3

**CONTACTED**
194:4
255:5

**CONTACTS**
183:16

**CONTAINED**
58:21

**CONTEMPLATE**
178:15

**CONTEMPLATION**
178:14

CONTEND  59:1
  60:7,15
  61:14,20

CONTENDS
  40:19

CONTENT  31:3

CONTENTION
  18:7 58:21
  61:2 62:9
  63:20
  90:22
  91:20
  97:16,17
  98:1
  100:19,25
  102:7
  214:3

CONTENTIOUS
  193:10

CONTENTS
  6:25 56:1
  221:8

CONTESTED
  27:24

CONTEXT  56:7
  57:2 69:7
  175:13
  176:12
  183:3
  185:2

CONTINGENCY
  255:15
  271:6

CONTINUE
  24:14 29:8

32:2,4
35:4 38:1,
5 42:23
78:25
118:21
120:12
131:9
141:18
145:1
149:11
151:3
200:23
213:20
238:21
240:10
241:2

CONTINUED
  24:2,7
  30:13
  36:12
  39:12
  144:12,19,
  23,25
  240:1

CONTINUES
  112:6

CONTINUING
  87:21
  146:17

CONTINUOUSLY
  31:6
  265:13

CONTRACT
  64:24 92:4
  143:6
  159:23

176:13
194:20
208:11
234:10
236:2

CONTRACTING
  65:4
  70:19,25

CONTRADICT
  88:8

CONTRADICTED
  252:12

CONTRADICTING
  270:20

CONTRARY
  27:18
  180:24
  181:7,13
  184:6

CONTRIBUTE
  145:4
  269:22
  271:19
  273:1

CONTRIBUTED
  29:15
  38:17
  46:24

CONTRIBUTIONS
  175:22
  233:12

CONTROL
  122:3,23,
  24 153:13

CONTROLS
  122:19

CONVENIENT
  99:18

CONVENIENTLY
  144:3

CONVERSATION
  20:1 22:9,
  14 53:21
  99:21
  148:9
  203:16
  227:8
  240:16
  241:14,20
  251:17

CONVERSATIONS
  22:6
  147:19
  254:4

CONVERSE
  266:4

CONVERSION
  27:16,18
  93:17,18
  195:2,16
  204:4

CONVERT
  266:4

CONVERTED
  25:23 36:6
  38:21
  101:11,13
  106:10
  194:8

232:7
265:14,15

**CONVERTING**
21:1

**CONVEY**
183:13,14
212:24

**CONVEYED**
21:20

**CONVINCE**
190:2

**CONVINCED**
24:20

**COOPERATING**
144:14

**COOPERATION**
65:21

**COOPERATIVE**
216:12

**COPIED**  22:4

**COPIES**  50:6
172:3
206:14

**COPY**  5:10
50:12,14
51:9 178:1
225:14
249:4
278:20

**COPYRIGHTS**
72:3

**CORDIAL**
216:15,18

261:2
266:2
270:17

**CORNER**  28:5

**CORPORATE**
5:10 19:18
97:21
103:23
108:8
109:4
111:12,14
114:14
115:12
123:4
161:16,20
162:4,11,
13,25
163:25
164:3
167:16

**CORPORATION**
162:13
172:8
175:15,18
176:8
246:8

**CORRECT**  9:9
16:2 20:18
49:7,21,25
51:13
52:19
54:14
55:24
57:4,20
59:23
62:19 63:9
65:12 71:1

72:7,16,
17,21
74:25
75:20 79:5
80:7 83:21
87:4
102:20
115:10
116:6
131:19
132:5,6
146:15
147:8
162:16
172:3
179:16
180:22
187:2
190:7
191:13
217:8
219:23
224:17
227:17,18
228:13
229:14
233:4,10
235:9,22
239:23
242:25
243:6
244:25
245:1,5
246:1,4,21
247:4
248:3
249:16
252:24

253:12,25
254:4,19,
25 255:23,
25 256:12,
13,15,16
257:20
264:23
265:23
270:13
273:11
275:23
280:2

**CORRECTED**
256:19

**CORRECTION**
223:13

**CORRECTLY**
72:19
197:1

**CORRESPONDENCE**
38:10
140:24
145:20
190:11
246:16

**COST**  46:5
124:11
229:22
231:16
255:5
269:25
271:20
272:17

**COSTING**
209:8

COSTLY  275:9

COSTS  154:2
178:10
231:2
250:1
263:10

COUNSEL  5:11
17:23
31:19 34:6
39:18 41:6
43:10
49:11,13
74:20 75:9
91:6 94:15
98:16
106:1
137:23
139:4
145:19
146:2,4
148:24
156:19
166:12
187:22
188:1,2
190:8
192:23
200:8
208:24
213:14,20,
21 215:10
246:7
249:23
256:17,20
270:16

COUNSELS
129:6

247:17
270:14

COUNT  48:8

COUNTED
84:24

COUNTING
46:15,16

COUNTRIES
71:5

COUNTY  18:1
226:13
278:4

COUPLE  4:7
107:2
149:12
225:6

COURT  17:9,
11,19
18:23
41:20,25
94:11,14
104:7
130:11,15
140:4
142:19
143:11,14,
15,18
145:15,16,
23 146:9
147:3
148:3,5
149:23
166:16
188:3
189:25

203:20
226:13
229:14,17,
23 230:5,
15,16,18
231:11
238:13
241:6
250:23
255:11
256:5,7,15
262:2,4,10
263:11
264:18
269:1,6,23
277:1
278:14,16

COURTROOM
209:12

COURTS  17:8
255:22

COVER  172:6
209:7
221:7

COVERED
93:23
178:10
216:11

CRAIG  139:1,
2 145:14
229:20
231:21

CRAZY  188:17

CREATE
197:13

211:9,10

CREDIBILITY
55:15

CREDIT
185:20

CREDITED
265:3,5

CROSS  88:14,
19

CROSS-
EXAMINATION
5:16 47:20
48:12,14,
18 52:12
87:22
171:16

CROSS-EXAMINE
184:7
279:8

CRUCIAL
117:18

CTC  24:15,
21,25
28:14,16,
24,25
29:16 33:5
39:19 40:7
42:15 45:7
46:12,14
47:6 78:1
95:23
98:6,9,17,
20 106:10,
18 118:1
135:24

138:6
166:2,5,8
168:7,17
191:12
254:24
262:8
266:15
270:18
272:9

CTC'S  104:17
106:8
166:21
167:8
272:11
275:15

CUFF  276:12

CUMULATIVE
81:24
166:24

CUP  242:6

CURIOUS
83:12

CURRENT
37:19
44:16,25
116:11,12,
14 135:16
190:25
191:17
199:16

CURTAILED
46:9

CUSTODIAN
171:20

CUT  260:22

CUTTING  54:1
200:15

——————————
          D
——————————

D-I-F-F
247:24

DAMAGES
29:16 33:5
41:12
46:18 47:3

DATA  104:11
226:18
227:15

DATABASE
182:17
204:19

DATE  8:14
26:22
54:21 80:9
83:17,19,
20 103:6
112:14
116:10
135:17
144:16,17
159:25
194:5,24
207:6
220:21
229:7
242:23

DATED  23:3
32:13 54:9
155:21

DATES  149:7

204:17
230:22,24

DAY  8:23
10:7 44:24
112:10
118:15
132:14
157:24
196:3
215:6
274:24

DAYS  21:1,
16,18 24:1
229:8
277:2

DEADBEAT
77:25 78:2
272:10

DEADLINE
9:12,20,24
14:4 194:9
195:9,10,
12 196:21,
22 197:24
201:11,13,
15

DEADLINES
20:20
182:13,15
193:21
201:13

DEAL  14:21
15:7 16:7
270:19

DEALING

148:24
213:2
257:8

DEALINGS
72:10,13
82:20
253:15

DEAR  54:10

DEBATING
50:25 83:9

DEBIT  23:18

DEBT  232:22

DECEMBER
22:1 23:17
140:10
141:15
144:10
170:14
208:15
229:5
240:18
245:7,8,10
247:8
251:19

DECENTRALIZED
124:4
177:13

DECIDE
211:21
234:8
275:7

DECIDED  17:1
19:23 24:9
27:19
138:5

142:15
234:10

**DECIDES**
16:19

**DECISION**
138:7
139:12,18
140:2
263:14
264:10

**DECLARANT**
198:9
279:8

**DECLARATION**
4:14,18
5:17 6:2,
4,11,23
7:5,7,12,
19 8:2
198:4,8,
19,21
201:2
277:12,14,
16,18,21
278:13,20
279:9
280:1,7,
13,18

**DECLARATIONS**
278:15

**DEFAULT**
228:10
249:24
261:12
262:3
269:1

**DEFAULTED**
271:3

**DEFEND** 224:8

**DEFENDANT**
190:9
191:12

**DEFENDANT'S**
271:2

**DEFENDANTS**
278:8,14

**DEFENSES**
224:7
268:18

**DEFENSIVE**
18:22
24:15,19
266:7

**DEFINE**
134:19

**DEFINED**
90:25

**DEFINITION**
168:6

**DEGREE** 13:7

**DELAY** 157:9

**DELAYED** 23:9
84:10,18
85:2,3,9,
10 210:13,
21 272:1

**DELAYS** 23:14
24:1,3,8
62:5

158:10

**DELIBERATELY**
82:21

**DELIVERED**
186:11

**DEMAND** 44:11
45:23
98:25
168:13
236:20

**DEMANDED**
136:6
149:24
252:8

**DEMONSTRATION**
278:1

**DENIAL**
132:11

**DENIED** 29:13
77:15
120:23
132:14,19
137:21
167:18,21
168:14

**DENIES**
209:22

**DENY** 208:21

**DEPARTURE**
122:20

**DEPEND**
171:12

**DEPENDING**
87:25

163:4
195:6

**DEPENDS**
134:21
135:5
162:14
163:3,7,20
172:23

**DEPOSITED**
172:21
173:5

**DEPOSITION**
15:21
119:3
268:11

**DEPOSITIONS**
275:5

**DESCRIBE**
41:23
262:17

**DESCRIPTION**
81:5 198:6

**DESERVE**
274:22

**DESERVES**
33:18
55:19
73:19

**DESIGNATE**
113:17,18
114:3

**DESIGNATED**
127:4

**DESPERATE**

197:9

**DETAIL** 22:5
24:5 39:14
149:15
231:14

**DETAILED**
198:5

**DETAILS**
157:14

**DETERMINATION**
43:5

**DETERMINE**
67:7 99:11

**DETERMINING**
168:6

**DEVELOP**
183:16

**DEVELOPED**
36:14
69:24
183:1,12

**DEVELOPING**
19:13
178:15

**DEVELOPMENTS**
267:25

**DIALOGUE**
82:2
140:6,9,10

**DIFFERENCE**
76:5,6
162:9
175:12
176:13

247:25

**DIFFERENCES**
193:2

**DIFFICULT**
151:10

**DIFFICULTIES**
214:20

**DIFFICULTY**
12:22

**DIGGING**
21:10
189:19

**DIGITAL** 50:9

**DILIGENCE**
15:18
21:13
31:18

**DILIGENTLY**
271:22

**DIME** 120:9
233:11
237:11

**DIRECT** 17:3
22:16
37:16
38:10 39:2
47:25 53:5
87:25
88:1,2,13,
14,19
110:15,19
115:18
149:16
150:9

170:21
176:23
177:9,19
193:20
215:14

**DIRECTED**
35:23
71:21
146:22
156:8
173:15
211:16
238:15

**DIRECTING**
207:4

**DIRECTLY**
25:3
132:10
173:4,10
180:21
181:19,21
188:16
212:2
217:1
234:11
252:11,23,
24

**DIRECTOR**
110:24
113:10
280:15

**DIRECTORS**
111:22
115:23
116:9,13
117:17

**DISABLE** 28:3

**DISAGREE**
165:6,8,9

**DISAGREEABLE**
253:14

**DISAPPEAR**
213:16

**DISBURSED**
236:5

**DISBURSEMENTS**
233:1
238:16
240:25
244:18

**DISCIPLINE**
222:3

**DISCLOSE**
67:25

**DISCLOSED**
6:1 101:22

**DISCLOSURE**
8:7 9:7
102:4
153:10

**DISCLOSURES**
6:22

**DISCOVER**
274:18

**DISCOVERED**
20:7
188:15
265:15

**DISCOVERY**

DISCREPANCIES
39:20
265:19

DISCREPANCY
41:15
43:16
98:18
248:2
249:16
251:15
252:9

DISCUSS
15:10 22:5
73:21
197:13
237:16
238:6

DISCUSSED
35:5 58:17
99:12
151:14
152:6
163:11
216:12
265:17
277:12
278:7

DISCUSSING
4:13 39:20
139:10
172:10,17
233:8

DISCUSSION
14:25

98:16,18
144:25
145:1
165:15
200:9
271:17

DISCUSSIONS
66:3,5
212:11
223:16,18

DISMISS
189:6
190:3,5
261:15

DISMISSED
29:2 189:9
219:9,10
278:9

DISPUTE
47:11
265:4

DISTINCTION
65:14

DISTINGUISH
191:19

DISTRIBUTED
124:5,14
165:25

DISTRIBUTION
5:22
39:21,23
40:1,5
41:15
42:13
151:24,25

152:1,14
247:15

DISTRICT
17:8,19
18:23
37:18
94:14
142:19
143:11,14
145:15,16,
17,23
146:9
147:2
148:3,5
166:16
229:14,16,
23 230:5,
15,16,18
231:11
238:13
250:23
255:22
256:5,7,15
262:1,4,9
263:11
269:1,23

DIVE    241:25

DIVERSITY
114:8

DIVERT    101:6

DIVERTED
101:8
141:1
209:4
267:15

DIVERTING

207:9
211:23

DIVIDE    281:2

DOCKET    196:3

DOCKETED
202:19
204:6

DOCKETING
19:20
182:4,11,
12,16,21
203:5,6
204:6,11,
19

DOCUMENT
22:18 28:2
32:9 34:8
35:9,10
38:24
40:23
42:21
44:19 51:4
55:24
58:11
59:13,25
60:10,11,
13,24
61:13,18
62:2 66:4
68:8 69:11
73:3 86:17
93:1
95:19,20,
22 96:17,
22 100:7
101:5,18

104:18
105:21
116:10
117:23
118:2,14,
16 120:4
139:3
146:12
151:12,13,
15 152:11,
12 155:25
156:3,4,6
157:19
159:12
160:13
162:7
164:8,12,
20,21,25
165:4,12
167:20
175:14
176:13
178:13
180:24
181:7
184:19
185:11
192:18
196:25
197:6
207:20,21
218:23
219:22
221:5,12,
14,17,19,
21,24
226:19
227:19,20

244:6
248:5,15
249:10,13,
21,22,23
250:15,16
253:17
257:18,25

**DOCUMENTARY**
103:20

**DOCUMENTATION**
40:12

**DOCUMENTED**
25:25
202:19

**DOCUMENTING**
20:19

**DOCUMENTS**
5:10,18
6:13 8:13,
22 9:15
13:7,10,
11,12 14:1
16:6 39:14
44:22
51:1,3
58:8 60:14
61:19
78:10,17
95:8,9,12
99:7
100:4,10
102:3,12,
16,21
109:4
117:2,13
118:7,18,

20 120:18
133:7
137:7
150:10
157:5
160:3
161:2
173:23,25
174:3,9
186:14
188:7,9
198:2
200:2
204:4
205:25
206:16
225:8,9,14
248:13
266:23
268:10,13

**DOLLAR**
169:11,14
255:10

**DOLLARS**
46:16
145:11
149:2
229:24
272:14

**DOT** 247:24

**DOWNLOAD**
54:13
249:1

**DOWNLOADABLE**
10:10

**DOWNLOADED**

12:17

**DRAFT** 142:14
209:10

**DRAFTED**
32:24
178:13
198:11,14
199:11

**DRAFTERS**
33:14

**DRAFTING**
188:7

**DRIVE** 51:2
52:18
249:2

**DROP** 190:2

**DUE** 15:18
21:12
31:18
101:19
154:7,11
195:11
247:20
251:4
277:4

**DULY** 52:11
110:17
270:24

**DUMBFOUNDED**
208:6

**DUMBSTRUCK**
209:11

**DUPLICATED**
12:12

DUPLICATES
153:9

DUPLICATION
276:16

DUPRE  126:22

DWELL  267:1

**E**

EAGER  238:11

EAR  111:2
136:4

EARLIER
64:19
74:23 81:3
83:23
116:16,22
193:20
194:3
196:24
211:14
216:8
228:8
238:23
256:16
277:12

EARLY  8:15
9:13 46:3
65:6
104:23
126:3
172:8
175:4
196:4
231:12
255:3

EASIER  25:20
161:15,20
162:10
268:20

EASILY
178:20
211:5

EASINESS
163:19

EASTERN
196:21

EASY  10:10
162:4,12,
25 163:5
270:18,25

EAT  205:14

EBAY  104:24

ECOMMERCE
270:24
271:1,3

ECONOMIC
228:25

EDITED  32:24
199:11

EDUCATION
202:8

EFFECT  44:20
103:21
259:20

EFFECTIVE
80:20
82:16,18
213:11

EFFICIENCY
160:20

EFFICIENT
35:17
157:2
276:22

EFFORT  10:8
47:8 77:15
91:12
95:23
97:1,22
98:5,12
143:9,25
144:8
146:13
149:25
224:12
255:4
276:16

EFFORTS
35:15
37:15
46:20
97:25
150:2
164:4
236:17,25
237:5
238:12
239:13
258:17

EIGHTY-TWO
158:23

ELECTRONIC
15:19,20
50:14 51:8

53:2 86:17
204:18

ELECTRONICALLY
8:2

ELEVEN
173:21

EMAIL  4:17
8:19
10:14,15
11:6,8
12:13 16:4
22:3,9,10
23:2,8
29:12
43:18
54:9,18,20
59:2,11
60:8 61:3
62:18,19
63:19
66:24 67:4
80:11 82:6
83:8 84:9
85:16
93:11
146:25
156:8
162:16
163:9
170:11
186:11
206:8,24
207:6,18
208:9
210:15
212:20,25
213:1

214:15,16
215:4
216:25
217:12,13,
15,18,19,
23 221:9
225:5,16
237:14
239:7,9,23
240:6,7,9
244:4
278:22

**EMAILED**  9:14

**EMAILS**  23:12
44:4
147:15
172:2
240:16

**EMBELLISHING**
71:23

**EMERGED**
88:18

**EMPLOYED**
190:22

**EMPLOYEE**
64:24
65:14 66:1
91:6
176:14,16

**EMPLOYEES**
176:15,19,
21

**EMPLOYER**
274:21

**EMPLOYING**

232:17

**EMPLOYMENT**
36:16 45:9
46:25
64:24
90:24
101:1
120:22
174:18

**ENCOURAGE**
27:24
121:24

**END**  22:14
23:11,15
28:15,21
29:12,17
31:8 32:6
39:13
47:25
50:22
118:15
125:1
135:1,4
157:10
158:7,12
177:11
215:5
242:24
245:23

**ENDED**  137:5
244:9
261:15

**ENDORSEMENTS**
185:22

**ENDS**  37:25

**ENFORCE**
39:19 45:7
47:5 74:24
75:1,3,6,
18 76:8,22
77:5,23
78:4,11
97:18
139:12,13,
18 140:3
143:10
147:5,7,24
148:11
231:23
232:18
242:22
243:5,17
255:15

**ENFORCEABLE**
94:14

**ENFORCED**
75:22
77:25
166:16

**ENFORCEMENT**
37:19
47:8,9
70:1,24
77:7,15,16
78:5 89:24
91:12
94:2,3,5,
8,20 97:2,
4,12,15,
22,25
98:5,8,12,
17,19

138:21
141:17
142:16,17
143:25
144:8,9
145:23
146:18
148:17
149:25
150:2
244:11
255:4
268:19,20
270:21
271:5
272:21

**ENFORCING**
146:7
233:9

**ENGAGE**  53:21
68:23

**ENGAGED**
140:9
183:20

**ENGAGEMENT**
21:17
68:10,20,
24 69:6
70:3,4,15,
17 89:11,
22 183:10
184:23
185:3
197:3,14
203:13
205:1,2

ENGAGING
  90:8

ENGINEERING
  192:12,16,
  18,22,24
  193:4

ENGLISH
  63:11 71:3
  128:1,14
  254:6,7,8
  266:3,5,8

ENTER  21:25
  257:17,18
  258:4
  271:21
  274:2

ENTERED
  72:24
  132:10
  145:19
  153:19

ENTIRE
  167:21
  168:1
  193:11
  225:23

ENTITLED
  36:1 47:1
  209:23
  249:19
  262:14
  266:24
  274:20

ENTITY  169:8
  212:10

ENTRY  213:17

ENVIRONMENT
  18:20

EQUATE
  175:16

EQUIPMENTS
  159:9

EQUITY
  175:10,13

EQUIVALENCE
  56:22

EQUIVALENT
  69:8 71:2
  244:23

ERIC  187:21
  189:13,22

ERROR
  249:17,18,
  20

ERRORS  9:14
  54:11

ESCROW  264:8

ESSENTIALLY
  35:6 38:19
  39:16
  41:6,9
  71:19 99:5
  124:8
  213:4
  219:8
  262:4
  267:18

ESTABLISH
  40:19

183:7
  225:9

ESTEEMED
  90:16

ESTIMATE
  199:6
  262:8
  267:20

ESTIMATED
  150:23
  231:8

ETHICS
  221:11

EVASIVE
  31:16 33:4
  268:15

EVENING  8:16
  9:13 133:1
  188:25
  194:6

EVENTS  81:8
  150:2

EVENTUALLY
  205:4
  262:13

EVERYBODY'S
  102:18

EVERYDAY
  189:1

EVERYONE'S
  26:8

EVIDENCE
  15:18
  26:13,16

27:13
  28:23
  30:16 32:8
  33:22
  34:15 35:8
  40:9 42:1,
  4,19,21
  44:17 58:7
  72:24
  73:9,13,18
  76:25 77:4
  89:9 90:20
  94:19,25
  95:5 96:3
  103:7,21
  105:7
  139:21
  160:4
  181:14
  200:9,11
  210:3
  225:2
  269:3,4
  273:22
  274:20
  275:2,8,
  11,15,19
  276:20
  279:11

EVIDENT
  223:20

EXACT  229:25
  250:9
  264:4

EXAMINATION
  17:3 47:25
  55:17

76:14
88:13,18
100:17
109:7
110:15,19
134:8
149:14
170:23
176:24
239:21
242:19
245:15
258:15

EXAMINE
  53:16  96:2
  280:9

EXAMINED
  52:11
  104:23
  110:18

EXAMINING
  53:13
  71:15
  143:1,2

EXAMPLES
  20:18
  174:7

EXCEL  182:19

EXCHANGE
  9:22  59:2,
  11  153:11
  203:20

EXCHANGED
  8:14  67:20

EXCITED

233:13

EXCLUDABLE
  13:16

EXCLUDE  9:3
  42:4

EXCLUDED
  29:14
  33:13  47:8
  77:13

EXCLUDING
  13:19

EXCULPATES
  27:17

EXCUSABLE
  211:7

EXCUSE  6:15
  10:21  13:2
  34:20
  54:12,17
  140:12
  156:23

EXCUSES
  12:25  21:8

EXECUTED
  58:17

EXHIBIT
  22:19,20,
  25  23:2
  24:11
  29:22,24
  30:1,17,
  21,23
  32:12,16
  33:21

34:2,4,7,
10,14
36:23,24
37:9,12
40:14,19
41:2,4
42:9  43:1,
7  50:21
51:13
54:3,6
56:13
58:13,14,
21  61:16,
24  63:13
64:16
66:25
67:3,11,
19,25  68:1
72:23
73:10,12
78:12
81:18
82:24,25
83:3,13,14
84:6  85:16
86:25
87:10  89:8
90:6
95:11,14,
16  96:5
97:17
99:16
100:2
101:1,23
103:23
104:18
115:18,25
117:1

120:1
137:9
151:5
152:21
154:21
155:18,20
158:13,14,
16  159:13,
15  161:11
164:7
174:12,13,
18  175:8
176:9
178:22
179:6,8,9,
13,14,16,
17  180:8
182:10
184:14
185:1,25
186:23
192:7
206:9
207:17,21,
22  212:18
214:25
216:20
217:4,5,8
218:17
220:15,19
225:23
226:1,11,
21  227:10,
21  235:8,
10,24
239:11
247:13,14,
15,18,19,

22,23
248:8,9
249:8
250:3,5,9,
11,19
251:8
252:18,21,
25 253:2,
3,5 257:16
265:17
266:17
269:6

EXHIBITS
4:11 9:3,
22,23
10:4,9
12:10,11
13:19,23
14:1,5
15:1,2,13,
25 16:15
22:4 24:4
41:10
50:6,18,21
51:8
52:16,24
54:10
58:24 67:1
78:15,18
84:19
92:18
99:3,4,17,
19,25
102:18
103:10
104:19,22
106:20
107:2

109:3
116:23
117:11
145:21,22
171:23
172:1
173:17
224:20
225:3,21
227:13
248:11
249:1,6
252:19
257:16
273:23
274:2

EXIST   113:16

EXISTENCE
101:22
197:6

EXPAND
19:10,14

EXPECT   88:7

EXPENSES
37:22
39:25 40:3
157:10
209:6

EXPERIENCE
177:14

EXPERIENCING
78:14

EXPERT
192:19

EXPLAIN

53:17 61:1
71:1 85:12
127:25
142:20
160:2
164:4
168:18
175:12
176:12
181:16
194:16
251:15

EXPLAINED
169:2

EXPLAINING
30:14
42:23

EXPLANATION
53:10 57:1
60:13 61:9
128:21
252:9

EXPLANATIONS
65:20

EXPRESSIONS
109:12

EXPRESSLY
13:12

EXTENDED
151:2

EXTENSION
195:18
202:12

EXTENSION-OF-
TIME   202:5,

7,20

EXTENSIONS
46:2

EXTENT   13:23
14:1 15:2
96:24
161:3
168:11
266:21

EXTRA   150:24
202:6,7
265:23

EXTRAORDINARY
269:11

EXTREME
38:20

EXTREMELY
124:14
168:10

F

FABOUT   26:17

FACE   97:3
109:25

FACIAL
109:11

FACING   30:8,
10 48:25

FACT   21:22
24:17 40:2
46:6 89:13
91:10
106:15
122:12

148:25
149:14
161:3
162:19
234:8
240:5
246:11
265:15
270:2
278:6,12,
24 280:4

**FACTS** 47:18
105:7
139:20
149:8
175:3

**FAIL** 137:15

**FAILED** 20:24
21:24
28:14
46:20
91:19
93:10
137:17
142:5
272:3

**FAILS** 91:8

**FAIR** 33:7
61:10 95:7
102:23
118:19
149:21
210:16
272:25
274:6
275:20

**FAIRLY**
274:21

**FAIRNESS**
15:14
60:19,20
274:23

**FAITH** 45:25
47:12

**FALL** 111:25
136:19
148:2,4
210:23
216:14

**FALLEN**
135:12

**FAMILIAR**
13:8,15,24
15:2 42:25
56:1
152:12
249:13

**FAMILIARITY**
13:1

**FAMILIARIZE**
117:11

**FAMILY**
103:17
106:3
227:11

**FANCY** 10:2

**FARM** 57:12

**FASTER** 69:15

**FAVOR** 56:10
197:8

219:13

**FAVORABLE**
24:22

**FEBRUARY**
22:15 23:4
44:9 45:5
115:1,2
136:9,10
137:2
142:15
172:9
194:5
197:10
207:5
208:14
245:23

**FEE** 90:13,
14 145:3
157:14
194:21
198:3
201:14,16,
25 202:2,
4,5,7,14,
21,22
234:23
246:9
267:6

**FEEDBACK**
276:4

**FEEL** 57:23
94:16
137:11
151:1
186:1
275:16

280:23

**FEELING**
184:10,17
218:10

**FEELS** 279:10

**FEES** 23:18
31:7 56:5
145:6
202:5
205:14
228:5,7,14
253:20
258:25
259:2
263:10
275:22,24

**FELT** 94:16
274:17
276:18

**FIFTEEN** 48:5

**FIGHT** 238:8,
12,22

**FIGHTING**
205:12
213:8

**FIGURE** 39:23
265:14

**FILE** 12:7,
12 45:22
194:19,20,
23,25
196:5,6
198:19
201:9
202:7

220:8

**FILED**  44:10,
16,25
78:21
120:2
142:15
144:9,24
145:15
188:8,10
190:7,8
195:9
196:17,20,
23 197:17,
19,21,23
198:7,21
199:15,24
201:2,18,
24 202:10,
11,13
204:3
218:25
220:17
222:1
223:21
229:5
230:11,14
238:13
261:13

**FILES**  11:13

**FILING**  98:25
182:12
193:21
194:21,24
195:16
198:3
199:22,25
204:17

229:10
261:15

**FILINGS**
103:24
118:1
188:4

**FILL**  200:1

**FILLED**
219:17

**FINAL**  8:12,
17 12:17
38:8 54:3
92:20 99:6
102:16
131:23
160:24
174:15
204:2
261:16,17
268:6
273:16
275:4,25

**FINALLY**
28:15
39:11 46:2
214:21,24
227:14

**FINANCIAL**
114:7
135:10
272:11
275:15,17
280:11,14

**FINANCIALS**
122:16

**FIND**  10:14
11:6 56:23
60:24
61:13,25
64:22 90:2
211:2
213:18
215:13,21
217:7
222:10
268:22
279:2

**FINDING**
246:11

**FINE**  13:5
14:7 15:9
28:9 32:3
63:8,17
66:14
79:14 89:4
95:18
105:12
107:4
130:1
153:5
154:20
193:13
279:3
280:21

**FINISH**  10:23
11:23 27:1
43:6,23
75:16 76:1
77:10,20
102:15
130:8
141:16

170:21
187:23
226:5
272:5

**FINISHED**
81:7
130:10
134:24
147:3
170:20
272:4

**FINISHING**
6:19
156:12

**FIRE**
213:13,19

**FIRED**  24:13
83:6

**FIRM**  18:12,
16,17
19:1,2,7,
16,18,20
21:3,5
37:21
56:25
57:7,12,13
64:23
66:18,20
73:23,24
74:13
80:18,21
81:9 89:22
90:11
91:4,7,11
111:6,7,
11,23

114:18,25
123:19,24
124:4,6,7,
8 125:18,
20,22
128:4,9
132:6
136:11
148:10
149:3
172:12
173:16
175:22
176:20
177:1,2,
13,14
178:4,12
182:23,25
183:3,7,
11,15,18,
19 185:2,6
187:17
188:3
190:25
191:12,19
192:1
193:16
197:11
202:18
204:9,20
205:3
209:2
210:7
212:3,6,7,
9,22
213:16,21
215:22
221:8

228:22,24
233:12
234:12
260:16
262:16

**FIRM'S** 19:8
112:5
131:25
133:20
183:5

**FIRMS** 21:3
182:16

**FIRST-YEAR**
21:3

**FISH** 161:7

**FIVE-FIGURE**
264:12

**FIVE-MINUTE**
48:1 87:13
242:10

**FIX** 110:8

**FIXED** 110:10

**FLAT** 76:9
82:22
267:6

**FLOW** 175:23

**FOCUS** 138:3
153:14

**FOCUSED**
19:2,18
100:3
276:6

**FOCUSING**

135:7

**FOLLOW**
146:10
248:17
257:8
260:22
266:20
272:2
277:11
278:17

**FORGET** 8:14

**FORGOT** 28:8

**FORM** 56:24
91:7 200:1
240:13
277:20

**FORMAT**
115:16

**FORMATION**
115:4

**FORMED** 74:9,
11 114:25
172:7,8

**FORMING**
73:22,24
74:13
125:18

**FORMULA**
148:20,21

**FORMULAS**
251:12

**FORMULATE**
276:21

**FORUM** 271:16

**FORWARD**
35:16
91:11
115:3
138:6
142:16,17
144:1,8
149:25
244:23
255:4

**FORWARDED**
187:1

**FOUND** 9:13
10:8 31:15
38:13
54:11
94:19,22
225:15
270:19
281:4

**FOUNDATION**
18:3,6
38:25 39:1
42:16,18
68:3,6
103:19
105:6
111:20
117:20
152:4,5,
10,11

**FOUNDATIONAL**
57:18

**FOUNDED**
18:12,17

66:18 74:4
111:15

**FOURTEEN**
184:15

**FOURTH** 225:9

**FRACTION**
209:23
258:11

**FRAME** 88:5
111:18

**FRANCISCO**
123:23

**FRANK** 32:14
38:9
112:19
113:7
114:17,22
115:7
124:17
166:19
222:15

**FRANKLY**
13:21
266:19
278:10

**FRAUDULENT**
224:5

**FREE** 202:10
271:16

**FREELY**
113:25

**FRENCH**
49:17,18

**FRIDAY** 4:1
108:1
135:4
158:9

**FRIVOLOUS**
189:6,10
237:17

**FRONT** 55:22
60:1 80:8
85:22
110:2,8
192:17
215:12
248:5,14,
15 251:2

**FROZE** 130:3
203:17

**FROZEN** 20:9,
10 37:2,4
70:6,9,14
129:20
159:2,5,7,
10 271:1

**FRUSTRATED**
147:20
193:14,17

**FRUSTRATING**
44:1

**FRUSTRATIONS**
204:7

**FRY** 161:7

**FSC** 99:13

**FTB** 46:1
245:18

**FULFILL**
22:12
93:9,10
143:5

**FULFILLED**
46:24

**FULL** 126:23
206:12
238:20
254:20
255:2
263:9
274:6,17
275:20

**FULL-TIME**
193:17

**FULLY** 121:25
242:2
276:18

**FUMBLING**
178:2

**FUNCTION**
257:7
270:2

**FUNCTIONING**
74:4

**FUND** 219:4

**FUNDING**
89:21

**FUNDS** 37:20,
22 56:5,
15,21
57:9,17
64:1,5,11,

15,19,20
90:10
91:21
92:1,2
96:24
101:6,19
124:4
146:19
159:19,20,
25 164:1
165:22,23
169:4
172:17,18,
20,21,24
173:1
174:21
207:9
232:20,25
235:25
236:4,5
238:14

**FUTURE** 38:10

---

**G**

---

**GAIN** 122:1

**GAP** 203:6

**GARNISHING**
270:23

**GARNISHMENT**
267:14

**GASKET**
199:25

**GATHERED**
150:1

GAVE  45:10
  46:19  52:2
  134:3
  157:1
  172:15
  179:14
  204:9
  269:6

GEARED  65:6

GENERAL  4:22
  163:5
  193:6
  211:11
  271:13

GENERATE
  129:16
  131:23

GENERATED
  152:1
  205:11
  266:10

GENERATES
  106:19

GENERATING
  129:3

GENERATION
  135:14

GERMANTOWN
  104:7
  226:14

GIRLS  132:24

GIVE  9:20
  20:18
  29:20

33:17  52:2
54:8  55:18
66:22  73:4
76:18
78:11
85:20
93:24
107:2
109:19
111:18
116:1,2,3
118:5
140:6
150:24
177:24
199:6
206:11
215:8
226:3,7,
10,20
231:15
262:15
276:4,20
279:4
280:24

GIVING  73:19
  224:21
  242:21
  271:15

GLAD  22:20
  130:1
  265:18

GLADLY  15:14
  37:20
  78:21

GLAZING
  230:24

GLEANED
  100:4

GLOSS  144:2

GOOD  4:6
  17:4  24:19
  42:3  51:9
  62:4  66:12
  103:25
  105:9
  121:6,9,23
  129:25
  132:20
  143:21
  154:25
  157:7
  158:11
  159:9
  192:9
  210:18
  230:13
  235:3
  254:3
  257:1
  266:4
  267:13
  272:23
  279:6

GOOD-FAITH
  47:11
  94:17

GOOGLE  249:2

GOOGLED
  179:1

GOVERNED
  89:19

GOVERNING
  159:22

GRACIOUSLY
  150:25

GRAND  264:5

GRANT  5:3

GREAT  8:6
  16:23
  19:16  38:2
  89:1  103:2
  170:22
  226:17
  241:22
  260:9

GREATER
  19:14

GREG  112:19
  113:5,20,
  22  115:5
  119:24
  122:17
  124:24
  125:2,21
  138:11
  147:25
  166:19
  201:20
  222:17

GROSSLY
  165:11

GROUND  7:3
  15:19  27:6
  42:4

GROUNDS  4:15
  7:4  27:5

40:18 44:6
119:6
262:5

GROUP  17:21
37:17
51:12,13
66:2 104:1
110:25
111:5
122:13,20
127:17
128:24
162:22
179:1
183:24
184:24
185:23
186:20,21
188:12
192:13
219:6
223:7,11,
12

GROW  18:20
66:23
89:17

GUESS  9:8
11:10,16
70:9 75:17
128:14
226:3
258:10
262:2
267:13
272:9
273:9

GUESSING
66:13

GUIDANCE
136:18
177:16
276:10,21

GUIDELINES
257:9

GULLIVER
12:20 20:4
31:1,6,10,
16 39:22
77:21
108:10,15,
16 112:19
113:5,20
115:5
119:24
122:17
125:2
138:11
141:13
147:25
152:2
155:12
159:14
166:19
201:20
222:17

GULLIVER'S
93:14
159:15

GUYS  99:13
208:24
231:24
249:7

— H —

H-Y-L  187:4

HABIT  119:15

HAC  256:9,
10,11,18

HALF  216:6
263:12

HALF-PAGE
217:15

HALFWAY
84:15

HAMPERS
13:19

HAND  10:12
12:1 30:6,
10 45:21
51:25 97:4
109:17

HANDLE  14:4

HANDLED
182:23

HANDLING
194:9

HANDS  205:13
208:13

HANG  5:23
95:3 135:7
160:18

HAPPA  72:10

HAPPEN  147:4
191:24

HAPPENED
41:23,25
141:15
190:4
195:12
199:22,23,
24 200:24
228:12
239:25
241:14
246:13

HAPPENING
34:22
79:7,9
98:24

HAPPY  127:22
150:24

HAPUS  70:2,
24

HARD  13:4
50:6,12
56:23
135:12
163:24
240:22

HARM  13:25

HART  5:1
6:5 12:20
17:5,22,25
18:7 19:6,
17 20:3
21:21
22:3,9,15
23:3,7,22
24:12,18
25:3,4,16,

28:15, 17,22 29:12,20 30:25 31:6,10,16 32:5,7,14 33:2,24 34:3 35:20 36:4,20 38:23 39:16,18, 22 40:5 41:5,11, 14,20 42:12 43:10,15 44:8,15,24 48:5 59:3, 12 60:21 61:3 62:21 63:20 73:21 74:3,8,13 76:17,20 77:21 80:17 81:2 82:2,3,20 85:15 87:25 93:13 95:17 96:2,10,22 98:12,16, 23 108:9, 12,13 109:7,10, 16 110:15, 16,20,22

111:1 119:12,24 122:18 123:2,17 129:5 130:4,17, 24 132:2, 13 133:23 134:3,6,12 140:2 141:20 143:17 149:13,19, 22 150:18 151:2,14, 24 152:1, 7,14,16 153:15 155:21 156:7,16, 21 157:1, 4,23 158:3 159:7 160:13,22 161:13,24 162:7,10, 12 164:2, 8,11 166:18 167:14 169:17 170:7,21 171:17 173:24 179:22 180:3 181:6,16 184:19

191:11 198:23 200:13 206:23 209:19 210:20 213:23 221:3 228:1 242:20 243:25 246:2 248:16 252:7,11, 20 255:21 256:22 257:15 258:16 260:9,25 262:8 266:1 267:3 270:16,23 271:7,10, 14,19 272:7 275:21 278:3 280:15 281:3

**HART'S** 19:15,24 20:7 21:23 29:3 43:17 58:22 59:3 88:7 109:24 130:18

133:11 155:22 184:5 238:3 278:1

**HATE**  154:18

**HATED**  142:6

**HATES**  147:21

**HATRED** 141:11 142:10 143:3,4,5 244:22

**HEAD**  196:12 266:20

**HEADED** 117:16 252:4

**HEAR**  10:25 11:25 14:18 17:12 20:13 26:9 30:5,9,12 34:20 36:23,25 44:8,15, 21,24 45:5,13,18 48:25 49:12 53:14,23, 24 68:14, 17,19,21 69:1 70:7

74:6
105:10
111:2
119:5
120:13
127:24
130:13
133:11
136:4
156:18,23
158:9
161:20
179:23
180:1
181:4
187:8,10,
11 230:24
240:21
241:12
253:10
260:24
261:1,6,7

**HEARD**  20:17
33:8 68:20
130:4
158:5
187:9
223:2
234:9

**HEARING**  15:4
27:13
55:5,10
63:6 99:20
108:15
136:3
229:9
261:16,17

268:7,22
273:22
275:5,8,20
281:10

**HEARINGS**
188:3
189:25

**HEARSAY**  4:18
29:6 32:8,
15,18 35:8
40:17
41:19 44:6
96:1 218:9
220:5
241:1
278:5

**HEART**  33:10
47:10
73:15
103:9

**HEATED**  275:8

**HEAVILY**
19:24
215:20

**HECK**  211:12

**HECTIC**
157:24

**HELD**  4:23
5:1 12:24
26:22
123:6
172:24

**HELPED**  24:21
136:16

**HELPFUL**  30:9
53:8 60:1,
3 99:15
149:13
192:2
209:19
248:16
251:10
262:24
265:9
266:14
280:18

**HELPING**  90:2

**HELPS**  268:21

**HIDE**  93:8

**HIDING**  93:8

**HIGH**  87:6
124:6
213:5

**HIGHER**
124:11
172:18

**HIGHLIGHTED**
178:1

**HIGHLY**  8:25
168:21,22

**HILL**  148:23
149:1
187:16
188:11
213:22
237:11
238:18
239:2
254:21

255:16

**HINDSIGHT**
208:4

**HIRE**  233:3

**HIRED**  145:14
180:14
229:19

**HISTORY**
17:20 23:9
84:14,18
85:2 122:2
210:20

**HOC**  118:6

**HOLD**  6:9
11:2 29:23
41:17 67:4
116:18
120:6
152:9
244:2
264:18
269:15
279:15

**HOLIDAY**  62:4
157:7

**HOLLY**  4:7
17:6,17
23:3 25:18
41:12 52:9
128:24
129:4
132:14,17
136:11
137:12,17
147:7,21,

24 148:11,
18,21
157:16
158:11
162:17
166:12
169:20
173:14
180:4
189:15
205:12
206:25
209:3
213:2,9,22
217:19,21
218:25
222:24
238:21
239:2
240:21
247:5,20,
23 249:11
251:4
253:13
255:16
257:10,13
260:19,23
272:25

**HOLLY'S**
146:19
238:11,16
239:14

**HOME** 104:20
105:1,15,
16 106:5
215:13
270:22

**HOMEWORK**
117:20

**HONEST**
265:11

**HONG** 18:17
19:12
83:22
89:19
132:25
178:17
180:4,12
181:10
193:2
209:8

**HONOR** 4:17
8:3,10 9:9
14:13
16:22 17:4
30:9,24
33:8 35:14
38:4 42:11
47:13,21
48:17 50:1
51:5,16
52:7 53:4
54:5 55:13
63:4,10
73:1 78:13
79:1 83:11
85:14
89:6,10
95:24
96:19 99:2
100:13
103:9
104:3
106:25

107:1
116:15
117:19
149:6
150:13
151:4
152:13
154:18
155:2,9
160:2,17
242:2
246:10
261:7
265:12
273:11
278:21

**HONOR'S**
275:2

**HONORARY**
175:17

**HOPE** 44:11
45:10
46:19 62:3
72:9 157:7
196:13,15
197:5
203:11
205:4

**HOPPA** 197:5

**HOSTILE**
53:19

**HOUR** 7:21
46:12
107:6
154:24
200:1

267:18
270:7

**HOURLY-BILLING**
135:25
136:6

**HOURLY-PAYING**
135:23

**HOURS** 29:15
46:11
54:22
83:23
195:7,10
197:21

**HOUSE** 103:18
105:18
106:4

**HOUSEKEEPING**
4:8

**HOW'S** 30:6
118:20
153:7

**HYL** 154:11
247:17
251:5

**HYPERBOLIC**
96:2

---
**I**
---

**I.E.** 20:3
56:21

**IDEA** 6:12,
24 12:9
231:15
235:18

272:20

**IDENTIFICATION**
29:3 36:14
61:17
73:11
226:22
227:22

**IDENTIFICATIONS** 101:24

**IDENTIFIED**
8:1 24:3
25:13 26:1
41:14
58:8,11
63:14
86:16
95:22
101:24
102:21
108:9,23,
25 109:3
137:7
179:4
196:25
202:20
265:16
270:23

**IDENTIFIES**
39:6

**IDENTIFY** 8:1
60:25
62:16
102:16
110:20
152:7
157:19

174:2,8,16
179:3
185:6
216:22

**IDENTIFYING**
221:5
269:10

**IGNORANT**
97:24

**IGNORE** 144:3

**ILLEGAL** 90:9

**ILLEGALLY**
25:24

**ILLUSTRATIONS**
104:25

**IMAGINE** 13:4
152:15
277:5

**IMMEDIATELY**
24:12,17,
18 207:15
215:9

**IMPERSONATED**
218:10

**IMPLIED**
168:12

**IMPORTANT**
82:15
142:24
151:12
161:4
281:1

**IMPOSSIBLE**
168:10,18

**IMPRESSION**
5:15 25:7

**IMPROPER**
90:8 141:6

**IN-HOUSE**
17:23
199:10,12

**INAUDIBLE**
43:20
116:17
133:4

**INCEPTION**
26:21
76:7,24
113:5,6,8
114:22

**INCIDENT**
193:24
194:2

**INCIDENTS**
193:24

**INCLINED** 5:3
102:14

**INCLUDE**
33:17 72:5
78:15
168:7
176:5
228:16
262:22

**INCLUDED**
40:14
228:13

**INCLUDES**

64:5 72:2

**INCLUDING**
129:5,13
132:12
165:25
176:20

**INCOMING**
204:15

**INCOMPLETE**
198:1

**INCONVENIENCE**
54:15

**INCORPORATED**
115:1

**INCORPORATION**
163:21

**INCORRECT**
239:24

**INCREASING**
201:16

**INCREASINGLY**
193:14

**INDEPENDENTLY**
177:18,20

**INDICATION**
219:18

**INDIVIDUAL**
278:8,14

**INDIVIDUALLY**
166:19

**INDIVIDUALS**
278:16

INDUSTRIAL
  72:3

INDUSTRY
  91:3

INDUSTRY-WIDE
  91:9

INFAMOUS
  101:21,23

INFORM    42:8

INFORMAL
  27:10

INFORMATION
  31:9,12
  57:16
  71:22
  83:24
  92:17
  94:9,15
  100:8
  104:11
  105:23,25
  106:1,7
  114:7
  129:14
  183:10
  204:15,18
  221:9
  234:3
  256:25
  272:15

INFORMATIONS
  257:6

INFORMED
  28:15
  35:22  36:5

79:7,8
190:11
245:16

INITIAL   6:22
8:7,15
153:10
230:11

INITIALLY
  24:16  94:5
  187:18

INITIATE
  138:6,7
  141:14
  224:3

INITIATED
  145:2

INJECT
  224:11

INPUT   132:9
  204:18

INPUTTING
  129:14

INQUIRY
  252:5

INQUISITION
  93:6

INSIDE
  136:11
  175:18
  209:2
  212:10

INSISTING
  31:6

INSTANCE
  18:11
  21:14

INSTANCES
  28:22,25
  174:16

INSTRUCT
  51:3
  185:18

INSTRUCTED
  81:13
  212:2

INSTRUCTIONS
  185:17
  237:9
  257:7

INSURANCE
  178:11
  182:20
  183:8
  205:2
  208:19
  211:10

INTELINK
  190:8,14,
  18,23
  191:11,14,
  15,17,19,
  21

INTELLECTUAL
  69:23
  70:20

INTEND   9:22
  15:13
  119:14

INTENDED
  72:1
  103:10
  151:3
  168:6
  183:13,14
  214:5

INTENDING
  212:24

INTENT   54:19

INTENTION
  19:10

INTERACTING
  214:20

INTERACTION
  182:14

INTERACTIONS
  193:1
  216:14

INTERCHANGEABL
Y   132:4

INTEREST
  13:21
  19:13,16
  37:23
  46:15,17
  159:21,24
  160:17,20
  166:16
  167:23,24
  249:24,25
  263:12
  264:14,21

INTERESTED
  19:19

144:13
230:22
233:6
238:8

**INTERFACE**
129:18,19

**INTERJECT**
10:24
123:1
264:17

**INTERLINK**
12:16,17

**INTERNAL**
209:1

**INTERPOSE**
44:14

**INTERPRETATION**
91:2
234:20

**INTERPRETATION
s** 100:7

**INTERPRETED**
92:7

**INTERROGATING**
143:1

**INTERRUPT**
10:13
45:19
60:22
146:20
194:11
245:14

**INTERRUPTING**
11:21

**INTERVIEWED**
219:10

**INTRODUCE**
14:25
15:13
16:20
30:25
32:12
33:23
34:10  43:4
94:20
103:10
159:15
160:4
225:1
227:10

**INTRODUCED**
67:2  99:19
159:13

**INTRODUCING**
5:22  13:25
184:12
273:25
280:1

**INTRODUCTION**
14:10  89:7
200:10

**INTRODUCTORY**
115:11

**INVENTION**
198:18

**INVENTOR**
196:11,15
198:10,17
200:13

**INVESTIGATED**
219:4

**INVESTIGATION**
272:10

**INVESTIGATIONS**
275:9

**INVESTIGATORY**
104:12

**INVITATION**
271:13

**INVITING**
36:15

**INVOICE**
25:19,24
84:25
91:14
92:15  93:6
101:25
131:23
135:1,16
138:4
186:16
189:21,23
205:10,11
212:12
221:10
258:5,6

**INVOICE-
GENERATION**
132:5

**INVOICED**
23:16

**INVOICES**
20:25
21:5,6,15,

18  22:8
23:10,11,
13  24:1,8,
25  25:1,9,
18  28:14
47:4  81:10
84:11,18,
23  85:1,2,
3,4,9,15
91:7,15,16
100:19
101:2,22
102:4
126:6
127:2,4,8
128:23
129:2,16
131:15,21
135:14
136:7
137:15
155:23
157:10,12,
15  172:25
173:1
185:19
189:24
206:1,25
208:14
210:13,14,
21,24,25
211:1,3,5,
13,15
224:4,5
257:14
262:18
265:2
272:3

**INVOICING**
 58:16
 182:8
 207:3
 258:1
 280:11

**INVOLVED**
 36:17
 47:10
 75:10
 122:17,18
 124:3,16,
 25 127:16
 189:20
 199:9
 201:14
 203:8
 215:20
 239:4

**INVOLVEMENT**
 188:11

**IOLTA** 172:24
 173:5

**IP** 18:12,
 13,14,25
 19:2,18
 23:16 53:2
 66:16,18,
 20,22,23
 68:10,15,
 24 69:5,9,
 13,22
 70:20,24
 71:1,4,5,6
 89:11,17,
 19 101:25
 102:4

 185:12
 188:16
 197:4
 205:19
 206:1,25
 207:3
 208:23
 211:7,8,
 14,17
 212:5
 219:24
 259:22
 262:11,18
 263:18
 266:7

**IP-RELATED**
 70:2

**IPA** 154:4,5

**IPAA** 89:11,
 15

**IRONIC**
 191:25

**IRONICALLY**
 190:23

**IRRELEVANT**
 89:7,9
 190:16
 191:25

**IRVINE** 4:1
 108:1
 123:21
 182:3
 186:21

**ISSUANCE**
 100:19

**ISSUE** 4:10
 7:24
 14:17,21
 15:7 16:19
 20:24
 23:18
 25:9,18
 32:10 47:4
 65:7 82:15
 91:7,14,16
 92:5 94:2,
 3 95:11
 101:2
 104:19
 110:6
 118:6
 124:20
 127:4
 136:1
 162:17
 167:13
 190:2
 195:23
 202:20
 208:23
 211:4
 212:4,10
 224:9
 242:23
 245:25
 257:13
 258:5
 265:24
 272:3
 273:6
 278:7

**ISSUED** 24:25
 25:1,24

 92:15
 93:12
 138:4
 211:13

**ISSUES** 16:7
 33:3 57:6
 88:18
 100:4
 121:22,24,
 25 125:6,
 7,20 127:2
 157:24
 178:21
 209:10
 231:13
 276:13,17

**ISSUING**
 24:1,8
 93:6
 101:25
 126:6
 128:23
 131:15
 155:23
 258:5
 260:12

**ITEMS** 154:1

--- J ---

**J-A-U-R-V-E**
 203:2

**J-A-U-V-R-E**
 72:19

**J-O-U-R-V-E**
 196:8

**JAMS** 8:1
9:2 74:24
79:4
141:14
142:20,22
144:9
145:2,3,4,
13,16
153:20
162:20
166:15
216:18
220:17
223:1
224:4
228:1,9,14
229:3
230:4,11,
17 231:10,
20 236:8
238:20
241:15
244:9
249:25
259:11
262:19
263:4,10
268:4
269:23
273:1

**JANUARY**
74:5,9
80:10
86:17 87:3
112:6,8
114:24
115:1
122:13,21

125:22
144:6
146:22
148:5
161:13
166:1
208:16
245:10,23
247:9
263:14

**JASON** 31:20
44:5
145:19,25
146:1,5,25
147:9,11,
19 148:1,
6,9 190:8
231:22
233:6
237:14
243:5
244:16,23
245:6
247:24
255:14
272:21

**JASON'S**
239:8

**JAURVE** 203:2

**JAUVRE** 72:19

**JEFF** 114:23
124:24
125:23

**JEFFREY**
112:19
113:6

115:3
119:25
166:19
222:19

**JERSEY** 17:7,
9,18 18:22
29:1,4,13
187:17
219:4
255:22,23
256:5,7,15
259:16
266:6

**JOB** 88:24
135:18

**JOIN** 19:23
51:12
64:23 66:2
174:18

**JOINED** 22:2
260:20

**JOINING**
19:16
73:22
172:10

**JOINS** 91:4

**JOINTLY**
46:15

**JOKE** 237:3,
6,7

**JOKING**
206:18

**JOURVE** 194:4
196:7,11,

16 197:9,
11,14
203:10,14

**JUDGMENT**
27:16
39:19,23
40:1,7
45:7 47:6
139:10,13,
19 140:3
142:18
143:10,20
144:7,10,
13 145:23
146:10,18
147:6,23
148:3,5,12
163:19
166:5,8,22
167:17
168:4,7,
12,17,21
169:10,20,
22 228:3
229:6,13
230:20
231:9,11
232:18
233:9
236:12
237:10
242:22
243:5
244:10,21
245:5
246:3,6,23
247:11,24,
25 249:25

254:13
255:11,15
261:12
262:9
266:15
270:25

**JUDICATA**
26:6 36:6
101:10

**JULY** 80:20
112:13,16
114:19
186:5,7
213:11
215:5,8,18

**JUMP** 116:15
269:3

**JUMPING**
176:10

**JUNCTURE**
25:21

**JUNE** 22:7
24:5,7,10
83:20
114:19
144:11,16
213:1

**JUNE/JULY**
112:17

**JURIS** 90:2

**JURISDICTION**
5:3 106:16

**JURISDICTIONS**
71:5 90:3,

12 105:5

**JUSTIFY**
278:13

---

**K**

---

**KEEPING** 46:7

**KIND** 7:20
13:20 14:3
39:9 42:6
85:17
140:7,18
177:12
212:1
220:9
233:17
246:15
260:18
266:19
271:16
272:10,17
276:15
280:18

**KNEW** 17:24
74:15
98:15
103:16
125:18,21
142:7,8
152:15
197:9
213:15
214:19
237:9
246:2
260:18

**KNOWING** 47:8

**KNOWLEDGE**
18:11
40:17
77:16 94:7
97:5 98:7,
10 105:3
190:19
201:23
203:12
222:4

**KONG** 18:17
19:12
83:22
89:19
133:1
178:17
180:4,12
181:10
193:2
209:8

---

**L**

---

**L-I** 23:6
36:20
37:13
151:20
152:24

**LABOR** 234:23

**LACK** 13:1
18:3,5
38:25
42:16,17,
18 43:14
45:2
103:19

105:6
152:4,5

**LADEMORE**
145:19,25
146:2
190:8

**LADY** 230:9

**LAID** 231:13

**LANGUAGE**
49:9,10,20
57:10 71:3
128:14

**LAPSED** 121:3

**LARGE** 38:20

**LARGER**
103:17
106:16
114:4

**LASER** 100:3

**LASTLY**
169:16

**LATE** 29:20
100:19
120:17
195:16
201:25
202:2,4,5
245:23
251:18

**LATE-PRODUCED**
6:13

**LATE-RECEIVED**
15:17

LATEST  9:21
 46:1

LAUGHLIN
 139:1
 145:14
 229:20

LAW  4:22
 12:23
 17:21
 18:14,15,
 19 19:1,7,
 18 21:3
 26:5,24
 27:18
 37:17
 51:12 65:7
 66:2
 73:23,24
 74:13
 80:18
 89:13,19,
 21 90:11
 91:4 92:8
 104:1
 110:24
 111:5,6,7
 123:19
 124:4,7,8
 149:3
 159:23
 163:21
 172:12
 179:1
 183:11
 184:24
 185:23
 186:21

187:17
190:25
191:19
192:1
212:6,7,22
213:21
215:21
219:6
221:8
223:7,11,
12 246:11

LAWSUIT
 146:3
 148:25
 177:12
 187:22
 188:23
 190:10,24
 192:20
 213:13,15
 215:11,21
 238:13
 256:17

LAWYER  17:6,
 17 20:4
 91:4
 136:12
 166:11
 213:13,19
 221:8,9
 251:20
 252:8
 266:6

LAWYERS
 18:14
 89:20
 122:13,20

194:18
213:19
258:4
260:17

LAWYERS'
 219:4

LAY  68:2,5
 152:11
 266:25

LAYING
 117:20

LAYPERSONS
 274:24

LAYS  260:14

LEAD  53:19
 138:20
 156:19
 192:23

LEADING  66:5
 90:6 200:8
 211:11
 238:10
 245:20

LEARN  207:2

LEARNED  21:6

LEARNING
 207:9

LEAVE  24:15,
 17,18,19

LED  66:4
 98:17

LEERY  268:16

LEEWAY  5:4

LEFT  8:23
 20:21
 28:13 38:9
 82:8
 122:14
 125:14
 152:7
 170:17
 202:17
 208:8
 227:1
 238:16
 241:11
 252:15
 255:20

LEFTOVER
 233:2

LEGAL  70:4,
 16,17
 71:2,6,9,
 10 89:14
 90:10,18
 91:3
 111:10
 113:22
 114:9
 178:21
 212:9
 234:20

LEGITIMATE
 13:2

LENGTHY
 208:5
 245:15
 275:3

LESSON

114:14
115:12
164:3

**LETTER**  24:10
25:23
32:5,11,
13,18,23,
25 33:1,
10,13,14,
17,19,23
34:1,3,17
35:21
36:21
37:14,25
38:13,19
39:2,4,5
41:14,19,
24 42:5,7
43:13,14
51:12 66:2
69:6 73:8
79:24
83:4,21,
22,25 84:2
89:11,22
95:25
96:10
100:20
101:1,21
146:7
174:1
185:3
186:5,7
208:5
215:1
221:8,10
234:19
235:17

**LETTERHEAD**
35:20
211:6,8,16
257:14
258:2

**LETTERS**  35:3
91:18
186:16

**LEVEL**  180:8

**LI**  4:7,15,
21,25 5:5,
6,8,25
6:3,7,8,
14,15,16,
17,18,21
7:11,16,
18,22,25
8:7,19,22
9:14,18,19
10:13,19,
20,21,22,
25 11:4,5,
18,20,22
12:4,8,21
14:18,25
15:12,24
16:2,10,19
17:2,4,6,
11,13,17
18:4,10
20:10,13,
18 22:18,
22,23
23:2,3
26:3,4,9,
12,15,21,
25 27:2,6,

16,22
28:1,8,10,
13 29:8,9,
23 30:1,2,
7,12,19,
20,24
32:2,5,9,
12,16,23
33:3,9,14,
23 34:3,4,
5,10,16,
19,20
35:2,4,5,
13,14
36:10,11,
12,24
37:4,6,10,
12,21,23,
24 38:3,4,
7 39:1,8,
9,11
40:10,11,
13,19,24,
25 41:2,
12,17,22
42:5,11,
17,22
43:4,6,7,
20,23
44:2,3,8,
20,21,23
45:2,11,
13,16,22
46:22,23
47:17,21
48:15,19
49:6,15
50:1,13,

15,16,20,
23 51:11,
22,23
52:8,9
53:7,14,
21,24
54:7,10
55:2,13,22
58:18,20
59:17
60:22
61:10
62:20,24
63:6,9,10,
18 65:22
66:24
67:9,10,
22,24 68:9
69:19 70:7
71:14
72:25
73:1,15,
17,20
74:19
76:11,13
77:2,3,6,
10,13,18,
21 78:6,9,
13,20,23
79:2 82:19
83:1,2,13
85:11,13
86:11,18
88:2,14,
16,22,24
89:2,5,6
92:1 93:1,
2,21 94:2

95:2,3,9,
14,16,17,
18,22
96:9,14,
16,21
97:10,15,
19 98:2,4
99:2,8
100:11,13,
18 101:8,
13 102:20,
24 103:3,
4,9,14,20,
22 104:10,
22 105:17,
25 106:10,
17,18,23,
25 107:3
108:6,8,
14,18,21,
23 109:2,
9,11,13,
23,24
110:4,11,
20 111:5
114:20
115:21
116:3,6,8,
17,18
117:16,19,
23 118:8,
21,22
119:4,8,20
120:6,11,
13 121:4,
6,12,13,
15,19,21
122:3,7,

10,19,24
123:1,8,9,
13 125:9
126:9,11,
18,21
127:10,20
128:1,20
129:4
130:3,6,
13,20
131:9,13,
14 132:14,
17 133:10
134:6,9
136:5
137:17,22,
25 138:14,
15 139:23,
25 140:12,
15,25
141:3,7,
11,16
143:8,17,
23 147:7
149:6,10,
11,19,22
150:7,9,
12,14,20,
21 151:4,
8,18,20,
22,24
152:5,9,
13,20,23,
24 153:2,
6,9
154:21,22
155:2,8,9,
12,16

156:3,7,
17,23
157:3,16,
17,18
158:11,14,
22 159:1,
5,12
160:8,12,
18,25
161:8
162:2,10
164:12
165:3,14
167:2,4,8,
12,23,25
168:3,16
169:20
170:4,6,8,
16,18,21
171:5,6,
12,14
172:10
173:14,20,
22 174:1,
4,10,17,25
175:2,6
176:24
177:5,7,9
178:16,17
179:3,8,
10,13,16,
21,23
180:12,13,
15,18,24
181:2,5,6,
13,23,24
182:1
183:14,19

184:1,4,5,
8,12,14
185:10,24
187:5,8,
11,14
188:15
190:2,11,
16,21
191:1,4,6
192:6,23,
25 193:18,
20 194:4,7
195:1,8,
20,22,24
196:1
197:4,7,8,
13,22
198:14
199:24
200:8,14,
17,20
201:22
203:8,16
204:8
205:18
206:4,16,
20,22
207:2,9,20
208:11
209:22
210:5,9,
10,13,20
211:15,16
212:2,5,20
213:22
214:8,13,
15,20,21
215:14

217:1,4,7,
10,13,25
218:4,6,
12,13,17,
25 219:6,7
220:5,13,
21,24
221:1
222:1,3,24
223:2,5,9,
11,13,14,
17,19,23
224:10,15,
21,22
225:1,4,5,
6,13,15,20
226:3,4,5,
18,23
227:4,12,
15,17,18
232:7,10,
13 233:8,
10 234:15,
17 235:7,
9,11,13,16
236:2,11
237:24
238:4,9
239:20
240:3
241:1,6,7,
8,10,12,25
242:2,7,
16,18,20
243:12,21,
23,24
244:1,11,
20 245:20,

24 246:1,
15,19
248:7,13,
18,20,25
249:8,11,
14 250:17
251:4
252:3,4,6,
14,16
253:4
255:9,16,
19,21
257:20,24
258:7,8,
17,19
259:18,19,
21 260:6,
8,24
261:1,7
262:13,15
263:21
264:2,17,
18 265:1,
4,10,11
266:12
268:10,15
269:14,15,
22 270:11,
13 271:5,
8,11,12,18
272:1,5,13
273:8,11
274:2,12,
14,17
277:10,11,
15,23
278:11,19,
21,24

279:10,14,
15,23,24
280:2,7,20
281:1,6

LI'S  16:24
25:18
35:11
47:25 88:8
99:4
110:14
123:4
149:18
181:4
182:5
190:25
191:17
193:8
214:3,4
215:1
216:8
219:13
258:25
276:8

LIABILITIES
91:22

LIABILITY
106:14
204:22,25

LIBEL  27:16

LICENSE
134:24

LICENSED  5:2
17:7,18
26:15
90:12
139:2

255:22

LIE  76:9
215:17

LIED  210:6

LIGHT  122:11

LIMINE  4:9
8:10,21

LIMITATION
19:1,2

LIMITED
39:15
62:15
65:20
66:5,16
69:9,22
88:17
89:12
106:14,19
224:7
279:9

LINES  154:4

LINK  9:23
10:16
11:5,11
52:18,21
54:13

LIST  4:16
7:3 50:21,
23,24
54:3,11
116:12
118:20
204:9,10

LISTED  5:9,

14 38:23
104:7
119:23
192:18

LISTEN  141:5
146:7
147:20
148:7
156:24
169:13
189:7,15
224:15
247:5

LISTING  4:17

LISTS  115:23

LITIGATED
259:15

LITIGATION
18:20,25
19:3,4,5
27:10
46:12
75:10 76:7
106:12
135:2,8,
11,13
137:13
177:15
185:5
188:7,8,10
189:3
190:21
193:18
213:18
258:21

LITIGATIONS

271:2

LLC  90:15
105:2
106:11
161:15,17
162:4,8,
18,22
163:1,18
164:4,23
169:7
183:24
184:24

LLCS  90:19
163:22

LLP  187:16

LOCAL  129:6
139:4
148:24
187:22
188:1,2
247:17

LOCATED
124:1
178:17

LOCATION
105:18

LONG  5:23
14:7 23:14
48:4 104:1
142:14
199:4
229:4,8,16
243:14
249:21
276:24

LONGER
140:15
189:12
224:10
250:14

LOOKED
181:18
196:24
198:17
199:10
209:14
211:14
214:25
239:11
249:20
250:22
251:6
265:12
272:12

LOS  238:13

LOSE  189:10
194:25
197:10

LOST  94:12
195:14
213:5

LOT  15:6
38:20
99:25
117:13
136:14,16,
19 137:8,
10 143:2
147:25
177:16
188:22

199:10
213:24
214:19
223:1
231:22
234:18,24
246:17
248:21
250:2
266:19
267:11
268:4
269:21,25

LOTS  28:14
114:8

LOUD  156:12
159:16
160:12

LOUDER  30:8

LOW  124:14
199:20
272:17

LULLABY
104:7
226:13
269:6

LUMP  153:11

LUNCH  7:14,
15,18,21
99:14,22
107:1,5
154:25
224:25

LYNN  230:10
255:10

## M

**MADE**  9:12
15:22
27:12
85:11
97:25
138:7
139:12,18
141:20
145:22
146:6
156:18
161:21
162:2
166:21
167:1
206:14
213:17
224:6
233:1
249:18
259:12
271:8,21

**MADE-UP**  21:7

**MAIN**  21:21
28:10
124:1

**MAINTAIN**
25:8

**MAINTAINED**
83:5  172:4

**MAINTENANCE**
178:11

**MAJOR**  29:10

272:18

**MAKE**  4:22
7:20  12:25
33:20
40:24  43:5
48:6  52:20
53:25
57:11
75:24  76:1
86:4,7,11,
14  89:2
115:22
117:23
118:19
120:9
140:2
141:21,23
142:2,3,4
143:9
145:11
148:23
149:12
150:21
152:19
155:16
156:4,5
158:10
175:21
191:6,9
192:4
199:21
200:14
210:1
244:17
251:12
259:10
263:15
268:19

271:13
273:18
276:21
279:10,22

**MAKES**  33:12
131:18,21

**MAKING**  42:3
99:17
105:9
120:9
124:19
125:3,4
133:17
140:22
233:24
234:2
240:25
279:6

**MALPRACTICE**
148:15
178:5,10
182:20
183:8
205:2
208:17,18,
25  209:7
211:10

**MANAGE**
119:24

**MANAGEABLE**
123:14

**MANAGED**
124:18

**MANAGEMENT**
66:22
118:24,25

119:5,7,21
122:16
124:18
280:10

**MANAGER**
278:19

**MANAGING**
123:10,12,
15  214:20

**MANDARIN**
49:10,11,
13,14,16,
19,21

**MANIFESTED**
93:13

**MANNER**  35:18
56:24
94:17

**MARA**  176:17
182:22
202:16

**MARCH**  45:22
98:24
123:25
208:16
244:12

**MARGIN**
199:20

**MARK**  10:8
140:7
227:19

**MARKED**  12:6
16:9  49:22
73:5,10

85:21
186:8
226:21
227:21

MARKET   19:14

MARKETING
178:7,12,
15,19

MARKING   10:4

MARYLAND
103:24
164:22
226:12,14
230:9,13
255:5

MASON   209:12

MATERIAL
118:14
178:8,15

MATERIALS
178:12,19

MATTER   4:7
27:19
33:10
41:21,22
70:3 72:20
73:16
82:12
118:17
128:6,16
131:22
135:3
187:19
209:21
220:3

224:2,3
233:11
274:22

MATTERS   4:8
46:12
72:11
89:14
132:9
161:4
185:5

MC   139:1
145:14
229:20

MEAGER   31:7
46:11

MEANING
20:25 56:5
57:12
66:21
89:16
174:20,23
192:14
235:25
253:24
263:7,8
268:8

MEANINGFULLY
14:2

MEANS   15:20
57:1,9,18
60:21
64:20 66:9
91:4 92:21
168:12
175:20
176:15

247:25
278:16

MEANT   82:4
132:18
164:5
176:24

MEET   9:20
273:24

MEETING
120:5,14,
16,21,24
121:1

MELLOW
132:22
176:17

MEMBER
103:16
105:1,4
106:3
109:4
111:21
114:23,24
161:15,17
162:4,8,
13,18,22
163:1,18,
22,23
164:4
165:16

MEMBERS
114:21
163:23

MEMORY   190:6
219:23

MENTION   66:7

89:23
113:20
175:9

MENTIONED
116:23
130:2
172:16
182:1
190:14,18
196:7
203:5
225:7
226:15,16
229:3,19
277:19
281:2

MENTIONING
38:14,18
172:20

MESS
208:12,25
209:1

MESSAGE
24:24

MESSES   213:2

MET   73:21
261:3

MICROPHONE
30:8,11
34:24
100:24

MICROSOFT
10:11

MID-FEBRUARY
177:15

206:5

**MIDDLE** 23:7
64:1 157:5
160:16

**MIDNIGHT**
9:24
196:21
197:10

**MIFFED** 145:8

**MIKE** 125:23

**MILEAGE**
27:22

**MILLION**
216:6
263:13
266:10
272:14

**MIND** 65:18
69:17
79:21
109:10,16
127:5
147:4
220:4
223:20
247:17
264:24,25
278:10

**MINDFUL**
149:14

**MINE**
171:13,14

**MINIMIZE**
100:9

276:15

**MINOR** 54:11
271:18

**MINUTE** 6:20
10:14,22
70:10
84:15 95:4
110:6
116:1,2,18
117:11,12
206:11
248:20
279:15

**MINUTES**
48:2,3,6
87:18
120:5,14,
16,21,24
121:1
129:22
131:1
149:24
150:14,23
155:8
161:2
170:17,25
196:22
197:24
221:4
227:1,5
241:23
242:9,16
243:15
252:15
255:20
274:12

**MISAPPROPRIATE
D** 37:23
209:16
219:6
232:14

**MISAPPROPRIATI
ON** 159:25
238:17

**MISCHARACTERIZ
ATION** 96:10
218:8
240:3

**MISCHARACTERIZ
E** 167:25
252:11

**MISCHARACTERIZ
ES** 134:2
150:4
162:6
165:12
167:20
191:4
232:10
243:8,18
255:6,17

**MISCHARACTERIZ
ING** 214:8
218:9
233:5
240:5

**MISCONDUCT**
213:18

**MISDIRECT**
259:21

**MISINTERPRET**
65:11

**MISINTERPRETIN
G** 65:10

**MISLED** 82:21

**MISPLACED**
101:9

**MISREAD**
96:14

**MISREPRESENTED**
82:22,23

**MISSED** 20:20
141:8,9,
20,22,23
193:21
195:13
203:16,19

**MISSING**
140:7
186:2,3
198:4
201:1,3,7,
12,16,19
248:12

**MISSPOKE**
24:6

**MISSPOKEN**
10:18

**MISSTATE**
240:5

**MISTAKES**
89:2

**MISUNDERSTAND**
82:5

**MISUSED**
101:14

MITIGATION
47:3

MODIFICATION
60:7,8,24
61:4,14,20
62:1,10,21
63:14 92:7
207:22

MODIFIED
101:5

MOMENT 85:20
87:12
116:16
177:24
179:15
194:12
209:12
232:1

MONDAY 62:19
80:10
135:3
158:6
213:1

MONETARY
39:19 40:7
139:9,19
143:10,20
144:7
166:8,22
167:9,17
168:4,9,
19,20,21
169:19
254:12
270:25

MONEY 28:20

36:7 38:14
46:5
56:21,22
98:20
136:14
139:9
140:19
141:1
142:9
143:4
145:14
147:21
148:13,19,
21,22
165:18,21,
24 166:4,
15,17,18,
20 169:8,
23 173:4
175:22
176:25
178:9
199:21
205:15
209:6,9,18
211:23
216:2
219:25
223:5,6,11
228:3
231:19,22,
25 233:14
234:11
235:19
236:6,8,9
240:23
242:22
259:4,7,22

262:10,12,
13 265:7
266:24
267:14
268:16
269:18,22,
23,25
270:10
272:23
275:6

MONITOR
34:22
37:15
59:20 60:5

MONTGOMERY
226:13

MONTH 23:13
44:10
135:5,15,
22 136:7,8
140:21
201:15
241:13

MONTHLY
134:22
135:2,9,20

MONTHS 22:2
46:1 81:10
134:25
137:16
148:2
172:13,14
193:9
201:10,17
208:15,16
213:3

229:11,18
262:3
268:11

MORNING 4:2,
6 17:4,5
48:13 52:2
55:3 196:4
239:21

MOTION 4:9
8:10 78:1,
15,20
120:25
121:3
189:5
190:2,5,7,
12 261:15
275:25

MOTIONS 6:23

MOVE 8:8,21
9:2 27:24
28:10
39:10,11
42:9 43:7
74:21 78:6
80:25
81:11 82:9
83:10 84:3
106:5
117:21
121:4,24
138:1,23
142:15,17
149:6
150:3,7,12
154:15,21
155:18
158:14

160:8
161:11
164:7
165:14,15
169:8
241:9
246:19
251:13
252:15

**MOVED** 103:18
147:24

**MOVING** 82:7
114:20
122:3
158:2
169:3,4
247:13
252:18,19

**MULTI-LINGUAL**
48:22
49:7,8

**MULTIPLE**
23:11,12
24:3 87:7
92:9,16
126:15
141:8
182:16,20
194:21
208:15,16
275:6

**MUMBLES**
261:8

**MUMBLING**
149:7
150:1

**MUTUALLY**
238:15

—————————
**N**
—————————

**NAMED** 72:9

**NAMES** 6:5
12:7 139:5
191:5
248:21

**NARRATIVE**
128:1
140:6

**NASTY** 25:22

**NATION** 19:11

**NATURALLY**
113:21

**NATURE**
89:21,22
90:3

**NAUSEAM**
278:8

**NECESSARILY**
51:10

**NEEDED** 69:1
85:19
86:18
137:11
170:4
175:22
178:19
180:5,10
188:4
190:1

**NEEDING** 28:2

**NEGOTIATE**
24:21

**NEGOTIATED**
180:6
254:11

**NEGOTIATING**
210:4

**NEGOTIATIONS**
173:25

**NET** 36:2
262:8

**NETWORK**
130:6
183:16

**NEUTRAL**
238:15

**NICER** 76:9

**NICHE** 272:17

**NIGHT** 13:9
44:16,24
45:4 222:8

**NONADMISSIBLE**
89:9

**NONCLIENT**
204:5

**NONCLIENTS**
204:20

**NONEQUITY**
175:10,13,
20

**NONLEGAL-
RELATED**

89:16

**NONOPERATING**
111:7,8

**NONRESPONSIVE**
71:7 77:19

**NONSENSE**
213:7

**NONSPECIFIC**
168:5

**NOON** 107:10

**NORMAL**
172:19

**NORMS** 91:10

**NOTATION**
155:16

**NOTE** 29:10
40:22
64:23
111:8
170:16
220:16
226:25

**NOTEBOOK**
206:12
248:11
260:6

**NOTED** 120:3
160:3

**NOTES** 255:9

**NOTICE** 4:21
201:1,3,6,
9,12,16,19
217:18

268:24

NOTICEABLE
  10:3

NOTICED   7:1

NOTIFICATION
  84:9

NOVEMBER
  8:4,5  22:1
  23:17
  62:3,20
  141:9
  142:4,5
  155:21
  156:9
  157:22
  278:25
  279:2

NUANCES
  114:10

NUMBER   4:16,
  18,20  8:13
  22:16,18
  30:21
  36:24
  58:10,14
  73:4
  77:13,18
  78:12  92:5
  95:6,14
  98:11
  147:18
  150:23
  152:21
  170:13
  173:20
  179:9

181:17
186:24
189:4
207:21
216:6
226:20
231:6
234:15
235:21,22
238:18
240:15
249:20
250:9,12,
20,21,23,
24  251:5,8
263:13
265:19,23
270:20,21
273:21
274:22

NUMBERS
  95:11
  99:16
  102:22
  139:6
  204:17
  248:21,23
  250:2,3,13
  251:7,9,11
  253:7,10
  263:15
  264:4
  266:19

NUMEROUS
  26:1  39:22
  46:2  92:13
  271:2

O

OATH   51:17
  109:15
  171:18

OBJECT   4:15
  14:8  15:2,
  14  16:17
  34:8  36:3
  40:18,20,
  21  41:16,
  18  43:17
  44:6  117:3
  122:5,7,8
  127:5
  129:10,11
  130:7
  140:5
  165:11
  166:9,13
  191:2
  223:9

OBJECTED
  119:6

OBJECTING
  62:13
  166:11

OBJECTION
  6:25  7:1
  16:11,15
  18:3,5
  26:2,9,17,
  25  27:3,5,
  21  29:6
  30:3,5,15
  32:8,15,17

33:18,24
35:1,8
36:7,8
38:25
40:9,22
42:16,25
44:2,14
45:12,15
55:13
67:9,18,
22,23
72:25
73:1,18
81:22
91:24
93:19
94:25  95:4
96:5,13,18
101:8,13
103:19
104:3
105:6,11,
19  117:5
118:10,25
119:10
120:7,8
121:2,11,
17  122:22
123:12,14
126:8
127:18,20
130:13,14
134:2
139:20
141:3,4
150:4
152:4,10
153:1

155:25
160:5,19
162:6
166:24
167:19
174:25
175:2
180:24
181:5
182:6
184:1,4
190:16
191:3
195:20
200:8,15,
16,17
210:9
214:8
218:6
220:1
227:12,16
232:10
240:3
241:1
243:8,18
245:19
248:4
252:1,10
255:6,17
256:2
257:19

**OBJECTIONS**
27:3 30:13
34:16
45:18
117:9
118:6
120:13

156:18
175:5
225:22
226:9
277:18

**OBJECTS**
168:3

**OBLIGATION**
25:9 101:2
167:9
236:2

**OBLIGATIONS**
22:11,13
25:9 46:25
92:3 93:10
166:5,8,21

**OBSERVATION**
4:22

**OBSERVE**
95:24

**OBTAIN** 19:4
31:9 35:16
104:14

**OBTAINED**
5:10,11
29:17
75:19
94:15
103:12
139:13
166:15
255:11
270:25

**OBTAINING**
104:12

**OBVIOUS** 93:1

**OCCASION**
173:13,14

**OCCASIONS**
77:6,10
92:16
170:13
193:3

**OCTOBER** 8:4
22:1 23:17
39:13,14
41:8 43:11
44:9
141:8,23,
25 142:3
145:24,25
146:24
147:10,12
170:9
230:21
240:11
244:4,8,12
245:1
251:18,21,
23

**OFFER** 27:17
28:21 45:6
51:12
64:23,24
66:2 82:21
99:1
100:3,20
101:1
145:22
174:1,18
238:8,10
244:13

245:9,11,
16 259:10
271:5
280:7

**OFFERED**
28:17 46:3
47:6 97:7,
10 98:17
103:11
220:2
236:15
245:11
255:15
275:12

**OFFERING**
28:23
41:21,22
95:25
269:16

**OFFERS**
235:12
238:19
259:12

**OFFICE** 32:14
123:21,22
124:1
180:4,12
181:19
182:14,15
200:1,25
201:8
221:11
239:15

**OFFICER**
109:2
110:24

113:10
114:7,8
165:5
280:16

OFFICERS
113:1,25
124:17

OFFICIAL
113:15
175:18

OFFSET
159:19

OFFSHORE
169:4

OMITTED
51:23

ONBOARDED
204:11,12

ONE-PAGE
227:14,20

ONE-THIRD
124:9,10

ONE-WORD
59:3

ONGOING
95:22
146:13

ONLINE  200:1
272:15

OPEN  50:22
67:17
197:1

OPEN-ENDED

168:4

OPENED
102:13
132:8

OPENING  17:1

OPENS  270:7

OPERATED
114:3
260:20

OPERATING
114:6
232:4,15
233:1

OPERATION
253:24

OPERATIONS
112:5
118:24
119:1,5,7,
22 122:15
123:20
133:20
173:1

OPINION
47:15
214:4
235:15

OPPONENT'S
92:13

OPPONENTS
90:16

OPPORTUNITY
15:1,3
76:18

88:9,17
93:25
175:20
229:1
257:10,13
271:16
274:6,18
279:11

OPPOSE
103:11

OPPOSED
103:25
261:11

OPPOSING
106:1,12
146:4
190:20
200:8
249:1
270:14

OPTION  46:5
194:20

ORAL  17:1
100:8
260:15,16

ORANGE  18:1
278:4

ORDER  8:12,
13 9:1,19,
21 13:17
23:15
50:13
80:25
94:14
230:1

ORDERS  9:1
13:13

ORIGIN
164:17,21

ORIGINALLY
39:21
151:3

ORIGINATE
56:14
64:4,13

ORIGINATING
127:8
128:2,8,10
131:16,17,
24 133:15
135:18
137:18
211:19

ORIGINATION
127:11,15
132:3
176:24
177:3,4
193:15
260:11

ORIGINATORS
124:13

OUTCOME
94:10

OUTLOOK
182:19

OUTRIGHT
244:14

OVERHEAD

124:10,13

**OVERLAP**
13:11

**OVERNIGHT**
10:5

**OVERRULE**
36:9

**OVERRULED**
18:9 29:7
44:7 91:25
104:4
105:8
119:11
175:6
181:15
190:17
195:22
200:22
210:10
214:10,11
218:12
220:7
232:12
241:3,7

**OVERSPEAK**
102:22

**OVERTALKING**
43:21
121:20
133:5,9
257:11
261:4
266:11

**OWE** 135:21
159:20
216:2

223:5,11
235:16,19
236:11
259:4,7
265:8,14

**OWED** 38:15
149:2
169:13
223:6
232:22
233:2
235:14
263:5
264:15

**OWES** 37:24
46:15
262:8

**OWNER** 105:19
270:18

**OWNERS**
124:17
169:16
176:20

**OWNERSHIP**
104:21
105:1,15
106:6,11
226:14

**OWNS** 106:3
168:8

———————

**P**

———————

**P.M.** 8:17,
23 9:6,15
54:9,17

110:14
130:25
131:8
150:16
155:3,7
157:22
171:8
227:2,3,23
241:24
242:11,15
260:1,5
281:9,12

**PACE** 157:13

**PACER** 146:9

**PACIFIC**
150:17
188:25

**PAGES** 12:9
117:14

**PAID** 12:19,
20 23:19
46:14
124:19
131:22
133:18
145:5
148:20,25
149:1,2
172:18
173:10
180:16,17,
18,19
181:21
193:4,14
198:3
202:22

205:6
219:24
228:19,20,
24 231:19,
20 233:11
255:13,14
261:18
262:11,20
263:6
264:2,6,9
265:1
274:21

**PANIC** 194:7

**PAPER** 118:4

**PAPERWORK**
138:22

**PARAGRAPH**
35:24,25
36:4 37:13
38:7,8
56:12
62:8,18
63:25
64:2,3,7,
22 69:3
81:18
159:17
168:2
175:9
176:12,22
177:24
178:3
179:12,19
182:10,24
183:13
185:14
212:21

236:19
237:15,18,
20,21,22
238:5

**PARALEGAL**
10:1,5,6,8
12:16,18,
21 19:21
128:17
132:12
182:3,5,22
202:17
206:11,14
248:11
259:8

**PARALEGALS**
12:15
128:5

**PARDON**  48:23
100:22
119:4
184:13

**PAREN**
238:16,18

**PARK**  249:4

**PART**  5:18,
19 6:2 8:7
12:22
13:24
16:21,22
23:7 33:14
58:17
62:23
63:7,14,
20,22
78:18

97:18
106:4
117:25
123:24
135:18
145:5,6
153:10
160:16
161:17
164:20
169:7
178:9
181:8
182:5
190:1
196:16
199:1,13,
25 228:11
244:21
263:22,25
264:2,9
275:25
279:22
280:8

**PARTIAL**
239:1

**PARTICIPATE**
79:3
142:21
223:3,15,
23 262:2,6

**PARTICIPATED**
144:21
261:14

**PARTICIPATING**
261:16
268:5

**PARTIES**  9:22
45:8 58:1
90:22 91:1
92:10
100:19,25
238:25
239:3
247:16
254:19
269:4

**PARTLY**  270:1

**PARTNER**  20:2
91:6
124:10
175:10,13,
19,20
179:4

**PARTNERS**
19:8 20:2,
3 73:25
175:16
176:7
208:6

**PARTS**  70:21
201:1,3,7,
12,16,19

**PARTY**  5:12
16:1 40:16
43:19
92:14
169:10
190:20
244:24
274:5

**PASS-THROUGH**
169:8

**PAST**  20:11
150:16
161:1

**PATENT**  71:25
72:5,20
135:2
182:2,4,
12,14
194:7,14,
19,25
195:3,16
197:17
198:6,17,
21,23,24
199:1,14
200:1,5,25
201:4,7
202:9,17
204:8,16
205:16

**PATENTS**
70:2,24
72:2
194:14
199:7,17

**PATIENCE**
213:5

**PAUL**  126:22

**PAUSE**  14:22
76:3,4
95:15
110:12
116:20
159:4
209:20

**PAY**  12:21

13:5 25:1,
2,17
28:14,19
31:7,17
35:24
91:8,18,19
133:18
140:16
141:6,7
142:8
143:4
144:22
145:3,6
173:3
178:4
180:6,9,20
212:2,13
228:7,8,
10,12,23
236:2,21
247:23
252:22,23
253:19
255:2
258:25
264:7
270:6

**PAYABLE**
124:20,22
125:6

**PAYABLES**
123:11

**PAYING** 21:8
135:15,22
141:12
172:25
208:18

209:6

**PAYMENT**
96:23
140:19
141:21,23
166:1,7,
21,25
167:1
202:11
205:20
207:4
211:16
216:10
235:14
254:12
275:21,24

**PAYMENTS**
90:17
135:13
140:22
141:8,21
145:12
154:4,5
185:15,19,
20 186:20

**PAYROLL**
176:18

**PC** 66:2
111:5

**PDFS** 13:1

**PENDING** 33:3
131:11
156:15
256:14

**PEOPLE** 10:23
41:7 53:2

66:21 91:1
114:5
119:23
123:20,21
124:24
128:6
132:10
178:25
225:11
233:2

**PERCENT** 36:2
56:15
159:21,24
263:15

**PERCENTAGE**
124:6,12
172:19
209:23
266:15
267:7,8
270:3

**PERFECTLY**
66:12

**PERFORMANCE**
47:2
193:15

**PERFORMED**
94:8 177:6
197:7
234:12

**PERIOD** 15:21
36:7
125:12
144:3
201:24
202:10,11,

13

**PERIODICALLY**
31:13
125:3

**PERJURY**
123:6

**PERMISSION**
53:13,16

**PERRY** 209:12

**PERS** 4:23

**PERSON**
108:12
114:6
127:14
128:15
129:5
133:13
218:9
253:14
257:8
266:5

**PERSONAL**
101:20
207:10,11

**PERSONALLY**
163:12,14
165:17
169:9

**PERSPECTIVE**
113:22
114:9
123:4

**PERTAINING**
155:22,23

| | | | |
|---|---|---|---|
| PETTY   209:17 | PLACES | 29:10  33:1 | 20 242:22 |
| PHONE   148:1, | 106:21 | 38:5,9 | 245:9 |
| 6 | 168:8 | 40:24 | 249:9 |
| | | 42:3,12 | 250:24 |
| PHRASE   45:4 | PLAINTIFF | 56:10 | 251:1,18 |
| 64:5,15 | 24:23 | 57:23 | 252:6 |
| 65:6,8 | 190:9,23 | 58:19 | 255:1 |
| 236:20 | 191:11 | 85:11 | 265:18 |
| | | 88:10 | 269:11 |
| PHRASES | PLAN   140:20 | 95:7,21 | 271:9,11, |
| 38:21 | 216:10 | 99:15,17 | 19  273:1 |
| | | 101:5,18 | 274:23 |
| PICK   51:3 | PLANNING | 104:11,24 | 277:11 |
| | 62:6  157:9 | 105:10 | 279:25 |
| PICKED   151:8 | | 111:23,24 | |
| PLATFORM | 115:3 | POINTED |
| PIECE   5:22 | 30:4 | 122:15 | 36:20 |
| 89:9  90:19 | | 123:22,24 | |
| 92:17 | PLAY   189:14 | 130:7 | POINTING |
| 117:1 | | 138:5 | 78:21 |
| 118:4 | PLAYED | 140:25 | 157:5 |
| 143:6,20 | 189:24 | 142:5 | 248:21 |
| 160:13 | | 149:21 | |
| 161:10 | PLAYER | 156:4,5,7, | POINTS   93:22 |
| 200:9,10 | 272:17,18 | 14,20 | 122:1 |
| 251:22 | | 176:6,18 | 271:13 |
| 275:11 | PLEADED | 181:20 | 277:23 |
| | 196:2 | 189:5,12 | 279:7 |
| PIERCE | | 191:1,6 | |
| 161:15,20 | PM   107:10 | 192:4 | POISONED |
| 162:4,11, | 131:6 | 205:13 | 224:14 |
| 12,25 | 155:5 | 210:4 | |
| 163:24 | 171:3 | 212:4 | POLICIES |
| | 227:6 | 213:3 | 177:8 |
| PLACE   171:23 | 242:13 | 214:22 | 260:18 |
| 183:11 | 260:3 | 232:5 | |
| 203:13 | | 233:6,10, | POLICY |
| 205:2,3 | POCKET   12:19 | 13  235:17, | 260:14 |
| 226:11 | 145:7,8 | | |
| 260:18 | 209:6 | | POLITICAL |
| 262:2 | | | 209:10 |
| 271:21 | POINT   5:24 | | |
| | 9:19  15:12 | | POLITICS |
| | 23:4,24 | | |
| | 24:5  28:11 | | |

209:2

**PORTER** 72:9,
11,14,15,
20 197:5
203:11
205:5

**PORTER'S**
72:15

**PORTFOLIO**
182:2
204:8,16

**PORTION**
200:6
262:11
263:20

**POSE** 253:25
277:25

**POSED** 162:3

**POSITION**
5:21
108:17,18
109:5
112:24
271:22

**POSSIBILITY**
35:16 46:8

**POSSIBLY**
132:5
185:4

**POST** 50:16
118:6

**POST-HEARING**
266:21
276:11

279:5,23

**POST-JUDGMENT**
263:12
264:21

**POST-TRIAL**
276:5
277:3

**POTENTIAL**
106:15
231:2

**POTTER** 249:3

**PRACTICE**
14:14
17:7,18
18:14,15,
19,20
19:13,19
26:15
71:1,2,4,
5,6,9
80:19 81:9
89:13,17,
18 90:9,11
91:10,11
115:12
122:9
193:17
199:1,13
255:22
256:6,12

**PRACTICES**
19:10

**PRACTICING**
256:4

**PRACTITIONERS**

89:20

**PREBILL**
131:17

**PRECIOUS**
161:2

**PRECLUDE**
27:13

**PRECLUDED**
13:13
71:23

**PREDATE**
102:3

**PREDECESSOR**
117:25

**PREFER** 50:12
101:11,12
153:12

**PREFERENCE**
23:15

**PREHEARING**
276:14

**PREJUDGMENT**
159:21,24

**PREJUDICE**
201:3
203:1

**PREJUDICED**
5:21

**PREJUDICIAL**
8:25 27:7
121:14,15

**PREPARE** 8:25
12:16

197:13

**PREPARED**
55:3
109:23
241:25
242:2
274:11

**PREPPING**
8:24

**PRESENT**
13:20
76:16
81:14
104:14
112:6
150:22
210:3
268:18
273:22
274:4,7
275:8

**PRESENTED**
20:2
42:12,14
66:1
207:20

**PRESERVE**
149:4
151:4
155:9

**PRESIDENT**
111:21,23
112:4,7,11
113:7,11,
12 114:5,
12 115:9

122:18
153:24

**PRESIDENTS**
113:18
114:13

**PRESSING**
189:7,8

**PRESSURE**
87:7

**PRETTY**
167:4,10
245:12
251:7
260:22

**PREVIOUS**
5:11 19:1
57:14
80:24
106:3
151:5
217:25
218:6
238:17

**PREVIOUSLY**
5:17 6:1
67:1 79:15
102:20
167:18
214:25
253:8

**PRICE**  85:24
86:20

**PRIMARILY**
114:12
124:5

189:23
203:8

**PRIMARY**
49:9,10,20
57:10
128:3

**PRIMO**
230:10,12
231:1,13
232:17
233:3
255:10
267:4
269:13,16

**PRINCIPAL**
5:12 43:10
109:2
165:5
196:10
280:5,8

**PRINCIPALS**
12:19
47:10
58:16 75:7
97:4,23
108:8
214:16,18
246:22
280:9

**PRINT**  11:9
54:5 86:2,
4,7,11,15,
16 87:2
249:5

**PRINTED**  4:17

**PRIOR**  11:17
15:4 18:24
23:11 25:4
42:14 97:7
101:20,21
122:20
207:8
211:13
249:10

**PRIVATE**
199:13
211:23

**PRIVATELY**
144:20

**PRO**  4:23
5:2 256:9,
10,11,18

**PROBATIVE**
27:8
121:14
279:9
280:23

**PROBLEM**
14:12
211:10,12
244:18

**PROBLEMS**
135:11
147:23
148:16
211:18
213:6,14

**PROCEED**
35:13
36:11

48:14
88:20,22
89:5 93:25
110:14
170:23
175:7
210:17
228:10
258:9
273:16

**PROCEEDED**
190:11

**PROCEEDING**
5:18,19
15:11
26:22
28:24
31:21 33:5
36:18
42:14
45:24 46:4
52:3
75:11,13
77:14,24
78:16
109:19
138:6,8,
12,16
141:14
142:20,23
144:20,24
145:5
153:20
245:4
246:8,22
259:11
261:11,14

263:5
271:20
277:8

PROCEEDINGS
4:24
281:12

PROCESS
15:19,22
16:1 17:25
25:8 67:21
104:12
122:4,9
132:1
195:6
230:11
265:12
270:21
271:5
275:3

PROCUREMENT
70:1,23
89:24

PRODUCE   8:20

PRODUCED
5:18 6:3
7:8 24:4
67:20
79:24 86:1
92:17 95:6
99:4
117:24
118:10
120:16
121:1
247:18
277:21

PRODUCING
5:21
120:18

PRODUCT
169:3
267:15

PRODUCTION
8:15 9:5,
7,11,12
13:24

PRODUCTIVE
12:2 83:9
121:22

PRODUCTS
86:9
191:14,17
267:12
272:12

PROFESSIONAL
22:12 91:3
216:15,18
235:15

PROFFER
210:1
279:18

PROFIT   38:17
106:22
124:14

PROFITS
124:10
175:21
228:22

PROGRAM
129:15

PROHIBITED
90:14

PROJECT
134:23
135:1
199:23

PROMISE   47:4

PROMISED
158:6

PROMPTNESS
21:13

PRONOUNCE
203:3

PRONOUNCED
208:7

PRONOUNCING
72:18

PROPER   90:6

PROPERLY
202:18

PROPERTY
69:23
70:20 72:3
226:13,18
227:14
269:5

PROPOSAL
148:8
239:10

PROPOSE
78:20
102:17
278:18

PROPOSED
254:25

PROSECUTE
199:17

PROSECUTED
199:7

PROSECUTION
70:1,23
71:25
72:1,2,5,
6,20 89:24
135:3
182:4
199:2,9

PROSECUTOR
200:5
202:9

PROTECTION
69:23
70:21,23
89:24

PROTECTIONS
89:17

PROVE   41:21,
22

PROVIDE   8:22
10:17 22:8
28:22
37:20
53:10
67:13
69:18
70:15,20,
25 71:16
90:10 99:3

134:8
136:18
177:15,17
188:2
225:12

PROVIDED
10:10,16
11:12
15:17 39:1
54:20 68:1
136:7
177:16
238:14

PROVIDER
128:18

PROVIDING
12:6 19:20
44:2 70:17
71:6,9,12
181:8,9,25
182:6,7
281:3

PROVISION
199:16
228:6

PROVISIONAL
194:8,14,
19 195:3,
7,16 204:3

PROVISIONALLY
226:19

PTO  17:18
200:25

PUBLIC
104:11

165:1

PULL  13:6
22:19
151:6

PULLED  51:11

PULLING
59:10

PURCHASED
103:17

PURE  96:1

PURPORTED
36:4 44:5

PURPOSE  96:1
105:18
144:25
185:17
214:17
271:24
280:1

PURPOSES
175:23

PURSUANT
35:25

PURSUE
146:17
232:4

PURSUING
230:6
271:22

PUSHED
197:18

PUSHING
132:20

189:5
193:19

PUT  7:2
10:3 22:17
34:11
35:16 58:7
76:9 90:9
91:11
98:17
116:20
138:5
143:25
144:8
149:25
160:10
172:23
183:11
184:16
203:13
205:3
211:5,7
213:7
224:19
231:25
242:24
245:9,21
255:4
260:17
261:19,20
262:17

PUTTING
161:12

PUZZLED
29:14

———————

Q

———————

QUALIFIED
256:6,12

QUALITY
195:6

QUESTION  6:1
11:11
12:5,6
23:8,9,21
25:2 31:17
43:15
48:20
53:5,6,8
55:1,18
57:8,18
59:1 60:23
61:5,8,18
62:24
63:1,2,5
64:14
65:19
74:17
75:14 78:5
81:16
82:10,12,
17,18
86:13,14
92:22 93:3
94:5 97:2
98:5,11
102:2,16
103:3
106:8
108:5
113:21
119:12,17

120:3
123:2,7,16
126:10,14,
17 127:24
128:22
129:7,10
131:10,12,
14 134:9
136:2,21,
22 137:14
138:1,13
139:8,15,
24 142:25
143:7,9
146:21,22
149:24
150:8
151:5
156:15,22
157:1,17,
18 159:1
161:8,18,
22,24
162:1,3,5,
24 163:2,5
166:13
167:3,5,6
170:3,19
173:7
193:6
204:2
218:6
223:9,22
232:11
233:16
235:23
240:10
243:16

245:20
246:20
249:15
252:1
253:21,25
257:23
261:5,9
265:20
266:13
271:10,15
272:6
273:9,13
274:3,5,14
275:1,2
279:25

QUESTIONED
77:15

QUESTIONING
69:10 98:8
117:17
118:3
216:9

QUESTIONS
57:6 69:19
71:21,22
81:13
87:23
100:15
102:25
106:24
123:4
126:15
134:6
137:24
140:6
144:2
147:16

149:18
160:23
172:16
177:17
212:16
213:25
241:21
254:23
259:25
273:15,17,
20 280:22

QUICK   7:20
13:9
130:23,24
171:1
233:16

QUICKLY
215:13
225:21
271:19

QUOTATION
37:25

QUOTE   272:9
278:2

QUOTED
134:25
231:7,16,
18 255:10

———————————

————   R   ————

R-   226:21

R-0   84:22

R-0001   51:11

R-001   55:22

59:5 60:9,
25 61:16,
21 62:22
63:15,21,
24 64:3,16
101:1,6
207:22

R-021'S
83:20

R-022   80:6

R-045   84:19,
20,22
85:10

R-049   84:21

R-087   234:16

R-089   244:7

R-201   73:9,
10,12 89:8
196:25

R-202   227:11

R-203
227:20,21

R-21   83:13,
14,15,17,
19 214:25

R-22   81:18
212:18

R-23   185:25
186:1
187:12,13,
15

R-26
206:17,21

**R-27** 216:20

**R-86**
247:13,15

**R-87** 234:14

**R-89** 239:5

**R-93** 247:22

**R-P-H** 187:6

**RAISE** 4:10
12:1 30:6,
10 45:20
51:24
67:17
132:24
271:9
277:8

**RAISED** 41:15
92:6
277:23

**RAISES** 30:3

**RAISING**
109:16
279:24

**RAMBLING**
151:9

**RANGES** 11:14
12:7 13:5

**RARELY** 21:22
209:11

**RATE** 46:11

**RAW** 94:19

**REACH** 44:12
99:14,22
106:13

254:18

**REACHED**
145:19
146:5
147:10
208:6
211:25
213:3
214:22
217:1,14
230:9,13
231:22

**REACTION**
217:23
223:17
231:17

**READ** 23:8
31:23 32:1
36:24
37:18
38:12
42:9,22
54:7 55:24
60:17
62:7,14
64:12
65:16
75:24 76:1
81:16
95:10,14,
18 100:1
119:17
130:11,15,
19 152:16,
18 153:15
154:1,3
156:3,11,

12 157:6,
19 158:3
159:16
160:3,12,
13,22
161:3,23
162:1
164:8
167:16,20,
21 168:1,3
203:20,22,
24 222:7,8
279:3
280:18,24

**READER**
278:10

**READING**
32:16
35:21
41:24
43:12
63:16
80:24
84:12,13
92:19
100:10
161:2
248:22

**READS** 38:8
51:11
181:7,8
247:23

**READY** 16:24
48:14
80:25
88:20,22
107:5

110:14
170:22
171:6
258:13

**REAL** 226:18
227:14

**REALITY**
89:25

**REALIZE**
34:21

**REALIZED**
22:7
188:21

**REASK** 108:5
131:12
136:22

**REASKING**
167:6

**REASON** 13:1
27:4 51:17
168:22
171:13
199:20
204:4
224:11
251:21,22
266:9
267:22
268:3

**REASONABLE**
21:12,19
57:1,5
139:7
271:7

**REASONS** 21:7

223:25

**REBUTTAL**
54:6  66:24
67:1,3,24
68:1  72:23
73:5,6
107:2
196:24
224:20
225:3
269:6

**RECALL**  6:11,
21,24  20:5
23:10
29:18
54:23,24
66:10,12
135:24
193:22
196:25

**RECAP**  104:16
227:8

**RECEIVABLE**
124:21,23
125:7

**RECEIVABLES**
123:11

**RECEIVE**
37:20  45:3
50:23
52:22  62:4
67:11,16
90:17
144:7
157:7,12
165:18

166:1,4,7
175:21

**RECEIVED**
15:20
32:23
33:21
34:14
37:22
56:6,24,25
64:19,20
73:12  84:2
90:15
93:15
96:23
139:10
142:18
159:25
165:21
167:1
172:2
201:1
205:19
215:3
217:23
238:14
254:23
275:20

**RECEIVING**
6:11
211:22

**RECENT**  5:10
224:23

**RECENTLY**
38:9

**RECESS**  48:10
87:19

107:10
131:6
155:5
170:24
171:3
227:6
242:13
260:3

**RECIRCULATE**
7:18

**RECOGNIZE**
114:12
156:8

**RECOGNIZED**
175:18

**RECOLLECT**
221:21

**RECOLLECTION**
126:1
196:14
251:19

**RECOMMENDED**
209:3

**RECONSIDER**
74:12

**RECONVENE**
242:11

**RECORD**  4:5
6:6  8:2
14:20,23
21:4  32:1
34:5  41:4
48:9,12
49:15
53:12,15

77:23  84:9
87:15,18,
20  100:2,
10  103:8
107:9
108:4
110:13
129:8
130:19,20
131:7
155:4,6,17
165:1
166:12
171:2,5,7,
24  184:16
192:13
203:24
208:25
213:14,20,
21,22
215:11
219:15
221:9
224:20
227:1,7,8
242:12,14
244:5
251:14
256:17,20
259:17
260:2,4
269:4
281:11

**RECORDED**
25:13,25
134:13

**RECORDING**

21:1 24:8

RECORDS 24:4
137:21
171:20
181:18
192:11
218:7
258:24
265:13

RECOVER
159:18
270:5

RECOVERED
209:24

RECOVERY
267:7

RECROSS 88:3
100:17
258:15

REDEEM
195:15

REDIRECT
71:17
76:14
78:24
81:15
85:12
88:17
97:10
100:12
155:10
191:7
195:23
210:11
220:25

242:1,19

REDUCE 40:6
46:11
166:5,21
254:12

REDUCED 40:3
167:9

REFER 28:2
55:21 57:7
69:6 99:20
158:22
160:23

REFERENCE
12:23
29:22,24
30:16
41:19
64:21
70:20
84:10
95:21
99:3,9
102:19
158:21
177:25
178:7
179:15,19,
21,24
180:23
182:11
185:12
210:13

REFERENCED
95:5
178:24
187:4,6

225:7

REFERENCES
99:8
210:20

REFERENCING
43:1 44:17
81:3 99:7

REFERRED
115:15

REFERRING
6:12 40:12
42:20
69:4,8
78:12
85:2,6
193:25
212:8
240:6,7
246:16

REFERS 57:13
192:14

REFLECT
49:15
116:12
174:3,9

REFLECTS
116:11
220:4

REFRAIN
192:6

REFRAME
144:5

REFRESH
196:14

REFUSAL 31:5
97:17,20

REFUSE 166:8
169:19,24
170:2
271:7

REFUSED 46:6
47:5 74:23
75:1,18
76:8,12,22
77:5 92:16
97:12
129:18
170:2
257:17
272:2
273:5

REFUSING
45:25

REGARD 5:4
65:21
85:17 89:7

REGARDED
71:6

REGISTER
164:22
212:7

REGISTERED
94:11,13
165:5
270:24

REGISTRATION
38:24
139:6
164:22

REGULAR
  172:4

REGULARLY
  134:14,16,
  18,19
  135:17

REHABILITATE
  76:13
  195:23

REHABILITATION
  214:22

REHASH
  121:22

REIMBURSEMENT
  209:17

REIMBURSEMENTS
  157:14

REJECTED
  28:17  47:7
  277:23

RELATED
  15:12,15
  65:7  70:25
  110:23
  125:6
  225:8

RELATING
  4:10  69:25
  89:23,25
  125:7
  227:11

RELATIONS
  209:1

RELATIONSHIP

149:4,5
183:7
187:21
190:20
214:23
215:4
233:17,19
234:10
261:2
266:3
270:17

RELEVANCE
  16:16  26:2
  73:1
  245:19

RELEVANCY
  55:14
  67:23

RELEVANT
  35:12
  42:8,23
  55:14
  73:15
  99:16
  100:8
  104:19
  139:8
  143:3
  200:20
  226:16
  281:4

RELIED  19:24

RELUCTANTLY
  215:24

REMAINDER
  154:7

262:14
265:25

REMAINING
  155:8
  241:23
  258:11

REMARKS
  149:12
  272:8

REMEMBER
  12:12
  45:20
  66:14
  101:20
  109:14
  112:1,14,
  16  138:19
  181:20
  198:3
  202:16
  203:21
  206:8
  229:6,12,
  25  253:13
  264:4

REMIND  89:3
  92:12
  222:7
  251:19
  253:18
  257:15

REMINDED
  93:9
  156:21,25

REMINDERS
  182:16

REMINDING
  91:18,19

RENDERED
  186:17

RENEW  118:9

RENEWED
  277:17

REPAID
  148:21

REPEAT  20:13
  36:25
  37:5,6
  100:22
  119:20
  138:13
  173:20
  234:15

REPEATED
  62:5  93:14
  94:8
  129:19
  157:9
  158:7,10
  170:12
  223:19

REPEATEDLY
  20:24
  21:15
  76:24
  133:14
  152:2
  158:8
  162:18,21

REPEATING
  35:20

**REPHRASE**
  123:7
  134:9
  137:14
  139:16,24,
  25 140:1
  167:2
  173:7
  235:23

**REPLACED**
  115:7

**REPLACEMENT**
  50:24

**REPORT**
  104:12
  136:24
  155:22
  226:12

**REPORTER**
  17:9,12
  130:11,15
  149:23
  203:20
  277:1

**REPORTING**
  6:4 271:23

**REPRESENT**
  18:21
  38:16
  69:22 90:1
  148:10
  172:3
  173:25
  192:10
  219:16
  266:8

**REPRESENTATION**
  19:15 86:9
  183:20
  188:12
  253:11

**REPRESENTATION
s** 20:8,16
  57:15

**REPRESENTATIVE**
  57:15

**REPRESENTED**
  31:20
  76:6,23
  106:12
  180:7
  191:12
  192:20
  208:13,14
  212:5
  230:10

**REPRESENTING**
  6:6 211:9
  245:7
  273:9

**REPRESENTS**
  89:14,15
  207:22
  213:12

**REPUTATION**
  19:25
  230:13

**REQUEST**
  21:13
  24:17
  42:24
  44:21 48:3

  51:21
  66:13
  69:16
  93:14 94:9
  133:15
  158:8
  167:14,15
  168:12
  170:24

**REQUESTED**
  20:1 21:15
  31:5,8,11
  92:15
  133:25
  174:4,10

**REQUESTING**
  22:10
  44:22

**REQUIRE** 25:1

**REQUIRED**
  8:20 10:9
  25:14 31:5
  129:12
  183:8
  202:11,14
  204:13
  234:3
  254:15

**REQUIRES**
  182:20
  205:2

**REREAD** 31:24

**RES** 26:6
  36:6
  101:10

**RESERVE** 14:8
  87:24 88:1
  170:18

**RESHARE**
  159:12

**RESHARING**
  154:16

**RESIDE** 98:21

**RESIDED**
  18:18

**RESIDENT**
  18:1,7
  104:6
  278:3

**RESIDING**
  19:12
  106:16

**RESIGN** 24:9

**RESIGNATION**
  24:10,13
  46:13
  79:24
  114:19
  215:1

**RESIGNED**
  79:17,18
  82:13
  83:4,5
  113:10
  114:18,23

**RESOLUTION**
  44:12

**RESOLUTIONS**
  46:19

**RESOLVE** 51:6
110:6

**RESOLVED**
219:13

**RESOLVING**
35:17

**RESPECT** 18:6
44:4 69:10
122:8
172:1
177:14
178:15
179:5
183:2,12
190:4
200:25
231:1
253:6

**RESPOND** 5:6
6:19 21:13
26:19
88:12
201:12
271:14
279:14

**RESPONDED**
49:20
146:8
147:15
184:18
220:6

**RESPONDENT**
5:12 17:21
34:6 41:5
49:24 50:2
73:6 91:21

94:16
168:3,7,13

**RESPONDENT'S**
49:23
55:21 56:8
80:5 168:7
171:23
173:18
174:12,13
175:9,24
178:22
184:10
186:8
203:15
204:1
205:22
206:10
214:12
218:5
226:20
236:1
237:12,13

**RESPONDENT/
PRINCIPAL**
41:5

**RESPONDING**
144:14
274:10

**RESPONDS**
168:14

**RESPONSE**
9:18 23:8
35:19
43:15 53:9
59:3 71:16
92:22 93:5

167:22
168:1
201:18
217:17,20
232:2
235:1
237:14,20,
22 238:3
239:8
241:17,18
271:10
273:19

**RESPONSES**
61:8

**RESPONSIBILITI
ES** 163:25
177:3
187:25

**RESPONSIBILITY**
91:17 92:3
123:10
124:19
128:4
132:20,21
137:18,19
197:20
206:12,15
260:12

**RESPONSIBLE**
71:8
124:20,22
125:3
127:8
129:14,17
133:13,16,
17 136:12
153:13

177:5
188:6
192:21
197:16
203:6,9
233:24
234:2
240:25

**RESPONSIVE**
60:23

**REST** 133:11
238:2

**RESTART** 94:6

**RESTRICTIONS**
150:16

**RESTROOM**
154:23

**RESULT** 62:5
157:8
219:1,3,7,
12 222:2,3

**RESULTED**
228:3

**RESULTING**
203:1

**RESUME**
227:24

**RETAIL**
106:21

**RETAIN** 31:19

**RETAINED**
192:24

**RETAINER**

172:24

**RETROACTIVE**
75:17

**REVENUE**
38:17
106:19
266:10

**REVENUES**
106:22
272:20

**REVERIFY**
250:19

**REVIEW**  7:14
8:24 13:9,
22 15:3
16:5 35:10
95:12
117:8
118:11
177:9
226:8
257:25

**REVIEWED**
32:24
171:22
188:9
199:11
227:16

**REVIEWING**
54:10
76:16 99:6

**REVIEWS**
131:18

**REVISITING**
81:8 122:2

**REVIVE**  45:25

**REVIVED**  46:2
245:22

**RHETORIC**
96:3

**RIGHT-HAND**
85:24

**RIGHTFULLY**
265:20,21

**RIGHTLY**
265:22

**RIGHTS**  72:3
91:16
130:21
194:25
195:14
197:10
243:5,17

**RISK**  270:7

**ROBERT**  17:22
23:3,9
25:3 32:14
58:22 61:3
62:3 82:2,
3 85:17
110:16,22
119:24
122:18
129:5
130:17
157:7,23
158:4
166:18
278:3

**RODRIGUEZ**

176:17
182:22
202:17

**ROGUE**  188:21

**ROLE**
111:17,19
112:2,25
119:15
125:5
128:11
134:7
137:23
187:18
189:14,17,
25

**ROLES**  114:5

**ROOF**
204:22,25

**ROUGH**  199:6
216:6
254:8
263:13
267:9
272:21

**ROUGHLY**  19:8
242:24
248:2
263:14
264:5

**ROUND**  14:24
15:21 48:7

**ROUTINE**
224:3

**ROUTINELY**
193:18

**RUBIO**  4:16
6:6,24
20:4 21:22
32:14 38:9
39:3
112:19
113:7
114:17,22
115:7
166:19
191:25
222:15
277:12
278:2
280:1,15
281:3

**RULE**  26:12,
16 119:9
200:19
221:10
261:22

**RULED**  26:6
27:2,15
121:25
200:6,11
264:10

**RULES**  9:2
21:12
22:12 42:1
78:14
260:23
272:2

**RULING**  7:21
27:12

**RUMOR**  62:11

**RUN**  129:22

169:22
183:9
231:4

RUNNING
135:10
137:13
172:12,13

RUSH  200:3

RYAN  139:3

## S

SAKE  53:12,
15

SALARENO
189:22

SALES  104:24
267:15
272:14

SAN  123:23

SANCTIONED
189:11,16

SANCTIONS
190:13
221:10
276:1

SARAH  14:16,
17

SATISFY
22:11
167:17

SAVE  46:5
102:19

SCHEDULED

55:10

SCHEDULING
229:23

SCHNEIDER
125:13
126:1

SCOPE  88:17
187:25
188:11,20
266:13

SCREEN  22:21
28:3 30:19
34:11 38:3
40:13 43:8
49:1 50:2,
16 51:10
65:23
86:2,4,7,
11,14,16
87:2
115:21
155:19
160:10
161:12
249:10
251:24
252:16

SCREW  148:15

SCREWED
206:12
248:11

SCROLL
177:24

SEARCH  37:16
97:5

226:12,18
227:15

SEARCHED
92:8

SECONDS
20:10,11
37:5
159:6,11
203:17,19,
23

SECRETARIES
113:19
114:13

SECRETARY
38:24
39:6,8
113:7
114:4
115:4
118:2
120:2
226:12

SECRETS  72:3
90:5

SECTION
185:1

SECTIONS
21:10,11

SECURED
10:10
86:21

SEEK  46:19
190:13

SEES

179:22,25
208:19

SELECTED
180:11

SELF-
FULFILLING
270:15,20

SELL  106:20
169:10
238:25

SEND  9:23
11:5 21:5,
17 23:10
62:6 91:18
93:7,14
135:16
137:15
140:20
152:3
157:9
158:9
170:11
173:15
186:20
205:9
206:7
234:11
276:10
278:19

SENDING
53:1,2
81:10
129:2
158:6
206:25
211:18,23

**SENDS**
131:17,24

**SENSE** 15:5
89:16
91:22
175:19

**SENTENCE**
6:19 11:24
38:8 43:6
56:14
60:17 61:3
68:18
80:14,15
81:18
84:11,17
170:5
176:2,5,11
226:6

**SENTENCES**
31:23

**SEPARATE**
12:11
114:5,6
212:10
264:22

**SEPARATED**
281:3

**SEPARATELY**
23:20
217:21
252:23
253:20

**SEPARATING**
225:24

**SEPARATION**

80:19
82:16
213:10

**SEPTEMBER**
22:1 23:16
32:13 41:7
43:11
98:24
136:9,25
142:2
193:13
231:12
239:8
243:13

**SERIAL**
204:17
253:7,10

**SERIES** 11:13
31:2 32:7
140:9

**SERVE** 80:25
112:7
275:6

**SERVED** 4:21
50:20
52:24 54:2
201:7

**SERVER** 10:10
15:22

**SERVERS**
15:19
230:11

**SERVICE**
15:22 16:1
38:15

70:18
90:4,10,
13,17 91:3
128:18
255:15
274:21

**SERVICES**
21:1 70:4,
16,19 71:9
90:18
180:18
186:17
192:12
259:5,8
269:16

**SES** 4:23

**SESSION** 4:2
108:2

**SET** 54:14
114:2
124:7
163:22

**SETTING**
262:12

**SETTLE** 44:11

**SETTLEMENT**
24:22
46:4,20
74:24
165:15
224:13
238:19,22
245:9,11,
16 247:9
254:11,12,

24 259:10,
12 270:19

**SHARE** 22:21
28:3 30:1
40:7,13
43:8 50:3
51:10
59:25
115:21
150:10
151:8
155:18
206:15
246:17
248:7
249:2,3,10
251:24
262:15,16
277:13
280:20

**SHARED** 50:1,
4 116:1
227:15
248:8

**SHAREHOLDERS**
112:18,21
124:15

**SHARING** 28:8
30:18
38:2,11
65:23
116:4
151:9,13
154:16,17
157:14
158:12
252:16,17

**SHE'D** 175:20
  212:13
  242:5

**SHE'LL**
  268:14,18

**SHEET** 41:15
  151:14,22,
  25 152:1,
  5,14,16
  153:2,15,
  25

**SHEETS** 39:21

**SHIPS** 86:21

**SHOCK** 38:13

**SHOCKING**
  38:13

**SHORT** 88:21
  242:5,7

**SHORTENED**
  191:24

**SHORTLY**
  20:6,14
  156:13

**SHOT**
  209:14,15

**SHOTS** 71:20

**SHOW** 32:11
  34:5
  40:14,15
  54:6 58:10
  60:6 61:12
  95:9 133:7
  137:9
  164:12

  210:4
  224:4
  253:4
  261:17
  262:5
  268:6,7,
  17,22,25

**SHOWED** 41:10
  54:21
  58:13
  120:1
  257:25

**SHOWERHEAD**
  87:7

**SHOWING**
  39:22
  41:14
  58:25
  103:25
  106:20
  180:25
  226:14
  247:15
  251:24
  252:21
  266:18

**SHOWN** 22:2,
  18 24:10
  35:19
  266:17

**SHOWS** 23:2
  40:5 41:4,
  24 43:9,14
  104:6
  105:18
  159:15

  165:4
  257:17
  263:1

**SIC** 203:2

**SIDE** 6:2
  53:22
  124:21
  146:2
  212:1
  228:8
  249:1
  273:21

**SIDES** 106:13
  145:2
  228:12

**SIGN** 253:23

**SIGNATORY**
  254:1

**SIGNED** 25:10
  46:25 47:1
  57:19,20
  65:9,13
  68:11,24
  85:17
  138:22
  139:3
  178:14
  185:22
  198:12,15
  211:16
  246:5

**SIGNIFICANT**
  139:9
  275:5

**SIGNING** 65:5

  66:4,6

**SILENCE**
  156:11
  157:19

**SILENTLY**
  157:6
  158:4
  160:13

**SIMPLY** 120:1
  121:15
  161:2
  270:22
  271:1

**SINGLE** 91:12
  103:16
  105:1,4
  161:15,17
  162:4,8,
  13,17,22
  163:1,18,
  22,23
  164:4
  165:16

**SIR** 13:4

**SIT** 209:12

**SITTING**
  110:2
  208:16
  232:8,14,
  25

**SITUATION**
  204:23

**SIXTH** 182:24

**SKILLS** 10:1

SKIMMED
  116:23

SKIP   151:1
  244:21

SLASH   131:24
  270:16

SLIGHTLY
  263:16

SLOW   135:13
  155:22

SMALL   28:4
  123:19
  153:18
  194:22

SMART   48:20

SMOKE   48:4

SNAPPING
  43:25

SOFTWARE
  129:3,9,
  15,16
  132:4,5
  133:24
  134:13
  260:13

SOLD   86:10,
  22 87:6
  267:12
  272:13

SOLICITATIONS
  18:24

SOLICITED
  10:5 18:21

SOLUTION
  35:6

SOON-TO-BE
  248:10

SORT   10:7
  25:23 43:2
  56:24 90:8
  97:1

SORTING
  265:20

SOUNDING
  246:17

SOUNDS   9:6
  13:15 16:5
  47:17 51:7
  104:17
  126:13
  227:15
  269:12
  275:13

SOURCES
  272:16

SOUTHERN
  17:23 18:7
  181:10
  182:1
  278:4

SPACE   119:8

SPARKED
  19:15

SPEAK   17:14
  26:16
  30:3,7,11
  40:25

49:18
53:22 71:3
76:12
97:11
99:25
103:14
104:4
105:21
111:1
116:19
125:23
130:21
164:16
175:3
254:6
255:9
257:4
266:3,5,6
269:14

SPEAKER
  11:23

SPEAKING
  6:15 12:2
  27:3 49:1
  50:17
  57:13
  135:23
  149:22
  175:5
  181:13
  216:9
  233:6
  240:4
  247:1

SPEAKS   32:25
  35:9 39:4
  42:7 83:8

155:25
162:7
164:14,15
165:1

SPECIALIST
  182:7

SPECIALIZED
  66:22
  182:4

SPECIFIC
  21:10
  29:25
  59:15
  64:14
  90:2,12
  99:7 143:8

SPECIFICALLY
  13:13
  21:23
  43:15
  57:13
  58:14
  69:25
  89:23
  92:2,22
  93:2 144:6
  174:11

SPECULATE
  74:18

SPECULATING
  66:13
  175:2

SPECULATION
  218:8

SPECULATIONS

195:20

**SPECULATIVE**
168:10,22
169:1

**SPEECH** 53:25
200:15

**SPEECHES**
120:10

**SPEED** 189:2

**SPELLING**
90:4

**SPEND** 15:6
92:18
125:4
135:19
188:22
228:3
275:5

**SPENDING**
5:24
233:14

**SPENT** 35:15
135:20
147:25
228:21
258:20
268:16
269:21

**SPLITTING**
234:23

**SPOKE** 21:22
49:11,13,
14,16 50:5
156:17

170:14
193:2
231:2,8
266:8
279:16

**SPRAY** 87:7

**SPREADSHEET**
251:11
262:25
263:2

**SPREADSHEETS**
266:16

**STAFF** 128:17
179:20
180:11,19,
20 181:21
182:1

**STAFFING**
179:25
180:3,5,9
181:9

**STAGE** 24:20
134:7

**STAKE** 146:19

**STAMPING**
11:16

**STAND** 6:25
45:19
109:11
209:13
256:19

**STANDARD** 5:1
12:24
26:22 91:3

**STANDARDS**
4:23 13:22

**STANDING**
105:11
121:6,9,23

**STANDS** 89:11
91:12
157:11
279:20

**START** 28:16
37:12 53:9
55:3,5
62:3 80:18
84:22
94:21
108:13
109:6
125:21
135:3
140:22
141:17
159:6,11
160:15
171:10,11,
14 172:11
187:23
196:4
212:21
233:14
258:13
276:8
279:16

**STARTED**
20:6,14
94:9,20,23
112:5,7
114:18,25

120:19
122:15
125:17,19
142:21
189:19
193:13
228:8
265:6

**STARTING**
19:7 37:6
84:19
125:22
154:4
157:6,22
161:14
243:13
246:21,25

**STARTS** 117:1
212:21

**STARTUP**
69:25

**STATE** 27:3
37:14
38:24
39:6,8
44:2 52:17
103:24
113:17
114:9
118:3
120:2
141:19
162:14
163:3,4,7,
21,22
164:22
200:18

212:7
220:4
223:20
226:12
253:21
278:14,16

**STATED** 24:13
35:20
37:14
38:22 41:7
50:13
60:20
62:2,11
77:24
80:24
95:17
109:5
239:11

**STATEMENT**
44:15
80:24 94:6
97:7
141:19
159:16
161:17,21
162:2
164:5
187:20
278:6

**STATEMENTS**
17:1 43:18
134:22
187:1
241:5

**STATES** 21:17
36:21 39:2
69:21,24

70:21
96:22
100:2
106:14
113:17
143:14
169:4,6
178:21
194:18
212:6

**STATING**
21:11
25:23
28:18
94:20

**STATUS** 8:12
31:4 46:1,
8 103:25
158:5
165:7
240:19
245:25

**STATUTE**
113:16

**STATUTES**
114:10

**STATUTORY**
159:22

**STAY** 24:14
151:5
215:15,18,
19,23

**STAYED** 24:21
244:13,18

**STAYING**

125:5
150:16

**STEAL** 256:24

**STEALING**
258:2,3
259:20

**STEALS**
256:23

**STEP** 140:3
189:14

**STEPPED**
190:10

**STEPS** 77:16

**STICK** 142:13
149:17
213:25

**STICKER**
186:9

**STICKING**
210:4

**STIFFED**
145:9

**STIPULATE**
34:12
69:12
99:3,19
104:5,6
118:17
150:13
158:24
160:21
164:24
273:25

**STIPULATED**
34:18,25
103:13
171:23
256:16
274:1

**STIPULATION**
99:14

**STOLE** 38:21
147:21
169:23
210:7

**STOLEN** 25:24

**STOOD** 260:19

**STOP** 26:3
28:8 38:2,
11 65:22
70:10
145:4
147:11
151:9
154:16
170:8
200:4
243:22,25
244:1
248:19
252:16,17

**STOPPED**
98:23
200:10
207:15
252:7
268:5
272:22

STRAIGHTFORWAR
D   25:20

STRANGE
  110:1

STREET
  124:1,2

STRENUOUSLY
  4:15 21:4

STRESS
  192:12,16,
  18,22,24
  193:4

STRICTLY
  21:4 42:2

STRIKE   24:6
  36:21 37:7
  39:17
  60:19
  81:12 82:9
  84:4 89:7
  91:5
  111:13
  112:25
  125:10
  165:17
  181:1
  250:21
  270:18

STRONG
  274:20

STRUCTURE
  19:8 57:14
  111:12,14
  116:13
  228:22

STUDIED   92:8

STUFF   146:6
  269:7

SUBCONTRACTORS
  129:6

SUBJECT   56:6

SUBMISSION
  6:4 8:1
  42:25

SUBMIT   6:8
  7:12 200:2

SUBMITTED
  8:2 24:10,
  13 78:19
  269:5

SUBPOENA   5:8
  15:16
  275:6

SUBPOENAS
  268:13

SUBSEQUENT
  9:7 57:14

SUBSEQUENTLY
  9:25
  18:13,17
  19:4 22:5
  24:24
  25:12
  41:13
  52:21
  54:18
  89:12
  98:22
  137:4

SUBSTANCE
  115:16

SUBSTANTIVE
  31:14

SUBSTITUTE
  56:23

SUCCINCT
  93:21

SUE   259:7

SUFFERED
  33:6 41:12
  46:18

SUFFICE
  253:22
  254:10

SUFFICIENT
  60:12 94:7

SUGGEST   16:3
  28:1 94:23
  96:8
  108:13
  161:5
  279:21

SUGGESTING
  96:24,25
  97:20

SUGGESTION
  14:6 99:1
  102:15

SUM   153:11
  266:24

SUMMARIZE
  31:3 41:9
  42:6 43:11

46:23
156:5

SUMMARY
  27:16
  46:10
  156:1

SUMMER
  112:12,15
  113:8
  115:8
  125:19
  144:15

SUMMERTIME
  112:13

SUPERVISION
  177:9,16,
  17,19

SUPPLEMENTAL
  8:16

SUPPORT
  19:3,4,5,
  21 20:19
  128:17
  179:20,24
  180:2,5,
  19,20
  181:9,21,
  25 182:5,
  21 204:20

SUPPORTED
  274:19

SUPPORTING
  61:6

SUPPORTS
  97:17

SUPPOSE  30:3

SUPPOSED
  12:10
  27:10  40:6
  50:16
  96:25
  127:1
  158:8
  186:20
  248:22

SUPPOSEDLY
  83:4
  265:14

SURNAME
  225:10

SURNAMES
  225:16

SURPRISE
  40:4  74:3,
  8

SURPRISING
  38:13

SUSPECT
  268:14

SUSPENDED
  246:6,8

SUSPENSION
  46:1,8
  104:1
  245:25
  246:4

SUSTAIN
  27:20

SUSTAINED

93:20
121:4
134:5
150:6
156:2
165:13
243:10
255:19

SUZANNE
  129:13,18
  130:21
  131:17
  132:8,22
  133:1
  156:12
  158:4
  176:17
  211:2
  260:21
  261:3

SWEAR  51:20,
  24  52:1
  109:18

SWIFTLY
  19:23

SWORN  51:22
  52:11
  110:17

SYMBOL  10:9

SYNONYMOUS
  128:11

SYSTEM
  132:16
  137:20
  204:6,11,
  19  228:6

SYSTEMS
  182:16,18,
  21

---

**T**

---

TAB  152:21

TABLE  179:19
  181:11
  244:13,19
  245:9

TABS3  129:15
  132:7,11,
  12,19
  133:24
  137:20

TACKED
  228:11

TAK  105:20
  106:3
  225:7
  226:16

TAKE-IT-OR-
LEAVE-IT
  66:3

TAKES  48:4
  134:25
  262:3

TAKING  19:22
  109:11
  140:3
  173:4
  178:9
  240:23

TALK  7:13

26:7  35:2
79:18,21
109:7
122:16
133:2
144:12,19,
24  216:7
232:1
240:1
243:24
247:10

TALKED  32:10
  141:13,24
  142:6
  170:13
  176:23
  188:24
  195:2
  223:1
  224:14
  228:1
  231:13
  247:9
  267:4

TALKING
  10:23  12:2
  15:7  29:25
  34:24
  43:12
  55:6,7
  98:23
  105:14
  143:18,19
  151:24
  152:14
  170:8
  172:20

176:6
181:3
200:5
210:21
221:6,15,
17,21
230:3
235:25
240:20
244:14
245:8
260:10
265:5

**TALKS**
  234:22,23

**TAMMY**  125:13
  126:1

**TASK**  10:7

**TASKS**  157:25

**TAUGER**  4:9,
  12,13 5:14
  6:5,12,15,
  17,18,21
  7:9,19
  8:3,10,12
  9:5,9,11,
  20,23
  10:16,18,
  21 11:1,2,
  4,5,8,11,
  13,16,19
  12:5 13:3,
  9,18 14:7,
  10,12
  15:1,9,13
  16:4,8,11,

21,22 17:5
18:3,5
26:2,5,11,
14,19,21
27:1,7,12,
15 28:12
29:6,22,24
30:3,6,10,
15,21
31:22
32:3,8,15,
17,20 33:8
34:1,4,7,
12,18,21
35:8 36:3,
9,22 37:3,
11 38:25
39:5 40:9,
18 41:16,
18 42:2,
16,18,24
43:17,22,
23,25
44:3,14,23
45:11,14,
20 47:13,
17,23
48:3,16,
17,19 49:6
50:3,8,11,
15,20
51:5,14,
19,21
52:7,14,17
53:4,8,12,
15,19,24
54:24
55:15,20

63:4,8,12
65:25
67:12,15
68:2,4,5,7
71:20,24
73:5,14,20
74:21,22
76:6,15,19
77:9,12,
17,19,21
78:8,18,
21,24 79:1
82:11,14,
17 83:3,11
85:14
87:15,21,
23 88:2,5,
7,15 91:24
92:6 93:19
94:25
95:5,24
96:7,12,18
97:6,9,13,
16,24 98:3
99:1,11
100:14,15,
18 101:10,
17 102:23,
25 103:11,
13,19
104:3,5,23
105:6,9,
11,13,19
107:1,7
108:16,19,
22,25
109:5
110:7

111:1,4
114:16
115:25
116:5,7,
15,19,20,
25 117:8,
12,24
118:9,16,
25 119:6,
9,14
120:6,8
121:2,11,
14,17
122:8,22
123:12,14
126:8
127:5,18,
21,24
130:17,23
134:2
136:1,3
139:20
140:11,14
143:7,13,
21 147:16
149:15
150:4,13,
19,25
151:15,19,
21,23
152:4,23,
25 153:2,
4,7
154:18,23
155:14,25
156:15,21,
25 158:18,
20,23

159:2
160:5,7,
17,20
161:22
162:6
164:10,24
165:11
166:24
167:19,24
168:15
170:3,6,24
171:9,10,
15,17
173:21,23
175:8
179:9,11,
14,17,22,
24 180:2
181:22
184:2,9,
13,15
187:8,13,
15 190:18
191:2,8
192:7,9
194:11,16
195:1,25
197:3
200:14,18,
21,24
203:18,25
206:18,21,
23 209:20
210:1,3,
12,18
214:11,14
217:5,9,11
218:14,18,

20 220:6,
8,23 221:2
223:10
224:19,24
225:6,19,
23,25
226:10,25
227:5,10,
24,25
232:11,13
234:16,18
235:8,10,
12 238:1,5
240:9
241:16,21,
24 242:5,
9,23
243:8,18
244:6
245:8,19
246:7,10,
14,16
248:4,7
249:5,11
250:5,7,
10,24
251:1
252:1,10
253:2
255:6,17
256:2
257:19
258:11,14,
16 259:25
269:3,10,
20 274:1
275:18,19,
23 276:8

277:16,20
279:7,13,
16,18
280:13
281:7,8

**TAUGER'S**
33:18
44:21
71:20
88:19 93:6
130:15
225:16
258:10
276:7
279:25

**TAX** 103:23

**TAXES** 125:2

**TECH** 17:24

**TECHNICALLY**
128:13

**TELEPHONE**
252:13

**TELLING**
41:25
50:25 77:1
80:1
217:13
241:6
258:3

**TEN** 48:1,6
277:1

**TEND** 47:16

**TENURE**
193:8,11

**TERM** 57:5
129:11
168:4
174:17
183:12
185:2
192:12
228:25

**TERMINATE**
82:6,8
214:5

**TERMINATED**
79:15,17,
20 80:12,
15 82:12
248:10

**TERMINATING**
81:19

**TERMINATION**
79:22
81:21
82:18
83:10

**TERMS** 28:23
35:21
36:13
64:18
71:21 92:6
94:4 99:5
127:13
128:11
132:3
150:16
172:16
217:3
245:12

254:23
266:24
273:15

**TERRAIN**
13:15
93:22

**TERRIBLE**
170:7

**TERRIBLY**
130:6

**TERRITORY**
47:14

**TESTIFIED**
44:23
52:11
74:23
75:17,20,
21 79:2,6
110:18
159:14
175:4
210:14
215:14
216:8
242:20
244:20
247:2
251:17
253:8
254:1,3
255:3,8
256:22

**TESTIFY**
32:21
47:19
74:4,9

155:13
268:12
275:4

**TESTIFYING**
18:10
40:16
104:20
137:22
155:15

**TESTIMONY**
27:17,23
31:23 36:3
38:1,12
40:21
46:22
47:14,18,
22 51:17
52:1,16,23
66:17
73:21
74:12,14
75:24
76:16,17
82:21
88:7,9
100:1,3,8,
12 109:18
130:16,18
133:11
134:3,8
150:5
167:25
191:10
193:20
214:4,9
217:12
233:5

239:21
240:6
241:4
243:9,19
252:11
255:7,18

**TEXT** 161:2

**THEORY** 35:12

**THIEF** 210:6
237:8
256:23
257:2,3,5,
12

**THING** 20:17
28:1 30:2
76:19
98:15
99:24
147:13
172:6
208:12
229:9
241:14
281:1

**THINGS** 22:16
36:13
38:18
122:16
125:23
131:22
176:7
208:9
215:15
216:13
234:24
253:14

257:12
268:13
276:22

**THINKING**
29:5,11
128:12
163:10
208:17
263:13
275:12

**THINKS** 42:23
211:8
235:13
279:20

**THIRD-PARTIES**
15:16

**THIRD-PARTY**
131:21
238:15

**THIRDLY** 5:17

**THIRTY-THREE**
199:5

**THOUGHT**
10:15 65:6
81:6 94:12
130:9
131:10
132:18
248:7
256:20
267:9
268:19
273:6

**THOUGHTS**
87:14

274:13
276:4,10
279:4
280:24

**THOUSAND**
145:11
149:2
229:24
262:22

**THOUSANDS**
92:9

**THREATENED**
190:7

**THREE-MINUTE**
131:3

**THREW**  205:13

**THROWING**
272:23

**THURSDAY**
8:23

**TIL**  111:20

**TILE**  28:4

**TIME**  5:24
7:24 8:17,
19 9:14
14:2 15:6
17:24
18:21 19:7
20:24
21:1,5,8,
25 22:10,
17 23:16
24:9 26:8
30:8,12

39:15 46:5
50:18
53:1,2
54:1 55:4,
5,6,8,11
59:17
62:14,15
63:17
65:4,5,20
66:7 74:15
76:3,17
81:15
83:22,23
87:24
92:19
102:19
104:1
106:9
108:7,12
109:14
111:18
114:18,23
115:4
116:3,21
120:9,22
121:2
123:22,24
125:1,12
126:23
128:5,18
129:8,13,
25 132:8,
9,10,25
134:12
136:9,24
137:8,10
140:17
141:3

142:6
144:3,5
147:25
149:19,20
150:11,16,
22,24
151:9
154:2,25
155:10,23
157:9,12
159:24
160:6,7
167:23,24
170:14,18
176:16,18,
19 180:7
181:21
188:22,25
189:23
193:1
195:18
196:18,20,
21 198:22
200:16
201:5,10,
24 202:6,
12,13,19
203:10
205:11
207:1,8
208:20
210:19
215:21
224:14,19
225:18
228:7,17,
20 231:2,9
242:12

245:10,13
246:6
248:19
249:21
251:7
252:19
256:2,4
257:17,18
258:1,4,7,
12 261:8
272:13
273:17
276:20
277:5
280:16

**TIMEFRAME**
111:25
112:17
113:4
189:1
242:24

**TIMEKEEPER**
128:12,15,
19 132:12

**TIMEKEEPERS**
129:12
165:25

**TIMEKEEPING**
129:9

**TIMELY**  20:25
21:7 22:8
24:25
91:7,8
101:2
103:24
104:13

| | | | |
|---|---|---|---|
| 118:10 | 79:2 113:2 | 162:18 | **TRADE** 72:3 |
| 197:19 | 114:3 | 174:17 | 90:5 |
| 233:25 | 115:4 | 189:6 | 190:24 |
| 272:3 | 116:11,16, | 196:2,3 | 191:5,24 |
| **TIMER** 116:20 | 22 150:17, | 228:9 | **TRADEMARK** |
| 171:10,11, | 24 155:13, | 253:19 | 72:1,2,6 |
| 12 | 15 162:23 | **TOLERANCE** | 182:15 |
| **TIMES** 23:12 | 184:11,17 | 213:6 | 200:25 |
| 26:1 39:22 | 193:21 | | 201:8 |
| 128:15 | 194:3 | **TOMORROW** | 204:16 |
| 129:3 | 196:24 | 194:8 | **TRADEMARKS** |
| 135:12 | 215:15 | **TON** 231:19 | 70:2,24 |
| 136:16,19 | 216:2 | **TOOLS** 10:2 | 182:13 |
| 147:19 | 221:16 | **TOP** 23:7 | **TRADING** |
| 153:23 | 244:8 | 86:20 87:5 | 18:21 |
| 161:1 | 246:24 | 158:3 | 21:15 |
| 173:3,8,10 | 247:8,11 | 159:11 | 25:17 |
| 188:24 | 258:18 | 160:15 | 35:23 36:2 |
| 275:6 | 272:19 | 176:2 | 37:17,20 |
| **TIMESHEETS** | 277:9 | 186:19 | 74:25 |
| 134:1 | 278:23 | 196:12 | 75:19 |
| **TIMESTAMP** | 280:9 | 207:25 | 77:25 |
| 54:16 | 281:10 | 238:2 | 79:4,7 |
| **TIMING** 86:16 | **TOLD** 19:7, | **TOPIC** 8:9 | 93:15 |
| **TIRED** 44:1 | 8,9,17 | 39:10 | 96:23 |
| **TITLE** 51:12 | 21:24 | 77:17 | 102:5 |
| 113:23,24, | 22:15 27:5 | 81:11 | 103:6,16 |
| 25 114:2 | 47:7 73:22 | **TOTAL** 154:2 | 104:8,13 |
| 115:6,15, | 74:1,13 | 263:5 | 128:24 |
| 16 175:16, | 75:1,2,5, | **TOTALLY** | 132:19 |
| 17,18 | 18,21 77:7 | 160:9 | 135:24 |
| **TITLES** | 78:10 | **TOUCHES** | 136:5 |
| 113:15 | 132:20 | 89:22 | 137:4 |
| 114:9 | 133:14,18 | **TRACK** 146:8 | 138:4,9,21 |
| **TODAY** 74:4,9 | 136:11 | 177:12 | 139:14,19 |
| | 141:2 | | 140:4,8 |
| | 145:4 | | 141:15 |
| | 146:16 | | |

144:11
145:3
146:3
147:6
148:12,24
153:21
159:19
160:1
161:16
162:3,22
163:20
164:22
165:4,16,
19 168:24
169:3,7
173:15
183:24
184:24
186:16,19
187:19,22
188:12,16
190:10,21,
24 192:13,
19,20
206:2
208:23
213:12,15
215:11,21
216:2
218:25
223:2,5,10
228:2
236:9
238:14
256:14
258:1
259:15,22
261:14,20

263:8
272:14

**TRADING'S**
19:22
145:6
267:10

**TRADITIONAL**
124:7

**TRAIN** 94:12

**TRAMPLE**
81:15

**TRANSACTIONAL**
19:2

**TRANSACTIONS**
86:21

**TRANSCRIPT**
276:23,25

**TRANSFER**
101:16,19
209:4
243:4,23
246:3

**TRANSFERRED**
20:21
89:13
253:9

**TRANSFERS**
185:20

**TRANSLATED**
178:19

**TRANSMISSION**
80:21

**TRANSMIT**

85:15

**TRANSMITTAL**
186:15

**TRANSMITTED**
85:18

**TREASURER**
113:23
115:5
125:2

**TREASURERS**
113:18
114:13

**TREATING**
94:16

**TREMENDOUS**
209:18

**TRIAL** 8:25
99:6,7
102:17
275:4

**TRIBUNAL** 6:4
10:19 26:6
41:10
45:23
76:23
87:11 99:5
104:14
121:18,19

**TRIBUNAL'S**
99:6

**TROUBLE**
136:3
213:7
268:3,4

**TRUE** 11:10
20:8,16
76:24 83:6
134:4
137:6
172:3
245:6
246:5
247:2

**TRUST** 44:12
133:21
147:20,22
148:8,13
169:22
173:5
210:6
232:8,15,
19 237:8
238:15
239:14,15
240:22,23,
24 244:17
258:19

**TRUSTED**
19:25
238:17
244:24

**TRUTH** 33:10
41:21
52:3,4
77:1
109:19,20
184:6
220:2

**TRUTHFUL**
215:16

TUCKER'S
  259:8

TUESDAY   8:14
  54:17

TUNE   145:10

TURN   49:3
  83:2
  133:12
  141:7
  161:4
  169:14,15
  182:9
  185:25
  261:19

TURNED   20:16
  59:20
  142:9
  269:24

TWENTY
  214:13

TYPE   23:25
  90:4  135:5
  143:25
  144:7

————————

U

U.S.   19:11,
  13  89:14,
  19  145:16
  193:2
  255:10
  256:4

UH-HUH   65:1
  70:22
  228:15

ULTIMATELY
  125:2
  174:13,14
  189:17
  190:4,6
  197:18
  201:18
  206:4
  209:21
  211:21
  269:19

UNABLE
  253:10

UNADULTERATED
  96:1

UNCLEAR
  248:22
  277:24

UNDERSCORE
  23:6  36:20
  37:13
  96:21

UNDERSTAND
  12:15
  16:16
  27:11
  36:10
  40:23
  55:6,7
  56:3,8,20
  64:17
  65:2,8,14
  66:8  69:5,
  14  71:4,24
  73:20
  80:11,15,

17,22,23
  81:17
  119:2,12
  123:2
  126:10
  128:1
  131:20
  156:25
  163:17
  164:5
  171:17
  174:17
  189:2
  192:14
  209:25
  239:13
  240:22
  245:3
  269:9
  273:4
  274:9

UNDERSTANDING
  25:7  50:8
  55:4  56:21
  64:11,15
  91:9  94:4
  153:22
  158:11
  187:24
  217:22
  254:7
  257:1
  260:15,16
  280:10

UNDERSTOOD
  8:6,8  20:3
  23:23

50:24  61:9
  81:2
  92:10,21
  133:22
  144:23
  152:15
  155:12
  217:12

UNFAMILIAR
  26:23

UNFOUNDED
  25:25
  38:21

UNITED   69:24
  70:21
  143:13
  169:3,6
  178:21
  194:18

UNPAID   37:23
  262:20

UNQUOTE
  272:9

UNRELATED
  117:2

UNSKILLFUL
  9:25

UNSURE
  275:14

UNSUSPENDED
  245:18

UNTRUE   247:5

UNTRUTHFULNESS
  278:1

UNUSUAL
 198:20

UPDATE  29:21
 31:13
 135:18,19

UPDATES
 31:14

UPLOADED
 10:9
 278:24
 279:2

UPSET  217:24
 218:1,3
 223:19
 264:24

URGE  21:3

URGENCY
 19:21
 21:20

URGENT  11:24

USPTO  17:8
 18:15
 20:19

USURP  119:15

UTILITY
 194:14,24
 195:3,9,16
 196:17
 197:16
 201:4
 204:4

UTMOST  10:8

— V —

VAGUE  118:25
 119:7,18
 122:5,8,
 12,22,24
 123:12,14
 126:8,9
 128:14
 140:5
 166:9,24
 256:2

VARIETY
 182:13

VEIL
 161:16,20
 162:5,11,
 13,25

VENDORS
 124:19
 133:17

VERIFY  50:18
 102:22
 251:14

VERIFYING
 53:1

VERSED  266:7

VERSION
 54:21
 81:14
 174:15

VERSUS  4:7
 194:14

VICE  111:21

 114:12
 256:9,10,
 11,18

VICTIM
 209:14,15

VICTORIOUS
 24:22

VICTORY
 29:18

VIEW  274:23

VIOLATE
 163:24

VIOLATION
 208:10

VIOLATIONS
 35:22 36:6

VIOLATIVE
 9:1,2
 13:16

VIRGINIA
 18:15

VIRTUAL
 123:23

VISCERAL
 141:11
 142:10
 223:17

VOICES  30:4

— W —

WAIT  10:23
 11:19
 67:10

 84:15
 135:4
 142:13
 156:22
 157:1
 186:5
 202:6

WAITING
 230:19
 240:21
 276:19,22

WAIVE  17:1

WALK  248:24
 266:16,22

WALL  53:22

WALLACK
 148:23
 149:1
 187:16
 213:22
 237:11
 238:18
 239:2
 254:22
 255:16

WALLACK'S
 188:11
 254:16

WALLET
 145:10
 256:25

WALMART
 106:21

WANTBA
 86:21,22

87:6 269:7
270:18

WANTED   4:10,
20 24:17
27:11 30:2
45:17
149:1,4
157:18
174:6
189:9,25
190:1
214:21
219:14
224:9
232:2
254:22
265:10
270:12
271:9,14
276:15
279:12

WANTING
191:9

WASTE   161:1

WASTES   62:14

WASTING   26:7

WATCH   136:15

WAYFAIR
106:21

WAYS   195:21
253:18

WEBSITE
104:25
178:11,25
179:1,3

WEBSITES
225:6,25
227:11

WEDNESDAY
9:15 62:5
157:8

WEEK   8:14
158:7
181:8,9
188:24

WEEKS   142:14
163:11
277:4

WEIGHT   33:17
55:18
60:20,21
73:19

WEIGHTY   16:6

WELL-ACCEPTED
91:10

WHATSOEVER
44:11 47:9
192:4
266:2

WHENEVER'S
129:25

WHISPER
87:16

WILK   112:19
113:6
114:24
115:3
119:25
166:19

222:19

WINDING
112:5
122:15
125:17

WINTER
210:24

WIRE   185:20

WISHED   274:7

WISHES   66:23
227:10
253:7
273:22

WITHDRAW
16:13
45:12,14
47:7
60:10,16
61:5,17
69:16 94:6
96:12,18
102:9
103:11
120:8
127:5
160:5
179:5
190:12
215:25
222:5
234:25
235:4
236:7
247:16
253:7,11
273:13

WITHDRAWAL
60:16

WITHDREW
200:21

WITHHOLD
47:7

WITNESS'
31:22

WITNESSES
4:17 8:24
50:14 99:2
108:6
109:8

WOMAN   72:9
223:18

WON   266:9

WORD   20:2
21:4 25:22
26:17
56:3,8,10,
23 57:7
58:22
60:19
76:12
90:21,22
91:5 92:20
93:17
101:8,11
233:8
247:16
250:21
267:13

WORDS   19:25
38:20 74:7
90:9 92:9,

10,19
143:2

**WORK**  11:21
19:3
23:14,15,
19 25:18,
19 46:24
47:2 48:1
56:14
58:14
64:4,13
66:18
70:2,25
111:10
122:14
124:9,12
126:23
128:7
131:16
132:22,23
134:23
135:5
138:20
140:22
144:5
148:14
157:13,14,
24 177:5,
10 183:1
189:24
193:19
197:7,8
205:6,16
209:7
212:9
224:12
228:23
234:12

252:22
260:21
266:7
270:8
274:21

**WORKED**  46:10
72:16
126:2
138:12,15
180:11

**WORKER**  128:6

**WORKERS**
128:4

**WORKING**
17:23,25
20:6,14
123:20,21,
23 127:17
129:4
134:22,24
140:15
157:23
171:13
177:18,20
183:15
185:4
211:2
224:10
230:3

**WORKS**  191:25

**WORKSHEET**
153:19

**WORLD**  69:24
70:21 71:5
225:11

**WORRY**  265:3

**WORTH**  76:16
77:24
168:9
228:16
238:24

**WORTHWHILE**
77:22
78:11

**WOW**  231:14
267:5

**WRAP**  125:22

**WRAPPING**
125:19

**WRITER**  38:23

**WRITING**
25:5,13,15
92:14

**WRITTEN**
25:5,13
36:15
38:19 44:5
45:1 58:1,
3,6,11,14,
15,22
59:4,6,7,
14 60:7,8,
18,24
61:4,14,20
62:1,9,21
77:23 78:1
83:25
92:6,7,10,
22 155:17,
24 181:19

208:5
235:1
257:6
260:14,18

**WRONG**  84:24
123:5
144:16,17
148:4
151:8
179:15
208:9
214:7
220:21
224:5
233:8
243:1,3,7,
11 246:12
257:21

**WRONGFULLY**
93:18

**WROTE**  8:19
22:10,15
23:7 24:12
25:21 32:5
33:2 41:13
83:21,22
93:11
157:23
190:10
217:19
252:20,21
277:23

**WWW.GOAPOGEE.**
**COM**  178:24

**WWW.PACER.GOV**
37:16

## Y

**YEAR** 117:25
125:1,14,
25 140:11,
12 141:25
142:2
148:3,9
194:23
229:6
240:20
245:7
250:14
272:15

**YEARS** 46:19
66:10
120:19
181:18
199:5
234:13
250:15
263:14
272:19

**YORK** 17:7,
18 54:22

**YUN** 98:12
103:17
104:7,21
105:1,4,20
106:4
140:8
165:16
186:11,19
212:11
216:9,12
218:24

219:17,18
220:4
221:25
222:10
223:16
224:16,18
225:8
226:15
253:19
254:24
259:10
269:5,8
270:17,19
271:20
275:3

## Z

**ZEROS** 88:25

**ZOOM** 30:4

**ZOOMING**
153:25

**Exhibit C**

DECLARATION OF PAUL N. TAUGER IN SUPPORT OF PLAINTIFF/PETITIONER APOGEE LAW
GROUP P.C.'S OPPOSITION TO DEFENDANT/RESPONDANT HOLLY LI'S MOTION TO DISMISS

# FIND AN INTELINK EXPERT IN YOUR AREA

Category ⌄          Area ⌄



**Holly Li**
Of Counsel



**Hannah Zhang**
Of Counsel



**Wei Zhang**
Partner

HOME   TEAM   SERVICES   CONTACT

© Intelink Law. All rights reserved.